## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

**FILED - LN**

October 13, 2023 4:52 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: EOD   SCANNED BY: _____ 10/16

JEFFREY RYAN FENTON,
Plaintiff

v.

VIRGINIA LEE STORY,
MICHAEL WEIMAR BINKLEY,
KATHRYN LYNN YARBROUGH,
ELAINE BEATY BEELER,
SARA B. MCKINNEY,
MARY ELIZABETH MANEY AUSBROOKS,
ALEXANDER SERGEY KOVAL,
HENRY EDWARD HILDEBRAND III,
CHARLES M. WALKER,
ROY PATRICK MARLIN,
THOMAS E. ANDERSON,
SAMUEL FORREST ANDERSON,
FRANK GOAD CLEMENT JR.,
ANDY DWANE BENNETT,
WILLIAM NEAL MCBRAYER,
JAMES MICHAEL HIVNER,
JOHN BRANDON COKE,
SANDRA JANE LEACH GARRETT,

Individually and in their official capacities,

STORY ABERNATHY CAMPBELL
        ASHWORTH MCGILL WALTERS
        AN ASSOCIATION OF ATTORNEYS,
ROTHSCHILD & AUSBROOKS PLLC,

BANK OF AMERICA, N.A.,
SPRAGINS, BARNETT, & COBB PLC,
BANCORPSOUTH BANK,
RUBIN LUBLIN TN, PLLC,

STATE OF TENNESSEE,
WILLIAMSON COUNTY TENNESSEE,
TENNESSEE ADMINISTRATIVE OFFICE
        OF THE COURTS,
TENNESSEE COURT OF APPEALS
        MIDDLE DIVISION,
CHANCERY COURT FOR
        WILLIAMSON COUNTY TENNESSEE,

Defendants

CASE NO.

1:23-cv-1097
**Jane M. Beckering**
**United States District Judge**

JURY TRIAL DEMANDED

1

## COMPLAINT FOR TORTIOUS CONDUCT & INJUNCTIVE RELIEF

Pursuant to T.C.A. § 66-27-123; 11 U.S. Code § 341 and § 725; 18 U.S.C. § 1341, § 1344, § 1503, § 1951, § 1952, § 1961, § 1962, § 1964; 28 U.S. Code § 1331 and § 1332; 42 U.S. Code § 1983, § 1985, § 1986, and § 12101 *et seq*; the Constitution of Tennessee; and the U.S. Constitution, Plaintiff brings this complaint as a result of the defendants' tortious and criminal acts committed on many dates, the first of which began after April 25, 2019. "Defendant" will mean both the singular and the plural herein, but the term will be clarified with an associated name whenever necessary.

## JURISDICTION AND VENUE

"[T]he traditional justification for diversity jurisdiction is to minimize potential bias against out-of-state parties." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001) (citing *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 111 (1945); *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir.1990)). Diversity jurisdiction is meant to "open[] the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties." *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010) (citations omitted) (reversing district court's finding that jurisdiction was lacking). The facts and evidence clearly show that Plaintiff has suffered prejudice on many occasions in the Tennessee Chancery Court—and in the United States Bankruptcy Court Middle District of Tennessee.

The district court has subject matter jurisdiction pursuant to 28 U.S. Code § 1332 since litigants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, and pursuant to 18 U.S. Code § 1964 because count 6 involves RICO, and pursuant to 28 U.S. Code § 1331 because counts 7 through 11 involve other federal laws/constitutional issues. Litigants in this matter are residents of at least two different states.

### The Parties—Plaintiff

- **Jeffrey Ryan Fenton** is a U.S. citizen residing and domiciled in Genesee County, Michigan, with an address of 17195 Silver Parkway #150, Fenton, MI, 48430-3426.

### The Parties—Defendants

- **Virginia Lee Story** is believed to be a U.S. citizen residing and domiciled at 31 Slades Farm

2

Lane, South Dartmouth, MA.

- **Michael Weimar Binkley** is believed to be a U.S. citizen residing and domiciled at 31 Slades Farm Lane, South Dartmouth, MA.
- **Kathryn Lynn Yarbrough** is believed to be a U.S. citizen residing and domiciled at 31 Slades Farm Lane, South Dartmouth, MA.
- **Elaine Beaty Beeler** is believed to be a U.S. citizen residing and domiciled at 31 Slades Farm Lane, South Dartmouth, MA.
- **Sara B. McKinney,**
- **Mary Elizabeth Maney Ausbrooks** is believed to be a U.S. citizen residing and domiciled at 120 Meadows Road, White House, TN.
- **Alexander Sergey Koval** is believed to be a U.S. citizen residing and domiciled at 281 Paragon Mills Road, Nashville, TN.
- **Henry Edward Hildebrand III** is believed to be a U.S. citizen residing and domiciled in Tennessee, with an address of P.O. Box 340019, Nashville, TN 37203-0019.
- **Roy Patrick Marlin** is believed to be a U.S. citizen residing and domiciled at 6586 Eudailey-Covington Road, College Grove, TN.
- **Charles M. Walker** is believed to be a U.S. citizen residing and domiciled in Tennessee.
- **Thomas E. Anderson** is believed to be a U.S. citizen residing and domiciled at 105 Long Valley Road, Brentwood, TN.
- **Samuel Forrest Anderson** is believed to be a U.S. citizen residing and domiciled in Tennessee.
- **Frank Goad Clement Jr.** is believed to be a U.S. citizen residing and domiciled at 220 Wilsonia Avenue, Nashville, TN.
- **Andy Dwane Bennett** is believed to be a U.S. citizen residing and domiciled in Tennessee.
- **William Neal McBrayer** is believed to be a U.S. citizen residing and domiciled in Tennessee.
- **James Michael Hivner** is believed to be a U.S. citizen residing and domiciled at 8019 Sara Jane Lane, Bartlett, TN.
- **John Brandon Coke** is believed to be a U.S. citizen residing and domiciled at 4324 Barnes Cove Drive, Nashville, TN.
- **Sandra Jane Leach Garrett** is believed to be a U.S. citizen residing and domiciled at 2021 Hunterwood Drive, Brentwood, TN.
- **Story Abernathy Campbell Ashworth McGill Walters An Association of Attorneys** is a law firm located at 136 4th Ave S, Franklin, TN (hereinafter "SACAMW").
- **Rothschild & Ausbrooks, PLLC** is a law firm located at 1222 16th Avenue South, Suite 12, Nashville, TN (hereinafter "R&A").
- **Bank Of America, N.A.** is a financial institution located at 4909 Savarese Circle, Tampa FL 33634 (hereinafter "BOA").
- **Spragins, Bartnett, & Cobb, PLCNS** is a law firm located at 312 E Lafayette, Jackson, TN 38301 (hereinafter "SBC").
- **BancorpSouth Bank** is a financial institution located at 914 Murfreesboro Road, Franklin TN 37067 (hereinafter "BCSB").
- **Rubin Lublin TN, PLLC** is a law firm located at 119 S. Main Street, Suite 500, Memphis, TN 38103 (hereinafter "RLTN").
- **State of Tennessee** is a government entity with an office located at 425 5th Ave N Nashville, TN (hereinafter "the State").
- **Williamson County Tennessee** is a government entity with an office located at 1320 West Main Street, Franklin, TN 37064 (hereinafter "the County").
- **Tennessee Administrative Office of the Courts** is a government entity with an office located at 511 Union Street, Suite 600, Nashville, TN (hereinafter "Admin Office").
- **Tennessee Court of Appeals Middle Division** is a government entity with an office located at 401 7th Avenue North, Nashville, TN (hereinafter "Appellate Court").

- **Chancery Court For Williamson County Tennessee** is a government entity with an office located at 135 4th Ave S #236, Franklin, TN (hereinafter "Chancery Court").

Venue is governed generally by 28 U.S. Code § 1391(b). Subsection (1) applies because the defendants are alleged to be residents of the same state.

## INTRODUCTION

1. The incredible saga that is the genesis to this complaint began when Plaintiff was deprived of constitutional rights, victimized by violations of civil and criminal law, and suffered great financial and emotional distress—all as a result of the defendants' actions, which at times were criminal. This complaint will prove with undeniable facts and evidence that the outcomes in Plaintiff's legal battles in the Tennessee state and federal court systems were predetermined, and thus were some of the several instances of deprivation of his Constitutional right to due process. Violations of his rights to free speech and equal protection and his Ninth Amendment right not be exploited because of his mental disabilities and to be humanely treated are also the foundation of this complaint. Rules of procedure were not followed. Judicial canons were broken. Rules of professional conduct were ignored. Crimes were committed. The U.S. Constitution was trampled.

2. This is an action for tortious conduct with the following causes:

- VIOLATION OF T.C.A. § 66-27-123, NOTICE TO TENANT OF INTENT TO CONVERT RENTAL UNITS TO UNITS FOR SALE
- ABUSE OF PROCESS
- INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
- ACTUAL FRAUD/CONCEALMENT
- CIVIL CONSPIRACY
- VIOLATION OF 18 U.S. CODE § 1962(c), RICO
- VIOLATION OF 11 U.S. CODE § 341, MEETINGS OF CREDITORS AND EQUITY SECURITY HOLDERS
- LIABILITY PURSUANT TO 42 U.S.C. § 1983, § 1985, AND § 1986
- VIOLATION OF CONSTITUTIONAL RIGHTS
- VIOLATION OF AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *ET SEQ.*

4

This is a *pro se* complaint entitled to a liberal reading and less stringent standards since it was prepared without assistance of counsel.  See *Haines v. Kerner, et al.*, 404 U.S. 519, 92 S. Ct. 594 (1972).

Plaintiff is a qualified ADA party and requests any accommodations which the court can provide, to help him fully participate in, benefit from, and receive justice through the Federal Judiciary. His most significant challenges, on top of extreme poverty caused by the defendants, involve being very slow, meticulous, and repetitious in research and writing, difficulty articulating succinctly, with an inability to effectively multi-task critical or significant tasks, projects, and/or defend against multiple concurrent actions. Plaintiff suffers from the following cognitive disabilities: Obsessive-Compulsive Personality Disorder (OCPD) DSM-5 301.4 (F60.5), Generalized Anxiety Disorder (GAD) DSM-5 300.02 (F4L1), Attention-Deficit Hyperactivity Disorder (ADHD) DSM-5 314.01 (F90.2).

Letters regarding his disabilities are included in Appendix-5.

## COUNT ONE: VIOLATION OF T.C.A. § 66-27-123, NOTICE TO TENANT OF INTENT TO CONVERT RENTAL UNITS TO UNITS FOR SALE

3.  This count is against defendants Story, Binkley, and the Chancery Court (the "Count 1 Defendants").

4.  During a hearing on August 1, 2019, in the Chancery Court, the Count 1 Defendants collaborated to issue an order removing the Plaintiff's tenants at the home located at 1986 Sunny Side Drive, Brentwood, TN (hereinafter the "home" or "marital home").

5.  Irrespective of the legitimacy of anything else related to the home, state law T.C.A. § 66-27-123 requires that tenants living at any property being sold be given a "two (2) months' actual notice" and may "continue renting such unit at the same rental rate until the expiration of the two-month notice period....."

6.  The order created and issued by the Count 1 Defendants on August 1, 2019, to remove the tenants after a maximum of just 29 days' notice and well before the time period required by law thus contravened T.C.A. § 66-27-123.

7.  As a direct and proximate result of the order created by the Count 1 Defendants contravening prevailing state law, Plaintiff was deprived of a minimum of $1,445.16 in rental income for one month and one day of lost rent.

8.  The Count 1 Defendants severally and jointly are thus liable to Plaintiff for compensatory damages of $1,445.16.

## COUNT TWO: VIOLATION OF T.C.A. § 39-16-507(A)3 COERCION OR PERSUASION OF WITNESS

9.  This count is against defendants Story, Binkley, Beeler, the County, and the Chancery Court (the "Count 2 Defendants").

10. Defendants orchestrated a scheme by which Plaintiff's wife had secretly filed for bankruptcy without notice, and now the Chancery Court had ordered the forced auction of his home, while in fact the State Court was specifically forbidden from exercising jurisdiction over the property, because the bankruptcy was filed 39 days prior to the divorce being filed, and 97-days before Plaintiff's first hearing before defendant Binkley.

11. The home was listed as part of his wife's "Bankruptcy Estate", hence both the Plaintiff and his Tenants were due Notice and a Hearing in Federal Court, per the Federal Rules of Bankruptcy Procedure and subsequent Federal Bankruptcy Laws. Had this been done legally, it would have ultimately led to the Federal Court requiring the Bankruptcy Trustee to remove the wife as the "Debtor in Possession" (because she was not "in possession") and removing the marital residence from the wife's secret "Bankruptcy Estate", as a "Burdensome Asset".

12. The interests of both the Plaintiff and the Plaintiff's Tenants outweighed any potential benefit to the bankruptcy estate. (The home auctioned only for the amount of the mortgages, plus auctioning and closing costs.) Especially since the Plaintiff was able and willing to bring the mortgages current and keep them current, with the help of his family, but defendant Story refused, saying that it was "too far along in the bankruptcy." This was a violation of due process, as well as federal bankruptcy laws, and ultimately both State and Federal constitutions.

6

13. Plaintiff was never notified that the mortgages had entered default, nor that the wife had filed for bankruptcy. Defendant Story also synchronized events to abruptly terminate all spousal support previously paid to Plaintiff, immediately upon service. While defendants Ausbrooks and Story concealed the wife's voluntary role as their family's primary breadwinner from 2011-2019, along with the fact that she had paid spousal support and promised to pay substantial alimony after the divorce. This fact was withheld from both courts, while the counsel colluded in bad-faith and falsified her bankruptcy filing.

14. Plaintiff was forced to release his counsel and proceed "pro se", after exhausting $9,500 to primarily defend against malicious predatory claims, while the actual divorce itself had yet to be spoken of, and actually was never allowed to be heard.

15. An alleged violation of the "Exparte' Order of Protection", related to an emotional post Plaintiff made on Facebook (which he quickly deleted after being notified by his mother, it could be misinterpreted), was leveraged by the Count 2 Defendants to rush Plaintiff back into Chancery Court.

16. In court, defendant Story stated, "Your Honor, the motion that we are here on today is a motion for violation of the order of the court that was August 14th of '19... I am not here today to argue about that motion necessarily. The more pressing matter... was the deadlines for getting this house sold."

17. Defendant Story continued, "What is obvious, Your Honor, is you're going to have to set a date for him to be out... he's got to be out for them to get this place ready to go... I have seen correspondence where he said September 1st." (Defendant Story actually proposed September 1st in an email with Plaintiff's prior counsel, Plaintiff never mentioned or agreed to such.) "Now he's saying he can't. So I would suggest September 3rd, which is next Tuesday. And I would like the Order to reflect that the Williamson County sheriff's department will accompany him... Off the property. And I don't think he needs to take any property."

18. During the hearing on August 29, 2019, in the Chancery Court, the Count 2 Defendants collaborated to issue an order wrongfully evicting the Plaintiff from his home, with only a five-day notice, while depriving him of taking his personal property. Defendant Story fraudulently claimed, "if you let him take anything out at this point it's going to be sold and he's dissipating marital assets, which would be

in violation of the restraining order." (Transcript page 6, lines 20-23).

19. This was clearly false, as defendant Story knew, since the Plaintiff had emailed her the night prior to correct those false claims (which she had voiced to his prior counsel), in hopes of preventing more defamatory "fraud upon the court, by officers of the court".

20. In fact, defendant Story's Complaint for Divorce filed in Chancery Court docket #48419B, on June 4, 2019, stated in section IV. **"Plaintiff would show that the parties have no assets other than personal property which has been divided with the exception of a few items. Husband and Wife have lived separately since April 2018."** (Transcript of Evidence, Page 2, Section 4).

21. Every nagging attempt that defendant Story made to convert Plaintiff's personal property back into marital property (while wife's personal property was already removed and separate), was purely fraud.

22. Furthermore, defendant Story had twice provided lists to Plaintiff's prior counsel, once in an email dated 8/2/2019 and a second time in a letter on 8/23/2019 (after the scheduled walk through, ordered by the court), containing the personal property which her client wanted, that still remained at the marital residence.

23. There was only one item of contention, which was a three-year-old television which was marital property and cost $1,000 when it was purchased new. While nothing was sold within the statutory injunction, since the divorce had been filed, as Plaintiff had already informed defendant Story, yet she had no interest in the truth. This was a flagrant violation of defendant Story's oath of office, fraud upon the court, obstruction of justice, financial exploitation of vulnerable person (Tenn. Code § 39-15-502), destruction of and tampering with governmental records (Tenn. Code § 39-16-504), and coercion or persuasion of witness (Tenn. Code § 39-16-507).

24. Defendant Story used this lie with the assistance of defendant Binkley to forcefully take the Plaintiff's home and subsequently discard him broke, destitute, and homeless, knowing that this would force his geographic displacement nearly 600 miles away, in the State of Michigan, to seek shelter and provision from his elderly mother.

8

25. Defendant Story's claims were a direct departure from the dialog during the 8/1/2019 hearing, along with the subsequent court order. Prior to needing to release his counsel (due to financial constraints), Plaintiff was allowed to remain in the marital residence until the auction provided both replacement housing along with the money necessary to move.

26. In fact, the "Ex Parte Order Of Protection Extended Pending Final Hearing And Order Granting Motion To Sell Marital Residence" from the 8/1/2019 hearing, filed for entry on 8/14/2019, clearly states the following (Chancery Court #48419B, Technical Record, Pages 110-112): "The attorneys for the parties will agree upon a date and time for Wife to walk through the home, since Wife has not been in the house since March 2018, to identify items of personal property and to inspect the premises. Wife will provide a list to Husband within ten (10) days from August 1,2019, through their counsel, of the items of personal property that she would like to obtain and the parties will either agree upon the same or, if they cannot agree, then Wife may file a Motion with the Court to choose the items on her list. **Husband will take such actions as necessary to move items of personal property that he would like to retain and tag, price or do whatever steps are necessary to sell the remaining items of personal property.** The remaining items at the house that Husband does not take and Wife does not take shall be sold at auction."

27. Therefore, every party from the Appellate Court to the Admin Office should have easily discerned the foul-play by the Count Two Defendants, since Plaintiff expressly advised them of such and as evidenced in his claims, motions, and requests for help, made to them. Plaintiff provided both Transcripts of Evidence along with the subsequent Court Orders, while clearly articulating the discrepancies. Yet despite Plaintiff's damages and the fact that Plaintiff would remain destroyed for many years to come (due to the fraudulent six-year, out of jurisdiction, bad-faith, DEFAULT "Order of Protection"), no court, judge, department, or party chose to intervene and mitigate Plaintiff's damages, or the cost of the entire suit for the State and all parties herein. They likewise refused their supervisory duties over lower court judges per the judicial canons, violated their oaths of office, and failed to correct or report both judicial and attorney misconduct, which is the responsibility of every B.A.R. member.

28. During the 8/29/2019 hearing, Plaintiff asked, "just as a question, were we saying that I disobeyed the Court order?" To which defendant Binkley answered, "No, no, we don't have anything like that really in front of us..." (Transcript page 11, lines 2-6)

29. Once Plaintiff was forced to represent himself "pro se", everything changed, while defendants Story and Binkley took turns "tag-teaming" him.

30. Plaintiff asked what he had "done wrong to receive that kind of treatment"? Informing the court that his "wife had two months to move out". (Transcript page 17, lines 4-6).

31. Defendant Binkley responded, "Sir, we have already talked about all that. We had a previous hearing. We have a previous Court Order. You're representing yourself. You're assuming to know everything we've already talked about. I'm not going to go over it with you and spend four hours –" (Transcript page 17, lines 7-12).

32. The Plaintiff reminded defendant Binkley, "On the last Court Order you said that I could take my stuff with me after the ten-day walkthrough. That's what your last Court Order said, and I would like to be able to do that." (Transcript page 18, lines 18-21).

33. Defendant Binkley demanded, "...Your personal items, sir. You're not stupid. Listen, please. Your personal items are your clothes, your personal jewelry, and that's it." (Transcript page 19, lines 2-5).

34. Plaintiff asked, "My bed or my furniture?" (Transcript page 19, line 6).

35. Defendant Binkley demanded, "No, sir. I'm going to say it for the third time. No furniture, no furnishings, no nothing." (Transcript page 19, lines 2-5).

36. Again, the Plaintiff plead with the court, "That's not what you said in the last order." (Transcript page 19, lines 10-11).

37. Defendant Binkley proceeded to chastise Plaintiff, "Sir, you're not paying attention. You're not listening to what has happened. You're not paying attention to anything. And I'm not going to spend three or four hours here at the -- just trying to be nice to you and go through everything again. I'm just not going to do that. You're expected to know all of this. Now, you're choosing to represent yourself. There's not a thing that I can do about that." (Transcript page 19, lines 12-21).

38. In fact, Plaintiff was paying attention to what had happened, and Plaintiff was correct, that the Count Two Defendants were committing "Fraud On the Court, by Members of the Court."

39. Upon receipt of the Court Order, the Plaintiff saw significant discrepancies in the written order from what had taken place in the Chancery Court the day prior.

40. Giving the Count Two Defendants the benefit of the doubt, that possibly it could have been an honest error, Plaintiff tried emphatically to contact the Chancery Court, defendants Binkley and Story, in an emergency effort to reconcile the discrepancies, before further damage was done, but was ignored and denied.

41. This was executed with just a five-day notice, over a holiday weekend. Executed and enforced by four sheriff's deputies from the County. The deputy sheriffs were actually leveraged by the Count Two Defendants to execute and then enforce multiple criminal felonies against Plaintiff, on behalf of the Count Two Defendants. This was unconscionable, and the refusal by the Courts and the State to help cure this atrocity is beyond words.

42. This was also a violation of at least the following Rules of Professional Conduct: Tenn. R. Sup. Ct. 3.4(e)(1) Fairness to Opposing Party and Counsel — allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, (g) request or assist any person to take action that will render the person unavailable to appear as a witness by way of deposition or at trial, Tenn. R. Sup. Ct. 3.5(e) Impartiality and Decorum of The Tribunal — engage in conduct intended to disrupt a tribunal.

43. Tenn. R. Sup. Ct. 8.4 MISCONDUCT (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; (f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

11

44. The order created and issued by the Count 2 Defendants on August 29, 2019, to wrongfully evict the Plaintiff, leaving him no shelter or provision within the State of Tennessee, with just five-days-notice, knowing that he would be forced to relocate to Michigan (far beyond the jurisdiction of the Chancery Court, the County, and the State), was not only without question bias and discriminatory, but also a clear criminal felony, "by means of coercion, influences or attempts to influence a witness or prospective witness in an official proceeding with intent to influence the witness: to be absent from an official proceeding to which the witness has been legally summoned." This was felony criminal conspiracy and "coercion or persuasion of witness" Tenn. Code § 39-16-507(a)(3).

45. If not prior, once the Count Two defendants committed this crime against Plaintiff, they were both automatically disqualified, and the Chancery Court was stripped of all lawful authority and jurisdiction to hear or decide any related manner in docket #48419B after 8/29/2019.

46. The U.S. Supreme Court stated that "when a state officer acts under a state law in a manner violative of the Federal Constitution, he comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 1687 (1974).*

47. In 1994, the U.S. Supreme Court held that "Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified." *Liteky v. U.S., 114 S.Ct. 1147, 1162 (1994).*

48. "Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and the judge is obligated to recuse herself sua sponte under the stated circumstances." *Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989).*

49. The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice". *Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing Offutt v.*

*United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954).*

50. "Should a judge not disqualify himself, then the judge is violation of the Due Process Clause of the U.S. Constitution." *United States v. Sciuto, 521 F.2d 842, 845 (7th Cir. 1996).*

51. "Acts in excess of judicial authority constitutes misconduct, particularly where a judge deliberately disregards the requirements of fairness and due process." *Gonzalez v. Commission on Judicial Performance, (1983) 33 Cal. 3d 359, 371, 374; *Cannon v. Commission on Judicial Qualifications, (1975) 14 Cal. 3d 678, 694.*

52. "No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued; **and an attempt to enforce it beyond these boundaries is nothing less than lawless violence.**" *Ableman v. Booth, 21 Howard 506 (1859).*

53. "The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury." *Owen v. City of Independence*

54. Irrespective of the legitimacy of anything else related to the home, state law T.C.A. § 66-27-123 requires that tenants living at any property being sold be given a "two (2) months' actual notice" and may "continue renting such unit at the same rental rate until the expiration of the two-month notice period....."

55. As a direct and proximate result of the order created by the Count 2 Defendants contravening prevailing state law, Plaintiff was deprived of an enormous amount of financial damages, compounded by years of completely unnecessary pain and suffering.

56. The Count 2 Defendants severally and jointly are thus liable to Plaintiff for compensatory damages of $1,445.16.

## COUNT TWO: ABUSE OF PROCESS

57. This count is against defendants Story, Yarbrough, and Binkley (the "Count 2 Defendants").

58. Assuming that defendants Story and Yarbrough were representing Plaintiff's now ex-wife in the Chancery Court, which they did, such legal proceeding would then have been done in "proper form."

However, the Count 2 Defendants have violated the plaintiff's constitutional rights, rules of procedure, various state and federal laws, and various elements of common law and have used the proceedings for an "ulterior or wrongful purpose"—to attach and/or seize real property owned by Plaintiff as tenancy by the entirety.[1] Moreover, the Count 2 Defendants have acted with malice and disregard of the law and left Plaintiff destitute and homeless.

59. The Count 2 Defendants have also abused the legal process by issuing—more than once— fraudulent orders of protection against Plaintiff without him being given any opportunity whatsoever to defend any related allegations. Defendants Yarbrough and Story falsely accuse Plaintiff of "domestic abuse" in their motion filed on July 17, 2019, in the Chancery Court. Prior to this date, Plaintiff had never been accused of domestic abuse nor been arrested nor been accused of committing a crime. Plaintiff was even licensed to own firearms. The Count 2 Defendants have falsely damaged Plaintiff's reputation and left a black eye on his record that *severely* impacts his freedom and enjoyment of both his natural and constitutional rights, along with his ability to obtain employment.

60. As a direct and proximate result of abuse of process by the Count 2 Defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, some of which contained the complete investment of his retirement account ($). Despite the lie from Defendant Binkley that Plaintiff "share in some of the proceeds" of the sale of the home, Plaintiff has not yet received a penny from it or his personal belongings, which were valued in the thousands of dollars.

61. The Count 2 Defendants severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife). Because of the egregiousness of the offenses and as supported by settled law from the U.S. Supreme Court, Plaintiff seeks punitive damages

---

[1] See Table 1 and Appendix 1 for a listing of the innumerable wrongdoings

14

in the amount of $150,000 against the Count 2 Defendants.[2]

## COUNT THREE: INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

62. This count is against all defendants.

63. The conduct of defendants Story and Binkley has been beyond outrageous since the true beginning of this legal nightmare—from violating ethical standards, rules of procedure, and civil laws to committing various crimes against Plaintiff. See Table 1 and Appendices 1 and 3.

64. Plaintiff had advised defendants and others at one time or another that the original offenders in the Chancery Court and in the bankruptcy court had violated rules of professional conduct, rules of civil procedure, due process, and civil and criminal law, yet none of them lifted a toxic finger to do anything corrective.

65. Thus far, Plaintiff has had to spend more than 10,000 painstaking hours on matters related to litigation underlying this matter because of the defendants' actions. The defendants have intentionally inflicted—if not at least negligently inflicted—emotional and financial distress upon Plaintiff as a result of their tortious acts during the creation of the fraudulent order to sell the home and the fraudulent order of protection against him, and he has suffered a great deal.

66. Plaintiff is an individual with various mental disabilities including ADHD and OCPD. See Appendix 2. The date emotional distress was first inflicted began on or about June 16, 2019, but the infliction of emotional distress continues to present day since Plaintiff remains virtually unemployable due to his need to obtain a work-from-home job because of his mother's high risk of contracting infectious disease. She has an IgA antibody deficiency and is homebound. See Affidavit 1. Defendants Story and Binkley have thus forced Plaintiff into a Catch-22. He cannot secure employment in an environment with a large public presence because doing so would endanger the wellbeing of his mother, but must do so in order to secure and afford living accommodations outside his mother's home. However, he cannot do so with the fraudulent order of protection on his record. Moreover he is not psychologically free to move forward with false and damaging claims on his record, wounding his

---

[2] *Heck v. Humphrey*, 512 U.S. 477 (1994)

reputation and diminishing his constitutional rights, wrongfully depriving his right to the free pursuit of happiness, due every person.

67. Plaintiff has been under constant oppression by the defendants and various others, and although several agencies and court personnel have been contacted, nothing remedial has been done, which has further increased stress levels.  Additionally, Plaintiff has been under tremendous emotional and financial distress due to the loss of the overwhelming majority of his income because of the defendants' actions, which are in violation of law as shown in other counts herein.

68. The defendants acted with malice or reckless indifference and committed extreme and outrageous acts, such as fraud to the highest degree.  Specifically, they:

- lied repeatedly on and off the record (See Appendix 3)
- violated rules of procedure, judicial canons, rules of professional conduct, civil and criminal law, and/or the Constitution (See Appendix 1 and Count Ten)
- knew Plaintiff would be driven well into extreme poverty and be forced to be put on SNAP/food stamps and state medical assistance because of their actions, and/or
- failed to intercede, report bad actors for wrongdoing, and/or perform their duties to assist litigants with disabilities

69. Yet defendants proceeded with wrongly seizing and selling the home anyway, or allowed it to happen, or did nothing remedial afterward.  Those defendants versed in law who did the most appalling acts—Story and Binkley—must have known they were violating several laws, but even if they were ignorant of existing relevant law, they were made aware of their transgressions via the filings Plaintiff submitted into the record, one of which he submitted on August 29, 2019.

70. Defendant Anderson instilled fear into Plaintiff and Plaintiff's mother when he pounded on the door of the home.  Plaintiff's mother said she "felt threatened and terrified by the auctioneer when he banged on the door prior to the auction."  See Affidavits 1 and 2.

71. Regarding rescheduling of the matters supposed to be heard on August 29, 2019, to a hearing on October 21, 2019—which is after Plaintiff was forced to move out of state 573 miles away by the

defendants—defendants Story and Binkley had originally conceded Plaintiff's attendance at the hearing by phone since this was the only feasible way for him to attend as a *pro se* litigant because he could no longer afford representation. Thereafter, Plaintiff was denied his constitutional right to defend himself and his property at the hearing because defendants Story and Binkley rescinded Plaintiff's means of attending by phone, which is a clear violation of due process. They effectively created the situation that required participation by phone and then blocked it afterwards. Such action shows a total disregard of Plaintiff's right to due process and inflicted emotional distress upon him.

72. Defendant Beeler did not assist Plaintiff when he asked her to point him to certain court forms. She told Plaintiff that the forms he requested did not exist. Plaintiff later found the forms for which he was looking on the court's website. She also failed to provide him reasonable ADA accommodations for him to defend his case. In doing so, Defendant Beeler also inflicted emotional distress upon Plaintiff.

73. Defendant Clement—and by extension the State and Appellate Court—with whom Plaintiff spoke via phone, initially sympathized with Plaintiff, but then immediately shut him down when he mentioned the corruption and crimes that had taken place.

74. Defendant Ausbrooks falsified Plaintiff's ex-wife's Chapter 13 schedules. Schedule H failed to list Plaintiff as a codebtor on the mortgages for the home, failed to list real estate taxes for the home, failed to list Plaintiff's past or future support, under the domestic support obligations, and failed to respond truthfully to the question "Do you expect an increase or decrease within the year after you file this form?" The answer "No" was given, but Ausbrooks knew beforehand that the proprietor for the ex-wife's business had planned to retire and close the business within a few months after the date of filing the Chapter 13. Through Defendant Ausbrooks's actions, she has caused Plaintiff significant financial and emotional distress.

75. Defendant Chancery Court was complicit in issuing the fraudulent orders, depriving Plaintiff of his right to free speech, due process, equal protection, and Ninth Amendment guarantees. Plaintiff relied on the court to make him whole, not essentially kick him to the curb after beating and robbing him.

Because of these actions, Defendant Chancery Court has inflicted financial and emotional distress upon Plaintiff.

76. Defendants Binkley, Story, Ausbrooks, and Chancery Court failed to use proper care at many points in time since 2019 and were reckless with regard to giving notice, maintaining docket fidelity, issuing orders, "selling" the home, following law, and whatnot. Discovery may reveal additional evidence that proves more of the defendants' actions were done intentionally to inflict emotional distress upon Plaintiff. As a result of the defendants' conduct, Plaintiff has suffered severe emotional and financial distress.

77. The symptoms caused by Plaintiff's mental disabilities have worsened since the onslaught of litigation at the hands of defendants' deliberate and wrongful behavior. Plaintiff has been afflicted with "Legal Abuse Syndrome" also known as Post-Traumatic Stress Disorder (PTSD).

78. As a direct and proximate result of the defendants' actions described in this count and throughout this complaint, Plaintiff has been negatively impacted with regard to standard of living, financial reserve, emotional distress, time expenditure, and mental/physical well-being.

79. Defendants Story, Ausbrooks, and Anderson severally and jointly are thus liable to Plaintiff for compensatory damages in an amount to be determined at trial. Because of the deliberate and outrageous conduct of defendant Story, Plaintiff also seeks punitive damages in the amount of $50,000 against her. The remaining defendants are also liable to Plaintiff who seeks declaratory and/or injunctive relief against them.

## COUNT FOUR: ACTUAL FRAUD/CONCEALMENT

80. This count is against defendants Story, Yarbrough, Ausbrooks, and Binkley (the "Count 4 Defendants").

81. In order to attempt to make F.R.B.P. 7001 apply with Mrs. Fenton as the "debtor in possession," Story states during the hearing August 1, 2019, "[Mrs. Fenton] is the owner of the property," and neglects to mention that Plaintiff is too (emphasis added). She didn't say *an* owner, but *the* owner. The definite article she used, *the*, means there can be only *one* owner. She should have used the

18

indefinite article *an*, which would have been correct because both parties owned the home as tenancy by the entirety. Defendant Binkley replied: "Is she the only titled owner?" He therefore knew that Story was attempting to fraudulently deny Mr. Fenton's ownership in the home when Story tersely replied "Both of them" in an attempt to mitigate the fact of Mr. Fenton's ownership interest so that the home could be sold relatively easily and against Plaintiff's wishes. Binkley therefore was well aware of what the game plan was.

82. F.R.B.P. 7001 states in part "A person with an interest in property in the possession of the trustee or debtor in possession may seek to recover or reclaim that property under §554(b) or §725 of the Code." And from 11 U.S. Code § 725: "the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest" (emphasis added). Plaintiff was never given official notice about the bankruptcy and thus did not file an adversary proceeding in the requisite timeframe to retain the home. Moreover, defendant Story stated to Plaintiff on his first day in Chancery Court, August 1, 2019 that it was "already too far along in the bankruptcy process" to save the home. See Affidavit 2. However, even if such a statement were true according to any rule, law, or common sense, it may not have been "too far along" if Plaintiff had rightfully been given notice of the bankruptcy and had been able to attend any meetings of creditors and equity security holders pursuant to 11 U.S. Code § 341.

83. Also on August 1, 2019, Defendant Story declares, "Well, we didn't sign a lease. We never authorized any renters to be in that house." However, this contradicts what Plaintiff was told in an email by Mrs. Fenton that he "should get renters to generate income." Story also said, "I feel sure we have an escape clause because my client didn't sign the lease." But the lease had a severability clause in it, and her mistaken belief that all owners of a property must sign one proves her "reasoning" wrong.

84. Also on August 1, 2019, Defendant Story exclaimed, "[H]e hacked the emails so he lost that job." This statement is utterly false and is further fraud upon the court. Plaintiff resigned from his job. See Exhibit "A".

85. As a direct and proximate result of the Count 4 Defendants committing fraud, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019,

19

has lost his portion of the equity in the home, and has a wrongful order of protection against him.

86. The Count 4 Defendants severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife).

## COUNT FIVE: CIVIL CONSPIRACY

87. This count is against defendants Story, Binkley, Ausbrooks, Yarbrough, Anderson, Marlin, Clement, the State, the Appellate Court, and the Chancery Court (the "Count 5 Defendants").

88. Plaintiff had repeatedly told defendants that he was being discriminated against not just because of his intellectual disabilities, but also because local rule 11.01 prevented him from objecting to the lie-riddled fraudulent orders written by Story. Rather than address his complaint and remedy the damages it caused him, the Chancery Court, the State, and/or the Appellate Court conspired to modify and did modify the rule so that *pro se* parties can no longer object to it. See exhibit "B."

89. Plaintiff repeatedly asked multiple sources for a final HUD-1 after the "sale" of the home, but never got one. This is additional proof that there was a conspiracy to conceal the amount of the outstanding mortgages on the home and that—like the WWE—the offering price by the "winning" bidder was predetermined. The fact that the home "sold" for an off-color dollar amount of $324,360 is highly, *highly* suspect. It is equally suspect that the closing company was owned by Samuel Anderson and the clerk for register of deeds Sherry Anderson. Recall that the auctioneer was Thomas Anderson, and Plaintiff asserts that there were back door dealings to acquire the home, auction it to a person who had inside information regarding the mortgages due, and then hide the evidence by refusing to provide Plaintiff with the HUD-1.

90. Plaintiff was residing at and owned the marital home during the divorce and bankruptcy litigation. The Count 5 Defendants knew this and worked methodically and deliberately to remove Plaintiff from the home and sell it right out from under Plaintiff. As such, the Count 5 Defendants have not only conspired to deprive Plaintiff of his real property, which had fully vested in it his retirement

20

account, but they also interfered with the business relationship of Plaintiff and tenants thereby stopping his rental income from them.  The Count 5 Defendants have thus caused serious economic harm to Plaintiff.

91. The Count 5 Defendants severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife).

## COUNT SIX: VIOLATION OF 18 U.S. CODE § 1962(C), RICO

92. This count is against defendants Story, Binkley, Ausbrooks, Yarbrough, Anderson, Marlin, and the Chancery Court (the "Count 6 Defendants").

93. The Chancery Court is an enterprise engaged in and whose activities affect interstate commerce.  The Count 6 Defendants are associated with the enterprise.

94. The Count 6 Defendants agreed to and did conduct and participate in the affairs of the enterprise through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically, they are responsible for the following racketeering activities:

- 18 U.S. Code § 1341 (when they used the U.S. mail to conduct their fraudulent activity, with one known parcel dated October 21, 2019, and another dated March 25, 2021, being sent by defendant Chancery Court to Plaintiff, thereby constituting a pattern of racketeering activity by itself)
- 18 U.S. Code § 1503 (when defendants Story and Binkley corruptly obstructed, influenced, and/or impeded the divorce in Chancery Court and issued orders of protection against Plaintiff without due process of law)
- 18 U.S. Code § 1951 (when they performed acts that affected commerce via civil theft of rent payments for the home and fraudulently transferred "ownership" of it and/or conspired to do so through the enterprise)
- 18 U.S. Code § 1957 (when they engaged in or enabled monetary transactions related to the home, which was derived from unlawful activity, including altering the auction listing after Plaintiff signed it, coercing Plaintiff to sign it, and falsifying other records)
- fraud connected with a case under title 11 (when Plaintiff was never given official notice of the filing, the Chancery Court assumed jurisdiction of the bankruptcy estate, and filed schedules/documents contained fraudulent entries)

See Appendix 4 for some RICO evidence.  All mailings contain fraud, violations of due process,

and criminal elements. The FINAL DECREE OF DIVORCE is especially rife with fraud. Adding insult to injury is the statement "each party shall be awarded any.....retirement accounts in their respective names," which is moot since Plaintiff invested his retirement into the home.....and did not receive a penny from it. Another instance is: "Husband.....agrees to remove Wife's name....." How can Plaintiff "agree" to something in which he was excluded from participating? Recall that he was blocked from attending hearings after August 29, 2019. Fraud and several other travesties of jurisprudence are evident in the "decree."

95. Pursuant to and in furtherance of their fraudulent scheme, the Count 6 Defendants committed multiple related acts of racketeering as shown in paragraph 43.

96. The acts set forth in this count constitute a pattern of racketeering activity pursuant to 18 U.S. Code § 1961(5).

97. The Count 6 Defendants have directly and indirectly conducted and participated in the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S. Code § 1962(c).

98. As a direct and proximate result of the Count 6 Defendants' racketeering activities and violations of 18 U.S. Code § 1962(c), Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and has lost his portion of the equity in the home, some of which contained the complete investment of his retirement account ($). Despite the lie from Defendant Binkley that Plaintiff "share in some of the proceeds" of the sale of the home, Plaintiff has not yet received a penny from it or many of his personal belongings, which were valued in the thousands of dollars

99. Defendants Story, Ausbrooks, Yarbrough, Marlin, and Anderson severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-

22

wife), trebled to $1,869,600.[3]  Plaintiff also seeks punitive damages in the amount of $200,000 against the Count 6 Defendants.

## COUNT SEVEN: VIOLATION OF 11 U.S. CODE § 341, MEETINGS OF CREDITORS AND EQUITY SECURITY HOLDERS

100.    This count is against defendant Ausbrooks (the "Count 7 Defendant").

101.    The Count 7 Defendant never properly listed Plaintiff on any of the papers filed with the bankruptcy court.  As a result, the bankruptcy court did not notify Plaintiff about the bankruptcy. Therefore, Plaintiff did not know about the 341 meetings or the home being in jeopardy of being sold.

102.    Regarding 11 U.S. Code § 341, the term "equity security holder" means holder of an equity security of the debtor, of which Plaintiff is since he was an owner of the home via tenancy by the entirety.[4]

103.    As a direct and proximate result of the failure by the Count 7 Defendant to list Plaintiff in the bankruptcy paperwork, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, some of which contained the complete investment of his retirement account ($).

104.    The Count 7 Defendant is thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife).

## COUNT EIGHT: LIABILITY PURSUANT TO 42 U.S.C. § 1981, § 1982, § 1983, § 1985, § 1986, AND § 1988

105.    This count is against all defendants. Clement/state/Appellate Court

106.    The defendants violated the civil rights of Plaintiff while acting under color of "statute,

---

[3] Courts have ruled that punitive damages are available under RICO. See *Com-Tech Assoc. v. Computer Assoc. Int'l*, 753 E Supp. 1078, 1079 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991) (holding that claim for punitive damages could be asserted in civil action under RICO, even though treble damages are available). See also *Sea Salt, LLC v. Bellerose, No. 2:18-cv-00413-JAW*, 10 (D. Me. Jun. 9, 2021) (where the court reasoned that "compensatory damages in the amount of $1,500,000, treble damages under the RICO Act, and punitive damages in the amount of $3,000,000" are viable).

[4] https://www.law.cornell.edu/definitions/uscode.php?def_id=11-USC-1767684303-71778042

ordinance, regulation, custom" when:

- Defendant Ausbrooks failed to list in any bankruptcy filings Plaintiff having a legal and financial interest in the home, which prevented him from getting notice of it and knowing it was taking place. As a result, Plaintiff could not take over the mortgages, assume full ownership of it, and prevent its "sale," thus violating due process. See affidavit 2 and Exhibit "C."

- The home was taken because of the actions of the defendants, despite Plaintiff not being heard in the bankruptcy matter as he should have been, thus violating due process.

- Defendants Clement, Hivner, the State, and Appellate Court failed to remediate the wrongdoing of others below them, thus violating due process and equal protection.

- Defendants Koval and C&W deprived Plaintiff of personal property without Plaintiff being allowed to defend, thus violating due process.

- Defendant Hildebrand failed to check the deed for the home, which listed Plaintiff as an owner of it, and provide notice of the bankruptcy to Plaintiff, thus violating due process.

- Defendant Garrett refused to allow Plaintiff to file a complaint against defendant Story, thus violating free speech and due process.

- Defendant Binkley said during the hearing in Chancery Court on August 29, 2019, "The husband will be enjoined and restrained from interfering in any form whatsoever directly or indirectly with a smooth transition and preparation of the home for auction," which meant that Plaintiff was not allowed to contact the bank to pay off the loan and thus prevented him from saving the home from auction and violated due process.

- Defendant Binkley made the preceding statement without consideration of Plaintiff being allowed to provide evidence that he could pay for the home if another renter was brought aboard, thus violating due process.

- Defendants Story and Yarbrough stated in the MOTION TO SELL THE MARITAL RESIDENCE filed in the Chancery Court on July 17, 2019, "Wife currently has an *Ex Parte* Order of Protection against Husband as the result of the domestic abuse she has incurred by Husband." This statement was made without evidence. In fact it is false. And since it was made in an official record, it violates T.C.A. §§ 39-16-504, 39-16-702, and 39-14-114, which carry up to a 30-year prison sentence and a fine of up to $25,000. Plaintiff was never afforded the opportunity to dispute this claim, nor provide evidence that the police had never previously come to the home. He has no arrest record and has never before or since been accused of abusive or violent behavior. See letters from mental health professionals in Appendix 5. To make such an unopposed and false claim without being given any opportunity whatsoever to prove its invalidity goes well beyond the heartland of infringement of constitutional rights. Indeed, it goes beyond any realm of infringement of all human rights. This statement is a violation of due process.

- Defendants Binkley and Story prevented Plaintiff from having a telephonic hearing in the Chancery Court on October 21, 2019, thus violating due process.

- Defendant Binkley stated on August 1, 2019, "who's going to control the husband?" because of Plaintiff's long emails, which is protected free speech. Signs on the property, which were designed by Plaintiff's ex-wife, were also protected free speech.

- Ninth amendment - "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Exploiting mental

disabilities, inhumane treatment, etc.

- Defendant Binkley, who apparently wanted to speed along the auction, said on August 1, 2019, "I don't have any assurance at this point that his conduct won't continue thereby delaying this process even more," thus violating due process.

- Defendant Binkley said on August 29, 2019, "You're to sign this contract today." He followed this statement shortly thereafter with: "You're going to sign this contract now," which are violations of due process—and of the Tennessee Code of judicial conduct rule 3.10. "A judge shall not practice law" because he was giving legal "advice."

- Defendant Binkley told Plaintiff "he is required to comply with the rules just as an attorney is required," yet none of the defendants followed the rules, which were violations of equal protection and due process. See Affidavit 2 and Exhibit "D."

- Defendant Binkley said to Plaintiff during the Chancery Court hearing on August 29, 2019, "I don't really care about all that. That's for another day," when Plaintiff tried to provide any input into the case whatsoever, and specifically about one of the motions to be heard that day–the motion on the order of protection. Plaintiff said, "Can I still tell a little bit of my side before you rule on all of that?" Defendant Binkley then says "briefly," then shuts Plaintiff down by saying "You've got to trust me here," and then immediately afterward, "I don't really care about all that. That's for another day." However, that day was supposed to be August 29, 2019, the very day of the hearing. The day to which Binkley referred never came for Plaintiff. For proceedings to continue to their conclusion—including loss of the home and income—after no hearings in the bankruptcy court with Plaintiff present, a mere two short "hearings" in Chancery Court, and without any real opportunity for Plaintiff to defend himself violated—or more appropriately, annihilated—his right to due process.

107.    42 U.S. Code § 1985 says that "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws" such a person may file an action "for the recovery of damages occasioned by such injury or deprivation." Two or more defendants did "conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice" while violating on multiple occasions the rights of Plaintiff.

108.    Plaintiff made the defendants, except for defendants J. Michaud and Abreau, aware on many occasions that due process rights were being abridged, that his income met the definition of poverty, that the home did not even belong to him, and that he was on the verge of homelessness due to their improper conduct. By proceeding anyway, the defendants in this paragraph acted with reckless,

willful, and wanton misconduct.

109.    "State officials in transferring possession of property" can "implicate due process," which defendant Binkley who is employed in the Chancery Court—by his acts—has certainly done.[5]

110.    For the reasons given heretofore in this complaint, the defendants have deprived Plaintiff of the right of due process guaranteed under the Due Process Clause and the right of equal protection guaranteed under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, which renders the defendants liable under 42 U.S.C. § 1983.

111.    As a direct and proximate result of the defendants' actions and liability pursuant to 42 U.S.C. § 1983, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019 and in his equity in the home, some of which contained the complete investment of his retirement account ($). See exhibit "A."

112.    The defendants are thus liable to Plaintiff for violation of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. Plaintiff seeks compensatory damages in the amount of $1,400 per month beginning September 2019 against defendants Story, Yarbrough, and Ausbrooks, who are severally and jointly liable, for their violations of said clauses that they violated when they conspired with court personnel to achieve their illicit goals. The remaining defendants violated those same clauses when defendant Binkley illegally issued an order of protection— and then extended it—against Plaintiff and prevented a telephonic hearing. Plaintiff also seeks an award of punitive damages in the amount of $150,000 in order to punish defendants Story, Yarbrough, and Ausbrooks $50,000 per person for their reckless, willful, and wanton misconduct with respect to disregarding the plaintiff's right to due process and violating such right and to deter such reckless, willful, and wanton misconduct in the future. The remaining defendants, Binkley and the Chancery Court, are also liable to Plaintiff who seeks declaratory and/or injunctive relief against them.

---

[5] *Mitchell v. W.T. Grant Co.*, 416 U.S. at 615–18 (1974) and at 623 (Justice Powell concurring). See also *Arnett v. Kennedy*, 416 U.S. 134, 188 (1974) (Justice White concurring in part and dissenting in part). Efforts to litigate challenges to seizures in actions involving two private parties may be thwarted by findings of "no state action," but there often is sufficient participation by state officials in transferring possession of property to constitute state action and implicate due process.

## COUNT NINE: VIOLATION OF CONSTITUTIONAL RIGHTS

113.    This count is against all defendants.

114.    Defendant Ausbrooks failed to list in any bankruptcy filings Plaintiff having a legal and financial interest in the home, which prevented him from getting notice of it and knowing it was taking place. As a result, Plaintiff could not take over the mortgages, assume full ownership of it, and prevent its "sale," thus violating due process. See affidavit 2 and Exhibit "C."

115.    The home was taken because of the actions of the defendants, despite Plaintiff not being heard in the bankruptcy matter as he should have been, thus violating due process.

116.    Defendants Clement, Hivner, the State, and Appellate Court failed to remediate the wrongdoing of others below them, thus violating due process and equal protection.

117.    Defendants Koval and C&W deprived Plaintiff of personal property without Plaintiff being allowed to defend, thus violating due process.

118.    Defendant Hildebrand failed to check the deed for the home, which listed Plaintiff as an owner of it, and provide notice of the bankruptcy to Plaintiff, thus violating due process.

119.    Defendant Garrett refused to allow Plaintiff to file a complaint against defendant Story, thus violating free speech and due process.

120.    Defendant Binkley said during the hearing in Chancery Court on August 29, 2019, "The husband will be enjoined and restrained from interfering in any form whatsoever directly or indirectly with a smooth transition and preparation of the home for auction," which meant that Plaintiff was not allowed to contact the bank to pay off the loan and thus prevented him from saving the home from auction and violated due process.

121.    Defendant Binkley made the preceding statement without consideration of Plaintiff being allowed to provide evidence that he could pay for the home if another renter was brought aboard, thus violating due process.

122.    Defendants Story and Yarbrough stated in the MOTION TO SELL THE MARITAL RESIDENCE filed in the Chancery Court on July 17, 2019, "Wife currently has an Ex Parte Order of

Protection against Husband as the result of the domestic abuse she has incurred by Husband." This statement was made without evidence. In fact it is false. And since it was made in an official record, it violates T.C.A. §§ 39-16-504, 39-16-702, and 39-14-114, which carry up to a 30-year prison sentence and a fine of up to $25,000. Plaintiff was never afforded the opportunity to dispute this claim, nor provide evidence that the police had never previously come to the home. He has no arrest record and has never before or since been accused of abusive or violent behavior. See letters from mental health professional in Appendix 5. To make such an unopposed and false claim without being given any opportunity whatsoever to prove its invalidity goes well beyond the heartland of infringement of constitutional rights. Indeed, it goes beyond any realm of infringement of all human rights. This statement is a violation of due process.

123.    Defendants Binkley and Story prevented Plaintiff from having a telephonic hearing in the Chancery Court on October 21, 2019, thus violating due process.

124.    Defendant Binkley stated on August 1, 2019, "who's going to control the husband?" because of Plaintiff's long emails, which is protected free speech. Signs on the property, which were designed by Plaintiff's ex-wife, were also protected free speech.

125.    Ninth amendment - "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Exploiting mental disabilities, inhumane treatment, etc.

126.    Defendant Binkley, who apparently wanted to speed along the auction, said on August 1, 2019, "I don't have any assurance at this point that his conduct won't continue thereby delaying this process even more," thus violating due process.

127.    Defendant Binkley said on August 29, 2019, "You're to sign this contract today." He followed this statement shortly thereafter with: "You're going to sign this contract now," which are violations of due process—and of the Tennessee Code of judicial conduct rule 3.10. "A judge shall not practice law" because he was giving legal "advice."

128.    Defendant Binkley told Plaintiff "he is required to comply with the rules just as an

28

attorney is required," yet none of the defendants followed the rules, which were violations of equal protection and due process. See Affidavit 2 and Exhibit "D."

129.    Defendant Binkley said to Plaintiff during the Chancery Court hearing on August 29, 2019, "I don't really care about all that. That's for another day," when Plaintiff tried to provide any input into the case whatsoever, and specifically about one of the motions to be heard that day–the motion on the order of protection. Plaintiff said, "Can I still tell a little bit of my side before you rule on all of that?" Defendant Binkley then says "briefly," then shuts Plaintiff down by saying "You've got to trust me here," and then immediately afterward, "I don't really care about all that. That's for another day." However, that day was supposed to be August 29, 2019, the very day of the hearing. The day to which Binkley referred never came for Plaintiff. For proceedings to continue to their conclusion—including loss of the home and income—after no hearings in the bankruptcy court with Plaintiff present, a mere two short "hearings" in Chancery Court, and without any real opportunity for Plaintiff to defend himself violated—or more appropriately, annihilated—his right to due process.

130.    Defendants have also recklessly changed "ownership" of the home—or are responsible for it—without Plaintiff being heard in the bankruptcy, which is another violation of Plaintiff's right to due process.

131.    Since Plaintiff was never noticed about the bankruptcy, title for the property is still legally in his name according to the U.S. Supreme Court in *Pennoyer v. Neff*, 95 U.S. 714 (1878): "This court now holds that, by reason of the absence of [notice].....on the [litigant], the [court] had no jurisdiction, its judgment could not authorize the sale of land in said county, and, as a necessary result, a purchaser of land under it obtained no title; that, as to the former owner, it is a case of depriving a person of his property without due process of law" (emphasis added).

132.    Notice must be given in a manner that actually notifies the person or that has a reasonable certainty of resulting in such notice.[6] Defendants were never assured that Plaintiff received such notice. In fact, he hadn't. See the email admitting as such in Exhibit "E."

---

[6] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); *Walker v. City of Hutchinson*, 352 U.S. 112 (1956); *Schroeder v. City of New York*, 371 U.S. 208 (1962); *Robinson v. Hanrahan*, 409 U.S. 38 (1972)

133.    Plaintiff had repeatedly told defendants that he was being discriminated against not just because of his intellectual disabilities, but also because local rule 11.01 prevented him from objecting to the lie-riddled orders written by Story. Rather than address his complaint and remedy the damages it caused him, the Chancery Court, the State, and/or the Appellate Court modified the rule so that *pro se* parties can no longer object to it. See exhibit "B." This rule was discriminatory and unconstitutional to *pro se* litigants in 2019 during the time of Plaintiff's litigation, but has been rewritten as a result of his complaints about it. However, this is too little too late. He has been wrongly burdened with a mark on his otherwise perfect record—which prevents him from obtaining meaningful employment—and has lost hundreds of thousands of dollars in money and property.

134.    As a direct and proximate result of the violation of the plaintiff's constitutional rights by the defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019, has lost his portion of the equity in the home, and has a wrongful order of protection against him.

135.    The defendants, except for the State, the Admin Office, the Appellate Court, the Chancery Court, and Binkley, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife). Because of the egregiousness of the offenses and as supported by settled law from the U.S. Supreme Court regarding malicious intent or the reckless indifference to the rights of Plaintiff by the defendants, Plaintiff seeks punitive damages in the amount of $250,000 against all defendants except the State, the Admin Office, the Appellate Court, the Chancery Court, and Binkley.[7] These remaining defendants are liable to Plaintiff who seeks declaratory and/or injunctive relief against them regarding rescinding and expungement of the order of protection issued by the Chancery Court.

**COUNT TEN: VIOLATION OF AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *ET***

---

[7] *Smith v. Wade*, 461 U.S. 30 (1983): "The common law, both in 1871 and now, allows recovery of punitive damages in tort cases not only for actual malicious intent, but also for reckless indifference to the rights of others."

*SEQ.* **AND VIOLATION OF FAIR HOUSING AMENDMENTS ACT OF 1988, 42 U.S.C. § 3601**
*ET SEQ.*

136.    This count is against all defendants.

137.    Plaintiff is an individual with various mental disabilities including ADHD and OCPD. See Appendix 2.

138.    It is a known fact that the two most limiting factors caused by Plaintiff's disabilities are being extremely slow, meticulous, as a result of Plaintiff's disabilities,

139.    Plaintiff was discriminated against on various occasions by the defendants because of his mental disabilities. Defendant Binkley openly mocked him in court and disregarded his disabilities as something he should just deal with. See Appendix 2.

140.    Other defendants prevented Plaintiff from special assistance, filing procedures, and accommodations as required by 42 U.S.C. § 12101 et seq.

141.    As a direct and proximate result of the violation of the plaintiff's ADA rights by the defendants, Plaintiff has been injured in his business/employment in the amount of $1,400 monthly beginning September 2019, has lost his portion of the equity in the home, and has a wrongful order of protection against him.

142.    The defendants, except for the State, the Admin Office, the Appellate Court, the Chancery Court, and Binkley, severally and jointly are thus liable to Plaintiff for compensatory damages of equity in the home totaling $623,200, the calculations of which are as follows: $916,000 (current value of the home) plus $67,200 (rental income lost to date) minus $300,000 (outstanding mortgages on the property) minus $60,000 (funds due to ex-wife). The defendants excepted above are also liable to Plaintiff who seeks declaratory and/or injunctive relief against them regarding rescinding and expungement of the order of protection issued by the Chancery Court.

## DEMAND FOR JUDGMENT

143.    WHEREFORE, Plaintiff seeks declaratory and/or injunctive relief pursuant to 42 U.S.C. § 1983 and the U.S. Constitution against defendants Blinkey and Tennessee Chancery Court by directing

31

them to abide by the law and Constitution and to vacate and expunge the illegal order(s) of protection issued by them against Plaintiff.

144.    Lastly, Plaintiff seeks compensatory and punitive damages as set forth in the following table, together with prejudgment interest at the prevailing rate set by law, court costs, fees, penalties imposed on Plaintiff, and any other relief or compensation deemed appropriate.  In the alternative to declaratory and/or injunctive relief against defendant Taft-Carter, the rightmost two columns of compensatory damages in the table are applicable.  Under compensatory damages, column 1 represents the $1,500 monthly rent or its double, as applicable.  Column 2 represents the approximate total taxes and interest due to early withdrawal of Plaintiff's retirement account, with column 3 being its triple.  Column 4 represents the 30-year loss of monthly rent ($1,128,567.36), with column 5 being its triple.[8]  Amounts in parenthesis in the table supersede the default values given at the top of it.

---

[8] Courts have ruled that punitive damages are available under RICO.  See *Com-Tech Assoc. v. Computer Assoc. Int'l*, 753 E Supp. 1078, 1079 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991) (holding that claim for punitive damages could be asserted in civil action under RICO, even though treble damages are available).  See also *Sea Salt, LLC v. Bellerose, No. 2:18-cv-00413-JAW*, 10 (D. Me. Jun. 9, 2021) (where the court reasoned that "compensatory damages in the amount of $1,500,000, treble damages under the RICO Act, and punitive damages in the amount of $3,000,000" are viable).

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues raised in this complaint.

October 13, 2023

Jeffrey Ryan Fenton, *pro se*
17195 Silver Parkway #150,.
Fenton, MI  48430-3426
P: (810) 428-6500
F: (810) 255-4438
jeff.fenton@live.com

"Due to sloth, inattention or desire to seize tactical advantage, lawyers have long engaged in dilatory practices... the glacial pace of much litigation breeds frustration with the Federal Courts and ultimately, disrespect for the law." *Roadway Express v. Pipe, 447 U.S. 752 at 757 (1982)*

"The federal rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." The court also cited Rule 8(f) FRCP, which holds that "all pleadings shall be construed to do substantial justice." *Conley v. Gibson, 355 U.S. 41 at 48 (1957)_*

"Society's commitment to institutional justice requires that judges be solicitous of the rights of persons who come before the court." *Geiler v. Commission on Judicial Qualifications, (1973) 10 Cal.3d 270, 286__*