TNJudicial Case 1:23-cv-01097-PLM-RSK  Williamson County Chancery Court Tennessee (Trial Court Records)  ECF No: 1-18, PageID: 741  Filed 10/13/23  DOC: 002 | Page 105 of 719

Page 1 of 57

From: Marty Duke          Fax: 16155411842          To:          Fax: (615) 790-5626          Page: 43 of 51          07/29/2019 4:06 PM

---

**Warning: File Your Forms on Time**

Section 521(a)(1) of the Bankruptcy Code requires that you promptly file detailed information about your creditors, assets, income, expenses and general financial condition. The court may dismiss your bankruptcy case if you do not file this information within the deadlines set by the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the court.

For more information about the documents and their deadlines, go to:
http://www.uscourts.gov/bkforms/bankruptcy_forms.html#procedure.

---

**Bankruptcy crimes have serious consequences**

If you knowingly and fraudulently conceal assets or make a false oath or statement under penalty of perjury—either orally or in writing—in connection with a bankruptcy case, you may be fined, imprisoned, or both.

All information you supply in connection with a bankruptcy case is subject to examination by the Attorney General acting through the Office of the U.S. Trustee, the Office of the U.S. Attorney, and other offices and employees of the U S Department of Justice.

**Make sure the court has your mailing address**

The bankruptcy court sends notices to the mailing address you list on *Voluntary Petition for Individuals Filing for Bankruptcy* (Official Form 101). To ensure that you receive information about your case, Bankruptcy Rule 4002 requires that you notify the court of any changes in your address.

A married couple may file a bankruptcy case together—called a *joint case*. If you file a joint case and each spouse lists the same mailing address on the bankruptcy petition, the bankruptcy court generally will mail you and your spouse one copy of each notice, unless you file a statement with the court asking that each spouse receive separate copies.

**Understand which services you could receive from credit counseling agencies**

The law generally requires that you receive a credit counseling briefing from an approved credit counseling agency. 11 U.S.C. § 109(h). If you are filing a joint case, both spouses must receive the briefing. With limited exceptions, you must receive it within the 180 days *before* you file your bankruptcy petition. This briefing is usually conducted by telephone or on the Internet.

In addition, after filing a bankruptcy case, you generally must complete a financial management instructional course before you can receive a discharge. If you are filing a joint case, both spouses must complete the course.

You can obtain the list of agencies approved to provide both the briefing and the instructional course from: http://justice.gov/ust/eo/hapcpa/ccde/cc_approved.html

In Alabama and North Carolina, go to:
http://www.uscourts.gov/FederalCourts/Bankruptcy/BankruptcyResources/ApprovedCredit AndDebtCounselors.aspx.

If you do not have access to a computer, the clerk of the bankruptcy court may be able to help you obtain the list.

---

**Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)**                                                                 page 4

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Case 3:19-bk-02693   Doc 1   Filed 04/26/19   Entered 04/26/19 13:28:31   Desc Main
Document   Page 42 of 50          98

From: Marty Duke          Fax: 16155411842          To:          Fax: (615) 790-5626          Page: 44 of 51          07/29/2019 4:06 PM

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Middle District of Tennessee

In re  Fawn ▪▪▪ Fenton

Debtor(s)

Case No. _____
Chapter  13

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1.  Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

| | | |
|---|---|---|
| For legal services, I have agreed to accept | $ | 4,250.00 |
| Prior to the filing of this statement I have received | $ | 0.00 |
| Balance Due | $ | 4,250.00 |

2.  The source of the compensation paid to me was:

   ▪ Debtor    ☐ Other (specify):

3.  The source of compensation to be paid to me is:

   ▪ Debtor    ☐ Other (specify):

4.  ▪ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm

   ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm.  A copy of the agreement, together with a list of the names of the people sharing in the compensation, is attached.

5.  In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a.  [Other provisions as needed]
      **Please refer to the attached Rights and Responsibilities of the Chapter 13 Debtor and Attorney**

6.  By agreement with the debtor(s), the above-disclosed fee does not include the following service:
      **Please refer to the attached Rights and Responsibilities of the Chapter 13 Debtor and Attorney**

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

**April 26, 2019**
*Date*

/s/ Mary Beth Ausbrooks
**Mary Beth Ausbrooks**
*Signature of Attorney*
**Rothschild & Ausbrooks PLLC
1222 16th Avenue South, Suite 12
Nashville, TN 37212-2926
(615) 242-3996  Fax: (615) 242-2003
notice@rothschildbklaw.com**
*Name of law firm*

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

99

## RIGHTS AND RESPONSIBILITIES OF CHAPTER 13 CLIENTS AND ATTORNEYS

It is important for clients who file a bankruptcy case under Chapter 13 to understand their rights and responsibilities. It is also important that the clients know what their attorney's responsibilities are, and understand the importance of communicating with their attorney to make the case successful. Clients should also know that they may expect certain services to be performed by their attorney. The below guidelines provided by the Court are hereby agreed to by the clients and their attorneys.

## CLIENT
The attorney and client acknowledge that they have discussed the obligation of the client to:

### Before the case is filed:

1. Provide the attorney with complete and accurate financial information, including all debts owed, all property owned, an accurate, current and projected budget, copies of all required tax returns or transcripts from the IRS, and 6 months of pay stubs.
2. Inform the attorney of any prior bankruptcies and the outcome of those proceedings.
3. Discuss with the attorney the client's reasons and objectives for filing the case.
4. Review the complete bankruptcy petition (including all schedules and statements) upon its receipt and promptly advise the attorney of any errors, omissions, or changes which need to be made.

### After the case is filed:

1. Pay the Trustee within 30 days of filing.
2. Keep the trustee and attorney informed of the client's address, telephone number and employment.
3. Inform the attorney of any wage garnishment or attachment of assets which occurs or continues after the case is filed.
4. Review the Confirmation Order when received, and advise the attorney if the client has questions about which creditors are being paid and how much or if the client has questions about anything the debtor must do.
5. Review the Trustee's Notice of Intent to Pay Claims when received, and advise the attorney of any filed claim that appears to be improper or excessive, or any creditor who has not filed a proof of claim but the client wants to make sure is paid.
6. Insure all property of the estate, including maintaining liability, collision, and comprehensive insurance on vehicles securing loans or leases.
7. Contact the attorney promptly if the client loses his/her job, becomes ill, experiences a budget change, or is otherwise unable to make plan payments.
8. Inform the attorney if any tax refunds the client is entitled to are seized or not returned to the client by the IRS.
9. Provide the documentation/information requested by attorney for the attorney to file necessary post-petition motions (tax returns, pay stubs, amended budget).

10. Contact the attorney before buying, refinancing, or selling real property or a motor vehicle or before entering into any loan agreements to find out what approvals are required, including retaining a real estate agent or listing property for sale.
11. Contact the attorney if the debtor receives an inheritance.
12. Contact the attorney if the client is sued during the case.
13. Contact the attorney if the client has any potential lawsuits against another person or company after the bankruptcy is filed.
14. Attend a financial management workshop no later than the due date of the last scheduled plan payment.
15. Open and read all mail from the attorney, Trustee, or Bankruptcy Court.

## ATTORNEY

The attorney has agreed to accept a flat fee of $ *4250*  for all aspects of the bankruptcy case except for services excluded from the flat fee (described below). For some of the excluded services, the attorney has agreed to limit the fees to amounts set by the Bankruptcy Court for the specific services. For the remaining excluded services, the attorney may request additional fees on an hourly basis in accordance with the agreement between the attorney and the client.

Fees shall be paid by the Trustee through the plan unless otherwise ordered. The attorney may not receive fees directly from the client other than the initial retainer, unless paid by a third party, in which event such payment must be fully disclosed to the Bankruptcy Court. Any fee must be agreed upon by the client and the attorney, and approved by the court.

**Services included in the flat fee.** The services the attorney agrees to provide for the flat fee include:

1. Meet with the client to review the client's debts, assets, liabilities, income, and expenses. Request appropriate financial information, including credit reports and information on any mortgage debt or support obligation.
2. Conduct necessary due diligence regarding any prior bankruptcies involving the client.
3. Counsel the client regarding the advisability of filing a bankruptcy and whether filing either a Chapter 7 or Chapter 13 case would assist in meeting the client's objectives; discuss procedures in both Chapter 7 and Chapter 13 with the client, and answer the client's questions.
4. Explain what payments will be made directly by the client and what payments will be made through the client's Chapter 13 plan.
5. Explain to the client how, when, and where to make the Chapter 13 plan payments, including advising the client that the first plan payment must be made to the Trustee no later than 30 days after the case is filed.
6. Explain to the client how the attorney's fees and trustee's fees are paid, providing a signed copy of the contract between the client and the attorney and a copy of this Rights and Responsibilities to the debtor.

7.   Advise the client of the requirement to attend the 341 Meeting of Creditors, arriving early, and instruct the client as to the date, time, and place of the meeting. Advise the client to bring a copy of the petition and the schedules and statements to the Meeting.

8.   Advise the client of the necessity of maintaining liability, collision, and comprehensive insurance on vehicles securing loans or leases and advise the client of the duty to insure all property of the estate.

9.   Timely prepare and file the client's petition, plan, statements, and schedules.

10.  Ensure that if the plan includes a motion to void liens, that the collateral is identified and an exemption is claimed.

11.  Ensure proper notice and service of the plan.

12.  Appear at the 341 Meeting of Creditors with the client.

13.  Review all documents filed in the case and all communications concerning the case.

14.  Respond to objections to plan confirmation and, where necessary, prepare an amended plan, and appear at the confirmation hearing.

15.  Explain that a plan may be modified after confirmation and, where needed, prepare, file, and serve necessary modifications to the plan which may include suspending, lowering, or increasing plan payments.

16.  Prepare, file, and serve necessary amended statements and schedules in accordance with information provided by the client.

17.  Review the confirmation order and the Trustee's notice of intent to pay claims.

18.  If necessary, object to improper or invalid claims based upon information provided by the client.

19.  File claims for creditors when the client's goals and interests are served by such filing.

20.  Respond to client communications, advising the client of the best and most efficient means of communications.

21.  File notice of change of employment/change of address.

22.  Represent the client in connection with all motions filed in the bankruptcy case, other than those listed in the excluded services below.

23.  Where appropriate, prepare, file, and serve necessary motions to avoid liens on real or personal property.

**Additional services requiring additional limited fees.** The following services are not included in the flat fee, but the attorney has agreed to provide these services, when necessary and appropriate for the case, for additional compensation based on a fee schedule approved by the Court. The maximum additional fee for work performed in connection with obtaining the necessary Court approval for certain activities is indicated below:

1.   Mortgage loan modification of the claim secured by the debtor's principal residence – up to $500

2.   Substitution of collateral – up to $400.

3.   Retention of a realtor, auctioneer or other professional relating to the sale of property or representing the interests of the estate – up to $200

4.   Sale of property and disposition of the proceeds, resulting in the closing of such sale and the filing of any necessary report of the sale – up to $300.

TNJudicial.org/c/e/irf0023.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC: 002 | Page 110 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-10, PageID.740    Filed 10/13/23    Page 6 of 57

5.      Retention of special counsel relating to collecting or pursuing a cause of action in a different judicial forum and that results in the filing of a motion and order authorizing the approval of a settlement of such litigation – up to $300.

**Additional services on an hourly basis.** The following services are not included in the flat fee and are not covered by any specific cap on fee, but the attorney has agreed to provide these services, when necessary and appropriate for the case, but may charge an hourly rate for the work performed – subject to Court approval:

1.      Motions for sanctions or contempt.
2.      Representation at a Rule 2004 examination.

**Services the attorney has not agreed to provide.** The attorney has not agreed to represent the client in any adversary proceeding or certain contested matters placed on an "adversary track" by order of the Court, unless the details of such separate litigation representation are spelled out in an addendum to this agreement or in a separate supplemental contract. The client will be fully apprised of any such anticipated litigation that would not be covered by this agreement.

Effective Date: _____4-24-19_____

Rothschild & Ausbrooks, PLLC

By: _____

CLIENT _____
          *Faron T Fenton*

CLIENT (*if joint*) _____

From: Marty Duke          Fax: 16155411842          To:          Fax: (615) 790-5626          Page: 49 of 51     07/29/2019 4:06 PM

## United States Bankruptcy Court
### Middle District of Tennessee

In re  **Fawn ▮▮▮ Fenton** _____     Case No. _____
                                            Debtor(s)          Chapter   **13**

# VERIFICATION OF CREDITOR MATRIX

The above-named Debtor hereby verifies that the attached list of creditors is true and correct to the best of his/her knowledge.

Date: **April 26, 2019** _____          **/s/ Fawn ▮▮ Fenton** _____
                                              **Fawn ▮▮ Fenton**
                                              Signature of Debtor

TNJudicial.org/c/a/jr0023.df    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC: 002 | Page 112 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-18, PageID.748    Filed 10/13/23    Page 8 of 57

FAWN  FENTON
BRENTWOOD TN 37027

MARY BETH AUSBROOKS
ROTHSCHILD & AUSBROOKS PLLC
1222 16TH AVENUE SOUTH, SUITE 12
NASHVILLE, TN 37212-2926

AMERICAN EXPRESS
ATTN: OFFICER MANAGER OR AGENT
PO BOX 981537
EL PASO TX 79998

ASCEND FEDERAL CREDIT UNION
ATTN: OFFICER MANAGER OR AGENT
PO BOX 1210
TULLAHOMA TN 37388

BANCORP SOUTH
ATTN: OFFICER MANAGER OR AGENT
914 MURFREESBORO ROAD
FRANKLIN TN 37067

BANK OF AMERICA
ATTN: OFFICER MANAGER OR AGENT
PO BOX 982238
EL PASO TX 79998

BANK OF AMERICA, NA
ATTN: OFFICER MANAGER OR AGENT
4909 SAVARESE CIRCLE
TAMPA FL 33634

CAPITAL ONE BANK USA NA
ATTN: OFFICER MANAGER OR AGENT
PO BOX 30281
SALT LAKE CITY UT 84130-0281

CHASE CARD
ATTN: OFFICER MANAGER OR AGENT
PO BOX 15298
WILMINGTON DE 19850

IRS INSOLVENCY
ATTN: OFFICER MANAGER OR AGENT
PO BOX 7346
PHILADELPHIA PA 19101-7346

IRS INSOLVENCY
801 BROADWAY ROOM 285
MDP 146
NASHVILLE TN 37203

TNJudicial Copy/clerk002.pdf    Case 1:23-cv-01097-PLM-RSK   Williamson County Chancery Court Tennessee (Trial Court Records)   ECF No. 1-10, PageID.749   Filed 10/13/23   DOC_002   Page 9 of   Page 113 of 719

57

TOYOTA MOTOR CREDIT CO.
ATTN OFFICER MANAGER OR AGENT
5005 N RIVER BLVD. NE
CEDAR RAPIDS IA 52411-6634

US ATTORNEY GENERAL
US DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVENUE
WASHINGTON DC 20530

████████████
C/O BROOKSIDE PROPERTIES, INC.
2002 RICHARD JONES ROAD, SUITE 200-C
NASHVILLE TN 37215

FILED
WILLIAMSON COUNTY
CLERK & MASTER

| **ORDER EXTENDING EX-PARTE/TEMPORARY ORDER OF PROTECTION** | Case No | 484196 |
| | Court | Chancery 2019 AUG -6 AM 11:33 |
| | County | Williamson Tennessee |
| | | FILED FOR ENTRY 8/13/19 |

**PETITIONER/PLAINTIFF**

| Fawn | T. | Fenton |
|------|------|------|
| First | Middle | Last |

**PETITIONER/PLAINTIFF IDENTIFIERS**

| 1/22/73 |
|---------|
| Date of Birth of Petitioner |

RECEIVED BY
Judges' Chambers
Date: 8-6-19 ah

**Minor Children Protected Under this Order:**

_____

_____

**V.**

| **RESPONDENT** | | | **RESPONDENT IDENTIFIERS** |
|---|---|---|---|

| Jeffrey Ryan Fenton | | SEX | 5'9 |
|---|---|---|---|
| First   Middle   Last | | M | 240 |
| Relationship to Petitioner Husband | | EYES | HAIR | Caucasian |
| Address & Phone No. 1956 Sunnyside Dr | | Blue | Black/Gray | |
| Brentwood TN 37027 | | | |
| Respondent's Employer Self employee | | Distinguishing Features: _____ |

It appearing to the Court that: (check all applicable)

☐ The Respondent was not served with the Ex Parte Order of Protection and law enforcement is requested to RE-ATTEMPT to serve the Respondent prior to the hearing date of _____.

☑ The parties have agreed to continue this matter to the 29th day of August 2019 at 9am o'clock ✓a.m./p.m. Failure of the Petitioner to appear on that date could result in the petition being dismissed. Likewise, failure of the Respondent to appear on that date could result in the granting of the Petitioner's petition. The parties have also agreed to extend the Ex Parte Order of Protection

3.21.19

107

until this hearing date. Respondent specifically waived the right to have a full hearing on the Ex Parte Order of Protection within fifteen days of issuance of the Ex Parte Order of Protection.

☑ It is necessary for the Court to consider the evidence presented during the hearing on the Ex Parte Order of Protection and the Ex Parte Order of Protection should be continued in full force and effect until the Court enters its final decision on the request for an Order of Protection. Said final decision on the request for an Order of Protection will be entered on or before _August 29,_____, 20_19_

☐ On the request and granting of the request of the Respondent to obtain counsel, the Ex Parte Order of Protection entered in this matter will remain in full force and effect until the hearing scheduled for the _____ day of _____ at ____ o'clock ___a.m./p.m. Respondent specifically waived the right to have a full hearing on the Ex Parte Order of Protection within fifteen days of issuance of the Ex Parte Order of Protection.

☑ Other: _Parties agreed in Open Court on 8/1/19 with Husband present and with counsel to leave the Exparte in full force + effect and to waive right to hearing._

**IT IS THEREFORE ORDERED** that the Ex Parte Order of Protection entered in this matter on the ____ day of _____, 20___ is extended and will remain in full force and effect until a hearing on the _29_ day of _August_____, 20 _19_ in the courtroom of the _Chancery_____ Court of _Williamson_ County, Tennessee.

**It is further ordered** that the clerk of court is to immediately serve the parties or their counsel and the _Williamson County Sheriffs DPT_ (law enforcement agency) with a stamp filed copy of this order and enter a certificate of service of the same.

Entered this _6th_ day of _August_____, 20 _19_

_[signature]_

**Judge**       Michael W. Binkley
Circuit Court Judge/Chancellor
21st Judicial District, Division III

3.21.19

108

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was forwarded via email to Charles M. Duke, Attorney for Husband, at marty@mdukelaw.com, and Mitchell Miller, Attorney for Husband, at mitchell@shafferlawfirmtn.com on this the 6th day of August, 2019.

VIRGINIA LEE STORY

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was forwarded via email to Charles M. Duke, Attorney for Husband, at marty@mdukelaw.com, and Mitchell Miller, Attorney for Husband, at mitchell@shafferlawfirmtn.com on this the 13 day of August, 2019.

CLERK

109

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

FAWN ████ FENTON,                      )
      Plaintiff/Wife,                  )
                                       )
vs.                                    )
                                       )
JEFFREY RYAN FENTON,                   )
      Defendant/Husband.               )

FILED
CLERK & MASTER
2019 AUG -6 AM 9: 22
FILED FOR ENTRY 8-14-19 nunc pro tunc 8-6-19
No. 48419B
RECEIVED BY
Judges' Chambers
Date: 8-6-19 es

## EX PARTE ORDER OF PROTECTION EXTENDED PENDING FINAL HEARING AND ORDER GRANTING MOTION TO SELL MARITAL RESIDENCE BY AUCTION

This matter came on to be heard on the 1st day of August, 2019, before the Honorable Michael W. Binkley, Judge holding Court for the Chancery Court of Williamson County, Tennessee, upon Motion to Sell the Marital Residence by Auction and upon Ex Parte Order of Protection. It appearing to the Court based upon arguments of counsel, exhibits introduced and the record as a whole that the following shall be the Order of this Court.

It is therefore **ORDERED, ADJUDGED and DECREED** that the parties have reached an agreement to extend the Ex Parte Order of Protection pending final hearing in this cause. Husband shall remain under the Ex Parte Order and is enjoined and restrained from contacting Wife any reason or from coming about her person. The Ex Parte Order of Protection shall remain in full force and effect and is extended pending further Orders of this Court and the hearing date is waived. Wife likewise is enjoined and restrained from contacting Husband for any reason or from coming about his person.

The Motion to Sell the Marital Residence by Auction is granted and the same shall be auctioned within 45 days from the date of August 1, 2019. Counsel for Husband and Wife will select a professional auctioneer as soon as possible so that the auctioneer can visit the property and market the sale in a fashion to obtain the best price possible for the home. The auctioneer shall prepare the property and market it for sale with the intent to obtain the highest sales price and most

1

110



**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Fawn** First Name | Fenton Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the:   **MIDDLE DISTRICT OF TENNESSEE**

Case number (if known) _____

☐ Check if this is an amended filing

## Official Form 107

## Statement of Financial Affairs for Individuals Filing for Bankruptcy          4/19

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:  Give Details About Your Marital Status and Where You Lived Before

1. **What is your current marital status?**

   ■ Married
   ☐ Not married

2. **During the last 3 years, have you lived anywhere other than where you live now?**

   ☐ No
   ■ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1 Prior Address: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|
| **1986 Sunny Side Drive Brentwood, TN 37027** | From-To: **May 2011 - April 2018** | ☐ Same as Debtor 1 | ☐ Same as Debtor 1 From-To: |

3. **Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

   ■ No
   ☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

### Part 2   Explain the Sources of Your Income

4. **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
   Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
   If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

   ☐ No
   ■ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income Check all that apply. | Gross income (before deductions and exclusions) | Sources of income Check all that apply. | Gross income (before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | ■ Wages, commissions, bonuses, tips | **$26,250.00** | ☐ Wages, commissions, bonuses, tips | |
| | ☐ Operating a business | | ☐ Operating a business | 8 7 |

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor 1 | Fawn ▮▮▮▮ Fenton | | | Case number (if known) | |

| | Debtor 1 Sources of Income Check all that apply. | Gross Income (before deductions and exclusions) | Debtor 2 Sources of Income Check all that apply. | Gross Income (before deductions and exclusions) |
|---|---|---|---|---|
| For last calendar year: (January 1 to December 31, 2018 ) | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | $93,108.00 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |
| For the calendar year before that: (January 1 to December 31, 2017 ) | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | $93,677.00 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |

**5. Did you receive any other income during this year or the two previous calendar years?**
Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

List each source and the gross income from each source separately. Do not include income that you listed in line 4

■ No
☐ Yes. Fill in the details.

| Debtor 1 Sources of Income Describe below. | Gross income from each source (before deductions and exclusions) | Debtor 2 Sources of Income Describe below. | Gross Income (before deductions and exclusions) |
|---|---|---|---|
| | | | |

---

**Part 3:** List Certain Payments You Made Before You Filed for Bankruptcy

**6. Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

☐ **No** Neither Debtor 1 nor Debtor 2 has primarily consumer debts. *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,825* or more?

  ☐ No. Go to line 7.
  ☐ Yes List below each creditor to whom you paid a total of $6,825* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.
  * Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.

■ **Yes** Debtor 1 or Debtor 2 or both have primarily consumer debts.
During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

  ☐ No. Go to line 7.
  ■ Yes List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for... |
|---|---|---|---|---|
| Toyota Motor Credit Co.<br>Attn Officer Manager or Agent<br>5005 N River Blvd. NE<br>Cedar Rapids, IA 52411-6634 | $300.00 Monthly Jan, Feb, March, April | $1,200.00 | $12,600.00 | ☐ Mortgage<br>■ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |

88

Case 3:19-bk-02693    Doc 1    Filed 04/26/19    Entered 04/26/19 13:28:31    Desc Main
Document    Page 32 of 50

Debtor 1  **Fawn Tiffany Fenton**                                    Case number *(if known)* _____

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| Bank of America, NA<br>Attn: Officer Manager or Agent<br>4909 Savarese Circle<br>Tampa, FL 33634 | $1,804.78<br>Jan, Feb, March,<br>April | $7,219.12 | $240,182.77 | ■ Mortgage<br>☐ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |
| BanCorp South<br>Attn: Officer Manager or Agent<br>914 Murfreesboro Road<br>Franklin, TN 37067 | Jan $263.56<br>Feb $275.01<br>March $275.01<br>April $275.01 | $1,088.59 | $53,967.42 | ■ Mortgage<br>☐ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |
| Chase Card<br>Attn: Officer Manager or Agent<br>PO Box 15298<br>Wilmington, DE 19850 | Jan $268.01<br>Feb, March<br>$100.00 each<br>April $429.10 | $897.11 | $0.00 | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |
| Ascend Federal Credit Union<br>Attn: Officer Manager or Agent<br>PO Box 1210<br>Tullahoma, TN 37388 | Jan $354.00<br>Feb $350.00<br>March $265.00<br>April $262.00 | $1,181.00 | $17,811.23 | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |
| Capital One Bank USA NA<br>Attn: Officer Manager or Agent<br>PO Box 30281<br>Salt Lake City, UT 84130-0281 | Jan $450.00<br>Feb $250.00<br>March $350.00 | $1,050.00 | $9,818.83 | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |

7  **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

☐  No

■  Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|
| Mark ▮▮▮▮<br>24176 Elrond Lane<br>Lake Forest, CA 92630 | March 17, 2018 | $5,659.80 | $0.00 | Loan repayment |

TNJudicial.Case.ID 23d-cv-01097-PLM-RSK Williamson County EC No. 13 Page ID 751 rt Reports Filed 10/13/23 DOC 0021 Page 97 of 719

From: Marty Duke     Fax: 16155411842     To:          Fax: (615) 790-5626          Page: 35 of 51     07/29/2019 4:06 PM

Debtor 1   Fawn ███ Fenton                                    Case number (if known) _____

8   Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?
    Include payments on debts guaranteed or cosigned by an insider

    ■ No
    □ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|

### Part 4:   Identify Legal Actions, Repossessions, and Foreclosures

9.  Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?
    List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

    □ No
    ■ Yes. Fill in the details.

| Case title Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| Fawn Fenton vs. Jeffrey Fenton | Divorce Proceeding | Williamson County Chancery Court Judicial Center 135 4th Avenue South Franklin, TN 37064 | □ Pending □ On appeal ■ Concluded |

10. Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied? Check all that apply and fill in the details below.

    ■ No. Go to line 11.
    □ Yes. Fill in the information below

| Creditor Name and Address | Describe the Property Explain what happened | Date | Value of the property |
|---|---|---|---|

11  Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?
    ■ No
    □ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?
    ■ No
    □ Yes

### Part 5:   List Certain Gifts and Contributions

13. Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?
    □ No
    ■ Yes. Fill in the details for each gift

| Gifts with a total value of more than $600 per person | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|
| Person to Whom You Gave the Gift and Address: Walden's Puddle Wildlife Rehab PO Box 641 Joelton, TN 37080 | $25.00 Monthly | 2016 - Present | $250.00 |
| Person's relationship to you: | | | |

Official Form 107          Statement of Financial Affairs for Individuals Filing for Bankruptcy          page 4
Software Copyright (c) 1996-2019 Best Case LLC - www.bestcase.com                    Best Case Bankruptcy

Case 3:19-bk-02693   Doc 1   Filed 04/26/19   Entered 04/26/19 13:28:31   Desc Main
                     Document   Page 34 of 50

90

favorable terms possible in the parties' best interests. This property shall not be advertised as a desperation sell and the parties will rely on the auctioneer's recommendation, whether an estate sale or other means of marketing, to obtain a fair market price. The auction will be without reserve. Husband is enjoined and restrained from interfering with preparation of the home for auction, the auction or stalling the sale in any manner, either directly or indirectly. The attorneys for the parties will agree upon a date and time for Wife to walk through the home, since Wife has not been in the house since March 2018, to identify items of personal property and to inspect the premises. Wife will provide a list to Husband within ten (10) days from August 1, 2019, through their counsel, of the items of personal property that she would like to obtain and the parties will either agree upon the same or, if they cannot agree, then Wife may file a Motion with the Court to choose the items on her list. Husband will take such actions as necessary to move items of personal property that he would like to retain and tag, price or do whatever steps are necessary to sell the remaining items of personal property. The remaining items at the house that Husband does not take and Wife does not take shall be sold at auction. The net proceeds of the sale of the real property and the personal property shall be deposited into the Chancery Court Clerk's office and placed in an interest-bearing account on behalf of the parties. If either party needs funds from the equity prior to the Final Hearing in this cause or Agreed Order, then he or she may file a Motion with the Court to receive a portion of the funds which will be allocated against their respective share of the marital estate. Husband will notify his tenants to vacate the home on or before August 30, 2019.

All other matters are reserved pending further Orders of this Court.

ENTERED on this _14th_ day of _August_, 2019, *NUNC PRO TUNC* _August 6, 2019_ (MB)

_____
**MICHAEL W. BINKLEY, JUDGE**

Michael W. Binkley
Circuit Court Judge/Chancellor
21st Judicial District, Division III

2

TNJudicial Cycle/arim 002.pdf — Williamson County Chancery Court Tennessee (Trial Court Records)
Case 3:23-cv-01097-PLM-RSK    ECF No. 18-3, PageID.759    Filed 10/13/23    DOC 002 | Page 119 of 719
of 57    Page 19

**APPROVED FOR ENTRY:**

**VIRGINIA LEE STORY; BPR #11700**
Attorney for Plaintiff/Wife
136 Fourth Avenue South
Franklin, TN 37064
(615) 790-1778
virginia@tnlaw.org

**CHARLES M. DUKE; BPR #23607**
Attorney for Defendant/Husband
LAW OFFICE OF CHARLES M. DUKE, LLC
1200 Villa Place, Suite 201
Nashville, TN 37212
(615) 541-1842
marty@mdukelaw.com

**MITCHELL MILLER; BPR #36126**
Attorney for Defendant/Husband
SCHAFER LAW FIRM, PLLC
1200 Villa Place, Suite 200
Nashville, TN 37212
(615) 712-6394
mitchell@schaferlawfirmtn.com

## CLERK'S CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing was sent by email and/or first-class
mail to Charles M. Duke and Mitchell Miller, Attorneys for Husband, and Virginia Lee Story,
Attorney for Wife, at their respective addresses, on this ____ day of August, 2019.

**CLERK**

3

· 112

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

FAWN ▊▊▊ FENTON,                    )
    Plaintiff/Wife,                 )
                         )
                         )
vs.                                 )        No. 48419B
                         )
JEFFREY RYAN FENTON,                )
    Defendant/Husband.              )

2019 AUG 15 AM 10: 44

FILED FOR ENTRY_____

### MOTION FOR VIOLATION OF THE EX PARTE ORDER OF PROTECTION AND FOR DATE CERTAIN FOR WALK THROUGH OF HOUSE
### AND
### MOTION FOR SCHEDULING ORDER

COMES NOW the Plaintiff, Fawn ▊▊▊ Fenton ("Wife"), by and through her attorney of record, Virginia Lee Story, and files the above-captioned Motion, and for grounds would show as follows:

1.      On August 14, 2019, an Order was entered extending the Ex Parte Order of Protection and a separate form Order for the Sheriff's Department entered on August 13, 2019. On August 3, 2019, Respondent, Husband, posted the attached Facebook message (see **Exhibit 1**).

2.      This post was in violation of the Ex Parte Order of Protection ("OP") and Wife would request that the OP be made permanent and that Husband be required to pay her attorney's fees for having to bring this Motion.

3.      The Court further Ordered, as part of the August 14, 2019 Temporary Order, that Husband allow a walk through for purposes of inspection. The parties through attorneys have agreed upon Pat Marlin, with McArthur-Sanders/HND Auctions, to list the property with the assistance of Tommy Anderson, Auctioneer. A proposed listing agreement was forwarded to counsel for Husband on August 12, 2019. A walk through was scheduled for August 14, 2019 at 2:30pm which date was provided by Husband.

1

113

TNJudicial.org/e/a/jrf002.pdf     Williamson County Chancery Court Tennessee (Trial Court Records)     DQS-002 | Page 121 of 719

Case 1:23-cv-01097-PLM-RSK     ECF No. 1-18, PageID.761     Filed 10/13/23     Page 21 of 57

4.     Husband stated that he wanted the "roommates doors to be locked and his office." Counsel for Wife responded that the date would work for the Auctioneer but that all rooms needed to be open so that the Realtor and Auctioneer could view and measure the square footage of the home but nothing would be touched. Per the Court Order, Wife has sent a list of the items that she would like from the house which is very limited. Husband did not respond on August 14, 2019 so that the walk through could take place despite Wife and the Auctioneer being in the area ready to pull into the home. Husband said in his email that he would provide the code for the door but he did not. The Auctioneer, Wife and her attorney were awaiting entry but there was no response from Husband. Wife would request that a date certain be set for the walk through and Husband be ordered to leave the residence and all doors open for a period of eight (8) hours so that Wife may remove the items on her list and do a walk through with the Auctioneer. Wife will have a witness present and record each item being removed from the home. Husband should be restrained and enjoined from interfering with the scheduled walk through and that he provide the code for entry into the home.

5.     Wife would also request a date certain for Husband to be vacated as he has stated that he is going to move to Michigan and await his proceeds.

6.     Wife would also request that an Order be entered allowing her to sign any necessary listing contracts or agreements to sell the home including closing documents on behalf of she and Husband as she cannot rely on Husband's compliance.

7.     Wife requests that she be granted attorney's fees in this cause to be paid from Husband's share of the proceeds as he has failed to abide by his agreement as well as the lawful Orders of this Court.

2

114

TNJudicial.org/e/afjrf002.pdf          Williamson County Chancery Court Tennessee (Trial Court Records)          DOS_002 | Page 122 of 719

Case 1:23-cv-01097-PLM-RSK          ECF No. 1-18, PageID.762          Filed 10/13/23          Page 22 of 57

8.  Husband's first counsel has withdrawn and now his second counsel seeks to withdraw which Motion is set for August 29, 2019. Because there were several deadlines in the August 14, 2019 Order and now that Husband may again be changing counsel, Wife would request that this matter be set for trial and that Mediation be waived due to the pending Order of Protection, and Wife is concerned for her safety and for the safety of those participating in the Mediation process.

9.  The parties have very limited assets, just what equity is in the house and to Wife's knowledge considerable credit card debt that Wife is repaying monthly through the Chapter 13 bankruptcy. Wife has just been given notice from her employer that her job will be ending as her employer is retiring and that she will not have a job or insurance as of November 1, 2019. See attached letter (**Exhibit 2**). Wife requests that Husband be Ordered to apply for marketplace insurance or other insurance through his employment as she will have no means of obtaining insurance for Husband after she is terminated. Wife would request that she be authorized to sign any necessary documents to proceed with the auction as Court Ordered.

10.  A Scheduling Order setting discovery deadlines and trial dates would be appropriate in this matter.

WHEREFORE, Wife would respectfully request that:

1.  The Order of Protection be made permanent and that Husband be required to pay her attorney's fees for having to bring this Motion.

2.  The Court set a date certain by which Husband will vacate the property so she can have access to the house for the purposes of complying with the Order.

3.  An Order be entered allowing Wife to sign any necessary listing contracts or agreements to sell the home including closing documents on behalf of she and Husband.

J J 5

4.      That Wife be granted attorney's fees in this cause to be paid from Husband's share of the proceeds for failing to abide by his agreement as well as the lawful Orders of this Court.

5.      That mediation be waived and a Scheduling Order be entered setting discovery deadlines and trial dates.

6.      Wife further requests that she be awarded a judgment for her attorney's fees incurred in this matter.

Respectfully submitted,

**VIRGINIA LEE STORY; BPR #11700**
Attorney for Plaintiff
136 Fourth Avenue South
Franklin, TN 37064
(615) 790-1778
virginia@tnlaw.org

*This Motion is expected to be heard on the 29th day of August, 2019 at 9:00 a.m.*
*If no written Response to this Motion is filed and served in a time set by*
*Local Rules of Practice, the Motion may be granted without a hearing.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was forwarded via email and/or first-class mail to Charles M. Duke, Attorney for Husband, at 1200 Villa Place, Suite 201, Nashville, TN 37212, and to Mitchell Miller, Attorney for Husband, at 1200 Villa Place, Suite 200, Nashville, TN 37212 on this the _15th_ day of August, 2019.

**VIRGINIA LEE STORY**

4



My HOME was declared on Thu... ✕ +

← C ⌂ 🔒 https://m.facebook.com/story.php?story_fbid=10217821886396076&id=1149862?688&ref=content_filter

← My HOME was declared on Thursday to be auctioned as an Estate Sale, along with everything that I've worked my life to own. So much for FAIRNESS in Tennessee, I will be long gone before the auction begins, to never a...

**Jeff Fenton**

My HOME was declared on Thursday to be auctioned as an Estate Sale, along with everything that I've worked my life to own

So much for FAIRNESS in Tennessee, I will be long gone before the auction begins, to never again set foot upon Tennessee soil, after 25 years with not so much as a traffic ticket.

This is what a woman can do to you, in Williamson County, with the tongue of vipers speaking horrendous lies!

The TRUTH will come out in the end, I PROMISE! Yet it will be too late to save my family of friends

They will be confused and distraught, with some probably even perishing, waiting for me to come home and care for them, yet never will I be allowed.

But no one shall injure me so cruelly without needing to answer for their sins!

Smile now, as the tidlewave approaches!

Your lies will never disempower the storm which you cast into furry.

👍 Like                                                                          💬 Comment

**Jeff Fenton**

The day of reckoning shall cost you more than ever your pride has dreamed!

I asked you a hundred times, to give me a boost up or be here with me. Yet you have leveraged everything in your life to hold me down.

God sees your sins, your prideful exaltation of self, your lack of care for your covenant, and a price unimaginable, as with other sins your heart was dead-set upon, is committed to harvest what it is owed, and in the end you will learn of your great folly, as I will never look upon you again. As you are but poison to my very being, regardless of what I once hoped that you were. The wrath of God is coming for us both. I hope you have your excuses recited, as he looks straight through them to the core of your polluted heart and mind. This is the END as never you have known it.

My heart would not now lift a finger to save your life. When before I offered all that I have for your profit. As you took it all, you filed suit to claim more than you were ever entitled or promised, due to your prideful greed and insatiable appetite for more than I could ever give you.

You cost me the best 25 years of my life, and leave me with nothing but your skillfully planned bankruptcy and your highly paid attornies, even though I was prepared to pay for your defaulted debt and future mortgage payments to keep my home, yet you would have no part in it!

You selfish brood of evil, it is not about money, but rather denying me what I want, cherish, and need the most.

Judgement day is coming.... first in Tennessee once I clear the state lines and all my proof of your misdeeds hits the national media, and again, as God curses the works of your hands!

You have been a very greedy girl, and soon the whole world will KNOW it!

5 hrs · Like · Reply · More

**Anne Thompson Fickel**

Jeff, I'm sorry for what you have been through. God sees you right where you are. Allow him to comfort you and be your refuge and strength. You are loved by the Father.

Like · Reply · More

tabbies'

here to search

12:09 PM
8/4/2019

EXHIBIT

FILED FOR EN

2019 AUG 15

10:44

 **Adkisson & Associates Architects, Inc.**


WILLIAMSON COUNTY
CLERK & MASTER

2019 AUG 15 AM 10: 44

FILED FOR ENTRY_____

August 14, 2019

To all the employees of Adkisson & Associates Architects, Inc. (the **"Firm"**)

I want to let everyone know that November 2nd of this year is my 65th birthday. As a result, I plan to begin downsizing the Firm so that I can significantly reduce overhead costs prior to the end of the corporate fiscal year end on December 31, 2019.

I want to give everyone ample time to secure other employment. I will continue to pay your salary and benefits up through November 15, 2019 so long as you are working full time at the Firm. If you secure new employment prior to November 15, 2019, I will provide you with two (2) weeks severance pay from the new employment start date, but said severance pay will not extend beyond November 15, 2019.

I greatly appreciate your good work over the past years and wish you well in your future endeavors.

With many thanks,

Kenneth C. Adkisson
President

· 118


**EXHIBIT**
2

3322 West End Avenue • Suite 103 • Nashville, Tennessee 37203 • (615) 298-9829 • Fax (615) 298-5122 • www.adkissonarchitects.com

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

FAWN ███ FENTON, )
    Plaintiff/Wife, )
       )
v. )
       )
JEFFREY RYAN FENTON, )
    Defendant/Husband. )

`FILED COURT`

2019 AUG 29 AM 9: 17

FILED FOR ENTRY
Docket No: 48419B

## HUSBAND'S RESPONSE AND COUNTERMOTION
## TO WIFE'S MOTION FOR VIOLATION OF THE
## EX PARTE ORDER OF PROTECTION AND FOR DATE CERTAIN FOR
## WALK THROUGH OF HOUSE AND MOTION FOR SCHEDULING
## ORDER

COMES NOW the Defendant/Husband, Jeffrey Ryan Fenton, for his response to the Wife's Motion, along with Husband's Countermotion, stating as follows:

First Husband would like to bring to the court's attention, the disabilities with which he has been diagnosed, and continues ongoing treatment for. If not properly understood, one could easily draw incorrect conclusions, specifically about Husband's communications, in how he speaks and even more so, his excessive use of words when writing. Please see Exhibit-A for a thorough explanation regarding this, from both Terry M. Huff (LCSW), Husband's Psychotherapist, and Dr. Richard E. Rochester (M.D.), Husband's Psychiatrist.

Husband suffers from the following handicaps:

Obsessive-Compulsive Personality Disorder (OCPD) DSM-5 301.4 (F60.5)

Generalized Anxiety Disorder (GAD) DSM-5 300.02 (F41.1)

Attention-Deficit Hyperactivity Disorder (ADHD) DSM-5 314.01 (F90.2)

1

119

Circadian Rhythm Sleep Disorder (CRSD) Non-24-Hour Sleep-Wake Disorder (Non-24)
DSM-5 307.45 (G47.24)

Special Note: Although "OCPD" (Obsessive-Compulsive Personality Disorder) sounds
very similar to "OCD", a disorder and acronym which are much more common, "OCPD"
is an entirely different disorder, with very little, if anything, in common with "OCD".
Please take a moment to discover the differences, as is well described, in Exhibit-A.

   1. The Facebook post is deeply regretted and was deleted as soon as Husband was
informed that it could be interpreted as a violation of the Temporary Order of Protection
(within a matter of hours). Wife was not named in the post, furthermore the post was only
to be found by searching the Husband's "Stories", not in the regular user "Feed". Wife
continued to search Husband's "Stories" even after requesting the Temporary Order of
Protection, based almost entirely upon fraudulent claims.

Still, Husband was wrong for venting on Facebook. Not only was the platform wrong, but
the words which Husband angrily spewed were also very wrong. Not just because of the
Temporary Order of Protection, but because they depicted God as Husband's little
"underling", who "blesses" and "curses" people upon his command. That's not who God
is. God is Love. Likewise, I shouldn't try to leverage any knowledge or belief in God, to
harm, hurt, distress, curse, anyone, ever! For that Mrs. Fenton, I am sincerely sorry, and I
ask that you please forgive me. I also ask for you to please remember, that despite what all
I may think that I know, or see, or find true, that your Father God loves you, and he is
NEVER going to curse the work of your hands or your heart. God will always love you
through the most warm, expectant, grateful, compassionate eyes, which you've ever

2

120

imagined. Though we may both do great wrongs within our lifetimes, God will never see that when he looks at you!

As for those who are shaken, scared, or concerned about Husband's extreme verbosity, grandiose language, searching, frustrated, angry, and at times even hostile WORDS, that is ALL that they are. They are not words which lead to something worse. There is no need to "read between the lines". Husband has no (or very, very little) "internal filter". If there is something on Husband's mind, then he says it, probably five times. So, if anyone is "adding to" Husband's words, fearing some greater storm ahead, they are fictitiously making-up a false narrative, as the words are the entire payload. They are the only thing that Husband has ever "threatened" anybody with.

In nearly 50 years, Husband has never been arrested for anything, ever. Husband hasn't even been cited with a traffic ticket, during his 25 years living in Tennessee. Prior to Wife's secretly planned divorce, which Husband was the last to learn about, "words" had usually been Husband's friend, and were often held in high-esteem by others, though you would never know it by looking at the wreckage of the past year and a half of Husband's life. There has been too much loss, too quickly, during too vulnerable of a season. With Husband's words, he is literally "fighting for his life". He has not a dollar, a home, a job, or a vocation to leverage in defense of himself. "Words" are all that Husband has (along with proof when there is time), and they just haven't been enough to survive this unforeseen, dedicated, non-relenting, course of mammoth unrecoverable loss.

121

Husband has never been physically aggressive. Husband can't remember getting into a "fist fight", in his entire life. To accuse Husband of physical violence, is not only inaccurate and unsubstantiated, but it is also harassing, abusive, and violent to Husband's character, which he takes very seriously.

Though you may be able to read Husband's words, with the intensity and ferocity which they sometimes bring, and interpret them to be suggesting or threatening any type of "physical violence", that is never what Husband is threatening or even suggesting. Husband's greatest threat, to anyone, is to lock himself inside his office for a week, while publishing painfully clear evidence online (if you can touch it, if you can feel it, if you can smell it) of the wrongs which someone else has leveraged to harm Husband. Regardless of what sort of "package" Husband comes "wrapped-in", the truth is on his side. For Husband cares not enough about what someone else thinks of him, to be pretentious. To be fake. To be egotistical. To be proud. Husband's top-two values in life are truth and authenticity. Citing, "To thine own self be true!"

To add context to the following two sentences, Husband is talking about a family of 8 racoons and a few opossums which he feeds at the marital residence's back door every night, with water kept outside for them year around. "Yet it will be too late to save my family of friends. They will be confused and distraught, with some probably even perishing, waiting for me to come home and care for them, yet never will I be allowed."

Husband and Wife are both critter lovers and gotten many hours of enjoyment from all the wildlife here at Sunnyside. We first had a groundhog who lived under our deck for four

4

122

years, with two or three litters of pups, who would wrestle and play on our rear deck daily. (The last groundhog left from those litters, died on the same day which I was served the Divorce Complaint and the Ex Parte Order of Protection, from Wife's counsel.) We had a really cute skunk for a while, along with probably a dozen different opossums, who have become what we call our "Yard Pets". Now three generations of raccoons are Husband's daily guests.

Every night, Husband and Wife (now just Husband), puts out a bowl of food (size depending upon the number of guests), calling the critters in for dinner, after which they typically arrive to eat within a matter of minutes. (One of the things which Husband will miss the most.) With the marital residence backed-up to a massive hill, where Husband and Wife own to the very top, with hundreds of acres of undeveloped woods behind it, Husband and Wife purposely built a 3-sided fence around their backyard, so to keep neighbors and their pets out (to protect our wildlife), while leaving the back of the property unfenced, so that wildlife can freely come and go. Furthermore, over the past decade, Husband has hauled all the brush and branches from tree trimming and clearing, up into the woods, creating two massive brush piles, for the critters to live in, find shelter, and thrive. This area is full of life and was one of the truly unique attributes of this property, which Husband and Wife shall never be able to replace.

The marital residence is located in a deep and narrow valley. Across the street, the homes all backup to "Owl's Hill Nature Sanctuary", so that our valley is surrounded on all sides by hundreds of acres of protected woodlands, while being centrally located between downtown Franklin, downtown Brentwood, Green Hills, Belle Meade, and Bellevue, with

5

- - - 123

a direct path into the West side of Nashville via Hillsboro Road, where some of the most highly paid vocations exists. The neighborhood has the peaceful atmosphere of a campground or park, yet it is as close to the city as you can get, while living in such serene surrounds, for anywhere near the price-point of the marital residence. Husband and Wife expect that as Nashville continues to develop, that this property will double and maybe triple in value within their lifetimes. This home was their retirement plan, in addition to eventually starting a small architecture business from home, in another 15 years, once they are at retirement age, with Wife being the Architect, and Husband handling all the marketing, bookkeeping, and learning to draft, to assist Wife. This was their entire "retirement plan", being as all their "retirement savings", was entirely invested into the purchase and improvements of this property. Complimented by the home being scheduled to be fully paid-off within those 15 years, so that part-time employment from home would comfortably support them both, while living in paradise, the nicest residence and neighborhood which Husband and Wife had ever lived, and likely ever will.

Regretfully with this divorce, plus the massive added loss from selling the marital residence, home, before it appreciates beyond all which they've invested in it, Husband will never be able to realistically "retire". In addition to having no savings, while having a large pile of debt in his name, with no technical skills qualified to employ husband with even a mediocre income, and not enough "working years" remaining for Husband to ever advance enough in any professional field, or to accrue any meaningful savings, with which to fund any sort of "retirement". Additionally, since Husband has not held a W-2 job paying Social Security in over a decade, Husband will have extremely little Social Security

124

to even look forward to, a massively disadvantaged future from any which Wife shall be privileged to enjoy. Some of Wife's family is also very wealthy, so Wife stands to inherit enough money to independently fund her retirement, while Husband has no such fortune to look forward to.

So the marital residence, rich in value to both Husband and Wife, for not only the fantastic location and expected appreciation, but also because of being land-locked by huge protected lands, in the most wealthy and vocationally prosperous county, as well as arguably the best section of that county, intended to vocationally and economically benefit Husband and Wife for the remainder of their lives.

The loss of the marital residence, is not only the loss of a couple hundred-thousand dollars, to a family who can't sustain such a massive loss without pushing them both into bankruptcy, but it is also the loss of over half a million dollars of future value and opportunities, the loss of the only chance which Husband will ever have at "retirement", while currently almost 50 years old, and the loss of a standard of living which Husband will never be able to obtain half of again, within his lifetime.

If you wonder why Husband has been reluctant to sell his Home, it is not only the totality of all that he has worked for and accomplished in life, but it is also the only vehicle by which Husband could have leveraged to obtain anywhere near the same standard of living, to that which the Husband and Wife were privileged to enjoy together.

This divorce, along with the loss of the marital residence, considering Husband's disabilities and the vocational challenges which he will face for the rest of his life, is

essentially the loss of Husband's life as he has known it, and worked all his life to obtain and sustain. Husband has deeply grieved the loss of Wife and their family of furry "children" (a dog, two bunnies, multiple aquariums). Husband has also deeply grieved the loss of their marital residence, along with the tremendous value which it represented. Most of all, Husband has grieved the loss of his life, as ever he has known it, with this mammoth and catastrophic economic loss, which there is no plausible way for Husband to fully recover from, within the remainder of his lifetime. Now Husband will need to live in the basement of his mother's small two-bedroom, one bath, home, for a season. Located in a small town in Michigan (near "Flint"), over an hour away from industries and vocational opportunities, equal to probably a quarter of the vocational opportunities, currently within 10 miles of Husband's home. In taking away his residence, Wife and the courts which Wife "gamed" and leveraged to oust Husband, have doomed Husband to a lifestyle ¼ of that which he has enjoyed over the past decade, and less than half that which Husband had 15 years ago, prior to meeting Wife.

While the court may deem Husbands rigidness in selling his home and his future to be unreasonable, Husband was literally "fighting for his life", with ultimately no say or control over the fate which Wife unilaterally forced upon him. Wife admitted knowing that this would realistically be a loss which Husband would never be able to recover from (even crying and apologizing), but regretfully Wife justified that Husband was an "acceptable loss" to regain her "independence". Demanding her "freedom" to enjoy the fruits of her vocational achievements, which have only been accessible to Wife and obtained because of the significant contributions (not mentioned herein) which Husband truly made to

8

126

Wife's licensing as an Architect, and the advancement of her career. While Wife will now temporarily seek to become "under-employed", at 50% - 75% of her current earning potential, helping to justify her bankruptcy, while alleviating much of the obligation to pay Husband alimony, under the guise of mental trauma and physical illness, which she erroneously attributes to Husband.

Really, Wife has managed narcolepsy successfully for well over a decade, and while early and extreme menopause has certainly taxed Wife physically for the past five years or so (which Husband largely blames for Wife's shift in allegiances to her family, ultimately pressuring Wife to divorce Husband), along with the mental stress of choosing to gamble so much money/debt/retirement, to oust Husband, while Wife has seriously compromised her integrity, committing fraudulent, unethical, and criminal acts, which she persists in, including perjury at both the State and Federal levels. This brings with it the risks of not only incarceration for Wife but could potentially result in the loss of her license as an Architect, for such blatant ethics violations. Husband believes that by Wife adamantly refusing any sort of "fair" divorce settlement, preferring rather to physically, mentally, and financially sabotage and destroy herself, forcing the loss of all their marital assets, that Wife is essentially giving herself "Chronic Fatigue Syndrome" in the process, by her absolute unwillingness to compromise at ALL costs.

Husband believes, based upon conversations with Wife, both oral and in writing, that Wife has been planning this since the end of 2018, knowing that her boss was soon planning to retire, while anticipating her Federal Income Taxes to increase to $31k per year post-divorce, under the new tax laws which went into effect at the start of 2019. Filing signally,

9

· · · 127

living in an apartment, while refusing all tax-wise options which Husband has fervently presented to Wife, as both an incentive and reward, to encourage Wife to continue to grow her career. Which is why Husband believes that Wife refused to sign any agreement with Husband, committing to the 50/50 equity split from selling the marital residence, combined with the $1,750 per month in "transitional" alimony, which the couple had verbally agreed to, for a duration of 6 years. This verbal agreement (also communicated via email) was a condition to the "Non-Suit", which they filed to sell their home outside the oversight of the courts, with Husband temporarily moving to Michigan. Since Wife repeatedly refused to "put her own words into writing", to secure Husband's equity split and their alimony agreement, Husband refused to relinquish possession of the marital residence, which had been his only "leverage" since wife abandoned him, because both mortgages were in Wife's name.

As shown in a text message from Wife, on December 22nd, 2018 (Exhibit-B), Wife stated to Husband as follows:

"Correct, my tax situation is going to suck for a very long time… 90k gross – 31k taxes – 21k alimony = 38k net. Plus or minus."

Wife went on to say:

"Someday when alimony is done, I **can** get a job making only $43k gross and have the same net of +/- $38k." (Emphasis added to point out that apparently the lower income is Wife's preference.)

10

128

TNJudicial.org/plaintiff002.pdf          Williamson County Chancery Court Tennessee (Trial Court Records)          DOC.002 Page 136 of 719

Case 1:28-cv-01097-PLM-RSK          ECF No. 18, PageID.776          Filed 10/13/23          Page 36 of 57

Husband already had concerns, but as a result of this conversation via SMS, Husband became convinced that Wife planned to down-size her career, to reduce both her alimony and her income taxes, once her boss retired within the following year. Husband further became convinced, that this was Wife's compelling reason for refusing to sign the previously agreed upon terms of their verbal settlement agreement, to Non-Suit and sell the marital residence outside the courts. Husband was rightfully concerned, that had he gone to Michigan without a written agreement signed, that wife would have "stiffed" him, once the marital residence sold, knowing that Husband could not afford to pursue an out-of-state lawsuit against Wife, for alimony, nor could Husband afford to move back to Nashville, without alimony, after Husband surrendered possession of his home.

Several months later, in a face to face conversation with Wife, Wife admitted that she didn't sign the agreement, because she wasn't sure that she could afford the agreed alimony, speaking of seriously downsizing her occupation after her firm closed, stating that she is even considering seeking part-time employment, instead of her fulltime job.

This was when Husband knew that he could not rely on alimony to help rebuild his life, so Husband decided that his best chance at not losing literally everything, was by trying to keep the marital residence. First Husband planned to obtain roommates, to leverage the wasted space currently in the 2,500 square foot home, while also meeting both Husband and Wife's negative monthly cashflow (Wife claimed to have a negative cashflow of $400 - $500 monthly). After obtaining roommates, with Husband's total rents equaling $1,400 per month, Husband gave Wife the financial benefit of approximately $900 of those rents, per month. Which should have lifted Wife out of the red, with a positive monthly cashflow

11

129

of $400 - $500. This is why Husband believes that Wife needed to accept a voluntary pay cut with her employer, to prepare Wife to meet the financial qualifications for filing Chapter-13 bankruptcy.

Shortly after Husband discovered that Wife had filed bankruptcy, Husband was served with both the Ex Parte Order of Protection, and Divorce papers once again, after Wife had assured Husband, that she was done "wasting" her money on lawyers for a "contested divorce". Husband had been emailing Wife extensively, to ensure that she was keeping up the mortgage payments on their home, which Wife simply refused to answer or reply to. Since the home has Husband's life invested into it, keeping the mortgages current was critical to Husband, but he no longer had access to the mortgage information, being in Wife's name, since she had changed the account credentials to lock Husband out.

Despite how many times Husband asked Wife about the status of the mortgages, and even if Wife choose to "keep" the home in her bankruptcy (elected by one checkbox on the bankruptcy forms), both which Wife refused to answer. Then to make matters worse, the frequency of those very emails, in comparison with how frequently Wife chose to reply, was used by Wife and her counsel, as substantiation for requesting an Order of Protection for Wife. Although those emails contained urgent concerns regarding the possibility (and now a forced reality) of Husband losing literally everything, those emails did not contain anything malicious, and certainly not anything threatening, by any means. Yet Husband's counsel chose not to take the matter to trial, but rather to settle for maintaining the Ex Parte Order of Protection, throughout the duration of the divorce.

12

- - - 130

Husband understood that the Ex Parte Order of Protection prevented Husband from pursuing Wife, entering her world, or interfering with her life in any way. What Husband absolutely did not understand, was that this Ex Parte Order of Protection still allowed for Wife to enter Husbands world, interrupting the sanctity, privacy, and enjoyment of his home, legally forcing Husband and his roommates to vacate their home for hours at a time, under the threat of incarceration, should Husband refuse to comply.

This, combined by the instant loss of his home, per court order, absolutely pushed Husband over the edge, leading to Husband lashing out inappropriately on Facebook, after days of physical and emotional exhaustion, compounded by the stress of accruing a massive financial debt to his mother for legal fees, without even reaching the stating gate for his divorce. At that point, accruing more debt to maintain legal counsel, no longer made fiscal sense for Husband, especially in light of the fact that his home, which was the Husband's only meaningful asset, had already been ordered by the court to be auctioned in 45-days, with no minimum.

Since wife has preemptively filed for bankruptcy, substantially less financial relief is expected to be obtainable from her. Despite Wife's role as the family's primary breadwinner for over a decade, compounded by the financial promises which Wife had made to Husband, in order to convince him to assume most of the family's unsecure debts (years prior), and the breadth of financial and legal bullying" which Wife had engaged in against Husband, while using both illegal and unethical tactics to undermine the equity in their home without Husband even knowing. Both by accruing "marital debt" on her credit cards, to support two residences, after Wife abandoned Husband, with a poorly planned

13

131

budget, which could never cash-flow, as Husband immediately pointed out to Wife. Unfortunately, Wife insisted that she was smarter than Husband and "would figure it out".

Having managed the couple's finances for over 13 years, Husband knew beyond any doubt that the couple could not afford two Brentwood residences. They simply didn't have enough income to support or justify such a brash and irresponsible decision. The evidence of which now is Wife having been substantially fined by the IRS, after her first-time filing taxes for the family, while again aggressively refusing Husband's assistance.

Wife even fraudulently filed the couples 2018 joint tax return, without Husband's knowledge or consent. While she changed the marital address from the family's home to her apartment, changing the phone on file to her own, and scheduling the automatic refund to be deposited directly into her personal and now private bank account, without so much as notifying Husband. This demonstrates the extent to which Wife has been on a power-trip beyond anything that Husband had previously seen in her, as she continued to financially and legally "bully", dominate, and oppress Husband, throughout Wife's crusade to "cut-off every limb" to simply discard Husband, without offering Husband any post-divorce support or assistance of any sort.

At one-point Husband asked Wife:

"Is there anything that I can do to help you, besides die?"

To which wife honestly answered:

"No."

14

··· 132

Later on, in a text message, Wife told Husband:

"You won't do anything for me, you won't let me be free."

As bad as Husband felt, still he was trapped inside a home which he could neither afford to keep nor to leave, as wife constantly "ripped the carpet out from under his feet". While denying Husband any opportunity to establish some basis of stability, without needing to rely upon Wife. That was one of the primary objectives for Husband obtaining roommates. Since most of the money went to benefit Wife anyways, Husband did not obtain roommates, choosing to share his living space with random strangers, simply for the immediate benefit.

Rather Husband was attempting to build a foundation which would be sustainable as Husband tried to obtain the vocational training and future job which would allow him to finally "free" Wife without the exorbitant need for alimony.

Husband's goal was simply to provide Wife with as much financial relief as he possibly could afford, putting off other financial commitments such as repaying his mother, and continuing to increase that relief as rapidly and substantially as possible. Hoping to gain back his financial independence, prior to Wife self-destructing, setting Husband back more than he could ever realistically recover from. Having shared that strategy with Wife (thinking it would appeal to her), Wife intentionally filed bankruptcy, before and to deny Husband of the opportunity to succeed in his declared agenda; to help save them both from financial ruins.

15

Utilizing a highly-strategic, extensively planned, fraudulent, focused, devoted, and relentless attempt to "discard" Husband without paying the alimony which Husband was legally due, as well as realistically needs, to have any chance at independently sustaining himself again, with even a fraction of the standard of living which he possessed 15-20 years ago. Husband believes that paying alimony is Wife's greatest fear, both due to her economic loss while doing so, without the beneficial tax advantages it included prior to 2019, compounded and exceeded by Wife's fear of her "losing face" with her elite, over-achieving, prosperous, snobbish, condescending, and judgmental family. (EXHIBIT-Z)

Husband believes that Wife's current philosophy is, that she can destroy herself, be burned to ashes, and still recover quicker, than she could if she agreed to pay Husband alimony fairly. Alimony could last for 6 or 7 years, while only providing Wife with enough income remaining to sustain the rest of her debt, after which she would still need to slowly pay it down. By self-sabotaging her career for a season, Wife has chosen to file bankruptcy, which will have all her debts legally satisfied in 3-5 years, while avoiding the expense of ever needing to pay Husband any substantial alimony. Although a complete betrayal of Husband (again), while further harming his chances at recovery, self-sabotaging and filing for Chapter-13 bankruptcy, as Wife has done, is literally the quickest path for Wife to financially recover. It will literally lead to at least a 50% quicker financial recovery time for Wife, than meeting her financial obligations to Husband and her creditors.

Meanwhile Husband is without, unqualified for, and possibly incapable of obtaining and maintaining gainful employment, a home again where he can both feel safe from storms (a serious phobia associated with Husband's GAD (Generalized Anxiety Disorder), where

16

134

Husband previously built a 40,000 pound, highly sophisticated storm-shelter in the basement of his Duplex, prior to meeting Wife. While Husband also feels safe in their current marital residence, since the home has a massive South-West facing hill, the direction which most severe weather comes from, following the jet-stream (this was a serious consideration in originally purchasing the home). Nestled within a tiny valley, which effectively makes the entire home, the safest place in which Husband has ever lived, which he has enjoyed without concerns about the weather, since it rarely impacts the home. Due to the natural shelter provided by the home's precise geographic location. (Previously, weather was a daily fear for Husband, affecting every facet of his life.)

To punctuate how critical this was, Husband and Wife would not have literally purchased a house on the opposite side of their street, since the South-West facing hill was so critical to Husband, in order to willingly forfeit the security and peaceful assurance, provided by his comfortable, customized, extremely robust storm shelter, which Husband had built inside his Duplex, prior to meeting Wife.

Now in addition to Husband losing the value of his home, Husband also lacks anywhere affordable to live, without Husband being physically forced to liquidate or discard the majority of his personal property, which is bulky, not of much value to others, but extremely important to Husband. So, Husband shall loose on every level, walking away from this marriage with less than he had 20 years ago. Crippled financially, materialistically, vocationally, and credit wise. Along with the increased physical and mental challenges, which typically increase with age, pushing the goal of recovery with a

17

TNJudicial.Org/a/ir1002.pdf   Case 1:23-cv-01097-PLM-RSK   Williamson County Chancery Court Tennessee (Trial Court Records)   ECF No. 13, PageID.783   Filed 10/13/23   DOC 002 Page 143 of 719   Page 43

of 57

fraction of the standard of living previously enjoyed (both prior to meeting Wife, and since) further out of Husband's reach.

Husband is repentant for that which he has done wrong, more than most people will ever understand. Husband understands that without his complicity and misplaced trust, he could have never found himself in such a dire state. Yet there is something much greater being done "wrong" here to Husband, than by Husband. As Wife leverages the law, along with her violent character assignations of Husband, with a fraudulent narrative, the uncommon minority stereotypes, media hype, and social anxieties. While gaining sympathy playing the victim, exploiting common misperceptions about the "weaker" more "fragile", "innocent" and "needy" gender. That is certainly the story which Husband believes that Wife would like the court to believe; however, that's not what Husband believes that the evidence here shows.

> a   Husband was sleep deprived, distraught, and overwhelmed after court on August 1st, when Husband learned that he is losing his home, which holds his entire life's savings, all his retirement, and nearly a decade of work, by the aggressive, unfair, harassing, demeaning, strategically planned, multi-faceted legal assault by Wife and her counsel. Wife's main objective is to not pay Husband alimony, at ALL costs. Even at the expense of destroying herself; her career, her health, and her life. (Claim will be backed with significant documentation.) Especially after the 2019 tax reform laws, where alimony is no longer tax deductible for the advantaged

18

136

party. Even though Wife has been the primary breadwinner for the past 12 years of their marriage.

    b   Wife has been "bullying" Husband, both financially and legally, with false claims. Wife's first divorce complaint stated that Husband is crazy, but highly skilled and employable, a complete contradiction of claims. Now Wife's narrative is that Husband is dangerous, while being highly employable since he is a "genius" with computers.

        i   Husband has been tested to have an IQ of 100, which is as perfectly "average" as they come.

        ii   Husband is not a "genius" at anything, especially related to any specific vocation, as he has spent his lifetime diluting his vocational value to any one discipline, by migrating from trade to trade, primarily determined by supply and demand, rather than passions, interests, and aptitude, which has been Wife's privileged vocational history. Prior to marriage, without any higher education, Husband has always been a blue-collar worker, often working two and sometimes three jobs simultaneously, simply to support himself with a comfortable but much, much lower standard of living, than the couple had together.

    c   Wife claims that Husband refuses to work.

*137*

i   That claim couldn't be more of a lie. Husband works constantly to try to meet every need of the family, to contribute "his share", and to (impossibly) please Wife. Husband has never been lazy, nor even accused of such. Wife complains now, accusing Husband of refusing to have a job outside their home, because it adds leverage to her divorce complaint, based upon conventional roles and social expectations.



20

· 138

███████████████████████████

    iii  Wife repeatedly assured Husband, that as long as the two could live on her income, without accruing a negative cash-flow, increasing their debt, that Wife was absolutely content in living their entire lives on primarily Wife's income, in order to have Husband manage and take care of every other major need for the family, and to be at her beckon call. Wife affectionately called Husband her "House Husband", both publicly and in private.

    iv  Wife also liked having Husband constantly at home, to care for, meet any emergency needs for, and provide company to the family's pets. Wife is a very abnormal pet lover, beyond any common conventional belief structure, and would sacrifice anything to ensure the happiness of the family's pets.

  d  Wife claims that Husband refused to sell their marital residence, despite the dire financial condition which Wife was in. That Husband was a constant obstructionist regarding the sale of their home.

    i  Though the home is a once in a lifetime opportunity for Husband and Wife, originally cherished by both, holding almost their entire net worth, which Husband had not only invested all

21

139

TNJudicial.org/s/a/jrf002.pdf     Williamson County Chancery Court Tennessee (Trial Court Records)     DOC.002 1 Page 147 of 719

Case 1:23-cv-01097-PLM-RSK     ECF No. 1-18, PageID.787     Filed 10/13/23     Page 47 of 57

of his wealth into, but also his daily labor maintaining and improving the property for nearly a decade.

ii Recognizing the realistic alternatives while trying to determine how to rebuild his life, there were many times, frequently for several months, within the past year and a half, when Husband was not only willing to sell the marital residence, but Husband even offered to freely surrender his equity to Wife twice, with the sole condition that Wife live in the home and enjoy it for five years, before selling it, simply to profit from cashing-out and keeping both of their equity.

iii In all the above-mentioned instances, for one reason or another, often without Wife even providing an explanation or a response why, Wife chose not to perform, hence keeping our joint ownership in our home.

iv The urgent financial need has been fabricated by Wife, and Wife has refused to put the primary terms of her own verbal settlement agreement with Husband, on paper. Resulting in at least as much delay in selling the home as Husband has caused.

e With Wife possessing a degree from MIT, and being a licensed architect, with a $94k per year gross income, which is actually an income of $116.5k per year with her employer provided benefits included (while

22

TNJudicial Ogrdersuijn02023 8df   Williamson County Chancery Court Tennessee (Trial Court Records)   DOS 002 | Page 148 of 719

Case 3:23-cv-01097-PLM-RSK   ECF No. 1-13, PageID.788   Filed 10/13/23   Page 48 of 57

Husband was a high-school drop-out and has never made over $50k per annum), neither of which would have been possible without Husband's support, it was jointly determined, very early in the marriage, that Wife's time is best leveraged earning income, while Husband's time is best leveraged making said income work hard and efficiently for our family, while filling every other crack in our lives. Husband managed, customized, and cared for our homes and their properties. Husband managed our finances, managed our taxes, managed a rental property for most of the marriage (Duplex), which Husband previously owned. Husband also ran several small businesses, from being a Residential Real Estate Agent, to opening a small marketing firm, building websites, performing IT work both locally and remotely, while managing and maintaining most of the Tech needs of Wife's architectural firm, for many years.

f   Husband is completely self-taught in the area of computers and technology, without any licensing or certification, and having never worked for any company in that capacity, except for his own tiny start-up, which almost completely serviced Wife's employer. Similarly, Husband's "jack of all trades and master of none" career path, has diluted his value in any one specific discipline.

g   Prior to the marriage, Husband worked blue-collar jobs all his life. The most recent of which was running multi-million-dollar printing presses, for Atlantic Envelope Company, with the global FedEx contract for

23

141

manufacturing their Tyvek envelopes. Husband was one of the top-three "Lead Pressmen", in both skill and wages, within his manufacturing plant. This was a good job, with good benefits, including an hourly rate of $24 per hour at its best, but there was a hard ceiling at that point with no room to grow, advance, explore, or excel.

h    Husband's employment with Atlantic Envelope Company ended shortly after the marriage, after Wife obtained her Architect's License with Husband's help. Wife encouraged Husband to pursue a career in Real Estate, which excited us both for a while, as we explored the intersection between Architecture and Real Estate, taking on a "flip", rehabbing it literally from the ground-up, and selling it, while we studied other investment models and properties. In the end, both Husband and Wife found Real Estate to be stressful, unreliable, and generally disappointing. Through an aptitude test in counseling, both learned that Husband is "wired" more toward the technical professions, instead of what are primarily "people centric" occupations.

i    Husband regretted leaving Atlantic Envelope Company for several years, since it was the best money and "fit" which he had found so far. Husband only feels good about a job, when he is seasoned, proven, and can out-perform most of his co-workers. Husband has always found his security in his skills, never before in his relationships.

24

142

j   Within a few years, Atlantic Envelope Company was sold a couple of times, then they went bankrupt. The Nashville plant was closed, and finally the entire company went out of business. The same has been the case for CPS in Franklin, where Husband previously worked as an "Assistant Pressman". Along with nearly every manufacturing printing company in town. Printing, once the second largest industry by volume, in the Greater Nashville Area, probably isn't within the top 100 today. The industry is simply gone, largely due to home computers and overseas manufacturing.

k   Husband needs vocational rehabilitation, in order to focus training on a specific tech discipline, to grow his skills, value, and to earn a certificate or license in an area which has the capacity to earn what Husband made prior to the marriage, over twelve years ago. Husband's only IT "reference" currently, would be Wife and Wife's employer. Neither of which are willing to lend their endorsement, despite Husband's excellent performance in serving their firm, in different roles for over a decade. While simultaneously saving them a small fortune, compared to industry-standard rates.

2. Agreed, in hindsight, this was a violation of the Ex Parte Order of Protection ("OP"). However, as evidenced by the documentation to follow, showing that Wife has manipulated and taken advantage of Husband, as well as the legal system, while extorting every bit of value from Husband's life, finally to discard him as a piece of trash without any responsibility or care. Wife blatantly lied to this court, to pretend to feel "physically

25

143

threatened", when Wife knows clearly that "words" are Husband's "weapon of choice". Actually, words are really what Wife fears the most from Husband, not in the toxic or abusive sense like she is portraying and you would expect (we rarely even communicate anymore), rather Wife fears Husband publishing evidence online, showing Wife's unethical, senseless, careless, and even criminal activities. Some of which Husband must now share here today, in order to have any chance at a fair trial, after the exhaustive amount of false and fraudulent narrative which Wife and her counsel have repeatedly attacked Husband with now (4x), before Husband even had the opportunity to file an "Answer and Counter Complaint for Divorce". Despite the false narrative presented by Wife and counsel to date, Husband continually wrestled with his first Attorney to file the "Answer and Counter", ultimately bringing about his "change in counsel", at Husband's choice.

      a  Wife's real reason for wanting an Order of Protection, was to use as a GAG order, preventing Husband from notifying the public online, or through local media, the scam which Wife is getting away with, legally and financially dominating Husband and then dumping him here, while self-sabotaging and lying about assets to qualify for bankruptcy, simply to exhaust any financial relief Husband is due, both during the interim, as well as after the divorce, by way of alimony.

      b  Through "Collaborative Divorce" with Sandy Arons, Husband and Wife learned that husband should be legally due between 22% - 24% of Wife's gross income, for approximately half the term of our marriage, which is about 6.5 years.

26

144

   c  In real numbers, during negotiations, that worked out to be between $2k - $2.2k in alimony, per month, for a period of 6 years (at that time). Even after Husband and Wife decided to do a "Non-Suit" to sell our home outside court, it was with the verbal agreement for the parties to split the proceeds from the sale 50/50, less only the first and second mortgages. Followed by Wife paying Husband transitional alimony, in the amount of $1,750 per month, for a duration of 6 years.

   d  The agreement was that after the marital residence was sold outside of court, each party would be responsible for the debts in their own name (hence the reason for doing this outside of court), each taking our 50% of the net sale proceeds, to do whatever we choose with it. Then, claiming to no longer have any "marital property" or "marital debt", we would file a FREE divorce using the forms provided online by the State of Tennessee. After which Husband would continue to receive the $1,750 per month (as transitional alimony, which can't be modified), for 6 years, as he sought vocational training, and began his whole life over at 50 years old.

   e  The only reason why Husband and Wife never proceeded with the plan to sell our home as agreed, is because Wife absolutely refused to put our agreement into writing. Though confirmed via email, Wife knew that her employer was planning to retire within the next year, so she expected the firm to close, and Wife wants to get a "fun" job now, or to only work "part-time", as she has since finally admitted.

27

145

f   The Chapter-13 bankruptcy forced husband out of the house, with
no prior warning about the default. Wife refused Husband's questions about
their mortgage status, as he saw most of this coming, except for Wife's own
bankruptcy, that was a surprise, but brilliantly cruel! While husband
suspects those mortgage payments were funneled to pay for Wife's legal
fees, both for her bankruptcy and the divorce, with Wife's current counsel.



28

146



i   Husband and Wife had promised each other that we were going to live in this home, on Sunnyside, for the rest of our lives. Everyday that's what Husband worked for... Forever! 60% of everything Husband did, wasn't for the benefit of that day, week, month, or even year... but to make a nice home for us forever! Without which, neither of us could have ever afforded to purchase a comparable home in this zip code. Husband would get to continue to work from home or be a "House Husband" as Wife affectionately called him (almost daily). Anything which Husband asked about around the House, Wife would make a snappy comeback with, "that's your job!" Husband's job never ended, and it was eventually discovered that once menopause started early (about 5 years ago), that Wife was absolutely impossible to please!

j   Keep in mind, that Husband contributed about 60% of our start-up capital, toward the down payment, and nearly $100k in renovations the first

29

147

TNJudicial.org/c/c/def/002.pdf — Williamson County Chancery Court Tennessee (Trial Court Records) — DOC.002 | Page 155 of 719

Case 3:23-cv-01097-PLM-RSK    ECF No. 1-18, PageID.795    Filed 10/13/23    Page 55 of 57

year we purchased our home. Both Husband and Wife cashed out all Roth IRA retirement funds, to invest into the down payment, as soon as the funds recovered 75% of their value prior to the 2008 housing market crash. So, with a purchase price of $350k in 2011, plus around $100k in renovations that first year alone, we were at around $450k during the start of 2012, then Husband sowed seven more years of work into improving our home, forever!

k  During this time, Wife invested her life/time into increasing her professional value as an Architect. (Something which no-one can ever take away from her.) Meanwhile, Husband invested his life/time into customizing and maintaining our home forever, to enjoy and benefit from (he believed), for the rest of our lives. Which was abruptly taken away by Wife's scams, financial and legal coercion, and the court ruling an absolute auction with no minimums, including all of Husband's personal property, if he can't move it out quickly enough. As Husband simultaneously needs to spend days and weeks endlessly trying to learn how to legally survive Wife's constant legal harassment.

l  As verified by the attached exhibits, the fraudulent narrative, and the motions and petitions filed by Wife hence far, Husband respectfully asks the court for relief, under the legislation known as "Stalking by Way of the Courts". Wife has filed abusive motions and petitions in this divorce, designed to "harass or maliciously injure" the Husband, by exhausting his economic resources and trying to force him to make financial concessions.

30

TNJudicial.org/a/e/sf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC: 002 | Page 156 of 719

Case 3:23-cv-01097-PLM-RSK    ECF No. 1-18, PageID.796    Filed 10/13/23    Page 56 of 57

This is simply a litigious form of domestic assault. Also referred to as "malicious prosecution or abuse of the legal process".

     i    All filings by Wife under Docket No: 48419B, show some form of this oppressive harassment, stalking, and domestic abuse.

     ii    Additionally, the "MOTION TO DEEM HUSBAND SERVED", and all the attached ugliness, including our custom "No Trespassing" signs, at the entry, designed collaboratively by Husband and Wife together. Yet falsely portrayed by Wife, as an irrational act by Husband, further used as justification for the Ex Parte Order of Protection, filed by Wife against Husband, to further harass, control, stifle, dominate, and injure Husband's first and second amendment constitutional rights, knowing exactly how crucial those freedoms are to both Husband and Wife.

         1    Wife's counsel filed this motion on 6/20/2019, the day after Husband's counsel (then), Attorney Brittany Gates, communicated with Ms. Story on 6/19/2019, informing her that Ms. Gates was representing Husband, that Husband had already received service, and that Ms. Gates was Husband's Counsel of Record. None the less, Wife's counsel filed this motion with the court, though totally unnecessary, purely for the opportunity to further

31

- - 149

TNJudicial.org/c/e/dsf002.pdf (Williamson County Chancery Court Tennessee (Trial Court Records) DOC. 002 | Page 157 of 719

Case 2:23-cv-01097-PLM-RSK    ECF No. 1-18, PageID.797    Filed 10/13/23    Page 57 of 57

smear the Husband's name, with their false and fraudulent narrative, solely for more litigious leverage over Husband. (They weren't going to let all that good ugliness go to waste.) Furthermore, someone from Ms. Story's office directly emailed the documents to Husband, though they had already received notice that Ms. Gates was Husband's Counsel of Record. Such created an ex parte communication, which was wholly abusive and unnecessary (Exhibit-C).

2   The marital residence was purchased on 4/29/2011 (Exhibit-D).

3   Honeywell Vista alarm system, was purchased on 6/13/2011 (Exhibit-E).

4   Zavio IP Dome surveillance camera was purchased on 3/15/2013 (Exhibit-F).

5   No Trespassing signs purchased Nov/Dec 2015 (Exhibit-G) shows communications between Husband and Wife will selecting sign styles, along with purchase receipts.

6   Hikvision IP network surveillance cameras (10x) were purchased on 1/20/2016. Floorplan design by Wife, allocation by Husband and Wife (Exhibit-H). Installation by Husband. The floorplan provided is file

32

· · · 150