**The scanned version of this document represents an exact copy of the original as submitted to the Clerk's Office. The original has not been retained.**

Vol 2
Appendix
13-2

# TECHNICAL RECORD
## II

NO. 48419B
COA NO. M2019-02059-COA-R3-CV

**APPPEALED FROM**
CHANCERY COURT
AT FRANKLIN TENNESSEE
MICHAEL W. BINKLEY CHANCELLOR
ELAINE B. BEELER, CHANCERY COURT CLERK

FILED
JUN 1 5 2020
Clerk of the Appellate Courts
Rec'd By _____

**IN THE CASE OF**
FAWN ███ FENTON
VS.
JEFFREY RYAN FENTON

**TO THE**
APPEALS COURT
NASHVILLE TENNESSEE

VIRGINIA L. STORY
135 FOURTH AVE. SOUTH
FRANKLIN, TN 37064
**ATTORNEY FOR APPELLEE**

JEFFREY RYAN FENTON
17195 SILVER PARKWAY, #150
FENTON, MI 48430
**PRO SE APPELLANT**

FILED 31ST DAY OF MARCH 2020.

CHANCERY COURT
NO. 48419B

_Sara B McKinney_ _____ CLERK
_____ DEP. CLERK

dated 9/5/2016, with Wife's handwriting visible on the bottom-right, with the following dimensions "outerhole: 3 ½" from each inside edge of facia…" Wife drew other plans and elevations, to help Husband determine roof/soffit/facia relationships and dimensions to install throughout.



8   Alarms are normal for everyone, Husband and Wife had those at their previous home. Husband and Wife also had "No Trespassing" Signs at their previous home,

33

· · 151

though that was primarily due to the transient rental neighborhood that the Duplex was zoned in, near Nipper's Corner.

9   The signage was for setting "boundaries". The alarm was really the only thing for "security". The surveillance cameras (which weren't monitored), were only for "accountability", after damage or intrusion was detected and researched for proof.

10 All of the electronics had something to do with the fact that both Husband and Wife like electronics, Husband more so than Wife, yet both are geeks at heart. Additionally, Husband's small business from home was in the tech industry, and Husband enjoyed learning about new technologies while installing them in his home first, to see if there might be any viability to adding that to the services he offered. Most took way too much time for Husband to ever be able to reasonably offer installation services to others. At the same time, both Husband and Wife got to enjoy a home (forever) which had built-in technologies, which neither of the parties could have ever afforded to pay third-party companies to install, administer, manage, and host. (At least not concurrently.)

34

· 152

m  The letters to Sheriff Long and Attorney Lisa Carson, of Buerger, Moseley & Carson, PLC (Exhibit-I), though written and signed by Wife, were really a work of collaboration, where Husband participated, researched, or assisted in some capacity, even though the final communications were all written by Wife. (Husband wanted to copy the White House and most of Washington DC, so Wife insisted upon writing her own words, as she always does.)

n  Husband believes that with the assistant of Wife's father, Wife undermined Husband's equity, by redirecting months of missed mortgage payments to the destination of Wife's choice. Hence benefitting Wife toward another financial need, while forcing the home toward foreclosure, and simultaneously leaving the court with no choice but to eject husband and tenants, followed by auctioning the home.

o  Husband refused to render himself "homeless", without having in writing (even without lawyers), some assurance about how Husband could again afford to have a place to live. Now because of Wife's games, her deep dark strategy (Wife's brother has an MBA, and thrives on strategy challenges, while her father spent his life in Real Estate and Finance, and is infamous in their family for bankruptcy schemes and scams), allows Wife's income to decrease (as she plans), and the bankruptcy court will modify her "bankruptcy plan" to accommodate her reduced income.

p  Husband insists that Wife had no legitimate need for an OP, but rather that she simply wanted the protections of a "GAG" order, along with

35

153

the opportunity to assassinate Husband's character and continue with her fraudulent narrative), was fully armed at all times, with both her Glock .40 caliber handgun, which she keeps inside her purse (it is under the seat of her car, while in court) and a large law-enforcement quality, pepper spray cylinder, attached to her keychain. her and Husband requests that the OP Ex Parte be abolished, as it was fraudulently requested, under fraudulent pretenses, for purposes other than which it was designed, as a sweeping order to provide physical safety to those in jeopardy of physical harm.

q    One of the realities which Husband understands in life, is if someone calls the police and says (with panic), "Help! I'm scared that my Husband (brother or friend) might publicly expose the TRUTH about me online, along with the substantiating proof." That the police don't usually rush over to arrest, restrict, or confine the perpetrator.

r    However, if you simply change a couple of words to say (with panic), "Help! I'm scared that my Husband (brother or friend) might physically harm me." In that event the police will probably rush right over, intervene, arrest, warn, restrict, or confine the perpetrator.

> i    At which point, if you can obtain an Order of Protection, or a Temporary Order, you're not only protected from physical harm (which was never really a concern).
>
> ii    You also are protected from a host of other concerns, since the "perpetrator" has had some of his basic constitutional rights revoked, as a result of the tiny lie which you told the police.

36

- 154

TNJudicial.org/e/a/inf0023.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC: 002    Page 163 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.803    Filed 10/13/23    Page 6 of 94

iii Husband has seen this abused more than once, and so has Wife, and people know the power which this one tiny lie can yield over others.

iv It is for this reason, that during Husband's research, that an Order of Protection is commonly referred to as "the second most oppressive and abused piece of legislation" used against the American people. It is also commonly referred to as "the nuclear bomb of divorces." Husband can personally attest to the accuracy of both of those descriptors.

s Even though Wife has convinced herself (and everyone within her circle of influence), that she is the victim here, really many of her "actions" (as opposed to Husband's "words") have been extremely aggressive, even violent, in a non-physically threatening way. Wife's unilateral choices, without a moment's notice, warning, or any opportunity to course correct, have financially devastated the family, and rendered all their property virtually worthless.

t Husband accepts his share of blame in all matters. Husband knows that he is neither a victim nor an abuser, he is something rather broken, in between.

u Husband had many opportunities to course correct without accurately recognizing what season he was in, and without Wife ever informing Husband that she is really even considering a divorce. Husband knew that they were in a storm, but he believed the storm to be primarily

37

155

financial, with a relatively short cure-time. Believing that once the financial stress was gone, that everything else would automatically find a significant measure of relief.



w  Throughout marriage, Husband felt as though he could never "catch-up". Between Husbands ADHD (challenge with focus) and OCPD (a need to do tasks excellently, or not at all), Husband never seemed to be able to "catch-up" to Wife (Exhibit-A). Wife appears to be counting upon that, with her divorce tactics now. To keep running, and running, and running. If Husband ever has the time and resources, he can disprove every false claim of Wife, which is why she is intentionally hitting him as hard and repeatedly as she can.

x  The simple thing which Wife apparently doesn't see, is if she worked "with" Husband a little bit, to help him reach some level of financial, vocational, or residential stability, Husband would make his way on his own. Never as quickly as Wife. Never nearly as fruitful or prosperous as Wife. But that is life. Husband wants to be "free" as badly as Wife does. He just hasn't had the time to fight these litigious battles while trying to reinvent himself at 50 years old. Husband can handle one major project or challenge at a time, If Husband is to move, then Husband needs 2-3 weeks

38

· ·· 156

TNJudicial.Circle/cir/0023.pdf — Williamson County Chancery Court (Tennessee Trial Court Records)
Case 1:23-cv-01097-PLM-RSK ECF No. 1-19, PageID.805 Filed 10/13/23 Page 8 of 94
DOC-002 | Page 165 of 719

with nothing else in the World to focus on besides moving. Likewise when he gets moved, he will need a couple of months to get sorted in his new environment, adjust to massive social and economic losses, and try to find some job to help buy food until he can improve his vocational training, to where he could be functionally independent again.

y   Husband doesn't want to "use" Wife as she and her family believes. Husband made more money and had significantly more property than Wife when they met. Husband was never attracted to Wife because of her MIT degree or her professional future, she didn't have a dime when Husband met her, and was actually $15k in debt to her mother from her previous divorce.

z   Husband's foundational belief is that both Husband and Wife reached this state of brokenness together, so they should work their way out of it together also, rather than poaching off of Husband's poor elderly mother, at the age of 50 years old. Husband's mother was primarily a single parent "nurse", with five children. Every penny Husband's mother has, is because she denies herself basic luxuries which Husband still enjoys daily, even though Husband is penniless, unemployed, largely unemployable (due to speed and specificity, along with outdated vocational skills and experience), and soon to be homeless. Please see the letter left to Husband and his mother's best friend and husband, regarding what she had saved her money for, since both of her parents got dementia as they aged (Exhibit-J).

TNJudicial.Org/cler/nf0023.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC-002 | Page 166 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.800    Filed 10/13/23    Page 9 of 94

aa  After October of 2018, when the Court schedule was mostly full, through the end the year, Wife refused to "settle", saying that since she missed-out on the tax write-off, which was grandfathered for all who finalized their divorces prior to 2019. Wife has refused to work with an independent third-party by any means since. The reality is that $120k in alimony over the next six years, is a lot scarier to Wife than throwing away our equity in our home, than paying a lawyer $20k-$40k to fight a "contested divorce", or even than filing bankruptcy herself, in the end. Earning slightly less than a six-figure income and filing bankruptcy over $50k in debt. Husband is the opposite, has never had over a $50k per-annum job, and has around $100k of debt legally in his name currently. While Husband's last retirement investment in his home, is being essentially forced-out by fraud... again.

bb  has ardently refused to perform with unfounded concerns unsubstantiated Wife would request that the OP be made permanent and that Husband be required to pay her attorney's fees for having to bring this Motion.

3.  Husband has a sleeping disorder, which Wife believes to be "Non-24", that she learned about during one of the narcolepsy conferences which she attended. Husband never saw any confirmation regarding Wife's walk-through confirming any time or date for the walk-trough, since it was so short notice (Husband has told his counsel, that he requires at least twelve hours' notice prior to any commitments or meetings, because Husband is often awake all night, and sleeps all day. Such was the case in this instance.

40

- - 158

Husband awoke around 3am to find information in his email about the appointment, after the scheduled date and time had already concluded, twelve hours prior. (Husband is often awake for 24 hours, then sleeps for 12 or 16. Husband must always know before going to bed, when he has any appointments or obligations the following day. , until after the time scheduled by Wife's counsel, while falsely claiming that I had confirmed the appointment time and date.

      a  Despite the complaints from Wife's counsel about Husband trying to delay or obstruct the walk-through or the auction in any way, that is completely false. The court order never mentioned anything about the Auctioneer accompanying Wife and her counsel during this walk-through. This walk-through per court order, was supposed to be completed much earlier, with a subsequent list of items which Wife wants to keep (determined during the walk-through, which was the purpose of the walk-through, as well as for Wife to ensure the condition of the property). Wife's counsel sent a list prior to the walk-through in an attempt to comply with the court order, but completely failing to meet the 10-day deadline for the walk-through, plus to provide to husband the subsequent list. Nobody informed Husband about the accompaniment of the Auctioneer, or any other parties beyond Wife and her counsel. Any other arrangements were at the fault, and outside the control, of Husband. To this day (8/27) Husband has been told that Wife is still compiling a more comprehensive list of personal property, which she established during the walk-through, yet even

41

though it was legally due by court order on August 11ᵗʰ, Husband has still never received any such document since the inspection.

   b  Husband made every attempt to communicate quickly and accurately with Wife's counsel to help schedule this, even going so far as copying her directly in Husband's emails to his counsel to ensure that his messages were getting relayed to Wife's counsel in the quickest possible fashion (for which Husband was reprimanded both by his counsel and wife's), but Wife's counsel still totally dropped the ball on this, while again aggressively blaming Husband and filing a complaint with the court.

       i  This is simply another example of litigious "bullying", which is completely inappropriate, harassing, abusive, unacceptable, and illegal.

       ii  Husband respectfully requests that the court order Wife and her counsel, to be less litigious, to work cooperatively with Husband toward solutions benefitting both parties, rather than filing inaccurate, twisted, false, and condescending motions, to hijack, oppress, and injure Husband, both in respect to the financial injury which he has suffered to date, of nearly $13k in legal fees, without even beginning his divorce, as well as injuring husband's physical and emotional, needing to figure out how to reply to these often fraudulent motions, under the threat of incarceration should he fail. Meanwhile, if Wife and her

42

160

counsel really want to sell the marital residence, then Husband both needs and deserves enough time to pack his possessions (all 3,000 SqFt of them) and move to Michigan. This will take an absolute minimum of two weeks to simply be ready to vacate the property, which Husband wants to do prior to the auction.

1   As such, Husband requests an extension for the sale date, as well as for the dates for Wife to remove her personal property, so that Husband will not again be forced to vacate his residence, when he needs every available moment for packing.

2   Husband requests that the court order a two-month moratorium on any deadlines and court filings on this docket, including all motions, petitions, etc… with the only exception being if Husband fails to vacate the property by September 15th.

3   This time is needed with Husband's handicaps, so that he can focus on his move, and have any chance at completely evacuating the property by September 15th. (Provided the court approves.)

4   This would allow the minimum time required both to pack and prepare to move, while allowing husband to break-down his office and complete the move to

43

161

Michigan, without fear of concurrent litigation being filed, forcing Husband to redirect all energies to meet the emergency legal demands.

5   The move will require Husband to obtain significant storage space, and will require a lot of physical assistance, for weeks, to just begin to get settled, while moving into Husband's mother's small basement in Michigan.

6   After which Husband will need to assemble office furniture, and rebuild his network, get his server up and running, etc… during which time Husband will have no access to any of his files and records related to this divorce.

7   Consequentially, until this move is completed, Husband will be physically incapable of responding to court filings without Wife first winning default judgments, which is absolutely unfair.

8   Should the court not find this two-week auction deadline extension agreeable, or the two-month moratorium on all court filings so that Husband will have the time needed to move, then Husband will be forced to remain in Tennessee throughout the Auction,

44

162

and require additional financial assistance to do so, now that Husband's tenants have been evicted by the court.

a   As per court order, there are no more rents coming in, plus Husband was forced to return tenant deposits, which he had used to merely survive, Husband is now behind on all the utilities for the property, and requires some emergency financial assistance from Wife, immediately, if the court will allow. Otherwise Husband will be forced to turn-off all utilities upon vacating the property, to not run up more debts in Husband's name than necessary.

b   The utilities run approximately $400 per month, plus with the loss of $1,400 in rental income, which just barely allowed Husband enough money for food, gas, meds, and to pay the utilities, Husband requests some immediate emergency financial relief from Wife, in the amount of $1,000 now, to bring the utilities current and to provide Husband with enough money to purchase food and his basic essentials, from now until September 15th, when Husband vacates the property to head to Michigan.

45

163

c   Husband is temporarily borrowing the money for the move from his mother, expecting that cost to be around $3,000, plus the cost of monthly storage. Husband requests the court to reimburse this expense to Husband's mother, immediately upon the sale of the home, from the Husband's portion of the remaining equity.

d   Husband also requests the court to order Wife to transfer all the utilities back into her name immediately, or if the court and the Wife prefer, to order Wife to pay Husband an additional $500 prior to 9/5/2019. to leave the utilities on in the Husband's name, through the auction, up until closing, provided that all takes place within our current timelines.

e   After the move, Husband respectfully requests that the court order Wife to begin paying Husband $500 per month again, adjusting her bankruptcy plan as needed, as temporary support, to help cover the cost of Husband's food, so not to further burden Husband's mother financially.

46

164

f    Of these monies listed above, Husband respectfully requests that only the costs of moving and storage, be deducted from Husband's share of the sale proceeds, as the rest is believed by Husband to be the minimum due Husband from Wife, under Tennessee law, to help partially support Husband, until a full and final divorce decree can be reached, along with hopefully a corresponding alimony agreement, which Husband sincerely hopes the court will grant him, so that Husband will have an opportunity to obtain vocational rehabilitation and one day become financially independent again.

9    Should the court be agreeable to extend the deadline of the auction for two-weeks, and to the two-month moratorium on all court filings, provided that Husband vacate the property by September 15th as proposed, then Husband requests that the court all the Wife to handle all communications and interactions with the Auctioneer, after September 15th, once Husband has vacated the property.

47

165

TNJudicial. Court Records.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC 002 | Page 174 of 719

Case 3:28-cv-01097-PLM-RSK    ECF No. 19-2, PageID.814    Filed 10/13/23    Page 17 of 94

10 In such event, not out of any disrespect for the court, obstinance, or belligerence on the part of Husband, nor due to any resentment toward the court, Wife, or this process, Husband respectfully requests that by court order, (not a POA or Quit Claim Deed, which Husband must sign), the court executively provide the Wife with the authority to completely sell the property, without the need for any signatures or participation by Husband.

    a   To frankly explain the reason this is so important to Husband, again, it is out of no act of disrespect, rebellion or defiance, it is simply a matter of beliefs. Husband believes that by providing his signature, that he is approving of the transaction which he is signing for.

    b   While Husband believes that he is being robbed of his home, and any opportunity to take over payments and try to keep it, by Wife's fraudulent default on the mortgages performed months ago by Wife, without providing Husband with any notice, while refusing to even reply to Husbands questions on the matter.

48

166

c    Husband does not blame court for this, but Husband absolutely feels as though he is being robbed of most of what he has worked for in his life. Regardless of the auction sales price, or the amount of final alimony Wife is ordered to pay Husband (should alimony be awarded), Husband will never, in his lifetime, have the opportunity to enjoy this standard of living again. With all the unique characteristics which this property naturally possesses, as well as those which Husband spent nearly a decade building and constructing on the property, for the family's home forever. Husband recognizes this as a once in a lifetime chance for both the Husband and Wife, which now they have foolishly forfeited.

d    Husband tried with every ounce of his being to prevent Wife from forcing this outcome, but with the mortgages in Wife's name, Husband ultimately was powerless over monitoring their status. At the same time, without some serious training, followed by a full-time job, and a few years of advancement, there is no way that Husband could have proactively paid the

49

167

mortgages, just "in case" wife wasn't continuing to pay those bills, as she had been. Without absolutely any notice to Husband that her financial situation had changed, even if legitimate, which Husband highly doubts. Regardless, with timely notice from Wife to Husband, that their jointly owned asset was at risk, Husband could have worked towards finding a solution to help cure that financial shortfall, prior to reaching the point of default.

e  Yet Wife stole that opportunity from Husband, and as such, suffering a loss of a lifetime, without so much as a hint in advance, Husband wishes to play no part in the final moves of Wife's schemes, to abandon and financially undermine Husband, costing Husband the largest loss of his lifetime, █████



50

168



f   The original plan was to leverage the Duplex to help with the $100k of improvements we made to our Sunnyside home within the first year. I then knew that we had five years before the Duplex $30k 2nd mortgage balloon note would be due.

g   So, the plan was after the improvements were completed at Sunnyside, after a couple of years of appreciation, we would refinance the second on Sunnyside to pay off the second on the Duplex. But it didn't work out that way.



51

$\cdot$ 169



4. Per court order, both the Wife's walkthrough and thereafter her list of personal property which she requested from the marital residence, were supposed to both be completed within 10 days of the August 1st hearing date. That means that per the order of the court, the deadline for both of those tasks to be completed was on 8/11/2019. Ms. Story never even contacted Husband's counsel to begin scheduling the walk-through until 8/12/2019, already missing the deadline, requesting the walkthrough on the on the 13th or 14th, days later after the court ordered deadline. Yet Wife's counsel still finds it necessary and appropriate to legally blame, bash, and harass me with her litigious accusations, twisting information to make me sound as if I'm the party who failed to adhere to the timelines ordered by the court. Again, Husband respectfully requests that the court take action to discipline Ms. Story, to correct her actions, and change her future narratives to much less frequent and less hostile, and to work on improving her accuracy some, while reducing her slander of Husband's name and his character, both which Husband finds highly offensive, and which is harmful to Husband's mental and emotional health.

a  Husband respectfully asks the court to please not allow Wife back on or inside the marital property, unless the court should choose to first terminate the Order of Protection Ex Parte, obtained by Wife's completely fraudulent testimony, so not to interfere with Husband's packing, by forcing Husband to vacate his home again, prior to either his move by September 15th, if approved by the court, or until after

52

the auction is finalized and the court provides Husband with the funds from the sales proceeds, necessary for Husband to move and obtain lodging here locally

5. Husband respectfully requests that he be awarded all his attorney's fees hence far, totaling around $13k, most of which Husband borrowed from his elderly mother, as Husband has not even reached responding to the divorce complaint yet, but all $13k in legal costs have been exhausted simply to protect Husband from the harassing, abusive, false, and fraudulent claims of both Wife and her counsel. both Wife and Wife's Wife requests that she be granted attorney's fees in this cause to be paid from Husband's share of the proceeds as he has failed to abide by his agreement as well as the lawful

Orders of this Court.

6. To date, absolutely no delays of process have been due to the fault of the Husband, despite the deceitful claims of Wife and her counsel. Husband's first counsel failed to perform, though Husband was promised a draft to his Answer & Counter Complaint, which Husband has still never seen to this day. Absolutely no documents were filed, except for an extension to the temporary OP, so that Husband could gather a shocking amount of evidence, to hopefully dissolve the matter, but the continued failures to perform by Ms. Gates, forced Husband to borrow another $5k from his mother to hire Husband's second set of counsel, with only two work days remaining to respond to both the fraudulent OP claims, as well as the order to sell my home. The two largest decisions in my life to date, with only two days to respond, while Ms. Story absolutely refused agree to an extension for my incoming counsel, in either of the monumental and immediate matters. As such I see not why she is carrying-on about any delays or failure to perform on my part, except again to assassinate my character and to litigiously harass and abuse me.

53

171

TNJudicial.org/upload/002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC.002 | Page 180 of 719

Case 3:20-cv-01097-PLW-RSK    ECF No. 2-19, PageID.820    Filed 10/13/23    Page 23 of 94

a    I respectfully request that the court order Ms. Story to attend a legal ethics class, to encourage her to be more honest, sincere, and kind in her legal motions. Such abuse by legal process is absolutely barbaric and intolerable.

b    Husband prays that the court will defend him in regard to Ms. Story's abusive treatment, and/or that she be replaced by another member of her firm in this matter, having failed to act as her office should require.

c    Husband has no objection to waiving the Mediation, as Wife has made it clear to Husband that she is in no way wanting to participate in any collaboration, mediation, or any other fair, neutral third-party assisted solution, or we would be divorced by now. Wife is only interested in a judgment, and refuses to settle by any other means, despite having filed bankruptcy, and the dire financial condition of both parties.

i    For the purpose or again correcting the narrative of Ms. Story's verbal attacks by legal process, Husband wants to clarify that Wife's desire to skip mediation has nothing to do with her fear of Husband, especially for the ridiculous benefit of being mindful of the safety of everyone else involved in the process. I've never been more falsely harassed by anyone, and again, I appeal to the court to please intervene.

ii    The real reason why Wife has refused every attempt to sit down at the same table with Husband and work towards a fair solution, has absolutely nothing to do with Husband's words,

54

172

the intensity of his presence, or any pressure which Husband could emotionally inflict upon Wife.

iii  The reason is because Husband is the one person in the entire World, which Wife really struggles looking in the eyes and lying to, about her fraudulent, victimized narrative, since Husband was THERE with Wife, and remembers vividly what really happened and what did not. In contrast, most other people take Wife at face value, seeing her obviously distraught, disheveled, and injured impressions, not realizing that the majority of what they are being told, is either a really twisted version of the truth, or an absolute lie. While the signs of abuse which she portrays, some of which are real, but are self-inflicted, and never ceasing, by Wife's relentless desire to discard Husband without a penny of alimony, vocational rehabilitation, a roof over his head, or food for his belly. Wife is absolutely destroying herself, fighting to be what she calls "free" or "independent", unwilling to recognize or accept any financial obligation, responsibility, or reparations for the impact which she has had upon the Husband's life, as it lies all in ruins now, and in two months another family will be living in the home which Husband invested the proceeds of his entire life, both financially, and in labor.

55

173

TNJudicial.org/ls/lsf/002/24f   Williamson County Chancery Court Tennessee (Trial Court Records)   DOC.002 | Page 182 of 719

Case 3:23-cv-01097-PLM-RSK   ECF No. 1-19, PageID.822   Filed 10/13/23   Page 25 of 94

7. Husband can't apply for any insurance, until Husband has either obtained vocational rehabilitation and subsequently found gainful employment, or until Wife starts paying adequate alimony to pay for said insurance, as well as meeting some of Husband's other real financial needs, such as purchasing food, paying for meds counseling, etc... Should the court be willing to order such support for Husband, then providing the sum is adequate, Husband will be happy to apply for such independent health insurance.

8. The reality is, that contrary to Wife, Husband can definitively prove each and every word written in this response and counter motion. Husband has put forth an absolutely exhaustive effort to provide the court with some of the information which Husband feels may be pertinent to helping the court discern whether Husband or Wife is presenting the truth to the court. At the same time, this is probably $1/100^{th}$ of the documentation which Husband possesses in support of his claims. The unfortunate outcome of the path which Wife has committed her life to, and is pursuing with reckless abandon, which caused her bankruptcy, which still makes bankruptcy eventually inevitable for me, as Wife continues to refuse any solution except for one appointed and ordered by the court.

As we are both completely broke, as recovery is realistically not even plausible for Husband, though his financial independence hopefully is, with some structured support and vocational training, leading to a technical certification or license in a progressive field, with vocational opportunities in the area which Husband resides. Continuing with this matter in the court is harmful to all parties, despite Wife's inability to stop injuring herself, and consequentially Husband, since Husband will never be able to focus, with his

56

174

handicaps (ADHD, OCPD, GAD, Sleep Disorder) as long as Husband's life is on trial, and due to Husband's financial shortcomings, and Wife's refusal to pay, Husband shall have no choice moving forward except to represent himself.

So at the end of the day, we can either continue as we have here today, for likely the next three years, forcing Husband to put recovery, rehabilitation, and all progress to rebuild his life on hold, until Husband no longer needs to "play lawyer", so that he can focus upon rebuilding some semblance of his life. Husband has serious concerns, about the proceeds from the sale being parked with the court for very long, since Wife's abusive and litigious counsel works right across the street from the courthouse, while Husband will not be in state or able to adequately defend himself.

Furthermore, Husband is absolutely terrified to drive over the Cincinnati bridge, as wife can well testify. (Husband has not driven over that bridge in a decade, and the last time Husband had a serious panic attack, and nearly passed out while driving a U-Haul with Wife.

So Husband's only options are either to take enough Xanax that he can probably drive over the bridge safely, to then need to shortly thereafter find a place to park and sleep it off, or to have someone else who can drive Husband over the bridge, of which Husband knows of no volunteers (mother is now too old for that drive). Therefore, due to these exceptionally complex and harmful consequences for both parties, to continue in court any longer, Husband asks that the court make an exceptional modification to protocol, and provide to Husband and Wife a full and final divorce, here today, upon the grounds of

57

175

TNJudicial.org/o/adrf902.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC: 002 | Page 184 of 719

Case 3:25-cv-01097-PLM-RSK    ECF No. 1-19, PageID.824    Filed 10/13/23    Page 27 of 94

irreconcilable differences, and determine as fair of a financial settlement between the parties as the court is realistically equipped with the information it has, including the exhibits provided herein. Should the court be willing to grant us a final divorce today, but require more time to review the abundance of documentation provided, which is honestly completely unbiased, and to issue said settlement in the near future, without requiring another court appearance, Husband would be very welcoming to such an outcome as well.

Despite Husband's real need for support in this matter, Husband needs even more to never need to drive back over the Cincinnati bridge, to continue this violent process against each other and our own persons. For reason of mental and physical health, I beg the court to end this once and for all today, to save us all the next three years of our lives, wrestling over breadcrumbs. Husband's requests for a settlement approximately half of what the parties previously discussed, planned, and verbally agreed upon, is outlined below, which Husband respectfully asks the court to consider granting. Should the court decide to grant less to Husband, then Husband shall find no need to object or file further motions, Husband shall gratefully accept whatever the court finds fair. Husband does request that the court not decide upon any judgment which can be modified, altered, or which leaves the door open for future litigation, by either party. Else Husband fears that this case shall perpetually carry on forever, costing both parties more than either party can financially, emotionally, and mentally afford.

Although settlements are typically reached between opposing counsel; due to the abusive manner in which Ms. Story has presented herself throughout her filings in this case,

58

176

Husband respectfully requests that the court make an exception here to help protect Husband from needing to sit with Ms. Story and endure her condescending narrative and tone. Instead Husband simply requests that the court make a full and final determination, without any further negotiations or litigation between the parties.

Therefore, should the court not find Husband's request to be in the best interest of both parties, as well as of that of the court, Husband is reasonably certain that he'll never realistically see or benefit from any of the proceeds from the sale of his home. As Wife's counsel and other demands nibble away at it, beyond the practical reach of Husband. Whereby losing his retirement savings, and everything which Husband has earned during his lifetime, which would be one final travesty to end this absolutely toxic divorce.

Yet whatever it must be, so be it. Husband just asks the court for fair and reasonable consideration, and to end this nightmare once and for all. So, Husband can focus on what lies ahead, returning from where he once came, but has been fortunate not to need to leave since reaching adulthood.

Should the court have any questions or need any information, please feel free to ask. Husband can be emailed directly at ▮▮▮▮▮▮▮▮▮▮▮ A mountain of documentation pertaining to the marriage is available upon your request.

Thank you for accepting this late filing, and earnestly considering the plethora of complex findings contained herein.

WHEREFORE, Husband would respectfully request that:

59

177

1. The court order a full and final divorce to Husband and Wife, on the grounds of Irreconcilable Differences. The Order of Protection be made permanent and that Husband be required to pay her attorney's fees for having to bring this Motion.

2. That the Temporary Order of Protection be terminated. (Husband is willing to sign a "Hold Harmless" with Wife, which can be styled to include both of our families, our employers, etc… so to protect both parties from either defaming them or publishing anything online about them, for the rest of our lives. Not requiring yearly renewal as with an Order of Protection, and also not injuring Husband's vocational potential, like an Order of Protection.

3. If for any reason the court is not willing to terminate the Temporary Order of Protection, Husband respectfully requests that it only apply to Davidson and Williamson Counties, and that it not be converted into a full order, so not to affect Husbands employment potential. (Husband's firearms are located in a friend's gun vault in Goodlettsville. Husband needs to be able to legally pick them up in the U-Haul, while driving North toward Michigan, as Husband moves there for the foreseeable future.)

4. That the court divide any proceeds remaining from the sale of the home 50/50, while ordering both parties to continue assuming responsibility for the debts in their respective names. (Whether that be by bankruptcy or however the parties can.) Husband requests that his half of the split be paid directly to his mother, "Marsha A. Fenton" ▓▓ ▓▓▓▓ to help setup a trust for the future needs of Husband, educationally or otherwise. (Provided there is enough money to justify doing so.)

5. That in addition to the 50/50 split requested above, that the court repay Husband's mother, "Marsha A. Fenton" ▓▓▓▓▓▓ $10,000 directly out of Wife's

TNJudicial.org/e/afjrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC-002 | Page 187 of 719

Case 3:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.827    Filed 10/13/23    Page 30 of 94

share of the sale proceeds, prior to paying any other debts, obligations, or creditors, except for the two mortgages. This is to reimburse Husband's mother for the expense of defending Husband against these totally unnecessary litigious claims, without even addressing the divorce yet in a conventional manner. Wife had previously assured Husband that she was finished with her litigious assaults, yet Wife still elected to execute her largest, most unfair, brilliant, but absolutely devastating legal assault upon Husband to date, again, without a moments warning. Husband therefore request the court to order Wife to repay Marsha A. Fenton for her resulting losses.

6. That at least a sum of $21,000 be paid to Husband's mother, Marsha A. Fenton, to repay Husbands debts to her, prior to paying off any other debts, obligations or creditors, except as stated herein.

7. That the court payoff the outstanding balances to Husband's legal counsel $8,600 to Marty Duke and $2,579.39 to Schaffer Law Firm, directly out of Wife's share of the sale proceeds, immediately following the repayment of Husband's mother, prior to paying off any other debts, obligations or creditors, except as stated herein.

8. That the court award Husband transitional alimony, which the court automatically deducts from wife's paycheck, in the amount of $1,000 per month, for a period of four years, and wife be ordered to have her bankruptcy plan modified to compensate for this.

9. If there are any emergencies where Wife cannot legally pay alimony for any reason, that all missed payments be added onto the end of the four years, so that the overall benefit to Husband is not diminished in the end. (With the proposed alimony of $1,000 per

month for a period of 4 years, that would equal a total alimony to be paid by Wife to Husband, of $48,000.)

10.    That after the full four year term of alimony is paid, by Wife to Husband, after having made up for any months missed throughout, that Wife should owe Husband, no more alimony or support of any kind, ever again, regardless of Husband's health, need or any other circumstances, conditions, or factors.

11.    That Wife's employer keep Husband insured, as Mr. Ken Adkisson previously promised until the end of this year, or until Wife is no longer employed with that firm, whichever comes first.

12.    That afterwards, Husband be responsible for his own insurance needs, without demand or oversight by this court.

13.    That the court would order that neither the Wife, nor her counsel, can further litigate, sue, or harass husband, by means of legal actions or otherwise.

14.    That the court order a "do not contact" on both parties for a period of one year, regarding the other.

15.    That both parties execute mutual lifetime "hold harmless" agreements, to include protection both to and from their families, employers, and friends, in addition to themselves.

16.    The court order the auction date to be extended by a period of three-weeks after the final litigation is entered/heard in this matter, or after a 2-month moratorium is ordered by the court, forbidding anymore legal filings, until Husband has had an opportunity to complete his move to Michigan and get settled. During which time Husband

62

. . . 180

is not to be disturbed by any of the parties in this matter, so that he can focus on packing and realistically have a chance to complete it, on such a short deadline.

17.    An Order be entered allowing Wife to sign any necessary listing contracts or agreements to sell the home including closing documents on behalf of she and Husband.

Respectfully submitted,

Jeffrey Ryan Fenton (Pro Se)
1986 Sunnyside Drive
Brentwood, TN 37027
jeff.fenton@live.com
(615) 837-1300

This Motion is expected to be heard on the 29th day of August, 2019 at 9:00 a.m. If no written Response to this Motion is filed and served in a time set by Local Rules of Practice, the Motion may be granted without a hearing.

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was forwarded via email, hand-delivered, and/or first-class mail to Virginia Lee Story, Attorney for Wife, at 136 4th Avenue South, Franklin, TN 37064, on this the _29_ day of August, 2019.

Jeffrey Ryan Fenton (Pro Se)

63

181

Terry M. Huff, LCSW
Suite 134
5115 Maryland Way
Brentwood, TN 37027
615-627-4191
terrymhuff.com

2019 AUG 29 AM 9: 23

FILED FOR ENTRY_____

August 28, 2019

To Whom it May Concern:

I'm writing at the request of my client, Mr. Jeff Fenton, to explain his mental health challenges and their effects on his general functioning. I am licensed as a clinical social worker in Tennessee, and I have a private psychotherapy practice in Brentwood. I have been providing psychotherapy services for thirty years. My specialty is in helping adults with attention deficit hyperactivity disorder (ADHD).

I began seeing Mr. Fenton May 3, 2018. His primary concerns for which he sought my help were marital problems and effects of his ADHD. He has a history of particular difficulties with occupational functioning due to extraordinary perfectionism and getting lost in details, which contribute to inefficiency and missed deadlines. This particular challenge, along with certain other features, are consistent with symptoms of obsessive compulsive personality disorder. ADHD and OCPD have been the focus of Mr. Fenton's psychotherapy. He also has specific phobias and social anxiety, which have not been the primary focus in therapy.

ADHD is a neurological condition that makes it difficult to manage one's attention and inhibit impulses. It is often misperceived as an inability to focus rather than difficulty managing and shifting the focus of one's attention. Adults with ADHD often have difficulty returning to open awareness when locked into a focused state of awareness. They often have trouble activating and sustaining effort on monotonous tasks, organizing and prioritizing tasks, keeping track of items needed for tasks, estimating and tracking time, managing emotions skillfully, inhibiting speech and action (tending to talk excessively and interrupt others), and inhibiting impulses.

Obsessive Compulsive Personality Disorder is characterized by "preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency," according to the DSM-5 (Diagnostic and Statistical of Mental Disorders - 5th edition). Individuals with this disorder try "to maintain a sense of control through painstaking attention to rules, trivial details, procedures, lists, schedules, or form to the extent that the major point of the activity is lost." They may get so caught up in the details of a project that they don't complete it, or they miss deadlines. If can take them a long time to complete a task due to this excessive preoccupation with details. They are often "inflexible about matters of morality, ethics, or values and may force themselves and others to follow rigid moral principles and very strict standards of performance." They often have trouble delegating tasks to others, as others must conform to their way of doing things. Those tasks must be done "correctly." They tend to "plan ahead in meticulous detail and are unwilling to consider changes." Their ability to compromise may be compromised by the inflexibility. They are uncomfortable with relationships and situations in which they are not in control or where they must rely on others. They are uncomfortable with the unpredictable.

**CHANCELLOR MICHAEL W. BINKLEY**
Williamson County Chancery Court

# EXHIBIT - A

RE: Fenton v Fenton   Case# 48419B

182

TNJudicial.org/o/a/jrf002.pdf          Williamson County Chancery Court Tennessee (Trial Court Records)          DOS-002 | Page 191 of 719

Case 1:23-cv-01097-PLM-RSK     ECF No. 1-19, PageID.831     Filed 10/13/23     Page 34 of 94

One effect of the OCPD is Mr. Fenton's communication when dealing with conflict. His excesses in speech and writing can appear imposing or hostile. He acknowledges his compulsion to communicate excessively. The compulsion is driven by an undercurrent of unsettled feelings that persist until he is certain there is no possibility of being misunderstood. This pattern is consistent with the disorder (OCPD). His effect on others—i.e., anyone receiving the excess of communication—is often lost on him, as his attention is locked into the effort to be understood. Consequently, those efforts are experienced by others as intense and sometimes hostile.

Mr. Fenton is aware that he has more work to do on this problem. He recently requested that we focus less on the present crisis and more on managing the challenge of coping effectively with the symptoms ADHD and OCPD, and decreasing self-defeating behavior. Due to both conditions, Mr. Fenton's excessive attention to what he wants to communicate obstructs him from being aware, in a given moment, of effects of his efforts (e.g., the impact of the volume of his voice when speaking, or the volume of information when writing).

Mr. Fenton has been forthcoming in psychotherapy sessions and has been open and willing to be challenged with respect to his symptoms and their effects. He acknowledges mistakes when they are pointed out and is working to understand how his best intentions sometimes go awry, and his persistent efforts can be self-defeating.

Mr. Fenton has never expressed any intention of harming himself or others during the sixteen months that I have known him. I have never had reason to suspect any intention to harm himself or others. He has participated frequently in a support group for adults with ADHD. He has participated actively and has offered help to others in the group.

Thank you for consideration of the role that mental health and disability have played out in Mr. Fenton's life and relationships. His participation in psychotherapy and related services will continue.

Respectfully,


Terry M. Huff, LCSW

183

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027
––––––
Telephone: (615) 373-5205
Fax: (615) 373-5165

July 19, 2019

To Whom It May Concern:

RE: Jeffrey Fenton, DOB: 10/08/19/69

Jeff Fenton has been a patient under my care since February 2012. He has been diagnosed with a Generalized Anxiety Disorder, Attention Deficit Disorder, and some Obsessive Compulsive Personality traits. He has been complaint with both his psychiatric medications prescribed and his individual psychotherapy with Terry Huff, LCSW.

The symptoms of his illnesses have interfered with his ability to maintain employment, despite compliance with our treatment recommendations. His condition does not predispose him to any violent behavior and, to my knowledge, he has not been involved in any violent behavior since being a patient under my care.

If you have any further questions regarding his diagnosis, treatment, or prognosis, please contact me with his permission.

Sincerely,

Richard E. Rochester, M.D.

184

Obsessive-Compulsive Personality Disorder (OCPD) DSM-5 301.4 (F60.5)

Generalized Anxiety Disorder (GAD) DSM-5 300.02 (F41.1)

Attention-Deficit Hyperactivity Disorder (ADHD) DSM-5 314.01 (F90.2)

Circadian Rhythm Sleep Disorder (CRSD) Non-24-Hour Sleep-Wake Disorder (Non-24) DSM-5 307.45 (G47.24)

TNJudicial.org/c/a/jrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC.002 | Page 194 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.834    Filed 10/13/23    Page 37 of 94

Terry M. Huff, LCSW
5115 Maryland Way
Brentwood, TN 37027
ph: 615-627-4191

July 29, 2019

To Whom It May Concern:

I have been seeing Mr. Jeff Fenton in individual psychotherapy from May 3, 2018 to present. He has also been a participant in my support group for adults with ADHD (attention deficit hyperactivity disorder). During this period I have never had any suspicion, or reason for concern, that Mr. Fenton is at risk for harming himself or others.

Respectfully,

Terry m. Huff, LCSW
Terry M. Huff, LCSW

186

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027

Telephone: (615) 373-5205
Fax: (615) 373-5165

November 1, 2018

RE: Jeffrey Fenton, DOB: 10/08/1969

To Whom It May Concern:

Jeffrey Fenton has been a patient under my care since 2012. He is treated for a severe Generalized Anxiety Disorder, Attention Deficit Disorder, and suffers from an Obsessive Compulsive Personality Disorder. He also has specific phobias regarding weather, driving across bridges, and flying, along with obsessive concerns over his health.

His symptoms of severe anxiety, obsessive worry, preoccupation with details and rules, perfectionism, inflexibility, and problems with rigidity have all interfered with his ability to hold a job and have a healthy relationship.

I have prescribed medication including Lexapro 40 mg a day, Vyvanse 70 mg a day, Xanax 1 mg every six hours as needed, and Restoril 30 mg at night for chronic insomnia. He also has continued to see Terry Huff, LCSW, in psychotherapy. Despite his compliance with his medication and therapy, his symptoms continue to be disabling.

Please consider Mr. Fenton's severe psychiatric condition in any judgments being made about his ability to work and his ongoing divorce. If you have any questions regarding his treatment or prognosis, please contact me with his permission.

Sincerely,

Richard E. Rochester, M.D.
RER/sde

187

TNJudicial.org/c/a/jrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC_002 | Page 196 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-13,   PageID.836    Filed 10/13/23    Page 39 of 94

Obsessive Compulsive Personality Disorder

Home » Disorders » Personality » **Obsessive Compulsive Personality Disorder**

# Obsessive Compulsive Personality Disorder

By **Steve Bressert, Ph.D.**
Last updated: 23 Apr 2019
~ 4 MIN READ

Obsessive-compulsive personality disorder is characterized by a preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency.



When rules and established procedures do not dictate the correct answer, decision making may become a time-consuming, often painful process. Individuals with obsessive-compulsive personality disorder may have such difficulty deciding which tasks take priority or what is the best way of doing some particular task that they may never get started on anything.

They are prone to become upset or angry in situations in which they are not able to maintain control of their physical or interpersonal environment, although the anger is typically not expressed directly. For example, a person may be angry when service in a restaurant is poor, but instead of complaining to the management, the individual ruminates about how much to leave as a tip. On other occasions, anger may be expressed with righteous indignation over a seemingly minor matter.

People with this disorder may be especially attentive to their relative status in dominance-submission relationships and may display excessive deference to an authority they respect and excessive resistance to authority that they do not respect.

Individuals with this disorder usually express affection in a highly-controlled or stilted fashion and may be very uncomfortable in the presence of others who are emotionally expressive. Their everyday relationships have a formal and serious quality, and they may be stiff in situations in which others would

TNJudicial.org/p/adirf002.pdf — Williamson County Chancery Court Tennessee (Trial Court Records) — DOC.002 Page 197 of 719

Case 1:23-cv-01097-PLM-RSK — ECF No. 1-19, PageID.837 — Filed 10/13/23 — Page 40 of 94

Obsessive Compulsive Personality Disorder

smile and be happy (e.g., greeting a lover at the airport). They carefully hold themselves back until they are sure that whatever they say will be perfect. They may be preoccupied with logic and intellect.

A personality disorder is an enduring pattern of inner experience and behavior that deviates from the norm of the individual's culture. The pattern is seen in two or more of the following areas: cognition; affect; interpersonal functioning; or impulse control. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations. It typically leads to significant distress or impairment in social, work, or other areas of functioning. The pattern is stable and of long duration, and its onset can be traced back to early adulthood or adolescence.

## Symptoms of Obsessive-Compulsive Personality Disorder

A pervasive pattern of preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency, beginning by early adulthood and present in a variety of contexts, as indicated by four (or more) of the following:

- Is preoccupied with details, rules, lists, order, organization, or schedules to the extent that the major point of the activity is lost

- Shows perfectionism that interferes with task completion (e.g., is unable to complete a project because his or her own overly strict standards are not met)

- Is excessively devoted to work and productivity to the exclusion of leisure activities and friendships (not accounted for by obvious economic necessity)

- Is overconscientious, scrupulous, and inflexible about matters of morality, ethics, or values (not accounted for by cultural or religious identification)

- Is unable to discard worn-out or worthless objects even when they have no sentimental value

- Is reluctant to delegate tasks or to work with others unless they submit to exactly his or her way of doing things

- Adopts a miserly spending style toward both self and others; money is viewed as something to be hoarded for future catastrophes

.189

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1197.00

- Shows significant rigidity and stubbornness

Because personality disorders describe long-standing and enduring patterns of behavior, they are most often diagnosed in adulthood. It is uncommon for them to be diagnosed in childhood or adolescence, because a child or teen is under constant development, personality changes, and maturation. However, if it is diagnosed in a child or teen, the features must have been present for at least 1 year.

Obsessive-compulsive personality disorder is approximately twice as prevalent in males than females, and occurs in between 2.1 and 7.9 percent of the general population.

Like most personality disorders, obsessive-compulsive personality disorder typically will decrease in intensity with age, with many people experiencing few of the most extreme symptoms by the time they are in their 40s or 50s.

## How is Obsessive-Compulsive Personality Disorder Diagnosed?

Personality disorders such as obsessive-compulsive personality disorder are typically diagnosed by a trained mental health professional, such as a psychologist or psychiatrist. Family physicians and general practitioners are generally not trained or well-equipped to make this type of psychological diagnosis. So while you can initially consult a family physician about this problem, they should refer you to a mental health professional for diagnosis and treatment. There are no laboratory, blood, or genetic tests that are used to diagnose obsessive-compulsive personality disorder.

Many people with obsessive-compulsive personality disorder don't seek out treatment. People with personality disorders, in general, do not often seek out treatment until the disorder starts to significantly interfere or otherwise impact a person's life. This most often happens when a person's coping resources are stretched too thin to deal with stress or other life events.

A diagnosis for obsessive-compulsive personality disorder is made by a mental health professional comparing your symptoms and life history with those listed here. They will make a determination whether your symptoms meet the criteria necessary for a personality disorder diagnosis.

## Causes of Obsessive-Compulsive Personality

190

Obsessive Compulsive Personality Disorder

## Disorder

Researchers today don't know what causes obsessive-compulsive personality disorder, however, there are many theories about the possible causes. Most professionals subscribe to a biopsychosocial model of causation — that is, the causes are likely due to biological and genetic factors, social factors (such as how a person interacts in their early development with their family and friends and other children), and psychological factors (the individual's personality and temperament, shaped by their environment and learned coping skills to deal with stress). This suggests that no single factor is responsible — rather, it is the complex and likely intertwined nature of all three factors that are important. If a person has this personality disorder, research suggests that there is a slightly increased risk for this disorder to be "passed down" to their children.

## Treatment of Obsessive-Compulsive Personality Disorder

Treatment of obsessive-compulsive personality disorder typically involves long-term psychotherapy with a therapist that has experience in treating this kind of personality disorder. Medications may also be prescribed to help with specific troubling and debilitating symptoms. For more information about treatment, please see **obsessive-compulsive personality disorder treatment**.

▶ **References** - Click to open

**APA Reference**
Bressert, S. (2019). Obsessive Compulsive Personality Disorder. *Psych Central*. Retrieved on August 28, 2019, from https://psychcentral.com/disorders/obsessive-compulsive-personality-disorder/

**Last updated:** 23 Apr 2019
**Last reviewed:** By a member of our scientific advisory board on 23 Apr 2019
Published on Psych Central.com. All rights reserved.

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1199.00

## Jeff Fenton

| | |
|---|---|
| **From:** | Brittany Gates <brittanylmgates@icloud.com> |
| **Sent:** | Wednesday, June 19, 2019 4:16 PM |
| **To:** | Jeff Fenton |
| **Subject:** | Re: Sunnyside house (This whole thread, explains a lot to do with our home, Fawn's devious plans, why I couldn't trust her to sell it with a POA (to sign my name), and some significant defects in the property, which Fawn refuses to legally disclose: |

2019 AUG 29  AM 9: 21

| | |
|---|---|
| **Categories:** | 5-Email: Present to Court |

I've reached out to Virginia and we've scheduled a call for tomorrow. Once I speak to her i'd like hear your side of the case in order to prepare a counter complaint. Does 11:00 am work for your schedule if I speak to Virginia in the morning?

Brittany Gates
Attorney at Law
1616 Westgate Circle, Suite 116
Brentwood, Tennessee 37027
(615)844-6195:office
(615)844-6196:facsimile
(615)517-9490: cell phone
Sent from my iPhone

**CHANCELLOR MICHAEL W. BINKLEY**
Williamson County Chancery Court

# EXHIBIT - C

192

RE: Fenton v Fenton          Case# 48419B

COPY

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

2019 JUN 20  AM 9: 17

FAWN ▮▮▮ FENTON,                    )
    Plaintiff/Wife,                    )          FILED FOR ENTRY_____
                                       )
v.                                  )          No. 48419B
                                       )
JEFFREY RYAN FENTON,                )
    Defendant/Husband.                 )

## MOTION TO DEEM HUSBAND SERVED

COMES NOW the Plaintiff/Wife, Fawn ▮▮▮ Fenton (hereinafter "Wife"), by and through her attorney of record, Virginia Lee Story, and files this Motion to Deem Husband Served and in support of her Motion, would state as follows:

1.    Wife filed her Complaint for Divorce on June 4, 2019.

2.    Counsel for Wife hired a private process server, Lori Polk, to attempt personal service on Husband.

3.    Ms. Polk attempted to serve Husband at his residence located at 1986 Sunny Side Drive, Brentwood, Tennessee on June 5, June 6, and June 8 to no avail. (See Affidavit of Lori Polk which was previously filed with the Court on June 11, 2019 and is attached to the Affidavit of Reasonable Efforts filed simultaneously with this Motion.)

4.    Husband has installed numerous cameras around the home and posted a "No Trespassing" sign on the property. (Photo of sign is attached to Affidavit of Lori Polk.)

5.    After Ms. Polk communicated that she was unable to serve Husband at the marital residence, counsel for Wife attempted service via certified mail as stated below. Counsel also mailed via U.S. first-class mail a copy of the Complaint which has not been returned by the post office. Based upon the numerous emails and texts from Husband to Wife, it is clear that Husband is aware of the Complaint and he is avoiding service. A copy of the Complaint has also been sent

1

· · 193

to Husband via email.

      6.     A file-stamped copy of the Summons and Complaint for Divorce was sent to Husband via certified mail, return receipt requested, on June 11, 2019. On June 17, 2019, counsel for Wife received the return receipt for the certified mail which had been signed. The signature on the return receipt is that of an adult roommate who is currently residing with Husband.

      7.     Wife believes that Husband is trying to evade service.

      8.     That Husband be deemed served pursuant to Tennessee Rules of Civil Procedure 4.04(1) which states that service is made:

> Upon an individual other than an unmarried infant or an incompetent person, by delivering a copy of the summons and of the complaint to the individual personally, or if he or she evades or attempts to evade service, by leaving copies thereof at the individuals dwelling or usual place of abode with some person of suitable age and discretion then residing therein, whose name shall appear on the proof of service, or by delivering the copies to an agent authorized by appointment or by law to receive service on behalf of the individual served.

      9.     That Wife has also filed an Alias Summons on June 11, 2019 requesting that service on Defendant be attempted by the Sheriff's Department. To date, the Sheriff's Department has not been successful in serving Defendant.

      10.    That counsel for Wife has made all attempts to obtain personal service on Defendant to no avail. (See Affidavit of Reasonable Efforts attached hereto as **Exhibit 1.**)

     WHEREFORE, premises considered, Wife respectfully requests that this Court grant her Motion to Deem Husband Served and that she be awarded her attorney fees for having to bring this Motion.

<center>2</center>

.194

TNJudicial.org/e/a/jf002.pdf — Williamson County Chancery Court Tennessee (Trial Court Records) — DOC 002 — Page 203 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.643    Filed 10/13/23    Page 46 of 94

Respectfully submitted,

_____
VIRGINIA LEE STORY; BPR #11700
*Attorney for Plaintiff/Wife*
136 Fourth Avenue, South
Franklin, Tennessee 37064
(615) 790-1778
virginia@tnlaw.org

**THIS MOTION IS SET TO BE HEARD ON <u>JULY 18, 2019</u> AT <u>9:00 A.M.</u> ON THE
CHANCERY COURT MOTION DOCKET HEARD AT THE <u>WILLIAMSON COUNTY</u>
COURTHOUSE. IF NO WRITTEN RESPONSE TO THIS MOTION IS FILED AND
SERVED IN THE TIME SET BY THE LOCAL RULES OF PRACTICE, THE MOTION
MAY BE GRANTED WITHOUT A HEARING.
TESTIMONY EXPECTED**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was forwarded by certified mail, first-class mail, and email to Jeffrey Ryan Fenton at Jeff@Meticulous.tech and 1986 Sunny Side Drive, Brentwood, TN 37027 on this the _20__ day of June, 2019.

VIRGINIA LEE STORY

3

195

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

FAWN ▆▆▆ FENTON,                    )
    Plaintiff/Wife,                 )
                     )
vs.                                 )          No. 48419B
                     )
JEFFREY RYAN FENTON,                )
    Defendant/Husband.              )

## AFFIDAVIT OF REASONABLE EFFORTS

STATE OF TENNESSEE          )
COUNTY OF WILLIAMSON        )

    Comes now, Virginia Lee Story, attorney of record for the Petitioner, and after being first duly sworn, states as follows:

    1.    I am over 18 years of age and have personal knowledge of the following facts.

    2.    On June 4, 2019, I filed a Complaint for Divorce on behalf of my client, Fawn ▆▆▆ Fenton.

    3.    That I have sent a file-stamped copy of the Summons and Complaint to Defendant on June 12, 2019 via certified mail.

    4.    That I received a signed return receipt for the Summons and Complaint on June 17, 2019.

    5.    That upon information and belief the signature on the return receipt is that of an adult roommate that is currently residing with Defendant. Pursuant to Tennessee Rules of Civil Procedure if a party is avoiding service, the service may be accepted by an adult living in the home.

    6.    That I have also attempted personal service via a private process server, Lori Polk, who attempted service on three separate occasions to Defendant's residence to no avail (see attached Affidavit of process server). After the process was attempted, Husband posted signs that he would prosecute those entering the property.

    7.    The Defendant is clearly evading service of the Summons and Complaint for Divorce. In 2018, Plaintiff filed for Divorce and Defendant avoided service for several months costing her enormous expense and wasting considerable time. The Defendant has installed video

196


EXHIBIT
1

and audio surveillance, blackout window shades, and physical gates and barriers specifically for the purpose of detecting and avoiding personal service.

8.      That Defendant should be deemed served pursuant to Tennessee Rule of Civil Procedure 4.04(1) so this matter may proceed to conclusion. This notice has been sent to the Defendant/Husband via regular mail and via certified mail with a copy of the Complaint. The Sheriff's Department now has the Complaint for Service as well as the Order of Protection.

FURTHER AFFIANT SAITH NOT.

VIRGINIA LEE STORY

SWORN to and subscribed before me this 20th day of June, 2019.

Notary Public
My Commission Expires: 6-19-...

FILED
WILLIAMSON COUNTY
CLERK & MASTER

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

2019 JUN 11  PH 1: 04

FILED FOR ENTRY_____

FAWN█████FENTON, )
Plaintiff/Wife, )
)
v. )    No. 48419B
)
JEFFREY RYAN FENTON, )
Defendant/Husband. )

**AFFIDAVIT OF LORI POLK**

STATE OF TENNESSEE )
COUNTY OF WILLIAMSON )

Comes now, LORI POLK, after being duly sworn, does state as follows:

1. I am over 18 years of age and have personal knowledge of the facts set forth herein.

2. I am a private process server in the State of Tennessee.

3. On June 5, 2019, I was retained by Virginia Story to personally serve the Summons and Complaint in the above-captioned matter on Defendant, Jeffrey Ryan Fenton.

4. On June 5, 2019 at 7:49 p.m., I went to Mr. Fenton's home address located at 1986 Sunny Side Drive, Brentwood, TN 37027 to personally serve Mr. Fenton with the Summons and Complaint. I knocked on Mr. Fenton's front door and got no answer. The lights were on inside the house. I knocked on the back door of the residence and got no answer. Some lights came on at the back of the property. I noticed that the property is under video and audio surveillance.

5. On June 6, 2019 at 1:34 p.m., I went to Mr. Fenton's home again to serve the papers. I could not approach the front door as the access to the stairs leading up to the front door and porch was newly chained and had a sign posted stating "No Entry."

6. On June 8, 2019 at 9:04 a.m., I went to Mr. Fenton's home again to serve the papers. I walked partially up the driveway towards the residence and noticed a sign posted on the property. Attached is copy of a photograph of the sign. From both the No Entry sign by the front door and the sign next to the driveway posted by the occupant, it is my belief that Mr. Fenton is avoiding service.

1

198

Further Affiant saith not.

_LORI POLK_

Sworn to and subscribed before me on this __11th__ day of June, 2019.

Notary Public
My commission expires: __6-19-22__

2

199

*filed Return 6-11-19*

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that I served this summons together with the complaint as follows:

Check one: (1) or (2) are for the return of an authorized officer or attorney; an attorney's return must be sworn to; (3) is for the witness who will acknowledge service and requires the witness's signature.

☐ 1. I certify that on the date indicated below I served a copy of this summons on the witness stated above by _____

☒ 2. I failed to serve a copy of this summons on the witness because *avoiding Service*

☐ 3. I acknowledge being served with this summons on the date indicated below:

DATE OF SERVICE: *June 1st, 2019*

SIGNATURE OF WITNESS, OFFICER OR ATTORNEY: *Don Polk*

ADDRESS OF PROCESS SERVER (TRCP 4.01) *2801 Sanford Road Nolensville TN 37135*

Signature of Notary Public or Deputy Clerk: *Thiel J Mcy*

Commission Expires: *6-19-22*

(seal: STATE OF TENNESSEE NOTARY PUBLIC — WILLIAMSON COUNTY)

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 2019, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons, and a copy of the complaint, in case no. _____ to the defendant _____ on the _____ day of _____, 2019. I received the return receipt, which had been signed by _____ on the _____ day of _____, 2019. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk and Master.

Signature _____ Address (TRCP 4.01) _____

Sworn to and subscribed before me on this _____ day of _____, 2019.

Signature of Notary Public or Deputy Clerk _____

Commission Expires: _____

## CERTIFICATION (IF APPLICABLE)

I hereby certify this to be a true and correct copy of the original summons issued in this case.

_____

**CLERK & MASTER**

For ADA assistance, please call ADA coordinator: 615-790-5428

200

TNJudicial.org/e/a/jrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC.002 | Page 209 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.849    Filed 10/13/23    Page 52 of 94

# STATE OF TENNESSEE
WILLIAMSON COUNTY
## SUMMONS
CLERK

### IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

**FILED FOR ENTRY**

**FAWN ███ FENTON**
**Plaintiff**

vs.

**JEFFREY RYAN FENTON**
**Defendant**

CIVIL ACTION NO. 48419B

**Service By:**
□ Sheriff
☒ Attorney
□ Sec. Of State
□ Comm. of Insurance

To the above-named Defendant:

**Jeffrey Ryan Fenton**
**1986 Sunny Side Drive**
**Brentwood, TN 37027**

You are hereby summoned and required to serve upon Virginia L. Story, Esq., Plaintiff's attorney, whose address is 136 Fourth Avenue South, Franklin, Tennessee 37064, an answer to the complaint which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witnessed and Issued, Elaine B. Beeler, Clerk and Master for said Court at office this ____ day of __June__ , 2019.

_Jacqueline Edward_
**Clerk & Master**

## NOTICE:

To the Defendant(s): Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the terms you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Mail list, including docket number, to: Clerk and Master, P.O. Box 1666, Franklin, TN 37065.

### RETURN TO CLERK & MASTER

201



FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1210.00



WILLIAMSON COUNTY
CLERK & MASTER

2019 AUG 29  AM 9: 21

FILED FOR ENTRY_____

# Welcome

# to

# Sunny Side!

**CHANCELLOR MICHAEL W. BINKLEY**
**Williamson County Chancery Court**

# EXHIBIT - D

RE: Fenton v Fenton  3

Case# 48419B

203

ListingDetailReportHeader

Page 1 of 1



| Residential | MLS No.1220084 | |
|---|---|---|
| Status Closed | Area 10 | List Price $360,000 |
| Type Site Built | Er/Ea Exc. Right to Sell | Media |
| Address 1986 Sunnyside Dr | City Brentwood | Zip 37027 |
| County Williamson | Sub/Dev Sunny Side | MLS Map |
| Lot Number | Tax ID 013J A 035.00 | Deed Book/Page 4743/715 |

Directions FROM NASHVILLE*SOUTH ON HILLSBORO RD, LEFT ON SUNNYSIDE DR, 1986 IS ON THE RIGHT

### General Information

| | | |
|---|---|---|
| Style Ranch | Stories 1.00 | Year Built 1977 / Approximate |
| Acres 1.470 | Acreage Source | Completion |
| Total Rooms 9 | Size 150.0 x 434.0 | Assoc Fee $ /mo |
| Constr All Brick / Wood | Lot Wooded | Basement Partial / Unfinished |
| Driveway Aggregate | Floors Carpet / Finished Wood / Tile / | Garage 2 / Attached - SIDE |
| Community Amenities | Waterfront / | Roof Composition Shingle |

### Rooms and Dimension Information

| | | |
|---|---|---|
| Liv 15X13 / Formal | Rec 25X33 / Over Garage | Bed 1 15X13 / Full Bath |
| Din 13X12 / Formal | Hobby / | Bed 2 12X11 / |
| Kit 15X12 / Eat-In | Other / | Bed 3 13X13 / |
| Den 19X13 / Fireplace | Other / | Bed 4 12X11 / |

| | Bedrooms | Full Baths | Half Baths | Finished Square Feet (est) | | |
|---|---|---|---|---|---|---|
| Main | 4 | 2 | 1 | Main | 2579 | Est. SqFt. Source |
| Other | 0 | 0 | 0 | Second | | Tax Record |
| | | | | Third | | |
| Total | 4 | 2 | 1 | Basement | | Total 2579 |

### Office and Showing Information

Show Call Showing Center    Owner Name                                    Open House
Agent John Taylor (Ph: 615-794-0833 ext 6035)      CoList Agent (Ph: )
Listing Office Zeitlin & Co., Realtors (Ph: (615) 794-0833)    CoList Office (Ph: )
Appt Phone (615) 327-0101    Subagency 0    Buyer Broker 3    Facilitator 3
Remarks: ALL BRICK RANCH*CUL-DE-SAC LOCATION*HUGE BEDROOMS & BONUS ROOM*9FT CEILINGS & CROWN MOLDING IN LIVING RM, DINING RM, & FOYER*HEATED FLR IN GUEST BATH*PRIVATE WOODED LOT*CONVENIENT TO NASHVILLE, BRENTWOOD & FRANKLIN

### Schools and Utilities

| | | |
|---|---|---|
| Elem1 Grassland Elementary | Elem2 | Middle/JR Grassland Middle School | High Franklin High School |
| Water City Water | Sewer Septic Tank | Cool Electric / Central | Heat Gas / Central |

### Features

| Appliances | Interior Features | Exterior Features | Miscellaneous |
|---|---|---|---|
| Range Cooktop / Electric | Firepl 1 | Fence | Handicap |
| Oven Double Oven / Electric | Drapes | Patio/Deck Deck | Energy Storm Doors / Storm Windows / |
| | Master Bath Sep. Shower/Tub / Ceramic | Pool | Green Cert |
| Other Dishwasher | Other Ceiling Fan / Extra Closets / Utility Connection / | Other Garage Door Opener | Other Cable TV |

### Financing and Taxes

Acceptable Buyer Financing FHA / Other / VA /                                    Taxes $1,461

### MLS Information

Photo None    List Date Sep 27 2010    Poss Date of Deed
Realtor Remarks: BUYER OR BUYER AGENT TO VERIFY SCHOOL ZONING AND ANY OTHER PERTINENT INFORMATION

### Comparable Information

| | | |
|---|---|---|
| Sales Agent Jeff Fenton | Co-Sales Agent | Days On Mkt 205 |
| Sales Office Benchmark Realty, LLC | Co-Sales Office | Presale No |
| Seller Participation 4000 | Closing Date 4/29/2011 | Orig. List Price $360,000 |
| Terms Conventional | Pending Date 4/20/2011 | Sales Price $350,000 |

Requested by: Jeff Fenton

*Information believed to be accurate but not guaranteed. Buyers should independently verify all information prior to submitting any offer to purchase.*

RealTracs Solutions ®
Report Date: 4/29/2011

- 204

CRS - Property Report for Parc ' Tax ID 013J A 035.00                                    Page 1 of 3



**Property Report**

Tuesday, September 27, 2011

1986 Sunnyside Dr, TN
Williamson County, TN parcel# 013J A 035.00

**Property Report**

**Location**

| Property Address | 1986 Sunnyside Dr TN |
| Subdivision | Sunnyside Est Sec 3 |
| County | Williamson County, TN |

**Current Owner**

| Name | Fenton Jeffrey R Fenton Fawn T |
| Mailing Address | 1986 Sunny Side Dr Brentwood, TN 37027-5404 |

**Property Summary**

| Property Type | Residential |
| Land Use | Residential |
| Improvement Type | Single Family |
| Square Feet | 2579 sf |

**General Parcel Information**

| Parcel/Tax ID | 013J A 035.00 |
| Special Int | 000 |
| Alternate Parcel ID | |
| Land Map | 013N |
| District/Ward | |
| Census Tract/Block | |

© 2011 CRS, Inc.    013J A 035.00    169 ft

**Sales History through 09/02/2011**

| Date | Amount | Buyer/Owners | Buyer/Owners 2 | Instrument | Quality | Book/Page or Document# |
|---|---|---|---|---|---|---|
| 04/29/2011 | $350,000 | Fenton Jeffrey R | | Warranty Deed | | 5313/452 11015616 |
| 02/20/2009 | | Terrell Mangel Jerome | | Quit Claim Deed | | 4743/715 |
| 07/08/2005 | $253,000 | Terrell Jerome & Etux Colette Keyser | | Accepted Waranty Deed Sale | Completely Qualified | 3615/152 |
| 08/07/1998 | $228,000 | Bond Melner R & Etux Kimala K | | Accepted Waranty Deed Sale | Completely Qualified | 1708/576 |
| 05/18/1989 | $125,950 | Sweitzer Robert J & Etux Michelle L | | Non-Qualfd Warranty Deed Sale | Completely Qualified | 836/702 |
| 01/01/1978 | $86,500 | | | Non-Qualfd Warranty Deed Sale | Completely Qualified | 318/97 |

**Tax Assessment**

| Appraisals | Amount | Taxes | Amount | Jurisdiction | Rate |
|---|---|---|---|---|---|
| Tax Year | 2010 | City Taxes | $0 | | |
| Appraised Land | $60,000 | County Taxes | $1,461.65 | Williamson | 2.310 |
| Appraised Improvements | $193,100 | SSD Taxes | $0 | | |
| Total Tax Appraisal | $253,100 | Total Taxes | $1,461.65 | | |
| Total Assessment | $63,275 | Exempt Amount | | | |
| | | Exempt Reason | | | |

205

CRS - Property Report for Parcel Tax ID 013J A 035.00         Page 2 of 3

### Mortgage History

| Date | Loan Amount | Borrower | Lender | Book/Page or Document# |
|---|---|---|---|---|
| 4/29/2011 | $280,000 | Fenton Fawn<br>Fenton Jeffrey R | Renasant Bank | 5313/455<br>11015617 |
| 4/29/2011 | $50,000 | Fenton Fawn T<br>Fenton Jeffrey R | Bancorp South Bank | 5313/469<br>11015618 |
| 3/19/2010 | $55,000 | Terrell Mangel Jerome<br>Keyser Colette | First Tennessee Bank National Association | 5033/1<br>10010447 |
| 2/20/2009 | $235,000 | Terrell Mangel Jerome<br>Keyser Colette | Suntrust Bank | 4743/717<br>09008279 |
| 7/8/2005 | $37,950 | Terrell Jerome<br>Keyser Colette | Suntrust Bank | 3615/171<br>05031674 |
| 7/8/2005 | $202,400 | Terrell Jerome<br>Keyser Colette | Suntrust Bank | 3615/155<br>05031673 |
| 10/9/2003 | $173,050 | Bond Melner R<br>Bond Kimala K | First Horizon | 3049/284<br>03582901 |
| 8/7/1998 | $182,400 | Bond Melner R Iii<br>Bond Kimala K | Amsouth Bank | 1708/0576 |
| 8/4/1997 | $15,000 | Sweitzer Robert H & Michelle L | Nationsbank | 1561/728 |
| 5/28/1997 | $30,500 | Sweitzer Robert J Etux | Nashville Bank Of Commerce | 1532/258 |
| 7/12/1996 | $15,181 | Sweitzer Robert & Michelle | Nationsbank | 1424/697 |
| 2/29/1996 | $8,652 | Sweitzer Robert J & Michelle L | Nationsbank | 1378/624 |
| 12/21/1995 | $10,000 | Sweitzer Robert J & Michelle L | Nationsbank | 1361/107 |

### Property Characteristics: Building

| Building # | Type | Condition | Sq Feet | Year Built | Effective Year | BRs | Baths | Rooms | Stories | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Single Family | | 2579 | 1977 | 1996 | | | | 1 | 1 |

| Building Square Feet (Living Space) | | Building Square Feet (Other) | |
|---|---|---|---|
| First Story (Base) | 2579 | Basement (unfinished) | 621 |

#### Construction

| | | | |
|---|---|---|---|
| Quality | | Roof Framing | Gable And Hip |
| Shape | Stair-Step Design | Roof Cover Deck | Composition Shingle |
| Partitions | | Cabinet Millwork | Above Average |
| Common Wall | None | Floor Finish | Carpet Combination |
| Foundation | Continuous Footing | Interior Finish | Panel'g Plast-D Wall |
| Floor System | Wood W/ Sub Floor | Air Conditioning | |
| Exterior Wall | Brick | Heat Type | Heat & Cooling Split |
| Structural Framing | None | Bathroom Tile | Floor & 1/2 Wall |
| Fireplace | 1 | Plumbing Fixtures | 8 |

#### Other

| | | | |
|---|---|---|---|
| Occupancy | Vacant | Building Data Source | Inspection |

### Property Characteristics: Extra Features

| Feature | Size or Description | Year Built | Condition |
|---|---|---|---|
| Drwy | C G | | |
| Patio | 12X14 | 1977 | |
| Frpl | | 1996 | |

### Property Characteristics: Lot

| | | | |
|---|---|---|---|
| Land Use | Residential | Lot Dimensions | 150.00 x 434.00 |
| Block/Lot | /29 | Lot Square Feet | |
| Latitude/Longitude | 36.019077°/-86.874929° | Acreage | |

### Property Characteristics: Utilities/Area

| | | |
|---|---|---|
| Gas Source | | Road Type |
| Electric Source | | Topography |
| Water Source | | District Trend |
| Sewer Source | | Special School District 1 |
| Zoning Code | | Special School District 2 |

206

CRS - Property Report for Parcel Tax ID 013J A 035.00

Page 3 of 3

**Owner Type**

| | |

**Legal Description**

| | | | |
|---|---|---|---|
| Subdivision | Sunnyside Est Sec 3 | Plat Book/Page | 5/67 |
| Block/Lot | /29 | Description | |
| District/Ward | | | |

Tuesday, September 27, 2011

1986 Sunnyside Dr, TN
Williamson County, TN parcel# 013J A 035.00

COPYRIGHT © 2011 COURTHOUSE RETRIEVAL SYSTEM. ALL RIGHTS RESERVED.
Information Deemed Reliable But Not Guaranteed.
Contact Realtracs at 615-385-0777 for Help.

# VISTA



## ADVANCED SECURITY AND ALARM COMMUNICATIONS FOR TODAY'S HOMEOWNER

# The Secure Connection

**CHANCELLOR MICHAEL W. BINKLEY**
**Williamson County Chancery Court**

# EXHIBIT - E

RE: Fenton v Fenton     Case# 48419B

# Honeywell

208



## ADVANCED COMMUNICATIONS

Thanks to Honeywell's VISTA security system, you can make sure that the most reliable technology is protecting your property and the people you love. VISTA can communicate alarm signals with more than just a phone line—giving you more flexibility by using the Internet and GSM wireless radios as either the primary or backup method of alarm transmission. It's a great solution for cell phone-only homes or people that rely on Voice Over IP (VoIP) digital telephone service.

VISTA's built-in communicators can provide you with enhanced security by alerting you when a child comes home from school, if a valuable object has been moved, if extreme temperature is detected and more. VISTA is a system that provides added reliability, security and convenience. It's simply the best way to stay protected...and connected.



209



**VISTA** provides a range of options that keep you aware of what's going on in and around your home and provide you with the peace of mind and protection you deserve. Choose from:



- **Keypads** that are easy to use and put security at your fingertips. Choose from standard or wireless versions, keypads that speak, or sleek graphic touchscreens that match any décor and double as digital picture frames.



- **Fire and Life Safety Products** including professionally installed wireless smoke, heat and carbon monoxide detectors that are connected to your alarm system and can be monitored 24 hours a day.

- **Remote Controls** that let you arm and disarm your security system from a distance, activate panic alarm and control lights and garage doors

- **Environmental Sensors** to help prevent spoilage, damage from flood and extreme temperatures. They're ideal for basements, bathrooms, kitchens, freezers and laundry rooms.

- **Wireless Indoor Theft Prevention Sensors** that alert you when an attempt is made to move or disturb valuable objects within your home, including flat screen TVs, heirlooms, paintings and more—even when the system is disarmed

- **Wireless Outdoor Motion Sensors** that alert you when someone is on your property. They are ideal for sheds, garages, pool areas and driveway alerts.

- **Glassbreak Detectors** provide shatter and shock protection for your windows to further enhance your perimeter protection



## TOTALLY CONNECTED!

You can opt to combine your security system with Honeywell's Total Connect Remote Services, which let you utilize the Internet and various mobile devices to view live video and receive updates about activity in and around your home wherever you are.

- If flood or extreme temperature change is detected, if motion is sensed in a specific indoor or outdoor area or if a protected asset is moved, you can receive e-mail alerts and notification via your PC or laptop, iPhone®, iPad™, cell phone or BlackBerry®. A free, convenient Apple® iPhone App is also available.



- The system can be customized to trigger an alarm in several ways, including sending a message, recording from a video camera or chiming a keypad

- Multiple account capability— lets you monitor vacation homes, investment properties and businesses with one log-in

Apple, iPhone and iPad are trademarks of Apple Inc. All other trademarks are properties of their respective owners.

### The Ultimate Protection

With VISTA, you'll have the ultimate protection—knowing that the proper authorities can be summoned to your home in the event of a burglary, fire or other emergency regardless of the communications path used. Ask your security professional for more information!



210

**For more information:**
www.honeywell.com/security/hsc

**Automation and Control Solutions**
Honeywell Security & Communications
2 Corporate Center Dr. Suite 100
P.O. Box 9040
Melville, NY 11747
1.800.467.5875
www.honeywell.com

L/VISTAEURB/D
April 2010
© 2010 Honeywell International Inc.

## Honeywell

··· 211

## Jeff Fenton

**From:** Jacob [jacob@geoarm.com]
**Sent:** Monday, June 13, 2011 9:15 AM
**To:** 'Jeff Fenton'
**Subject:** RE: Large Residential Honeywell Security Order

Jeff,

Here is the updated list. Simply write in the comments section of your order that "I agree to an additional charge to this credit card of $3,605.04 for the parts as agreed upon in the email with Jacob."

| PART | PRICE | QUANTITY | TOTAL |
|---|---|---|---|
| 21IP Hybrid KIT | 299.99 | 1 | 299.99 |
| 6272CSV | 295.99 | 1 | 295.99 |
| 5828V | 142.99 | 1 | 142.99 |
| 5800RP | 109.99 | 1 | 109.99 |
| Transformer | 17.99 | 1 | 17.99 |
| 5804BDV | 123.99 | 2 | 247.98 |
| 5800WAVE | 107.99 | 1 | 107.99 |
| 748 Ademco | 39 | 1 | 39 |
| 702 Ademco | 27.99 | 1 | 27.99 |
| 5808W3 | 89.99 | 6 | 539.94 |
| 5800CO | 114.99 | 2 | 229.98 |
| 5821-470PB | 73.99 | 1 | 73.99 |
| 5853 | 99.99 | 5 | 499.95 |
| FG701 | 64.99 | 1 | 64.99 |
| 5800PIR-RES | 92.99 | 5 | 464.95 |
| 5800PIR-OD | 274.99 | 1 | 274.99 |
| 5816WMWH | 41.99 | 5 | 209.95 |
| 5814 | 59.99 | 5 | 299.95 |
| 5802MN2 | 56.99 | 1 | 56.99 |

NO Tax, Free Shipping

Total = $4,005.59

-10% Discount ($400.55)

Total = $3,605.04

*Jacob McAuliffe*

Business Development

GeoArm Security Solutions

1133 Old Okeechobee Rd.

8/14/2011

212

TNJudicial. 002 info info.pdf    Case 1:28-cv-01097-PLM-RSK    Williamson County Chancery Court Tennessee (Trial Court Records)    ECF No. 1-19, PageID.861    Filed 10/13/23    Page 64    DOC-002 I Page 221 of 719
of 94

Page 2 of 5

West Palm Beach, FL 33401

Phone #: (561) 209-2550 ext. 102

Fax #: (561) 655-4423

www.alarmclub.com

www.geoarm.com

---

**From:** Jacob [mailto:jacob@geoarm.com]
**Sent:** Friday, June 10, 2011 10:02 AM
**To:** 'Jeff Fenton'
**Subject:** RE: Large Residential Honeywell Security Order

Jeff,

I had to redo the math so here is the correct list:

| PART | PRICE | QUANTITY | TOTAL |
|------|-------|----------|-------|
| 21IP Hybrid KIT | 299.99 | 1 | 299.99 |
| 6272CSV | 295.99 | 1 | 295.99 |
| 5828V | 142.99 | 1 | 142.99 |
| 5800RP | 109.99 | 1 | 109.99 |
| Transformer | 17.99 | 1 | 17.99 |
| 5804BDV | 123.99 | 2 | 247.98 |
| 5800WAVE | 107.99 | 1 | 107.99 |
| 748 Ademco | 39 | 1 | 39 |
| 702 Ademco | 27.99 | 1 | 27.99 |
| 5808W3 | 89.99 | 6 | 539.94 |
| 5800CO | 114.99 | 2 | 229.98 |
| 5821-470PB | 73.99 | 1 | 73.99 |
| 5853 | 99.99 | 5 | 499.95 |
| FG701 | 64.99 | 1 | 64.99 |
| 5800PIR-RES | 92.99 | 5 | 464.95 |
| 5800PIR-OD | 274.99 | 1 | 274.99 |
| 5816WMWH | 41.99 | 5 | 209.95 |
| 5814 | 59.99 | 5 | 299.95 |

NO Tax, Free Shipping

Total = $3,948.60

-10% Discount ($394.86)

Total = $3,553.74

8/14/2011

· 213

If you are ready to place the order, I will have you order the monitoring service plan you want on the website here:

http://www.geoarm.com/alarmnet-internet-alarm-monitoring.html

and then in the comments section of the order, write that you agree to a charge of 3553.74 as per the equipment list in this email.


**Jacob McAuliffe**

Business Development


GeoArm Security Solutions

1133 Old Okeechobee Rd:

West Palm Beach, FL 33401


Phone #: (561) 209-2550 ext. 102

Fax #: (561) 655-4423

www.alarmclub.com

www.geoarm.com

---

**From:** Jeff Fenton [mailto:Jeff@FentonMail.com]
**Sent:** Thursday, June 09, 2011 5:26 PM
**To:** <Jacob@geoarm.com>
**Subject:** Re: Large Residential Honeywell Security Order

Free shipping and no sales tax, right?

Sent from my iPhone


On Jun 9, 2011, at 3:32 PM, "Jacob" <jacob@geoarm.com> wrote:

Jeff,

Because of the size of your order, I am authorized to offer you our maximum discount of 10%.

I added our price for the 5828V ($142.99). I also matched the HSS prices on the two items not listed on our website, the 6272CSV and the 748 Siren.

8/14/2011

_ 214

I also added a transformer for the 5800RP ($17.99) which I recommend for your order.

The total (you may need to check my math) comes to $3883.61. With our 10% discount, the total price for the order would be $3495.25. This is practically cost for the equipment, but our goal is to retain happy monitoring clients. Yes, the magnets are included with the equipment. If you have any additional questions, or want to go ahead with placing the order, just let me know so I can assist you.

*Jacob McAuliffe*

Business Development

GeoArm Security Solutions

1133 Old Okeechobee Rd.

West Palm Beach, FL 33401

Phone #: (561) 209-2550 ext. 102

Fax #: (561) 655-4423

www.alarmclub.com

www.geoarm.com

---

**From:** Jeff Fenton [mailto:Jeff@FentonMail.com]
**Sent:** Thursday, June 09, 2011 12:31 PM
**To:** Jacob@GeoArm.com
**Subject:** Large Residential Honeywell Security Order
**Importance:** High

Hello Jacob,

Please find attached a list of Honeywell equipment that I'm going to purchase. If your company can match the prices of the Home Security Store, then I'll glady give your company the entire order (along with a 3 year monitoring contract with Total Connect), otherwise I'll have to go with what makes the most sense financially.

I want to place this order ASAP, so please let me know what your company is willing to do.

8/14/2011

- 2 - 5

TNJudicial.org/e/a/jrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC. 002 | Page 224 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.864    Filed 10/13/23    Page 67 of 94

Page 5 of 5

Thanks.
Jeff Fenton
(615) 837-1301

---

&lt;Image001.jpg&gt;

**Confidentiality Notice:**

This e-mail message, including any attachments, may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution, or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

8/14/2011

216

**CHANCELLOR MICHAEL W. BINKLEY**
Williamson County Chancery Court

# EXHIBIT - F

RE: Fenton v Fenton          Case# 48419B

WILLIAMSON COUNTY
CLERK & MASTER

2019 AUG 29  AM 9: 20

FILED FOR ENTRY_____.

## Live Office Video Feed

Take a LIVE look into our office in real time! If you see us online then we are READY and able to help! Give us a call for a free consultation on moving forward with your project! Office: (615) 837-1300  Mobile: (615) 837-1301 (ask for Jeff).

**Internet Explorer does not support this video format, please use Firefox, Chrome, or Safari.**



Office Feed Hours: Monday - Friday (8 am - 4 pm)
Audio is Disabled for Personal & Professional Privacy

... - 217

TNJudicial.org/e/a/jrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC_002 | Page 226 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.866    Filed 10/13/23    Page 69 of 94

Datasheet ⬚ Dome IP Camera



# D3100 720p Megapixel Mini Dome IP Camera



- ⦾ **Megapixel 720P HD resolution**
- ⦾ **Multiple H.264, Motion JPEG and MPEG-4 video streams**
- ⦾ **MicroSD card slot**
- ⦾ **Power over Ethernet**
- ⦾ **Ultra-compact**
- ⦾ **Screwless 3-axis angle adjustment for easy installation on wall or ceiling**

- Megapixel CMOS image sensor

- Multiple H.264, Motion JPEG, MPEG-4 and 3GPP video streams

- 30 fps in 1280 x 800

- F1.8 fixed lens , 4.0 mm

  F2.0 fixed lens , 2.8 mm (option)

- Two-way audio and built-in microphone

- Micro SD card slot storage

- Power over Ethernet (IEEE 802.3af)

- 1 x alarm input, 1 x alarm output

- RTC with built-in battery

- SSL v3 advanced HTTPS encryption

- Full support for Firefox, Safari, Chrome and Mac OS

- Supports Samba network storage

- 32 channel ZAVIO CamGraba NVR software

- 3GPP mobile surveillance

- Multi-lingual user interface

WWW.ZAVIO.COM

2 J 8

Datasheet 2  Dome IP Camera    ZAV  D3100 Mini Dome IP Camera

## Technical Specifications

### Camera

| | |
|---|---|
| **Models** | D3100 Mini Dome IP Camera |
| **Image sensor** | 1/4" progressive scan megapixel CMOS sensor |
| **Lens** | F1.8 fixed lens , 4.0 mm<br>F2.0 fixed lens , 2.8 mm (option) |
| **Angle of view** | 53° horizontal<br>81° horizontal (option) |
| **Digital zoom** | 10x digital |
| **Min illumination** | 0.2 Lux at F1.8 |
| **Shutter time** | 1/2 ~ 1/10000 sec |
| **Pan range** | ± 172° |
| **Tilt range** | ± 79° |
| **Rotation** | ± 180° |

### Video

| | |
|---|---|
| **Video compression** | Motion JPEG<br>MPEG-4 part 2 (ISO/IEC 14496-2) simple profile<br>H.264 baseline profile |
| **Resolutions** | Motion JPEG:<br>5 resolutions from 1280 x 800 to 160 x 120 via API,<br>5 selections via configuration web page<br>MPEG-4:<br>5 resolutions from 1280 x 800 to 160 x 120 via API,<br>5 selections via configuration web page<br>H.264:<br>5 resolutions from 1280 x 800 to 160 x 120 via API,<br>5 selections via configuration web page |
| **Frame rate** | Motion JPEG: Up to 30 fps at 1280 x 800<br>MPEG-4:Up to 30 fps at 1280 x 800<br>H.264:Up to 30 fps at 1280 x 800 |
| **Video streaming** | Simultaneous Motion JPEG, MPEG-4, H.264 and 3GPP<br>(4 streams)<br>Controllable Frame rate and bandwidth<br>Support Unicast and Multicast<br>Support 3GPP/ISMA RTSP<br>(Real Time Streaming Protocol) |
| **Image settings** | Brightness, contrast, saturation<br>WDR enhanced<br>Rotation: mirror, flip, mirror flip<br>Overlay capabilities: time, date, text and privacy<br>image |

### Audio

| | |
|---|---|
| **Audio streaming** | Two-way (full duplex) |
| **Audio compression** | G.711 µ law, a law, AMR |

### Network

| | |
|---|---|
| **Security** | Multiple user access levels with password protection,<br>HTTPS encryption |
| **Supported protocols** | Bonjour, TCP/ IP, DHCP, PPPoE, ARP, ICMP, FTP,<br>SMTP, DNS, NTP, UPnP, RTSP, RTP, HTTP, TCP,UDP,<br>3GPP/ ISMA RTSP |
| **Users** | 10 simultaneous users<br>Unlimited number of users using multicast |

### Alarm and Event Support

| | |
|---|---|
| **Alarm input** | Alarm input 5V DC |
| **Alarm and event<br>management** | Input: alarm buffer, motion detection, audio<br>detection<br>Output: network storage, FTP, SMTP, pre-and post<br>alarm buffer |

### System

| | |
|---|---|
| **Connectors** | RJ-45 Ethernet 10/ 100 Base-T<br>Reset button<br>6pin cable for 1 alarm input, 1 output,<br>1 Line in, 1 Line out |
| **Local storage** | MicroSD card slot |

### General

| | |
|---|---|
| **Casing** | Top: PC+ABS casing; Bottom: Aluminum casing |
| **Power** | IEEE 802.3af PoE Class 1 |
| **Operating conditions** | 0 ~ 50 ℃ (32 ~ 122 °F) |
| **Installation,<br>management, and<br>maintenance** | ZAVIO camera management tool on CD and<br>web-based configuration. Configuration of backup<br>and restore firmware upgrades |
| **Minimum web<br>browsing requirement** | Pentium 4 2.8GHz (or equivalent AMD)<br>256MB RAM graphic cards<br>(or equivalent on-board graphic cards)<br>1G RAM<br>Window 2000, 2003, XP, Vista or Windows 7<br>Mac OS Leopard 10.5 or later |
| **Dimensions<br>(HxWxD)** | 60.6 x 99 (φ)mm (2.4"x 3.9") |
| **Weight** | 285g (0.63lb) excl. power supply |
| **Included accessories** | Quick Installation Guide, CD (IP Surveillance Software,<br>Intelligent IP Installer, User Manuals, and Language<br>Pack), mounting and connector kits, focus adjustment |
| **Certification** | CE, FCC, RoHS |

### Integration

| | |
|---|---|
| **Video management<br>software** | IP Installer & Video management software– ZAVIO<br>CamGraba for viewing, recording and archiving up to<br>32 cameras |

## Physical Description



---



ZAVIO Inc. | 2F., No.13, Yanfa 2nd Rd., East Dist., Hsinchu City 300, Taiwan
TEL: 886-3-579-0275 | FAX: 886-3-668-6845 | E-Mail: sales@zavio.com

219

©ZAVIO Inc. 2011 | All brands and product names are trademarks or registered trademarks of their respective owners | Product specifications are subject to change without prior notice.

**Jeff Fenton**

| | |
|---|---|
| **From:** | info@cctvcamerapros.net |
| **Sent:** | Friday, March 15, 2013 1:00 PM |
| **To:** | Business@MeticulousMarketing.com |
| **Subject:** | CCTV Camera Pros Order Confirmation |

---

**CCTV Camera Pros**
www.cctvcamerapros.com 

CustomerID# 26665

Thank you for your order. Your order number is 29437, placed 03/15/2013 at 02:00PM.

**Bill To:**

Jeff Fenton
1986 Sunny Side Drive
Brentwood, TN 37027
United States
(615) 837-1300
Business@MeticulousMarketing.com

**Ship To:**

Jeff Fenton
1986 Sunny Side Drive
Brentwood, TN 37027
United States
(615) 837-1300

**Payment Info:**

**PayPal**

**Shipping Method:**

Free Shipping (UPS Ground)

**Order Details:**

| Code | Item | Qty | Price | Grand Total |
|---|---|---|---|---|
| Zavio-D3100 | Zavio D3100 1 Megapixel Mini Dome Network IP Camera, Indoor, PoE H.264 | 1 | $219.99 | $219.99 |
| POE-12V48 | POE-12V48 Power Over Ethernet for IP Camera, PoE Midspan Injector | 1 | $29.99 | $29.99 |

| | |
|---|---|
| Subtotal: | $249.98 |
| Tax: | $0.00 |
| Shipping Cost: | $0.00 |
| Grand Total: | $249.98 |

Thank you for shopping at CCTV Camera Pros! We appreciate your business!
Visit us again at http://www.cctvcamerapros.com

1

220

**IMPORTANT NOTE:** It is recommended that you test all cameras and cables prior to installation. It is not often, but does happen from time to time that parts are damaged in shipping. To save you time, please test before installing.

**Are you a CCTV Installer?** CCTV Camera Pros wants to refer business to you. We are looking for local installation partners to refer business to. Click here to learn more and to sign up: <u>CCTV Installer Directory</u>

**Technical Support Links** - Please click below for our support pages and other useful resources.

- <u>Support & Knowledge Base</u>
- <u>Support Forums</u>

**Connect with Us** - CCTV Camera Pros posts articles, online tools, and surveillance product information on these pages and apps.

- <u>CCTV Blog</u>
- <u>Facebook Page</u>
- <u>YouTube Channel</u>
- <u>Twitter Feed</u>
- <u>Download our Free iPhone App</u>
- <u>Download our Free Android App</u>

**Thank You for your Business!**

3/15/13          Payment Receipt - PayPal

## CCTV Camera Pros

---

## Payment Receipt

**PayPal transaction number**
7HG17698XP3785838

**Total**
$249.98 USD

We'll send a confirmation email to Sales@MeticulousMarketing.com. This transaction will appear on your statement as PayPal *CCTVCAMERAP.

**Paid to**
CCTV Camera Pros
sales@cctvcamerapros.com
888-849-2288 x 1

**Shipped to**
Jeff Fenton
1986 Sunny Side Drive
Brentwood, TN 37027
United States

## Your shopping cart

| Description | Price | Quantity | Amount |
|---|---|---|---|
| Order Number 29437 | $249.98 | 1 | $249.98 |
| | | **Item total** | **$249.98** |
| | | Tax | $0.00 |
| | | **Total** | **$249.98 USD** |

222

TNJudicial.org/e/a/jrf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC_002 | Page 231 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.871    Filed 10/13/23    Page 74 of 94

12/29/2014 6:24 AM                                                    PayPal Website Payment Details - PayPal

## Transaction Details

**Web Accept Payment Sent (Unique Transaction ID #7HG17698XP3785838)**

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Mar 15, 2013 | Payment To CCTV Camera Pros | Completed | ... | -$249.98 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Mar 15, 2013 | Charge From Credit Card | Completed | Details | $249.98 USD |

**Business Name:** CCTV Camera Pros (The recipient of this payment is Verified)
**Email:** sales@cctvcamerapros.com

**Total amount:** -$249.98 USD
**Fee amount:** $0.00 USD
**Net amount:** -$249.98 USD

**Item amount:** $249.98 USD
**Sales Tax:** $0.00 USD
**Shipping:** $0.00 USD
**Handling:** $0.00 USD
**Quantity:** 1

**Item Title:** Order Number 29437
**Item Number:** 29437
**Date:** Mar 15, 2013
**Time:** 13:04:56 CDT
**Status:** Completed

**Shipping Address:** Meticulous Marketing LLC
1986 Sunny Side Drive
Brentwood, TN 37027
United States
Confirmed ❓

**Business Contact Information**

**Customer Service URL:** http://www.cctvcamerapros.com
**Customer Service Email:** sales@cctvcamerapros.com
**Customer Service Phone:** 888-849-2288 x1

**Funding Type:** Credit Card
**Funding Source:** $249.98 USD - American Express Card XXXX-XXXXXX-X1007

This credit card transaction will appear on your bill as "PAYPAL *CCTVCAMERAP".

**Description:** CCTV Camera Pros

Return to Log

223

https://history.paypal.com/us/cgi-bin/webscr?cmd=_history-details&inf...                    1 of 1



Home > Private Property Signs > Designer Private Property Signs > K-7395

FILED FOR ENTRY_____

**Private Property, STOP No Trespassing, No Exceptions!**
24" x 18" SignatureSign™

data:image/png;base64,iVBORw0KGgoAAAANSUhEUgAAA7UA...

CHANCELLOR MICHAEL W. BINKLEY
Williamson County Chancery Court

**EXHIBIT - G**

224

RE: Fenton v Fenton    Case# 48419B



## My **Security** Sign

300 Cadman Plaza West, Suite 1303, Brooklyn, NY 11201

## Invoice

Questions? Call (800) 952 1457

**Bill To**

**Fawn Fenton**
1986 Sunny Side Dr.
Brentwood, TN 37027
Phone: 615-█████
Email: accounts@fentonmall.com

**Ship To**

**Fawn Fenton**
1986 Sunny Side Dr.
Brentwood, TN 37027
Phone: 615-█████
Email: accounts@fentonmall.com

Order No.: MSS-111641    Date: November 16, 2015    Ship by: UPS Regular

| Item Description | Unit Price | Qty. | Amount |
|---|---|---|---|
| 1. **Private Property, STOP No Trespassing, No Exceptions!**<br>Color: Green Reversed<br>Size: 18" x 24" (H x W)<br>Part #: K-7395 • HTC Code: 8310.00.00.90 | $43.99/Sign<br>Package: 1 Sign | 2 Signs | $87.98 |
| 2. **Sign Attachment Kit - 2 bolts and 2 nuts**<br>Size: 2.5" x 0.3125" (H x W)<br>Part #: K-KIT • | $1.05/Kit<br>Package: 1 Kit | 2 Kits | $2.09 |
| | Product Subtotal : | | $90.07 |
| | Estimated Shipping Charges : | | Free |
| | Order Total : | | **$90.07** |

Please make checks payable to **SmartSign**.

Print Page     Close Window

225

· 11/16/2015 6:12 PM

PayPal: Transaction Details



**November 16, 2015**

**XpressMyself.com LLC**
Authorization

**- $90.07**

---

ℹ This is a temporary authorization to make sure your payment method will cover the payment. Your payment method will be charged when XpressMyself.com LLC completes your order.

**Paid with**
**VISA x-6593**

**Seller info**
XpressMyself.com LLC
(718) 797-1900
customerservice@smartsign.com

**Ship to**
Fawn Fenton
1986 Sunny Side Dr.
Brentwood, TN 37027
United States

**Your purchase**
XpressMyself.com LLC                    $90.07

**Transaction ID**
4XX364771G426804E

| | |
|---|---|
| Shipping | $0.00 |
| Tax | $0.00 |
| Purchase total | $90.07 |
| Fee | $0.00 |
| **Total** | **$90.07** |

226

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1234.00

**Jeff Fenton**

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Thursday, December 3, 2015 1:37 PM |
| **To:** | Jeff Fenton |
| **Subject:** | RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes |

Hello,

Hm, I find that red-and-white stop sign to be TOO eye-catching, and therefore an offensive eye-sore, right where I pull up my car every day and see it.
Would you maybe consider this sign instead?
http://www.mysecuritysign.com/Private-Property-Signs/Premises-Protected-24-Hours-No-Trespassng-Sign/SKU-K-7496.aspx
and have the small text customized to say "these premises under 24 hour surveillance".
12"x18" size?
Have you considered the reflective-aluminum ones? Looks like only a couple bucks more?

Thank you for asking my opinion!
=)

**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 1:15 AM
**To:** Fawn Fenton
**Subject:** NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes
**Importance:** High

Hello Lovie,

I'd like you to weigh-in regarding two of the "No Trespassing" signs that I'm planning to purchase.

About "No Trespassing" laws in Tennessee:
- https://www.youtube.com/watch?v=Ir6TziJ9g9Q
- http://law.justia.com/codes/tennessee/2010/title-39/chapter-14/part-4/39-14-405 (See Section 'C')
- http://www.ehow.com/how_6604312_enforce-trespassing-signs-tennessee.html

I've already purchased (and have received) 3 "designer", decorative residential, "No Trespassing" signs for our front yard, to comply with the requirements of TN State law, for us to have legal grounds to press criminal charges (misdemeanor offense) against anyone found to be trespassing on our property, provided that they accessed our property from the street.

- One sign (http://www.mysecuritysign.com/No-Trespass-Sign/Private-Property-STOP-Sign/SKU-K-7395.aspx) will be posted on each side of our driveway (so it can't be missed), near the street, at the bottom of our tree line, between us and the Mosses.

1

227

- One sign (http://www.mysecuritysign.com/Video/Oval-Designer/Sign/SKU-K-4574.aspx) will be posted at the base of our front porch, for anyone who may have parked on the street and walked across our front yard, thereby being able to claim that they "didn't see" the signs posted on our driveway.
- We already have these three signs in our possession, and they are the ones that we will be installing the black posts into the ground for mounting, as I've already mentioned to you.
- I tried to select the nicest looking, clear and concise signs as I could, for these three, because they will stand-out more than the others.
- I didn't mention "surveillance" on the signs near the road, because I felt that was irrelevant as long as they stayed OFF of our property. (Plus it was more of an outstanding eye-soar near the street.) There is a legal requirement to inform people that they are being recorded (audio and video) once they do come onto our property though (both indoors and outdoors). Actually the laws are more strict in regards to recording audio than video, more along the lines of "wire-tapping" or "eavesdropping", and the individual's personal RIGHT to know.

In addition to these three "posted" signs, I will be purchasing four more signs to hang on our fences. One to go near the gate on each side of our house, and one to go on each of the short sections where the fence terminates, up in the woods. These four signs are what I'm currently in the process of purchasing. I'm in discussions with the sign manufacturer to customize one of their stock signs (http://www.mysecuritysign.com/signs/video-security-surveillance-sign/sku-K-4703.aspx), to make it more appropriate for a residential application, instead of a commercial building, for which it appears to have been originally designed.

- Stock Sign: http://www.mysecuritysign.com/signs/video-security-surveillance-sign/sku-K-4703.aspx
- Requested changes:

   o I'd like to replace the words "██████████████" with "NO TRESPASSING".

   o I'd also like to replace the word "████████" with "PROPERTY".

I spent an entire DAY looking through hundreds of "no trespassing" and "surveillance" sign designs, what I like about this sign is the simplicity and clarity, without being obnoxious. Yes, it costs a little bit more to have it customized, but it is worth it to me to make it more suitable for our residential application. When manufactured with the higher grade materials (you can choose plastic or metal), it is only about $10 more per sign than the stock design.

What I like about this design and why I selected it:
- The simplicity and clarity, without being obnoxious.
- The classic "STOP" sign look, catches your attention and speaks universally.
- I think the design sort of "draws you in" and makes you curious, rather than "pushing you away" with a plethora of text, listing a slew of offenses and warnings.
- I like the small video cameras on both sides, rather than a large central graphic.

2

228

- The fact that it says "SURVEILLANCE" instead of "Video Surveillance". IF we choose to SPECIFY "Video Surveillance", then rightly by law we should specify "Audio Surveillance" as well. This gets to be a lot of jumbled crap to put on a sign. I prefer just warning that there is "24 Hour Surveillance" without SPECIFYING whether it is "audio" or "video" or BOTH.

IN the woods I'm planning to install two 18" x 18" signs, one on each side where our fence terminates, as previously described.

**HERE IS THE PART THAT I WANT YOUR FEEDBACK ON:**

For the two signs that will be attached to our fence, mounted NEAR the GATES, one on each side of our home, I had originally planned for those to be the smaller 10" x 10" signs (they are about HALF the cost of the larger signs, when using the STOCK designs). However, after getting pricing with the customizations that I requested, it will **COST THE SAME** for the 10" x 10" signs as it will for the 18" x 18" signs. **So the question that I have, is with it ALL COSTING THE SAME, which SIZE do YOU PREFER that we purchase to attach to our fence, NEAR the GATES, on both sides of our home?**
  - 10" x 10"
  - 12" x 12"
  - 14" x 14"
  - 18" x 18"

**Please let me know your preference**. Likewise, if for some reason you dislike this design, please feel free to suggest an alternative, just please bear in mind the legal purposes for which it is being purchased: BOTH to protect our property from trespassers, while ALSO meeting our legal obligations to INFORM guests that we use audio & video surveillance throughout our property.

I'd like to order this within the next 48 hours if possible. Please let me know your thoughts.

Thanks Lovie! ☺

**Jeff Fenton**
**Meticulous Marketing LLC**
(615) 837-1300 Office
(615) 837-1301 Mobile
(615) 837-1302 Fax

**When it's worth doing RIGHT the first time!**

Submit or respond to a support ticket here.

3

229

## Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Thursday, December 3, 2015 4:13 PM |
| **To:** | Jeff Fenton |
| **Subject:** | RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes |

Hm, ok, I guess at the 10"x10" size, they'd be ok.

**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 4:11 PM
**To:** Fawn Fenton
**Subject:** RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes

I thought that the 10" x 10" stop signs would look good on the gates... not too loud in my opinion. Again, it conveyed a lot of information without being too obnoxious or slow and difficult to read.

## Jeff Fenton

**Meticulous Marketing LLC**
(615) 837-1300 Office
(615) 837-1301 Mobile
(615) 837-1302 Fax

**When it's worth doing RIGHT the first time!**

Submit or respond to a support ticket here.

**From:** Fawn Fenton
**Sent:** Thursday, December 03, 2015 4:08 PM
**To:** Jeff Fenton <Jeff@Meticulous.pro>
**Subject:** RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes

Yes, that's what I meant, use the big STOP sign ones for the ends of the fence in the woods. Only get less-obtrusive ones at the gates, since they're highly visible.

**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 4:03 PM
**To:** Fawn Fenton
**Subject:** RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes

We could still specify the two 18" x 18" stop sign looking ones for in the WOODS, at the termination points, and just select something different for the two gates...?

Your thoughts?

## Jeff Fenton

**Meticulous Marketing LLC**

1

230

TNJudicial.org/p/jeirf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC.002 | Page 239 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.879    Filed 10/13/23    Page 82 of 94

## Jeff Fenton

**From:** Fawn Fenton
**Sent:** Thursday, December 3, 2015 4:25 PM
**To:** Jeff Fenton
**Subject:** RE: NO Trespassing Signs for Fence | Feedback Requested: Sign Sizes

Black with white text like this would match fence?



**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 4:19 PM
**To:** Fawn Fenton
**Subject:** RE: NO Trespassing Signs for Fence | Feedback Requested: Sign Sizes

We might could use it if you prefer. To be honest, I really didn't look at those very much, I thought they were too small. They look more like a sign that you put directly on an entry door. I'm not planning to attach these TO the gate, I'm planning to attach them to the panel immediately adjacent to the gate. They might be ok if you really prefer them.

## Jeff Fenton

__Meticulous Marketing LLC__
(615) 837-1300 Office
(615) 837-1301 Mobile
(615) 837-1302 Fax

**When it's worth doing RIGHT the first time!**

Submit or respond to a support ticket here.

**From:** Fawn Fenton
**Sent:** Thursday, December 03, 2015 4:16 PM
**To:** Jeff Fenton <Jeff@Meticulous.pro>
**Subject:** RE: NO Trespassing Signs for Fence | Feedback Requested: Sign Sizes

Oh, I see, customizable signs.

This one too small for you?

1

- 231

---

## Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton |
| **Sent:** | Thursday, December 3, 2015 4:39 PM |
| **To:** | Jeff Fenton |
| **Subject:** | RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes |

Meet you in the middle.... Get the 3"x9"?

**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 4:38 PM
**To:** Fawn Fenton
**Subject:** RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes

I'll let you decide... let me know which size you want, with all things considered. ☺

## Jeff Fenton

**Meticulous Marketing LLC**
(615) 837-1300  Office
(615) 837-1301  Mobile
(615) 837-1302  Fax

**When it's worth doing RIGHT the first time!**

Submit or respond to a support ticket here.

**From:** Fawn Fenton
**Sent:** Thursday, December 03, 2015 4:31 PM
**To:** Jeff Fenton <Jeff@Meticulous.pro>
**Subject:** RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes

I was looking at the 3"x9" or 4"x12" ones.
I hadn't noticed that other one was only 2"x6".
;)

**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 4:29 PM
**To:** Fawn Fenton
**Subject:** RE: NO Trespassing Signs for Fence \| Feedback Requested: Sign Sizes

Isn't that the same size as the one you sent?

## Jeff Fenton

**Meticulous Marketing LLC**
(615) 837-1300  Office
(615) 837-1301  Mobile
(615) 837-1302  Fax

**When it's worth doing RIGHT the first time!**

1

· - 232

Submit or respond to a support ticket here.

**From:** Fawn Fenton
**Sent:** Thursday, December 03, 2015 4:28 PM
**To:** Jeff Fenton <Jeff@Meticulous.pro>
**Subject:** RE: NO Trespassing Signs for Fence | Feedback Requested: Sign Sizes

Wow, ok, that's really tiny!
I am good with that one!

**From:** Jeff Fenton
**Sent:** Thursday, December 03, 2015 4:27 PM
**To:** Fawn Fenton
**Subject:** RE: NO Trespassing Signs for Fence | Feedback Requested: Sign Sizes

How about the one I attached?

## Jeff Fenton

**Meticulous Marketing LLC**
(615) 837-1300  Office
(615) 837-1301  Mobile
(615) 837-1302  Fax

**When it's worth doing RIGHT the first time!**

Submit or respond to a support ticket here.

233



FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1242.00

TNJudicial.org/p/jsjrf002.pdf          Williamson County Chancery Court Tennessee (Trial Court Records)          DOS-002 | Page 243 of 719

Case 1:23-cv-01097-PLM-RSK          ECF No. 1-19, PageID.883          Filed 10/13/23          Page 86 of 94

## Jeff Fenton

**From:** Fawn Fenton
**Sent:** Friday, July 24, 2015 1:49 PM
**To:** Jeff Fenton
**Subject:** RE: Hello :)

Yow!

;)

**From:** Jeff Fenton
**Sent:** Friday, July 24, 2015 1:48 PM
**To:** Fawn Fenton
**Subject:** Hello :)

http://cdn.wideopenspaces.com/wp-content/uploads/2015/01/No-Trespassing-44.jpg

## Jeff Fenton

**Meticulous Marketing LLC**
(615) 837-1300 Office
(615) 837-1301 Mobile
(615) 837-1302 Fax

**When it's worth doing RIGHT the first time!**

Submit or respond to a support ticket here.

1

235

TNJudicial.org/e/afirf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DQS_002 | Page 244 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.884    Filed 10/13/23    Page 87 of 94

12/3/2015 4:23 PM        (PNG Image, 957 × 504 pixels)



data:image/png;base64,iVBORw0KGgoAAAANSUhEUgAAA70AA...

236   1 of 1

TNJudicial.org/0/0/0/af0022.pdf — Williamson County Chancery Court Tennessee (Trial Court Records) — DOC 002 Page 245 of 719

Case 3:23-cv-01097-PLM-RSK    ECF No. 1-19, PageID.885    Filed 10/13/23    Page 88 of 94

11/24/2015                                                    Invoice



My **Security** Sign

300 Cadman Plaza West, Suite 1303, Brooklyn, NY 11201

## Invoice

Questions? Call (800) 952 1457

**Bill To**

Fawn Fenton
1986 Sunny Side Dr.
Brentwood, TN 37027
Phone: 615-▮▮▮▮▮
Email: accounts@fentonmail.com

**Ship To**

Fawn Fenton
1986 Sunny Side Dr.
Brentwood, TN 37027
Phone: 615-▮▮▮▮▮
Email: accounts@fentonmail.com

| Order No.: MSS-111910 | Date: November 24, 2015 | Ship by: UPS Regular |
|---|---|---|

| Item Description | Unit Price | Qty. | Amount |
|---|---|---|---|
| 1. No Trespassing, This Property Is Protected By Video Surveillance, Trespassers will be Prosecuted Sign (with Graphic)<br>Color: Green Reversed<br>Size: 12" x 18" (H x W)<br>Part #: K-4574 • HTC Code: 8310.00.00.90 | $28.59/Sign<br>Package: 1 Sign | 1 Sign | $28.59 |

|  |  |
|---|---|
| Product Subtotal : | $28.59 |
| Estimated Shipping Charges : | Free |
| Order Total : | **$28.59** |

Please make checks payable to **SmartSign**.

🖨 **Print Page**    ✖ **Close Window**

https://www.mysecuritysign.com/xp5/PrintInvoice.aspx?eqs=Zc2LgpWSQUOdY%2b7iqORUYsfdzodsTC8kW8aFWDOlRXQ%3d

1/1
*237

TNJudicial.org/admin100228/ Williamson County Chancery Court Tennessee (Trial Court Records)
Case 1:23-cv-01097-PLM-RSK ECF No. 1-19, PageID.886 Filed 10/13/23 DOC 002 | Page 246 of 719
Page 89
of 94

11/24/2015                                         PayPal: Transaction Details



**November 24, 2015**

XpressMyself.com LLC                                              - $28.59
Authorization

---

ℹ This is a temporary authorization to make sure your payment method will cover the payment. Your
   payment method will be charged when XpressMyself.com LLC completes your order.

**Paid with**                              **Seller info**
VISA x-6593                                XpressMyself.com LLC
                                           (718) 797-1900
**Ship to**                                customerservice@smartsign.com
Fawn Fenton
1986 Sunny Side Dr.                        **Your purchase**
Brentwood, TN 37027                        XpressMyself.com LLC                    $28.59
United States

**Transaction ID**                              Shipping                          $0.00
1G6000416Y163691M                               Tax                               $0.00
                                                Purchase total                    $28.59
                                                Fee                               $0.00
                                                **Total**                         **$28.59**



WILLIAMSON CLERK & MASTER

2019 AUG 29 AM 9: 20

FILED FOR ENTRY

# DS-2CD2742FWD-IZS
## 4 MP WDR Dome Network Camera with IR



     

### Key Features

- 4 Megapixel High Resolution
- Full HD1080p Video
- Dual Video Streams
- 2.8 mm to 12 mm Motorized Lens
- 120 dB Wide Dynamic Range
- 3D Digital Noise Reduction
- Smart Features
- PoE (802.3af)
- IR Range 30 Meters (~100 feet)
- IP66 and IK10 Protection
- Audio and Alarm Input/Output
- Edge Storage, MicroSD Slot, 128 GB

### Dimensions



| | DS-2CD2742FWD-IZS |
|---|---|
| **Camera** | |
| Image Sensor | 1/3" progressive scan CMOS |
| Minimum Illumination | Color: 0.014 lux @ (f/1.4,AGC on); B/W: 0 lux with IR |
| Shutter Speed | 1/3 s to 1/10,000 s |
| Slow Shutter | Yes |
| Lens | 2.8 mm to 12 mm @ f/1.4, motorized lens |
| Angle of View | 112° to 33.8° |
| Lens Mount | Φ14 |
| Day/Night | IR cut filter with auto switch/schedule/triggered by alarm |
| Digital Noise Reduction | 3D DNR |
| Wide Dynamic Range | 120 dB |
| Pan/Tilt/Rotation | Pan: 0° to 355°, tilt: 0° to 75°, rotation: 0° to 355° |
| **Compression Standards** | |
| Video Compression | H.264+/H.264/MJPEG |
| H.264 Type | Main Profile |
| Video Bit Rate | 32 Kbps to 16 Mbps |
| Dual Streams | Yes |
| Audio | G.711/G.722.1/G.726/MP2L2, 64 Kbps (G.711)/16 Kbps (G.722.1)/16 Kbps (G.726)/32 to 128 Kbps (MP2L2) |
| **Image** | |
| Maximum Resolution | 2688 × 1520 |
| Frame Rate | 20 fps (2688 × 1520), 30 fps (1920 × 1080, 1280 × 720) |
| Image Settings | Compression, color, saturation, brightness, contrast, sharpness, rotate mode, privacy mask |
| Backlight Compensation | Yes, zone configured |
| Region of Interest (ROI) | Yes |
| **Analytics** | |
| Smart Features | Line crossing detection, intrusion detection |
| **Network** | |
| Network Storage | NAS (supports NFS,SMB/CIFS); ANR |
| Alarm Triggers | Motion detection, line crossing detection, intrusion detection, tamper alarm, network disconnect, IP address conflict, storage exception |
| Protocols | TCP/IP, UDP, ICMP, HTTP, HTTPS, FTP, DHCP, DNS, DDNS, RTP, RTSP, RTCP, PPPoE, NTP, UPnP, SMTP, SNMP, IGMP, 802.1X, QoS, IPv6, Bonjour |
| Security | Three level user authentication, password authorization, HTTPS and SSH certificate, IEEE802.1X, basic and digest authentication, watermark, IP address filtering, log-in lockout |
| Standards | ONVIF (PROFILE S, PROFILE G), PSIA, CGI, ISAPI |
| **Interface** | |
| Communication | 1 RJ-45 10M/100M Ethernet port |
| On-Board Storage | Built-in microSD/SDHC/SDXC slot, up to 128 GB |
| Alarm | 1 alarm I/O |
| Audio | 1 audio I/O |
| **General** | |
| Operating Conditions | -30° C to 60° C (-22° F to 140° F), humidity 95% or less (non-condensing) |
| Power | 12 VDC ±10%, PoE (802.3af) UL/cUL Listed |
| Power Consumption | Maximum 5.5 W |
| IR Range | 30 meters (~100 feet) |
| Ingress Protection | IP66 |
| Impact Protection | IEC60068-275Eh, 20J; EN50102, up to IK10 |
| Dimensions | Φ140 mm × 99.9 mm (Φ5.51" × 3.94") |
| Weight | 1000 g (2.20 lbs) |

### Accessories







| RCM-1 In-Ceiling Mount | PC135 + WMS Pendant Cap With Wall Mount | AB135 Angled Base | SRSL Rain Shade | CB135 Conduit Base |

### Order Model
DS-2CD2742FWD-IZS

Hikvision USA Inc., 908 Canada Court, City of Industry, CA 91748, USA • Hikvision Canada, 4485 Dobrin, St-Laurent
Tel: +1-909-895-0400 • Toll Free in USA: +1-866-200-6690 • E-Mail: sales.usa@hikvision.com • www.hikvision.com
© 2015 Hikvision USA Inc. • All Rights Reserved • Specifications subject to change without notice.

**CHANCELLOR MICHAEL W. BINKLEY**
Williamson County Chancery Court

# EXHIBIT - H
239

RE: Fenton v Fenton                Case# 48419B



| Lens Size | 2. 5mm | 2. 8mm | 3. 6mm | 4mm | 6mm | 8mm | 12mm | 16mm | 25mm | 60mm |
|---|---|---|---|---|---|---|---|---|---|---|
| View Angle | 100° | 90° | 75° | 70° | 60° | 40° | 30° | 20° | 12° | 5° |
| see clearly the number plate from | 1.5M | 2M | 2.5M | 3M | 5M | 7M | 10M | 20M | 25M | 50M |
| Cover Distance | | | 5 | 6 | 10 | 20 | 30~35 | 50~60 | 70~80 | |



Pictures taken by the same camera with different size lens



241

< < SALES ORDER > >

**AUDIO VIDEO SUPPLY, INC.**
4575 RUFFNER ST.
SAN DIEGO CA 92111

MET44

Sold To: **METICULOUS PROFESSIONAL**          Ship To: **METICULOUS PROFESSIONAL**
**SOLUTIONS**                                                **SOLUTIONS**
1986 SUNNY SIDE DR.                          1986 SUNNY SIDE DR.
BRENTWOOD TN 37027                           BRENTWOOD TN 37027

Phone: 615-837-1300

| Order No. | Order Date | Loc ID | Terms | | | Customer P.O.# | Ship Via | Sls | Pg |
|-----------|-----------|--------|-------|---|---|----------------|----------|-----|-----|
| 00126676 | 07/20/16 | A-STK | Credit Card | | | ******** | BESTWAY FOB AVS | T02 | 1 |
| | | | | | | VERBAL / J.FENTON MA | | | |

| | Item No/Description | Units | Qty Ord | Qty Shp | Qty Bko | Unit Price | Extended Price |
|---|---------------------|-------|---------|---------|---------|------------|----------------|
| 001 | DS2CD2742FWDIZS | EA | 4 | | | 327.00 | 1308.00 |
| | 4MP WDR DOME NETWORK CAMERA | | | | | | |
| 002 | DS2CD2542FWDIS/2.8 | EA | 3 | | | 198.00 | 594.00 |
| | COMPACT DOME 1080P H264 2.8mm | | | | | | |
| 003 | DS2CD2142FWDIS/2.8 | EA | 1 | | | 173.00 | 173.00 |
| | OUTDOOR DOME 1080P H264 2.8mm LENS | | | | | | |
| 004 | DS2CD2142FWDIS/4MM | EA | 1 | | | 173.00 | 173.00 |
| | OUTDOOR DOME 1080P H264 4.0MM LENS | | | | | | |
| 005 | DS2CD2142FWDIS/6MM | EA | 1 | | | 173.00 | 173.00 |
| | OUTDOOR DOME 1080P H264 6.0mm LENS | | | | | | |
| 006 | | | 1 | | | 0.00 | 0.00 |
| | EMAIL INVOICE/TRACKING TO: | | | | | | |
| | accounting@fentonmail.com | | | | | | |

TERMS AND CONDITIONS: All sales are final. No unauthorized returns will be accepted
                       All returns subject to minimum 25% Restocking fee
                       All shortages/damages must be reported in 10 days

Customer Signature/Date: _____

|  |  |  |
|---|---|---|
| | Taxable SubTotal: | 2421.00 |
| | Calif. Sales Tax: | 0.00 |
| Box Count _____ Weight _____ | Sub Total : | 2421.00 |
| | Shipping : | 0.00 |
| Thank you very much for your business | Total : | 2421.00 |

242

**HIKVISION**

# DS-2CD2542FWD-IS Series
## 4 MP WDR Mini Dome Network Camera



     

## Key Features

- 4 MP High Resolution
- Full HD1080p
- Dual Video Streams
- 2.8 mm, 4 mm, 6 mm Fixed Lens Options
- 120 dB Wide Dynamic Range
- 3D Digital Noise Reduction
- 3-Axis Adjustment
- 12 VDC and PoE
- Supports H.264+
- Up to 10 Meters IR Range
- IP66 Weatherproof Protection
- IK08 Vandal Resistant
- Built-In Microphone, Audio Output, Alarm I/O
- Wireless Option (-IWS)

## Accessories

  

| Wall Mount<br>PC120 | Wall Mount +<br>Junction Box<br>WML + PC120 | Pendant Mount<br>CPM + PC120 |

  

| Sun/Rain Shade<br>SRSM | Vertical Pole Mount<br>PM | Corner Mount<br>CM |

## Dimensions

  

Units: mm

## Order Model
DS-2CD2542FWD-IS
DS-2CD2542FWD-IWS, WiFi

| DS-2CD2542FWD-IS Series | |
|---|---|
| **Camera** | |
| Image Sensor | 1/3" progressive scan CMOS |
| Minimum Illumination | 0.01 lux @ (f/1.2, AGC on), 0 lux with IR<br>0.028 lux @ (f/2.0, AGC on), 0 lux with IR |
| Shutter Speed | 1/3 s to 1/10,000 s |
| Lens | 2.8 mm, 4 mm, 6 mm @ f/2.0 |
| Lens Mount | M12 |
| Day/Night | IR cut filter with auto switch |
| DNR | 3D DNR |
| Wide Dynamic Range | 120 dB |
| Angle of Adjustment | Pan: -30° to 30°, tilt: 0 to 75°, rotation: 0 to 360° |
| **Compression Standard** | |
| Video Compression | H.264/MJPEG/H.264+ |
| H.264 Type | Main profile |
| Video Bit Rate | 32 Kbps to 16 Mbps |
| Dual Streams | Supported |
| Audio Compression | G.711/G.722.1/G.726/MP2L2 |
| Audio Bit Rate | 64 Kbps (G.711)/16 Kbps (G.722.1)/16 Kbps (G.726)/32 to 128 Kbps (MP2L2) |
| **Image** | |
| Maximum Resolution | 2688 × 1520 |
| Frame Rate | 20 fps (2688 × 1520), 30 fps (1920 × 1080), 30 fps (1280 × 720) |
| Image Setting | Rotate mode, saturation, brightness, contrast, sharpness adjustable by client software or Web browser |
| BLC | Supported, zone configurable |
| ROI Codec | Supported |
| **Network** | |
| Network Storage | NAS (supports NFS,SMB/CIFS), ANR |
| Alarm Trigger | Motion detection, tampering alarm, network disconnect, IP address conflict, storage exception |
| Protocols | TCP/IP, UDP, ICMP, HTTP, HTTPS, FTP, DHCP, DNS, DDNS, RTP, RTSP, RTCP, PPPoE, NTP, UPnP, SMTP, SNMP, IGMP, 802.1X, QoS, IPv6, Bonjour |
| General | One-key reset, flash-prevention, dual stream, heartbeat, mirror, password protection, privacy mask, watermark, IP address filtering, anonymous access |
| Standard | ONVIF (PROFILE S, PROFILE G), PSIA, CGI, ISAPI |
| **Interface** | |
| Communication Interface | 1 RJ-45 10M/100M Ethernet port |
| On-Board Storage | Built-in microSD/SDHC/SDXC slot, up to 128 GB |
| Alarm Interface | 1x alarm I/O |
| Audio Interface | Built-in microphone and 1x audio output |
| Reset | Yes |
| **Wi-Fi (-W models only)** | |
| Wireless Standards | IEEE802.11b, 802.11g, 802.11n |
| Frequency Range | 2.4 GHz to 2.4835 GHz |
| Channel Bandwidth | 20/40 MHz support |
| Protocols | 802.11b: CCK, QPSK, BPSK, 802.11g/n: OFDM |
| Security | 64/128-bit WEP, WPA/WPA2, WPA-PSK/WPA2-PSK, WPS |
| Transmit Output Power | 11b: 17 ±1.5 dBm @ 11 Mbps 11g: 14±1.5 dBm @ 54 Mbps 11n: 12.5±1.5 dBm |
| Reception Sensitivity | 11b: -90 dBm @ 11 Mbps (typical) 11g: -75 dBm @ 54 Mbps (typical) 11n: -74 dBm (typical) |
| Transfer Rates | 11b: 11 Mbps, 11g: 54 Mbps, 11n: up to 150 Mbps |
| Wireless Range | 50 meters    *The performance varies based on actual environment. |
| **General** | |
| Operating Conditions | -30° C to 60° C (-22° F to 140° F), humidity 95% or less (non-condensing) |
| Power Supply | 12 VDC ±10%, PoE (802.3af) |
| Power Consumption | Maximum 5 W, maximum 9 W with pan and tilt |
| IR Range | Approximately 10 meters |
| Ingress Protection | IP66 |
| Impact Protection | IEC60068-275Eh, 20J; EN50102, up to IK08 |
| Dimensions | 99.3 mm × 96.7 mm × 52.8 mm (3.91" x 3.81" x 2.08") |
| Weight | 600 g (1.32 lbs) |

Hikvision USA Inc., 908 Canada Court, City of Industry, CA 91748, USA • Hikvision Canada, 4485 Dobrin, St-Laurent, Quebec, Canada, H4R 2L8
Tel: +1-909-895-0400 • Toll Free in USA: +1-866-200-6690 • E-Mail: sales.usa@hikvision.com • www.hikvision.com
© 2015 Hikvision USA Inc. • All Rights Reserved • Specifications subject to change without notice.

- 245

010816US