**The scanned version of this document represents an exact copy of the original as submitted to the Clerk's Office. The original has not been retained.**

VOL 4

Appendix
13-4

# TECHNICAL RECORD
IV

NO. 48419B
COA NO. M2019-02059-COA-R3-CV

**FILED**

JUN 1 5 2020

Clerk of the Appellate Courts
Rec'd By _____

*APPPEALED FROM*
CHANCERY COURT
AT FRANKLIN TENNESSEE
MICHAEL W. BINKLEY CHANCELLOR
ELAINE B. BEELER, CHANCERY COURT CLERK

*IN THE CASE OF*
FAWN ▮▮▮▮ FENTON
VS.
JEFFREY RYAN FENTON

*TO THE*
APPEALS COURT
NASHVILLE TENNESSEE

VIRGINIA L. STORY
135 FOURTH AVE. SOUTH
FRANKLIN, TN 37064
**ATTORNEY FOR APPELLEE**

JEFFREY RYAN FENTON
17195 SILVER PARKWAY, #150
FENTON, MI 48430
**PRO SE APPELLANT**

FILED 31ST DAY OF MARCH 2020.

CHANCERY COURT                                           CLERK
NO. 48419B          _Sara B McKinney_          DEP. CLERK

TNJudicial.org/e/e/isf002.pdf

02/18/2020  13:40    810756                    THE UPS STORE      TN            PAGE  26/54

492   So, all that I'm asking, is that I at least be HEARD by the TN STATE COURT! Without allowing

493   my case to be thrown-out due to some legal technicality, which would not be "common sense", to

494   the average person, who unfortunately can't afford to spend tens of thousands of dollars, in an

495   attempt to defend himself **against absurdly false claims,** hoping only to survive the wrath of Ms.

496   Fenton, Ms. Story, and the State of Tennessee, in a manner resembling some element of

497   "FAIRNESS". Where I can realistically work toward becoming financially independent again,

498   with a respectable vocation that allows me just a little more money than I need each month, to

499   enjoy some level of comfort which I had earned, long before ever crossing paths, with Ms. Fenton.

500   Is that such an unreasonable request?

501   Please find and accept the attached "Transcripts". I also have an audio recording, from the August

502   29th Hearing at the "Old Courthouse", which I believe adds CONTEXT by hearing the TONE of

503   the communications: chastising, threatening, discriminatory, resentful, biased, and apparently

504   collaboratively bombarding me from both the bench and by opposing counsel (Ms. Story), with

505   very little differentiation between the two. I am also requesting a two-week extension to provide

506   the court with a couple of "Statements of Evidence" regarding the events which have transpired,

507   both in the most recent action with Ms. Story, as well as in Ms. Fenton's original divorce action

508   (#47426 – attached as supporting Exhibits, along with the voluntary NON-SUITS after a

509   "VERBAL SETTLEMENT AGREEMENT" *(Exhibit #18)* was reached between us on 10-27-

510   2018 to stop dissolving our remaining life's savings, simply to waste on legal fees to continue

511   FIGHTING in court.

451

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1460.00

TNJudicial.org/s/s/sf002.pdf Williamson County Chancery Court Tennessee Trial Court Records DOC: DOC | Page 3 of 100

02/18/2020  13:40  81075£                    THE UPS STORE    ON              PAGE  27/54

512   In the end, contrary to the falsified narrative provided to the Court by Ms. Fenton and Ms. Story

513   (#48419B), Ms. Fenton reneged upon the terms of our "Verbal Settlement Agreement",

514   rescinding her commitment to pay me $1,750 per month in Alimony for a period of 6-years,

515   as she previously outlined and agreed to in paragraph #8 of the attached email dated 10/27/2018

516   from Ms. Fenton, attached herein as "Exhibit #18".

517   On 12/22/2018 I received a series of texts from Ms. Fenton *(Exhibit #12)* sharing her disturbing

518   discovery of what she calculated the tax implications of her making $90k+ per year, while filing

519   single after our divorce, while choosing to rent an apartment rather than keep our home or purchase

520   another piece of property (which could provide a tax shelter), concluding the following:

521   • "Correct, my tax situation is going to suck for a very long time."

522   • "90k gross - $31k taxes - $21k alimony = $38k net. Plus or minus."

523   • "Someday when alimony is done, I **can** get a job making only $43k gross and have the

524   **same net of +/- $38k.**"

525   • *(This was the point at which I KNEW in my heart that Ms. Fenton was lying about settling*

526   *out of court, and planned to refuse to pay my agreed $1,750 per month alimony, for the*

527   *agreed period of **six-years**, for me to cooperatively vacate, forfeit, and allow the sale of*

528   *OUR HOME.)*

529   • **I realized that I was being played!**

530   Ms. Fenton secretly decided that it would be more financially beneficial for her to continue to feed

531   an attorney, rather than to reach any sort of FAIR "Settlement Agreement" with me. So we had

532   gone from approximately $2,400 per month in support (22%-24% of Ms. Fenton's Gross Annual

533  Income), for a period equal to half the duration of our marriage (initially 6 years), during my

534  attempt at a COLLABORATIVE DIVORCE (which Ms. Fenton fought vehemently), down to

535  **$1,750** per month in alimony for us to settle alone outside the courts, selling our home

536  cooperatively, while equally splitting the proceeds, until that too Ms. Fenton refused to honor or

537  proceed with.

538  THAT is WHY I was no longer "cooperative" with selling my HOME, because every penny which

539  I had ever saved, we invested into it. I couldn't conceivably forfeit my one and only asset in the

540  World, my only investment and provision toward retirement, as well as my personal domicile,

541  without the guaranteed provision for me to rent or purchase another cheaper residence. Once I

542  realized that Ms. Fenton changed her mind without notice, and had been lying to me for an

543  unknown period of time regarding our "Verbal Settlement Agreement", I knew that I could no

544  longer TRUST her without at least requiring Ms. Fenton to put her OWN WORDS in WRITING

545  and simply SIGNING IT! No legalese or attorneys required, but rather a SIMPLE signed

546  agreement between the two of us, which we are both MORE than capable of drafting ourselves.

547  Yet to no avail, Ms. Fenton REFUSED to sign ANY agreement including ANY alimony of ANY

548  amount, which was the ONLY way that I ever could have afforded to forfeit MY HOME without

549  becoming HOMELESS!

550  So, Ms. Fenton decided that it would be cheaper for her to hire Ms. Story to STEAL from me, that

551  which she was no longer willing to FAIRLY COMPENSATE me for. Saving Ms. Fenton $126k

552  in alimony payments @ the agreed $1,750 per month, plus from reimbursing me for the estimated

553  $75k in EQUITY which I had in OUR HOME, while also evading her financial responsibility for

554  the nearly $100k in MARITAL DEBTS which she ABANDODED in MY NAME.

555    Rather than any slightly FAIR "settlements", Ms. Fenton decided that it was more financially

556    advantageous to her to pay the legal expenses, falsifying her claims, even to FRAUDULENTLY

557    file bankruptcy and to downgrade her career temporarily (to help her seemingly "qualify" for

558    bankruptcy) while denying me EVERY form of support, legal representation (as previously

559    promised), and to make alimony extremely difficult if not impossible for me to extract or be

560    awarded by a court. Especially a court in Williamson County, where the judgments are known to

561    by far favor women over men, as opposed to Davidson County, who hears a broader scope of

562    cases, and whose traditions are more in line with the State laws, which show **no partiality due to**

563    **the gender** of the parties.

564    Ms. Fenton's secret bankruptcy scam was also leveraged to **manipulate the court** into FORCING

565    ME OUT OF MY HOME, while forcing the SALE of MY HOME, against my wishes, due to Ms.

566    Fenton secret plan to default on our home mortgages. Since Ms. Fenton was the only one (after

567    she changed the account passwords) who had access to our mortgage statements, while she

568    voluntarily forfeited our home in her fraudulent bankruptcy filing. **While I was never even**

569    **NOTIFIED that a single mortgage payment had been missed**, that any bankruptcy action was

570    in motion, or that my one and only FINANCIAL ASSET, including all of my premarital 401k

571    retirement funds, and everything which I had earned since, **was at RISK of being LOST! Which**

572    **then WAS LOST by COURT ORDER**, without me ever receiving a SINGLE PENNY in return

573    for my beautiful, highly customized, 2,500 SqFt, half-a-million dollar HOME, located in

574    BRENTWOOD TENNESSEE. One of the most sought after, unique, beautiful, financially affluent

575    and opportunistic areas of these UNITED STATES! (Now I live in the BASEMENT of my

576   MOTHER'S 1940's era, 725 SqFt Home, located an hour and a half North-West of Detroit

577   MICHIGAN!)

578   That must be what Chancellor Binkley meant when he told me that, "Fair is something you do in

579   the fall." *(Recorded on the 8/29/2019 transcripts, as EXHIBIT-2, page 22, line 6.)*

580   **I AM STILL REQUESTING CASE MANAGEMENT IN THIS APPEAL,** combining ALL

581   the work and litigious assaults manipulated to force this divorce upon me: Including Collaborative

582   Divorce work with **Sandy Arons** *(Certified Divorce Financial Analyst)*, Docket **#48426**, our

583   **"Verbal Settlement Agreement"** *(Exhibit #18)* and Docket **#48419B**, into ONE comprehensive

584   divorce decree.

585   Due to my mental disabilities and the IMPOSSIBLE challenges which have been unjustly forced

586   upon me by the Williamson County Chancery Court, plummeting me from a healthy middle class

587   lifestyle straight into poverty, rendering me literally homeless, and forcibly removing me from my

588   home and my property, by four armed Sherriff's deputies, who had their hands on their guns,

589   skittish about whether or not I REALLY am DANGEROUS because of the FALSIFIED OP used

590   to HOLD ME DOWN while I was RAPED!

591   Chancellor Binkley was also quite fond of belittling my disabilities, as documented in that same

592   transcript (Exhibit-2), on Page 13, Lines 19 through Page 14, Line 4.... *"Sir, I respect that. But*

593   *we all have burdens.... Everybody in this room has things going on in their lives to one extent or*

594   *another, just like you do... I can't make excuses for that. Listen to what I'm saying. I don't want*

595   *you and I to get crossways with each other."*

· 455

02/18/2020  13:40   8107501/          THE UPS STORE F.   IN          PAGE  31/54

596    Ms. Fenton and I knew, a year in advance, that her boss/owner was planning to retire, at which

597    point she expected that he would close their firm. So Ms. Fenton held off on everything, giving

598    me some hope of obtaining roommates, taking over the utilities, and seeking vocational

599    rehabilitation, to prepare for full-time employment again, when as soon as she had the dominos all

600    lined-up (as I personally believe that only Ms. Story has the financial and legal knowledge,

601    expertise, and aptitude to do. (Despite the monumental ethical violations this would require, to

602    intentionally lead someone into bankruptcy fraud, simply to reduce their financial exposure during

603    a divorce, to intentionally deprive the opposing party of their jointly owned property and ANY

604    chance at ever receiving a FAIR divorce settlement or decree.


605    Please confirm for me if the "Transcripts" in Exhibits #2 & 3 are acceptable, or if I'm missing

606    some legal detail or requirement which will otherwise exclude them. I will obtain and deliver

607    anything within my means, as absolutely quickly as I can, if you will merely extend to me the

608    kindness, courtesy, and fairness of informing me of specifically what else you need and when you

609    need it by.


610    I just began an outdoor day labor job in construction, for slightly over minimum wage, requiring

611    a three-hour round-trip commute to Detroit on each day when I can work. With this being only my

612    second week on the job, and having "called-out" on Monday 2/10/2020 in order to devote nearly

613    three straight days to this matter, I cannot afford to take any more time off from work, without

614    risking losing my job. So please provide me adequate notice to take into consideration the 5-days

615    mailing back and forth, as well as providing me with at least one WEEKEND where I can read,

616    research, and respond to any requests by the court. I can't afford to keep overnighting documents

617    to the court, due to restrictions prohibiting faxed or emailed document submissions.

456

618    In order to prepare the audio recording from my hearing at the "Old Courthouse", in whatever file

619    format you prefer, as well as to transfer it to the court, upon your preferred storage medium, please

620    inform me how you would like to receive that file. Please also provide me with ample time to

621    prepare and provide it to you, without requiring that I send it by overnight mail, due to the unfair

622    expense.


623    I did attempt to do the "due diligence" on my own, prior to this technical faux pas, having contacted

624    Ms. Lisa Marsh on multiple occasions. She has been very kind and helpful so far, and I specifically

625    request that the court please appoint her to be an advocate to assist me through the remainder of

626    this legal process. From my discussions with her, I had expected that I was waiting for the

627    Chancery Court to forward all of their documentation on my case to the State Appellate Court,

628    which once received I was told that I would be notified by the State Appellate Court to prepare

629    my BRIEF, at which point I will have a period of 30-DAYS to research, write, and form my

630    "BRIEF" to the best of my ability. I was not aware of any duty, obligation, rule, request, or

631    requirement that I submit any "Transcripts" or "Statements of Evidence" to any court prior to

632    filing my BRIEF.


633    I do not blame this oversight on Ms. Marsh, though she has advised me on much of the process,

634    since she was not informed that I would check the box indicating that I plan to substantiate the

635    claims of my BRIEF with my transcripts and/or "statements of evidence". Similarly, nor did I

636    understand that such a minor detail on the form, placed any further burden upon me to produce

637    such, in a pre-defined manner, unbeknownst to me.


{ Page 31 of 52 }                                              .·  457

638   I'm honestly doing my very best to comply with all the legal requirements, to have my case

639   HEARD by the court, before being cast away to the fate which my ACCUSERS have chosen for

640   me.

641   Please inform me about what form or format I need to deliver my audio file in (MP3 file, burned

642   onto a CD, a thumb drive, sent via email, etc...) Just to be clear, I asked Chancellor Michael W.

643   Binkley for his permission to record the hearing, which he consented to, before I ever even pressed

644   the "record" button.

645   Any case management, legal advocate, flexibility and notice about deadlines, or court ordered

646   concessions and oversight to see this case THROUGH until I AM JUSTLY HEARD, would be

647   greatly appreciated!

648   Please forgive any failures in style, format, procedural requirements, technicalities, and/or delivery

649   of these requests. I simply don't have the time or ability (physically, mentally, emotionally) to

650   research and refine this further, unless I quit my job again to devote my time and efforts full-time

651   to studying Tennessee laws, in hopes of obtaining anything reminiscent of "FAIRNESS" within

652   the Tennessee courts.

653   I understand that in the grand scheme of things, I stand to lose more by choosing to work now (for

654   near minimum wage) rather than devoting all my TIME to learning about the LAW to defend

655   myself better. Due to my handicaps, along with the circumstances forced upon me by the court,

656   my ex, and her counsel, I know that I cannot "multi-task" and adequately pursue both

657   simultaneously. This is keenly known by Ms. Fenton, as the court and Ms. Story have also been

658   notified of, in Exhibit #1 (testimonies from my psychiatrist and my psychotherapist), which the

659   court has already PREVIOUSLY RECEIVED yet disregarded without consideration or care.  As

660   is also demonstrated by my need to remain awake AGAIN for three-days straight, in order to

661   research and respond to this action, while needing to go straight to work thereafter, for 12-hours

662   of physical labor, without ANY rest for nearly FOUR days! Yet my choices to do otherwise before,

663   waiting to work so that I could focus instead upon defending myself from the litigious ambush

664   which I was overwhelmed with, have returned to me absolutely NOTHING in return. Now I must

665   at least TRY to contribute toward my living expenses.


666   The cry of my heart is only for JUSTICE! Not pity or extra compensation for my disabilities, rather

667   simply that my TESTIMONY BE HEARD by the court, DESPITE the realistic challenges and

668   limitations of my disabilities, combined by the financial poverty which has been recently forced

669   upon me, by those who thrive upon money, power, and greed! Where "FAIRNESS" is NOT

670   amongst their "moral code", despite what the "code of conduct" demands regarding their

671   professions, and their sworn oaths.


672   Likewise, due to my poverty and my mental handicaps (as outlined in Exhibit #1), please allow

673   me to participate in any and all legal proceedings REMOTELY, in a manner available to me,

674   without significant expense. I possess the computer equipment to participate in court hearings via

675   video, or can do so simply via audio, using either the Internet or a landline telephone. I likewise

676   will continue to do my best to communicate and meet deadlines via snail mail. (Again, please

677   provide extra time and flexibility with deadlines, so that I have a realistic OPPORTUNITY to

678   legally participate, be HEARD by the court, and defend myself.)

02/18/2020  13:40    8107501          THE UPS STORE  ,  'N          PAGE  35/54

679   Furthermore, if anyone should question the VALUE which I personally place upon the TRUTH

680   (also an OCPD symptom), please see my website which I've had many different versions of, over

681   the past twenty years, prior to ever meeting Ms. Fenton (#3): http://trueworld.org. The slogan of

682   which was once *"Searching for TRUTH in a World of LIES!"*

683        1.  My highest personal value is **"AUTHENTICITY"**.

684        2.  My second highest personal value is **"TRUTH"**.

685   There are very few if any exceptions, in my black & white world!

686   You can probably find 100 people who LIKE Ms. Fenton MORE than they LIKE me. (Not that

687   they DISLIKE me, but many are rather indifferent.)

688   But I doubt that you'll ever find someone (unrelated) who believes that Ms. Fenton is more

689   TRUTHFUL or HONEST than I am!

690   I'm that PAINFULLY HONEST guy! It's not WORTH my TROUBLE to LIE to PEOPLE! I don't

691   care that much about what OTHER PEOPLE THINK about me!

692   That's not to say that I NEVER LIE, or that I'm ALWAYS COMPLETELY HONEST, or I

693   wouldn't even be allowed inside restaurants anymore. But as a rule of thumb, I am painfully honest

694   by default, as I am also my own worst critic. If someone is saying something WORSE about me

695   than what I'm saying, then they are PROBABLY LYING!

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1469.00

696    If the court would like a CHARACTER WITNESS, from someone other than my Psychiatrist and

697    my Psychotherapist *(Exhibit #1)*, who are both highly respected, conscientious, and morally

698    unquestionably members of the Williamson County Mental Health community, then I offer you a

699    devout man of God, who deeply values TRUTH (and is extremely sensitive/perceptive to it), who

700    is well known (both locally and nationally), well reputed, down to earth, who speaks frankly and

701    freely without concerns for any "agenda", who has personally KNOWN ME like a "FATHER",

702    for the past TWO DECADES! I ask that you please take a few minutes, before proceeding further,

703    getting more misperceptions about my person, to reach-out and contact:

704                      **Pastor Jerry Bryant**
705                      2608 Mesa Drive
706                      Nashville, TN 37217
707                      (615) 491-5448

708    I came to know "Pastor Jerry" as the founding Pastor of the Vineyard Christian Fellowship in

709    Nashville, which I discovered and joined near their inception, and avidly participated in for many

710    years. Shortly after joining the church, I assumed responsibility for managing their media ministry,

711    which then made me an integral cog in the daily and weekly life of the church. Very little

712    happened, which I did not participate in, which made way for some very deep, transparent, and

713    authentic relationships. To date, still, some of the best relationships of my life!

714    Pastor Jerry has a very rich history of serving on local, national, and even global levels. He is

715    currently the Chairman of "Worship City Alliance" in Nashville, he is the Nashville Care-

716    Coordinator Pastor for "Artists In Christian Testimony, International", produces the weekly "Full

TNJudicial.Case3m0.281rcv-01097-PLWilliaRSKCounty Clapskry.Cpu2Tennessee (Trial Court Records)d 10/13/23DOC002.LPage 471 of 719

ECF No. 1-24; PageID.1121  Filed 10/13/23  Page 13 of 100

717   Circle Jesus Music" radio show, serves as a missionary to South America and Asia and travels as

718   a itinerate teacher and mentor with the Underground Shepherd Ministry.


719   Pastor Jerry preaches throughout the Greater Nashville Area, and is held in very high and

720   honorable esteem by hundreds if not thousands of people!


721   IF anyone is willing to do the smallest bit of research and DISCOVERY about ME, BEFORE

722   continuing to cast judgment, then please give him a call! I can likewise provide dozens of

723   references throughout Middle Tennessee, who may not be "up to speed" with everything currently

724   involving our divorce, but who KNOW concretely (without any doubts), WHO I AM! I'm an

725   "acquired taste" for sure! Either someone likes my STRAIGHT-FORWARDNESS, or they want

726   to get as far away from me as they can.


727   Pastor Jerry can help clear up any of these fraudulent allegations about WHO I REALLY AM,

728   what I am about, whether or not my disabilities are a "danger" to anyone other than myself, and

729   to what LEGAL lengths I will go to see that my NAME and my RIGHTS OF CITIZENSHIP

730   become fully RESTORED! Being a man who has known me intimately for over 20-years, and

731   who referred to me fondly as **"having the tenacity of a pit bull"**, along with constantly

732   encouraging my "gift" in writing, which are both CORE pillars of my IDENTITY. (Though my

733   writing has gotten away from me with the recent drama... it has been difficult, sometimes

734   impossible, to collect my thoughts and deliver on paper, what I can see inside my mind. I expect

735   and hope that will come back to me though, as my life stabilizes after this unprecedented loss.)


736

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1471.00

737  **WHEREFORE, I respectfully request that:**

738      1.  The Appellee's "Motion to Dismiss" be denied.

739      2.  That all fees associated with this totally unnecessary action be taxed to the Appellee. (A

740         simple phone call or email from her attorney or the court, would have sufficed.)

741      3.  That included Exhibit-1 regarding my mental health disabilities be accepted and recorded

742         by the court, as adequate proof of my disabilities, in all actions currently in process within

743         Williamson County as well the State of Tennessee Court of Appeals.

744      4.  That the court extend to me additional consideration and procedural flexibility. Especially

745         regarding legal technicalities and deadlines, not commonly known to the average person,

746         who can't afford counsel and hasn't the time to perform exhaustive research, while

747         simultaneously trying to survive having recently been legally forced into poverty and

748         homelessness. Simultaneously struggling to survive the litigious abuse, while coping with

749         several mental, educational, and financial disabilities.

750      5.  That the court extend to me the protections promised to disabled persons, as outlined in the

751         Administrative Policies and Procedures of the Tennessee Supreme Court, Administrative

752         Office of the Courts, in Index #2.07, in compliance with T.C.A. §16-3-803, 42 U.S.C.

753         12131 et seq. (Americans with Disabilities Act).

754      6.  That I be allowed to participate in all related actions, motions, depositions, hearings, trials,

755         etc... remotely, from the State of Michigan, through another communication technology

756         (Internet, telephone, etc...), which is affordably within my means.

757      7.  That nothing be required of me, whether to support my defense or otherwise, which would

758         place my current employment in jeopardy.

759    8. That my attached "transcripts" be accepted by the court, or that I be informed if
760        modifications are required, why they have been rejected, while allowing me with ample
761        time to realistically cure the mistake, to include the substantiating documentation.

762    9. That I be granted an extension to submit my "transcripts" and "sworn testimonies", of two
763        additional weeks, from the date which I am notified, if this order is granted.

764    10. That the court demand and promise to HEAR my testimony, while not allowing my RIGHT
765        to be HEARD, to be stifled, silenced, or dismissed, for any reasons. Provided that I remain
766        in contact with the State of Tennessee Appellate Court, while remaining accessible and
767        responsive to their direct communications with me.

768    11. **That all Exhibits and documents included herein, as listed below (though sent under**
769        separate cover to expedite delivery, while adhering, the best that I reasonably can, to
770        Williamson County's delivery and fax restrictions), as an out-of-state, disabled, financially
771        destitute, litigant, **be accepted into the evidence of this case, on both the County and**
772        **State levels.**

773        a. Per my understanding of Williamson County Chancery's rules, only 50-pages can
774            be faxed at once, which is less than a single transcript.

775        b. Delivery is not allowed, directly to the Clerk and Master, at the courthouse, by any
776            nationally recognized expedited mail or package delivery services, such as Fed-Ex
777            or UPS.

778        c. To the best of my understanding, as verbally instructed before by a deputy clerk,
779            mail is only allowed via the USPS, addressed and delivered to an offsite PO Box
780            (POB 1666, 37065-1666).

TNJudicial.org/efserf002.pdf   Williamson County Chancery Court Tennessee Trial Court Records
Case 1:23-cv-01097-PLM-RSK   ECF No. 1-24,   PageID.1124   Filed 10/13/23   DOC 002   Page 474 of 719
of 100

781    d. That the Clerk & Master typically only checks that PO Box once each morning, at

782       an EARLIER time than I can physically have the delivery of my included

783       "Exhibits" guaranteed by the USPS, on Tuesday 2/18/2020, which I believe is the

784       deadline issued by the State Appellate Court, in the Administrative Order by James

785       M. Hivner, on 2/3/2020. (Although I didn't receive that order in the mail, until

786       nearly a week later.)

787    e. Due to the time constraints of USPS, and Monday 2/17 being a Federal Holiday

788       (President's Day), the absolute soonest that I can have the transcripts and included

789       Exhibits listed herein Guaranteed by the USPS to be delivered to the Chancery

790       Court's PO box by, is 3PM on Tuesday 2/18/2020.

791    f. Since the delivery constraints required by the Chancery Court are much more

792       restrictive than those provided by the State of Tennessee, and since I am out-of-

793       state and have no other means of delivery reasonably within my means (having a

794       freshly acquired, extremely demanding job, with terribly long hours - including the

795       commute to and from Detroit).

796    g. While having taken a full day-off of work last Monday, to spend three-entire-days

797       to providing this information to you all via email, only to have it rejected without

798       notice. To now devoting another three-full-days to modifying, printing, and binding

799       this information, to provide it to you as quickly as is physically possible, through

800       overnight mail via the USPS, while simultaneously faxing you this portion to

801       ensure that I meet Mr. Hivner's deadline with at least this pleading. Having no

802       control over either the USPS or at what TIME the Clerk & Master's office chooses

803       to check their PO Box each day.

*465*

{ Page 39 of 52 }

02/18/2020  13:40   8107501                    THE UPS STORE I      )N              PAGE  41/54

804          h.  **I am requesting the following:**

805                   i.  That the Clerk & Master's office please send one of their Deputy Clerks

806                       back over to your PO Box on Tuesday February 18th, between 3pm (the

807                       time which the USPS has guaranteed my delivery by) and 4:30 pm when

808                       the Clerk & Master's Office closes, so that my submissions can be file

809                       stamped as received within the deadline provided by Mr. Hivner. (The

810                       Clerk & Master's Office has done me this favor before, in a past filing.)

811                  ii.  That if there is any problem with the USPS meeting their delivery guarantee

812                       of 3pm on Tuesday 2/18/2020 (as indicated on my receipt, included with

813                       this fax), that Mr. Hivner and both the Williamson County Chancery Court

814                       and the State of Tennessee Court of Appeals please extend my filing

815                       deadline, as indicated on the Administrative Order of 2/3, until such time

816                       as the USPS is able to deliver my Exhibits to the Chancery Court, per their

817                       required mode of delivery. Having made my absolute best efforts to

818                       comply, and no control over the delivery or receipt myself.

819                 iii.  Having no fax machine, please email or snail mail me a copy of the top page

820                       of each document, including this one, after file stamping it received by the

821                       court. **My email address is jeff.fenton@live.com.**

822        12. That the court please provide me with **CASE MANAGEMENT**, combining every action

823              of Williamson County Chancery Court Dockets **#47426 & 48419B**, as well as

824              including/considering the terms and expectations of our "VERBAL SETTLEMENT

825              AGREEMENT" *(Exhibit #18)*, which was the agreement by which we BOTH executed

826              Voluntarily Non-Suits to our Divorce Complaints in **#47426**, *(Exhibits #13 & #15)*

                                                                                    - 466

─────────────────────{ **Page 40 of 52** }─────────────────────

02/18/2020  13:40  8107501                     THE UPS STORE     ON                PAGE  42/54

827          agreeing NOT to waste any more of our equity or to increase or debts further, by hiring

828          legal counsel again *(Exhibit #10)* to seek a "CONTESTED" divorce.

829      13. Please inform me as to what I am expected to provide to the court next, along with the

830          timelines for me meeting those expectation and requirements, so that my testimony can

831          finally be HEARD by the court.

832

833      **EXHIBITS INCLUDED:**

834      Exhibit #1.) Letters about my mental health diagnosis, explanations, and certifications proving

835      my psychological disabilities & handicaps from Psychiatrist Dr. Richard E. Rochester, M.D. of

836      Radnor Psychiatric Group, PLC, and Psychotherapist/Author Terry M. Huff, LCSW, both with

837      their practices located locally, in Brentwood Tennessee.

838      Exhibit #2.) **08/29/2019**  Transcript of Hearing with Chancellor Michael W. Binkley, by Emily

839      L. Sipe, RPR, LCR, of Harpeth Court Reporters.

840      Exhibit #3.) **08/01/2019**  Transcript of Hearing with Chancellor Michael W. Binkley, by Susan

841      D. Murillo, LCR, CCR.

842      **Exhibit  #4.)** Documentation showing Ms. Fenton's firearms certifications, memberships, and

843      licenses. Her firearms resume as a "Self-Defense Handgun Instructor". Along with documentation

844      of her advanced military training in the Nevada desert. Also shown are elements of Ms. Fenton's

845      firearms arsenal, with **handguns, assault rifles,** and a **$3k optic** for long range target acquisition.

846      Complimented by over **5,000 rounds of ammunition** at the date of her departure. Ms. **Fenton** is

{  Page 41 of 52  }                                                    467

847     anything BUT a "scared victim"! She ALWAYS has her Glock and pepper-spray on her person,

848     or close nearby. (I don't know how ANYONE can VIEW this exhibit and still believe that her OP

849     was obtained in "good faith", without EVER a single violent incident by me!)

850     Exhibit #5.) 06/16/2019 Ms. Fenton answers a few questions about her bankruptcy, after I

851     accidentally discovered it and emailed her, confronting the issue. (I still had no idea about her

852     refiling for ANOTHER CONTESTED DIVORCE through Ms. Virginia Story in #48419B.)

853     Exhibit #6.) 06/14/2019 Ms. Fenton's accidental bankruptcy discovery (which she kept a secret).

854     I am notified by Rothschild & Ausbrooks that they can't represent me because they are currently

855     representing my "soon to be ex-wife".

856     3:19-bk-02693 Fawn      Fenton

857     Case type: bk Chapter: 13 Asset: Yes Vol: v Judge: Charles M Walker

858     Date filed: 04/26/2019 (Two months earlier, without ever NOTIFYING me.)

859     Exhibit #7.) 05/16/2019 Ms. Fenton Agrees to Continue Paying Utilities in Exchange for

860     Relieving her $500 Monthly Support Commitment for Food and consumables, from my newly

861     acquired Tenant Rents. (She still doesn't NOTIFY me about a single defaulted mortgage payment,

862     or mention her Bankruptcy, which I later learn that she filed almost a MONTH earlier.)

863     Exhibit #8.) 03/30/2019 Settlement Proposal from Mr. Fenton to Ms. Fenton - After Ms. Fenton

864     Defaulted upon our "Verbal Settlement Agreement" (Exhibit #18) No feedback was ever received

865     regarding this 3/30 proposal, from Ms. Fenton.

02/18/2020 13:40 8107501     THE UPS STORE F ?N     PAGE 44/54

866    **Exhibit #9.) 01/11/2019** Settlement Proposal (after Ms. Fenton defaulted upon our "Verbal

867    Settlement Agreement") from Mr. Fenton to Ms. Fenton, for her to keep the family residence with

868    reduced alimony. Ms. Fenton gets excited, seriously considers offer, but then becomes

869    HOPELESS again and rejects it.


870    **Exhibit #10.) 01/08/2019** Ms. Fenton assures me via Text that she is not trying to cheat me, that

871    she is and has always planned to pay me alimony, that there is no "legal battle" coming in the

872    future between us, and that she does not want anything to do with lawyers moving forward, since

873    we can't afford lawyers, stating that lawyers are **"a waste of time and money."**


874    **Exhibit #11.) 12/31/2018** Ms. Fenton Requests to Participate in Counseling Sessions with Me and

875    Terry, in hopes of maintaining a post-divorce friendship between us.


876    **Exhibit #12.) 12/22/2018** Ms. Fenton's Calculations about Income Tax and Alimony Impact upon

877    her Salary.


878    **Exhibit #13.) 11/21/2018** Notice of Voluntary Non-Suit (#48426) Filed by Husband/Defendant.


879    **Exhibit #14.) 11/11/2018** Email from me to Fawn, asking her Questions about a Contingency Plan

880    regarding House Sale (no response received).


881    **Exhibit #15.) 11/05/2018** Notice of Voluntary Non-Suit (#48426) Filed by Wife/Plaintiff.

469



882   **Exhibit #16.) 10/30/2018** <u>Husband Files Answer & Counter-Complaint for Divorce</u>, drafting the

883   documents and representing himself "Pro Se", due to not having enough money to hire counsel to

884   defend myself.

885   Exhibit #17.) **10/29/2018** Emails between Ms. Fenton and her attorney Edward Porter, regarding

886   our "Verbal Settlement Agreement" *(Exhibit #18)*, with instructions and forms for filing Voluntary

887   Nonsuits as agreed, forwarded to me, by Ms. Fenton.

888   **Exhibit #18.) 10/27/2018** <u>Email from Ms. Fenton to me, outlining her understanding and</u>

889   <u>consent to our "Verbal Settlement Agreement"</u>.

890   **Exhibit #19.) 10/22/2018** Text Messages from Ms. Fenton stating that I'm "a good person" but

891   that my mental illness is as if I have "developed cancer", while she has watched me "die over the

892   years", claiming that "The illness has taken everything."

893   Exhibit #20.) **10/14/2018** Fawn - Text Messages - Invitation and Directions to Her Apartment.

894   **Exhibit #21.) 09/28/2018** <u>Wife files Divorce Complaint</u>, Williamson County Docket #47426 on

895   08/30/2018, through her counsel, W. Edward Porter, IV.

896   **Exhibit #22.) 08/30/2018** Ms. Fenton's Budget Projections if I accept her offer to keep the

897   Sunnyside home for myself to purchase, own, and live in. (Which she later revoked.)

898   Exhibit #23.) **08/23/2018** Ms. Fenton refuses to offer me the SAME generosity which I have

899   offered to her.

900   Exhibit #24.) 08/04/2018 Sandy Arrons, MBA (collaborative divorce professional I hired),

901   informs Ms. Fenton that alimony is about 22.5% of her Gross Income. Also, Ms. Fenton discusses

902   possibility of me keeping our home.

903   **Exhibit #25.) 05/02/2018** Email from Ms. Fenton with her BUDGET projections for the next year,

904   based upon her maintaining both of our households with her income alone. Since Ms. Fenton had

905   voluntarily agreed to be our primary "breadwinner", both for the decade prior, extending forward

906   into our retirement, in exchange for me filling other crucial and agreed upon roles in our life

907   together.) Leveraging Ms. Fenton's career for INCOME and my TIME for meeting other agreed-

908   upon needs for our family, seemed to both of us to be the smartest leveraging and utilization of

909   what we both brought into our marriage. We had a $300k life insurance policy on Ms. Fenton

910·  ALONE, in case of traumatic injury or death, so that I'd never become "homeless" as a result of

911   what I sacrificed for our marriage. The only problem was that we never built-in a provision for IF

912   SHE CHOSE to unilaterally terminate and dissolve our union. I was convinced that our

913   relationship was TRULY "until death do us part!" I was wrong! Ms. Fenton betrayed a lifetime of

914   promises to me, upon which I had gambled everything!

915   **Exhibit #26.) 04/22/2018** WCSO call by Ms. Fenton, to escort herself along with our pets off our

916   property under false allegations of fearing for her safety. (Although she had both her Glock and

917   her pepper spray on her person, and I was not and NEVER·have physically threatened her.) This

918   was the first of MANY legal games by Ms. Fenton (which I am aware of), strategically targeted

919   at manipulating the legal system to TAKE EVERYTHING from me, AFTER she received legal

920   counsel and understood "how to play the game", while I was financially denied counsel for the

921   YEAR to follow.

922    This incident occurred AFTER Ms. Fenton was advised by her counsel, then Attorney W.
923    Edward Porter, IV, that she NEEDS a history of "domestic disturbance" calls, PRIOR to being
924    able to legally justify and obtain an OP.

925    Which Attorney Story proved false a YEAR LATER. With enough money and the right
926    LEVERAGE, combining her RELATIONSHIPS, her REPUTATION, and her EXPERIENCE,
927    with completely FALSE and FABRICATED allegations and "sworn" testimony, she had the
928    POWER to have an OP issued, to bind and gag me.

929    With the "right" attorney, PROOF was NOT required, and the TRUTH was not only
930    unnecessary, refused to be HEARD, but was legally manipulated to be stifled and hidden, still
931    to THIS DATE!

932    The 4/28/2018 incident with the WCSO where Ms. Fenton began gaming the legal system,
933    was ruled a "Domestic Verbal" by the officers at the scene, as I was informed that no laws
934    were broken, that it is LEGAL to ARGUE with your spouse.

935    Ms. Fenton returned to the property alone the very NEXT DAY (the day after "needing" police
936    protection, for "fear" of her safety), to merely the next day

937    Ms. Fenton has not resided at the property since, though the has been allowed and has accessed
938    the property, unaccompanied, with me present, on countless occasions since. Each time I was
939    polite, cordial, and I even physically assisting her in packing-up, preparing, and moving her
940    personal property, on multiple occasions, over the course of a YEAR, without incident.

941    The escalating event on this day, was that Ms. Fenton finally admitted upon questioning, that
942    she had chosen to renege upon her promise to me, to wait until AFTER we had sought some
943    marriage counseling, BEFORE moving forward with FILING FOR A CONTESTED
944    DIVORCE. This was the "loudest", most "emotionally overwhelming", and/or "instable"
945    incident between us, or ever to follow. Yet a YEAR later, without incident, after I had accepted
946    Ms. Fenton's betrayal and ALL the DRAMA was over, once Ms. Story began representing

472

TNJudicial Case 1:23-cv-01097-PLM-RSK Williamson County Chancery Court ECF No. 24 enPage ID 1382 Received Filed 10/13/23 DOC 0.23 Page 24 of 719 of 100

947    Ms. Fenton, I received a falsified affidavit and complaint by Ms. Fenton, issuing a "guilty until

948    proven innocent" exparte' Order of Protection against me, simply as legal leverage to dominate

949    and control me as they began THEIR violent assault upon what remained of my life.

950    IF EVER Ms. Fenton had any legitimate fear or concern for her PERSONAL SAFETY,

951    regarding any danger which I might be capable of (without ever threatening her), I believe that

952    it was based upon Ms. Fenton insecurity about how I MIGHT REACT to HER harshly

953    VIOLENT, strategic, manipulative, dishonest, and unfair ASSAULT which she and Ms. Story

954    had falsely orchestrated and PLANNED against me, to VIOLENTLY ROB everything that I

955    ever had in my life!

956    I compare Ms. Fenton's "fear" to that of a criminal, about to commit an ARMED ROBBERY,

957    with their adrenaline pumping, AFRAID that they COULD get caught or even shot by either

958    the police or the owner of the store. That does NOT qualify as something which I (as the store

959    owner, or the police officer) should be penalized for.

960    If you find that difficult to believe, I'd like to draw your attention to Exhibit #27 (Ms. Fenton's

961    divorce notification, via text messages on 3/13/2018).

962    **Exhibit #27.) 03/13/2018** Divorce Notification from Ms. Fenton via Text Messages:

963    • In the first text which she sends, at 5:51pm, Ms. Fenton asked me: **"Will you damage**

964    **property? I sorry."**

965        o WHY would I damage my OWN property? This was HER projection!

966    • At 6:11pm Ms. Fenton admitted that she tried to obtain an OP, but that she wasn't able to

967    obtain one, stating: **"Not yet. No clear physical threats."**

968        o That NEVER changed, yet she was able to obtain an OP a YEAR later, at a MUCH

969        less emotionally charged time, when we were not communicating much at all.

970    • At 6:18pm, Ms. Fenton stated: **"Yes, I'm sorry, I did betray you."**

FRBP Violated: #3:19-bk-02693       TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)       JRF.002.1482.00

TNJudicial@agy/cejfir10023-df       Williamson County Chancery Court Tennessee (Trial Court Records)
Case 1:23-cv-01097-PLM-RSK   ECF No. 1-24, PageID.1133   Filed 10/13/23   DOC 003   Page 483 of 719
Page 25 of 100

| 971 | • | At 6:27pm, Ms. Fenton stated: **"I know, may cost me everything. But I've decided it's** |
| 972 | | **worth it to get away from constantly having conflict at home…"** |
| 973 | | ○ WHY would it need to cost her "EVERYTHING", and why had she settled upon |
| 974 | | that determination, prepaying $5k for a "Contested Divorce" before she ever even |
| 975 | | mentioned to me that she really wanted a divorce, to see if I would cooperate and |
| 976 | | if we could MITIGASTE OUR LOSSES instead of destroying everything which |
| 977 | | we owned in a legal battle which was far beyond the financial limitations of our |
| 978 | | lifestyle! |
| 979 | • | At 6:48pm, Ms. Fenton stated: **"…I knew how devastated you would be if we broke up,** |
| 980 | | **and I didn't want to do that to you. But…"** |
| 981 | • | At 7:51pm, Ms. Fenton stated: **"Really? You'd cooperate?"** |
| 982 | | ○ Aghast that I would prefer to mitigate our damages and cooperate in a divorce, |
| 983 | | rather than wasting everything on a big ugly legal fight. (Because of her |
| 984 | | "projections" again, not because of how I ACTED!) |
| 985 | • | 7:52pm, Ms. Fenton stated: **"I would want to stay your friend, there is so much I really** |
| 986 | | **do love about you, but…"** |
| 987 | | ○ I believe that this was "shut-down" because of the counsel of her attorney's, to help |
| 988 | | her game the system more effectively, to leave me with LESS. Ms. Fenton had the |
| 989 | | "bad habit" of accidentally being HONEST with me, contradicting her sworn LIES |
| 990 | | written in all of her divorce actions. So, she grew more distant and eventually quit |
| 991 | | communicating with me. I don't believe that she TRUSTED HERSELF not to |
| 992 | | compromise her case with the TRUTH, and that is the REAL reason why she |
| 993 | | refused to participate in MEDIATION! She never planned to participate in |
| 994 | | mediation the first time that she filed either. Though she didn't try to use the |
| 995 | | outrageous excuse, "for the safety of everyone involved!" Give me a break! I never |
| 996 | | threatened or assaulted anyone! I purchased her cute little gifts, with the little bit of |
| 997 | | money that I had. Whenever it suited HER, she came to our home ALONE, while |
| 998 | | I was nice, cooperative, and helped her, time and time again. Then out of the blue, |
| 999 | | upon hiring Ms. Story, I'm falsely labeled a MONSTER! I have a TON of |

1000      documentation which will disprove those assertations, IF ever the court will allow

1001      me to PRESENT THEM!

1002    o   I was the one who forced us into a collaborative process, and kept trying to

1003      encourage mediation or hiring an independent third party to facilitate an

1004      uncontested divorce, yet Ms. Fenton REFUSED, showing absolutely NO CARE

1005      about how much of our net worth was dissolved/wasted/discarded simply to bully

1006      me by legal process, while she had locked me out of all of our income and debt

1007      accounts, knowing that I had no financial means to hire ANY counsel, to have any

1008      opportunity to defend myself on even grounds! That was exactly what she

1009      WANTED!

1010   • At 7:58pm, Ms. Fenton stated, **"I thought you would hate me for this, and you would**

1011    **make me as miserable as possible to get back at me."**

1012    o   Once again, this was 100% PROJECTION on her part, based upon her erroneous

1013      beliefs as a consequence of her planned actions. Not at all based upon any ACTION

1014      or WORD spoken by ME!

1015   • At 8:00pm, Ms. Fenton honestly admitted (for once): **"You forced me to choose. So yes,**

1016    **my family won."**

1017    o   Ms. Fenton's brother and mother had waged war on me over the past year, not ever

1018      believing that I was GOOD ENOUGH for Ms. Fenton, and believing that I was

1019      little more than a financial LEACH at this point, which apparently Ms. Fenton

1020      began to entertain and talk behind my back with them, the last few years of our

1021      marriage.

1022    o   When I met Ms. Fenton, she kept her family at a TREMENDOUS distance from

1023      her (both physically and emotionally), because her mom was incredibly controlling,

1024      critical all her life, and impossible to please. Now she had chosen to betray me to

1025      align with her family again, something which she would have NEVER done before.

1026   • At 8:04pm, Ms. Fenton responded, **"That was 13 years ago. A lot has changed."**

1027   • At 9:19pm Ms. Fenton stated, **"Ok. Thank you. I was truly afraid you would be blinded**

1028    **by rage and hurt, (understandably so)."**

475

| 1029 | | o | Again, this is 100% PROJECTION by Ms. Fenton. I believe that this is the MOST |
| 1030 | | | TELLING statement ever made regarding her "fear" of me. |
| 1031 | | o | Ms. Fenton states that she was afraid and believed that I would be BLINDED by |
| 1032 | | | rage and hurt... because of HER planned actions. |
| 1033 | | o | Ms. Fenton RATIONALIZED that if I were BLINDED by RAGE and HURT, |
| 1034 | | | posing a PHYSICAL THREAT TO HER SAFETY, that was |
| 1035 | | | **"understandably so)."** |
| 1036 | | o | While I still had no idea about the VIOLENT LITIGIOUS ASSAULT which Ms. |
| 1037 | | | Fenton had planned to bombard my life with, she had already RATIONALIZED |
| 1038 | | | that the only "UNDERSTANDABLE" response by me would be one of returning |
| 1039 | | | her VIOLENCE in an unpredictably VIOLENT way. |
| 1040 | | o | IF EVER Ms. Fenton had ANY real "fear" for her "safety", despite her arsenal, |
| 1041 | | | excessive firearms and self-defense training (as I've lightly documented in Exhibit |
| 1042 | | | #4), it was BASED ENTIRELY UPON HER OWN knowledge about HER violent |
| 1043 | | | plans, combined with HER beliefs and projections about how someone might |
| 1044 | | | UNDERSTANDABLY react to those! |
| 1045 | | o | None of Ms. Fenton's FEARS had any basis in what my REAL |
| 1046 | | | ACTIONS/REACTION/WORDS were, previously, then, or in the future. It was |
| 1047 | | | ENTIRELY PROJECTION on Ms. Fenton's part! Which I should have NEVER |
| 1048 | | | been legally penalized for! |
| 1049 | • | | At 8:42pm, Ms. Fenton stated: "I was SO convinced you were going to try to destroy me, |
| 1050 | | | I was too afraid to ask you for an agreement." |
| 1051 | | o | PROOOOJECTION! Nothing I say even remotely responds as Ms. Fenton falsely |
| 1052 | | | projected that I would! |
| 1053 | | o | Similarly, I AGREED to an AGREEMENT long before Ms. Story entered the |
| 1054 | | | picture, with her high dollar legal fees. Yet Ms. Fenton still chose to DEFAULT |
| 1055 | | | upon our "Verbal Settlement Agreement" *(Exhibit #18)*, yet Ms. Fenton still chose |
| 1056 | | | the path to VIOLENTLY FIGHT IN COURT, at ANY COST, over simply keeping |
| 1057 | | | her word and providing me with ANYTHING which slightly resembled |
| 1058 | | | FAIRNESS on any level! |

476

{ Page 50 of 52 }

02/18/2020 13:40 8107501          THE UPS STORE .     ℸN          PAGE 52/54

1059   Ms Fenton NEVER wanted a FAIR divorce! She wanted EVERYTHING, and regretfully, that is

1060   exactly what Williamson County Chancery awarded her! While taxing me with her exorbitant

1061   legal fees... ABSOLUTELY UNFATHOMABLE! On the highest level! Yet without a second

1062   thought... Where is lady JUSTICE today?

Respectfully submitted,

Jeffrey Ryan Fenton (Pro Se)
17195 Silver Parkway, #150
Fenton, MI, 48430
jeff.fenton@live.com
(615) 837-1300

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded via email, U.S. mail, hand-delivered, faxed, and/or shipped by courier to:

Virginia L. Story
136 4th Ave. South
Franklin, TN 37064
Fax: (615) 790-7468

Clerk & Master
P.O. Box 1666
Franklin, TN 37065-1666
Fax: (615) 790-5626

Court of Appeals
100 Supreme Court Building
401 Seventh Avenue North
Nashville, TN 37219-1407
Fax: (615) 532-8757

This the 18th day of February 2020.

Jeffrey Ryan Fenton (Pro Se)

{ Page 52 of 52 }

*478*

LINDEN
215 S MAIN ST
LINDEN, MI 48451-9998
255460-0451
(800)275-8777
02/15/2020 12:12 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| PM Exp 2-Day | 1 | $39.55 | $39.55 |
| (Domestic) | | | |
| (FRANKLIN, TN 37065) | | | |
| (Weight:2 Lb 12.10 Oz) | | | |
| (Signature Waiver) | | | |
| (Scheduled Delivery Day) | | | |
| (Tuesday 02/18/2020 03:00 PM) | | | |
| (Money Back Guarantee) | | | |
| (USPS Tracking #) | | | |
| (EJ267268960US) | | | |
| PM Exp Insurance | | | $0.00 |
| (Up to $100.00 included) | | | |
| Total: | | | $39.55 |

Credit Card Remitd $39.55
(Card Name:VISA)
(Account #:XXXXXXXXXXXX9769)
(Approval #:115111)
(Transaction #:930)
(AID:A0000000031010 Chip)
(AL:VISA CREDIT)
(PIN:Not Required)

Includes up to $100 insurance

Save this receipt as evidence of insurance. For information on filing an insurance claim go to https://www.usps.com/help/claims.htm

Text your tracking number to 28777 (2USPS) to get the latest status. Standard Message and Data rates may apply. You may also visit www.usps.com USPS Tracking or call 1-800-222-1811.

Preview your Mail
Track your Packages
Sign up for FREE @
www.informeddelivery.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT
POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5493-0036-003-00033-35772-02

or scan this code with
your mobile device:



Lori

or call 1-800-410-7420.

YOUR OPINION COUNTS

Receipt #: 840-54930036-3-3335772-2
Clerk: 03

479

DOC 002 · Page 489 of 719

Terry M. Huff, LCSW
Suite 134
5115 Maryland Way
Brentwood, TN 37027
615-627-4191
terrymhuff.com



EXHIBIT #1

2020 FEB 19 PM 1:10

FILED FOR ENTRY _____

August 28, 2019

To Whom it May Concern:

I'm writing at the request of my client, Mr. Jeff Fenton, to explain his mental health challenges and their effects on his general functioning. I am licensed as a clinical social worker in Tennessee, and I have a private psychotherapy practice in Brentwood. I have been providing psychotherapy services for thirty years. My specialty is in helping adults with attention deficit hyperactivity disorder (ADHD).

I began seeing Mr. Fenton May 3, 2018. His primary concerns for which he sought my help were marital problems and effects of his ADHD. He has a history of particular difficulties with occupational functioning due to extraordinary perfectionism and getting lost in details, which contribute to inefficiency and missed deadlines. This particular challenge, along with certain other features, are consistent with symptoms of obsessive compulsive personality disorder. ADHD and OCPD have been the focus of Mr. Fenton's psychotherapy. He also has specific phobias and social anxiety, which have not been the primary focus in therapy.

ADHD is a neurological condition that makes it difficult to manage one's attention and inhibit impulses. It is often misperceived as an inability to focus rather than difficulty managing and shifting the focus of one's attention. Adults with ADHD often have difficulty returning to open awareness when locked into a focused state of awareness. They often have trouble activating and sustaining effort on monotonous tasks, organizing and prioritizing tasks, keeping track of items needed for tasks, estimating and tracking time, managing emotions skillfully, inhibiting speech and action (tending to talk excessively and interrupt others), and inhibiting impulses.

Obsessive Compulsive Personality Disorder is characterized by "preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency," according to the DSM-5 (Diagnostic and Statistical of Mental Disorders - 5th edition). Individuals with this disorder try "to maintain a sense of control through painstaking attention to rules, trivial details, procedures, lists, schedules, or form to the extent that the major point of the activity is lost." They may get so caught up in the details of a project that they don't complete it, or they miss deadlines. If can take them a long time to complete a task due to this excessive preoccupation with details. They are often "inflexible about matters of morality, ethics, or values and may force themselves and others to follow rigid moral principles and very strict standards of performance." They often have trouble delegating tasks to others, as others must conform to their way of doing things. Those tasks must be done "correctly." They tend to "plan ahead in meticulous detail and are unwilling to consider changes." Their ability to compromise may be compromised by the inflexibility. They are uncomfortable with relationships and situations in which they are not in control or where they must rely on others. They are uncomfortable with the unpredictable.

480

TNJudicialOracle/jr0023.pdf · Williamson County Chancery Court · Terrence Dial 040 Received · Filed 10/13/23 DOC 0024 P32

Case 1:23-cv-01097-PLM-RSK · Williamson County Chancery Court · Terrence Dial 040 · Page ID 1240 · Filed 10/13/23 DOC 0024 Page 490 of 719 of 100

One effect of the OCPD is Mr. Fenton's communication when dealing with conflict. His excesses in speech and writing can appear imposing or hostile. He acknowledges his compulsion to communicate excessively. The compulsion is driven by an undercurrent of unsettled feelings that persist until he is certain there is no possibility of being misunderstood. This pattern is consistent with the disorder (OCPD). His effect on others—i.e., anyone receiving the excess of communication—is often lost on him, as his attention is locked into the effort to be understood. Consequently, those efforts are experienced by others as intense and sometimes hostile.

Mr. Fenton is aware that he has more work to do on this problem. He recently requested that we focus less on the present crisis and more on managing the challenge of coping effectively with the symptoms ADHD and OCPD, and decreasing self-defeating behavior. Due to both conditions, Mr. Fenton's excessive attention to what he wants to communicate obstructs him from being aware, in a given moment, of effects of his efforts (e.g., the impact of the volume of his voice when speaking, or the volume of information when writing).

Mr. Fenton has been forthcoming in psychotherapy sessions and has been open and willing to be challenged with respect to his symptoms and their effects. He acknowledges mistakes when they are pointed out and is working to understand how his best intentions sometimes go awry, and his persistent efforts can be self-defeating.

Mr. Fenton has never expressed any intention of harming himself or others during the sixteen months that I have known him. I have never had reason to suspect any intention to harm himself or others. He has participated frequently in a support group for adults with ADHD. He has participated actively and has offered help to others in the group.

Thank you for consideration of the role that mental health and disability have played out in Mr. Fenton's life and relationships. His participation in psychotherapy and related services will continue.

Respectfully,

Terry M. Huff, LCSW

481

- 482

FRBP Violated: #3:19-bk-02693     TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)     JRF.002.1491.00

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027
————
Telephone: (615) 373-5205
Fax: (615) 373-5165

July 19, 2019

To Whom It May Concern:

RE: Jeffrey Fenton, DOB: 10/08/19/69

Jeff Fenton has been a patient under my care since February 2012. He has been diagnosed with a Generalized Anxiety Disorder, Attention Deficit Disorder, and some Obsessive Compulsive Personality traits. He has been complaint with both his psychiatric medications prescribed and his individual psychotherapy with Terry Huff, LCSW.

The symptoms of his illnesses have interfered with his ability to maintain employment, despite compliance with our treatment recommendations. His condition does not predispose him to any violent behavior and, to my knowledge, he has not been involved in any violent behavior since being a patient under my care.

If you have any further questions regarding his diagnosis, treatment, or prognosis, please contact me with his permission.

Sincerely,

Richard E. Rochester, M.D.

483

*Obsessive-Compulsive Personality Disorder (OCPD) DSM-5 301.4 (F60.5)*

*Generalized Anxiety Disorder (GAD) DSM-5 300.02 (F41.1)*

*Attention-Deficit Hyperactivity Disorder (ADHD) DSM-5 314.01 (F90.2)*

*Circadian Rhythm Sleep Disorder (CRSD) Non-24-Hour Sleep-Wake Disorder (Non-24) DSM-5 307.45 (G47.24)*

484

# What are the symptoms of OCPD?

The symptoms of OCPD include:

- perfectionism to the point that it impairs the ability to finish tasks
- stiff, formal, or rigid mannerisms
- being extremely frugal with money
- an overwhelming need to be punctual
- extreme attention to detail
- excessive devotion to work at the expense of family or social relationships
- hoarding worn or useless items
- an inability to share or delegate work because of a fear it won't be done right
- a fixation with lists
- a rigid adherence to rules and regulations
- an overwhelming need for order
- a sense of righteousness about the way things should be done
- a rigid adherence to moral and ethical codes

OCPD is diagnosed when symptoms impair your ability to function and interact with others.

485

486

# Radnor Psychiatric Group, PLC
### 5123 VIRGINIA WAY
### SUITE C-11
### BRENTWOOD, TENNESSEE 37027

Telephone: (615) 373-5205
Fax: (615) 373-5165

November 1, 2018

RE: Jeffrey Fenton, DOB: 10/08/1969

To Whom It May Concern:

Jeffrey Fenton has been a patient under my care since 2012. He is treated for a severe
Generalized Anxiety Disorder, Attention Deficit Disorder, and suffers from an Obsessive
Compulsive Personality Disorder. He also has specific phobias regarding weather, driving
across bridges, and flying, along with obsessive concerns over his health.

His symptoms of severe anxiety, obsessive worry, preoccupation with details and rules,
perfectionism, inflexibility, and problems with rigidity have all interfered with his ability to hold
a job and have a healthy relationship.

I have prescribed medication including Lexapro 40 mg a day, Vyvanse 70 mg a day, Xanax 1 mg
every six hours as needed, and Restoril 30 mg at night for chronic insomnia. He also has
continued to see Terry Huff, LCSW, in psychotherapy. Despite his compliance with his
medication and therapy, his symptoms continue to be disabling.

Please consider Mr. Fenton's severe psychiatric condition in any judgments being made about
his ability to work and his ongoing divorce. If you have any questions regarding his treatment or
prognosis, please contact me with his permission.

Sincerely,

Richard E. Rochester, M.D.
RER/sde

487

**Terry M. Huff, LCSW**
**5115 Maryland Way**
**Brentwood, TN 37027**
**ph: 615-627-4191**

July 29, 2019

To Whom It May Concern:

I have been seeing Mr. Jeff Fenton in individual psychotherapy from May 3, 2018 to present. He has also been a participant in my support group for adults with ADHD (attention deficit hyperactivity disorder). During this period I have never had any suspicion, or reason for concern, that Mr. Fenton is at risk for harming himself or others.

Respectfully,

Terry M. Huff, LCSW

488

**Radnor Psychiatric Group, PLC**
5123 VIRGINIA WAY
SUITE C-11
BRENTWOOD, TENNESSEE 37027

Telephone: (615) 373-5205
Fax: (615) 373-5165

August 15, 2018

RE:  Jeffrey Fenton, DOB: 10/08/1969

To Whom It May Concern:

Mr. Jeffrey Fenton has been a patient under my care since 2012.  He is currently being treated for a Generalized Anxiety Disorder, for which he receives antianxiety medication and psychotherapy.  Due to his illness, and despite compliance with all of our treatment recommendations, he continues to have difficulty with anxiety on a daily basis and, especially, during travel.

I have recommended and encouraged him to have an emotional support animal to help with his anxiety symptoms.  It is my medical opinion that this is necessary for treating his condition, and it meets the definition of a disability under the Americans with Disabilities Act, the Fair Housing Act and the Rehabilitation Act of 1973.

If you have any questions regarding my recommendations, please feel free to contact me with Mr. Fenton's permission.

Sincerely,

Richard E. Rochester, M.D.
RER/sde

489

o bb -

TNJudicial.org Case 1:23-cv-01097-PLM-RSK County Chancery Court Tennessee Trial Court Records   ECF No. 1-24   Filed 10/13/23   DOC 002   Page 42   Page 500 of 719
of 100

Obsessive Compulsive Personality Disorder

Home » Disorders » Personality » **Obsessive Compulsive Personality Disorder**

# Obsessive Compulsive Personality Disorder

By **Steve Bressert, Ph.D.**
Last updated: 23 Apr 2019
~ 4 MIN READ



Obsessive-compulsive
personality disorder is
characterized
by a preoccupation with
orderliness, perfectionism,
and mental and
interpersonal control, at the
expense of flexibility,
openness, and efficiency.

When rules and established procedures do not dictate the correct answer,
decision making may become a time-consuming, often painful process.
Individuals with obsessive-compulsive personality disorder may have such
difficulty deciding which tasks take priority or what is the best way of doing
some particular task that they may never get started on anything.

They are prone to become upset or angry in situations in which they are not
able to maintain control of their physical or interpersonal environment,
although the anger is typically not expressed directly. For example, a person
may be angry when service in a restaurant is poor, but instead of
complaining to the management, the individual ruminates about how much
to leave as a tip. On other occasions, anger may be expressed with
righteous indignation over a seemingly minor matter.

People with this disorder may be especially attentive to their relative status
in dominance-submission relationships and may display excessive
deference to an authority they respect and excessive resistance to authority
that they do not respect.

Individuals with this disorder usually express affection in a highly-controlled
or stilted fashion and may be very uncomfortable in the presence of others
who are emotionally expressive. Their everyday relationships have a formal
and serious quality, and they may be stiff in situations in which others would

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1500.00

smile and be happy (e.g., greeting a lover at the airport). They carefully hold themselves back until they are sure that whatever they say will be perfect. They may be preoccupied with logic and intellect.

A personality disorder is an enduring pattern of inner experience and behavior that deviates from the norm of the individual's culture. The pattern is seen in two or more of the following areas: cognition; affect; interpersonal functioning; or impulse control. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations. It typically leads to significant distress or impairment in social, work, or other areas of functioning. The pattern is stable and of long duration, and its onset can be traced back to early adulthood or adolescence.

## Symptoms of Obsessive-Compulsive Personality Disorder

A pervasive pattern of preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency, beginning by early adulthood and present in a variety of contexts, as indicated by four (or more) of the following:

- Is preoccupied with details, rules, lists, order, organization, or schedules to the extent that the major point of the activity is lost

- Shows perfectionism that interferes with task completion (e.g., is unable to complete a project because his or her own overly strict standards are not met)

- Is excessively devoted to work and productivity to the exclusion of leisure activities and friendships (not accounted for by obvious economic necessity)

- Is overconscientious, scrupulous, and inflexible about matters of morality, ethics, or values (not accounted for by cultural or religious identification)

- Is unable to discard worn-out or worthless objects even when they have no sentimental value

- Is reluctant to delegate tasks or to work with others unless they submit to exactly his or her way of doing things

- Adopts a miserly spending style toward both self and others; money is viewed as something to be hoarded for future catastrophes

49 2

ttps://psychcentral.com/disorders/obsessive-compulsive-personality-dis...

2

Obsessive Compulsive Personality Disorder

- Shows significant rigidity and stubbornness

Because personality disorders describe long-standing and enduring patterns of behavior, they are most often diagnosed in adulthood. It is uncommon for them to be diagnosed in childhood or adolescence, because a child or teen is under constant development, personality changes, and maturation. However, if it is diagnosed in a child or teen, the features must have been present for at least 1 year.

Obsessive-compulsive personality disorder is approximately twice as prevalent in males than females, and occurs in between 2.1 and 7.9 percent of the general population.

Like most personality disorders, obsessive-compulsive personality disorder typically will decrease in intensity with age, with many people experiencing few of the most extreme symptoms by the time they are in their 40s or 50s.

## How is Obsessive-Compulsive Personality Disorder Diagnosed?

Personality disorders such as obsessive-compulsive personality disorder are typically diagnosed by a trained mental health professional, such as a psychologist or psychiatrist. Family physicians and general practitioners are generally not trained or well-equipped to make this type of psychological diagnosis. So while you can initially consult a family physician about this problem, they should refer you to a mental health professional for diagnosis and treatment. There are no laboratory, blood, or genetic tests that are used to diagnose obsessive-compulsive personality disorder.

Many people with obsessive-compulsive personality disorder don't seek out treatment. People with personality disorders, in general, do not often seek out treatment until the disorder starts to significantly interfere or otherwise impact a person's life. This most often happens when a person's coping resources are stretched too thin to deal with stress or other life events.

A diagnosis for obsessive-compulsive personality disorder is made by a mental health professional comparing your symptoms and life history with those listed here. They will make a determination whether your symptoms meet the criteria necessary for a personality disorder diagnosis.

## Causes of Obsessive-Compulsive Personality

493

Obsessive Compulsive Personality Disorder

## Disorder

Researchers today don't know what causes obsessive-compulsive
personality disorder, however, there are many theories about the possible
causes. Most professionals subscribe to a biopsychosocial model of
causation -- that is, the causes are likely due to biological and genetic
factors, social factors (such as how a person interacts in their early
development with their family and friends and other children), and
psychological factors (the individual's personality and temperament, shaped
by their environment and learned coping skills to deal with stress). This
suggests that no single factor is responsible -- rather, it is the complex and
likely intertwined nature of all three factors that are important. If a person
has this personality disorder, research suggests that there is a slightly
increased risk for this disorder to be "passed down" to their children.

## Treatment of Obsessive-Compulsive Personality
Disorder

Treatment of obsessive-compulsive personality disorder typically involves
long-term psychotherapy with a therapist that has experience in treating this
kind of personality disorder. Medications may also be prescribed to help
with specific troubling and debilitating symptoms. For more information
about treatment, please see **obsessive-compulsive personality disorder
treatment**.

▶  **References** - Click to open

**APA Reference**
Bressert, S. (2019). Obsessive Compulsive Personality Disorder. *Psych Central.* Retrieved on August
28, 2019, from https://psychcentral.com/disorders/obsessive-compulsive-personality-disorder/

**Last updated:** 23 Apr 2019
**Last reviewed:** By a member of our scientific advisory board on 23 Apr 2019
Published on Psych Central.com. All rights reserved.

444

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCOX: 48419B)          JRF.002.1503.00



EXHIBIT #2

2020 FEB 19 FH 1:10

FILED FOR ENTRY _____

# *FAWN* ▮▮▮▮▮ *FENTON*

### vs

# *JEFFREY RYAN FENTON*

Hearing

*August 29, 2019*

# H
## HARPETH
### COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

- 495



1  IN THE CHANCERY COURT FOR
   WILLIAMSON COUNTY, TENNESSEE

2

3

4  FAWN ▮▮▮▮ FENTON,            )
                                )
5                               )
              Plaintiff,        )
6                               )  No. 48419B
   vs.                          )
7                               )
   JEFFREY RYAN FENTON,         )
8                               )
                                )
9             Defendant.        )
   - - - - - - - - - - - - - - -

10

11

12

13             HEARING

14  Before Judge Michael W. Binkley

15         August 29, 2019

16          11:20 a.m.

17

18

19

20

21

22

23
              Reported by:
24       Harpeth Court Reporters
           Franklin, Tennessee
25       Emily L. Sipe, RPR, LCR

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1505.00

FAWN █████ FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1    APPEARANCES:

 2    For the Plaintiff:
           VIRGINIA LEE STORY
 3         136 4th Avenue South
           Franklin, Tennessee   37064
 4         (615) 790-1778
           Virginia@tnlaw.org
 5

 6    For the Defendant:
           Pro se
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2              THE COURT:  I want that to be in the
 3    Order because it's best that we put everything in the
 4    Order.  This gentleman, he's going to share and pay
 5    one half of the per diem plus any expenses that he may
 6    incur as a result of asking for all or a portion of
 7    the transcript that will be ordered by him.  Okay?
 8              All right.  Ms. Story?
 9              MS. STORY:  Your Honor, the motion that
10    we are here on today is a motion for violation of the
11    order of the court that was August 14th of '19.  And
12    after the order was entered, there was a pretty scary
13    communication from Mr. Fenton.  I am not here today to
14    argue about that motion necessarily.  The more
15    pressing matter -- and that was his response, that is
16    the lengthy response we received this morning.  It
17    deals more with the issues of why he made those
18    statements and those type of things.
19              But the more pressing issue, Your Honor,
20    was the deadlines for getting this house sold.  So
21    having leased the property, 1986 Sunnyside Drive in
22    Brentwood, you ordered that it be sold by auction.
23    You ordered the attorneys to select an auctioneer,
24    which we did, and we got a referral from the chancery
25    court clerk's office.  And it ended up it was Pat
```

FAWN███████ FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1   Marlin, who was actually a Realtor, but he does
 2   auctions and he used the services of Clyde Anderson.
 3   You know Clyde.  He had done auctions for many years
 4   around here.  And his son, Tommy Anderson, is now in
 5   the business.  So Mr. Anderson went out to the
 6   property with Ms. Fenton, Mr. Fenton.  We had some
 7   difficulty with the scheduling date, but we were able
 8   to get into the house.  And Mr. Anderson, Mr. Duke,
 9   who was Mr. Fenton's previous lawyer, and Ms. Yarbro
10   from my office went to the property.  Ms. Fenton
11   tagged the items like your Order told her to, and it
12   was our understanding that Mr. Fenton would be out of
13   the house by September 1.  He said he was going to
14   Michigan and that's where his, I think, his mother
15   lives.  I think his father has a lake home in
16   Tennessee.  That's where we thought maybe it would be
17   more logical for him to go, but that is up to him
18   where he wants to go.
19             What is obvious, Your Honor, is you're
20   going to have to set a date for him to be out.  The
21   order said it would be auctioned 45 days from
22   August 1st, and so that would be -- this is in your
23   order of August the 16th.  It would be 45 days from
24   the date of August 1st, the marital residence would be
25   sold by auction.  And I have the auction contract here
```

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1508.00

```
 1    for Mr. Fenton to sign, and I'm asking him to do that

 2    today.  If for any reason he refuses to sign, I'm

 3    asking the court to put in the order that Ms. Fenton

 4    have the authority to execute any and all documents

 5    necessary for Mr. Anderson to get his property sold.

 6              The other thing I think is important,

 7    Your Honor is --

 8              THE COURT:  What do you suggest as a

 9    deadline again?

10              MS. STORY:  It was in the Order already.

11    It was September 15th.  He said that he was moving

12    September 1st.  That is Sunday.

13              MR. FENTON:  That was my tenants move out

14    by then, and then I had 45 days was for me.

15              MS. STORY:  That is not true.  He said

16    that he had 45 days after September 1st to move, but

17    that wouldn't even make sense.

18              THE COURT:  Okay.  Well, what does the

19    Court Order say?  Because I'm going to stick with

20    that.

21              MS. STORY:  The Court Order says, "The

22    motion to sell marital residence by auction is granted

23    and the same shall be auctioned within 45 days from

24    the date of August 1st."

25              THE COURT:  Okay.
```

FAWN ███ FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1            MS. STORY:  So he's got to be out for
 2   them to get this place ready to go.
 3            THE COURT:  All right.  What date do you
 4   suggest?
 5            MS. STORY:  I have seen correspondence
 6   where he said September 1st.  Now he's saying he
 7   can't.  So I would suggest September 3rd, which is
 8   next Tuesday.  And I would like the Order to reflect
 9   that the Williamson County sheriff's department will
10   accompany him.  And at this point --
11            THE COURT:  You mean off the property?
12            MS. STORY:  Off the property.  And I
13   don't think he needs to take any property.
14            What he did, Your Honor, in this response
15   he filed, they had a TV that -- a Sony TV, a big
16   screen, that my client's brother had given her.  He
17   now tells me in this response that he sold it for
18   $1,000.  And then the other thing, there was a
19   dehumidifier in the basement that was like a $2,500 to
20   3,500 dehumidifier for moisture.  He sold that.  So if
21   you let him take anything out at this point it's going
22   to be sold and he's dissipating marital assets, which
23   would be in violation of the restraining order.
24            And at this point Mr. Anderson, he can
25   tag everything, they can video everything.  We will
```

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1510.00

1   not disturb anything.  If we have to use proceeds to

2   get a storage unit, we will do that for Mr. Fenton's

3   belongings.  Mr. Fenton, in his response says he has a

4   fear of heights.  And so driving to Michigan, he has

5   to drive over the Cincinnati bridge.

6               MR. FENTON:  Yeah.  That's really hard

7   for me.

8               MS. STORY:  And so he says he can't drive

9   a U-Haul over it.  So if we can just let him take his

10  clothing, his jewelry, his personal effects, whatever

11  he needs that he can pack in his car, and not have to

12  drive a U-Haul of furniture at this point, that might

13  be the best thing to do.

14              MR. FENTON:  Where is my furniture going

15  then?

16              THE COURT:  Wait a minute.  We're doing

17  this one at a time.

18              MR. FENTON:  I'm sorry.

19              THE COURT:  Go ahead.

20              MS. STORY:  If he will tag the items that

21  he wants, like my client tagged the items per your

22  order, if he'll just put a tag on items he wants,

23  we'll make sure that those get stored, and then we can

24  use the proceeds from the sale.  We're going to

25  deposit those into the clerk's office.  And we can use

```
 1   those to pay the next storage unit and then when he
 2   gets ready to come here and get his things, or maybe
 3   he wants to use some of his proceeds to have them
 4   shipped to him since he, you know, does have a fear of
 5   driving the U-Haul.
 6              So I'm trying my best to be as
 7   accommodating to him and considering his condition
 8   that, you know, this is going to be a simple process
 9   for him.  He can take his clothes, his personal
10   property, be out September 3rd.  We will tag
11   everything, take care of it.  Mr. Anderson is not
12   going to destroy property.  That's all I'm asking for.
13   And if he would sign the listing agreement today and
14   we put in the order that it be -- that she have the
15   authority to sign any other necessary documents in
16   case he does go to Michigan.  It would be a little
17   bit, logistically, difficult to do that.
18              THE COURT:  What do you want me to do
19   with this violation of the Order?
20              MS. STORY:  Just continue it.  We can
21   just reset that portion of the motion.  He just filed
22   a response today.  I'm fine to -- the ex parte remains
23   in effect anyway under the Order of the Court, and I
24   have not seen any further violations of that Order.
25   The selling of the marital property is a concern to me
```

TNJudicial.com/tr/ad/0020.tif    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC: 002 | Page 513 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-24, PageID.1163    Filed 10/13/23    Page 55 of 100

FAWN ▮▮▮▮ FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1    but I can deal with that at final hearing.  One of the
 2    things, too, is you might want to waive mediation in
 3    this case.  I have requested in my motion that
 4    mediation be waived.  There is an Order of Protection
 5    where they are not to be around each other.  It would
 6    be difficult for a mediator to accommodate that.  And
 7    I think that it really is just settling personal
 8    property.  They don't have any -- and then whatever
 9    comes from the proceeds.  They have no children.
10                THE COURT:  That's granted.
11                Okay, sir, let me talk to you about one
12    thing.  We're narrowing the issues before the Court
13    today.
14                MR. FENTON:  Okay.
15                THE COURT:  We're not going to be talking
16    about the violation of the Order of Protection.
17    That's going to be reset.  So all of these documents
18    you have don't apply to today.
19                MR. FENTON:  Well, the back portion of
20    them does talk about the marital residence but there
21    is a lot of it about what you're saying, yes.
22                THE COURT:  Now, let me just tell you
23    this -- and I just want to be clear about this.  I
24    don't want to get into an emotional discussion about
25    what I will do and what I won't do.  Let me just tell
```

1   you how it, works.  Once I put a Court order down, I

2   really expect people to obey it.

3               MR. FENTON:  Yes.

4               THE COURT:  And so the only way a judge

5   can enforce a Court order if someone refuses to do it,

6   and we're seeing it more and more, people are doing

7   what they want to do and not really paying attention

8   to a Court order.  And I'm taking the time to tell you

9   this because I don't want you and me to have problems

10  with this.

11              MR. FENTON:  No.

12              THE COURT:  And let me tell you, my

13  personal feeling is, as a judge, a judge who does not

14  back up his or her Court order is worthless.

15              Now, if you have a reasonable excuse for

16  disobeying an order, I will certainly hear it.  And

17  the last thing I want to do is put someone in jail for

18  violating an order.

19              MR. FENTON:  Yes.  And that's the last

20  thing I want, too.

21              THE COURT:  Sure.  Right.  And so you and

22  I have an understanding.  And so you don't know me but

23  I do mean what I say.

24              MR. FENTON:  I believe that.

25              THE COURT:  Okay.  Good.  And so we can

```
 1    dispense with the rest of that.

 2              MR. FENTON:  And just as a question, were

 3    we saying that I disobeyed the Court order?  Because I

 4    had --

 5              THE COURT:  No, no, we don't have

 6    anything like that really in front of us but --

 7              MR. FENTON:  Okay.

 8              THE COURT:  But let me tell you what I'm

 9    going to do here because we have to get moving.

10              MR. FENTON:  Right.  Can I still tell a

11    little bit of my side before you rule on all of that?

12              THE COURT:  Briefly.

13              MR. FENTON:  Okay.  So basically on my

14    side, the narrative that has been brought to the Court

15    so far is completely fraudulent about my person, about

16    who I am, about me being violent.  All of this stuff.

17    The documentation that I provided you with shows that

18    my wife is a highly skilled handgun instructor who

19    owns assault weapons, has 5,000 rounds of ammunition

20    under her bed.  I mean, she is trained by the NRA,

21    certified by the State of Tennessee to do rape

22    prevention, pepper spray, everything.  So the whole

23    guise of feeling physically endangered was not -- she

24    tried to do that with her first attorney --

25              THE COURT:  We're not dealing with that
```

506

 1   today.

 2                  MR. FENTON:  I know.  But that's

 3   basically the tone under which everything else is laid

 4   and that's --

 5                  THE COURT:  I practiced law for 35 years.

 6   Long, hard years in the trenches.

 7                  MR. FENTON:  Right.

 8                  THE COURT:  I am trained to separate

 9   things in my mind that are important --

10                  MR. FENTON:  Okay.

11                  THE COURT:  -- and things that are

12   unimportant.  And I'm not trying to be rude to you,

13   but you've got to trust me here.  If you were a

14   lawyer, I would be telling you the same thing.  I

15   would be saying, "Lawyer, that's not relevant to me

16   right now."

17                  MR. FENTON:  Right.

18                  THE COURT:  I don't really care about all

19   that.  That's for another day.  But let me just tell

20   you this.

21                  MR. FENTON:  Okay.

22                  THE COURT:  These are real easy issues.

23   I have got to put an order down for you to be out of

24   that house.

25                  MR. FENTON:  I understand that.

FAWN TIFFANY FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1                THE COURT:  On September 3rd.
 2                MR. FENTON:  Can I speak a little more
 3     first?
 4                THE COURT:  No.
 5                MR. FENTON:  I can't be out that quick,
 6     Your Honor.  Everything that I own is left in personal
 7     property.  To say that I just take my clothes and lose
 8     everything I've owned all my life is not fair.  That
 9     is not at all fair.  And I don't mean to be hard.  I'm
10     willing to do things as quick as possible, but I
11     cannot possibly move out without a two-week's time to
12     do it.  And I need to have some time where I know that
13     there is not going to be anymore litigation for a
14     while because I can't -- with the ADHD -- and one of
15     the things I provided you is something from my
16     psychiatrist on the different disorders I have, but I
17     cannot physically do -- be a lawyer, play a lawyer,
18     and packing at the same time.  For example, that's --
19                THE COURT:  Sir, I respect that.  But we
20     all have burdens.
21                MR. FENTON:  Well --
22                THE COURT:  Let me talk.  We all have
23     burdens.  Everybody in this room has things going on
24     in their lives to one extent or another, just like you
25     do.
```

FRBP Violated: #3:19-bk-02693        TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)        JRF.002.1517.00

FAWN TIFFANY FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1              MR. FENTON:  Right.
 2              THE COURT:  I can't make excuses for
 3    that.  Listen to what I'm saying.  I don't want you
 4    and I to get crossways with each other.  We have to
 5    get a date set.  I'm not going to make it two weeks.
 6              MR. FENTON:  Well, originally we had said
 7    the 45th, and that's when I understood that date that
 8    I had to be out.  And I never communicated with her
 9    anything other than that.  You had said 30 days for my
10    roommates and that's what I always thought it was.
11    And originally my understanding was I was staying
12    there while I was selling the property so I could stay
13    there till closing.  Now, I understand that's not my
14    preference and I understand it's not their preference.
15    I'm willing to do that different, but I need to
16    have -- I have 3,000 square feet of stuff.
17              THE COURT:  What about another day in
18    September?  The first week in September?
19              MS. STORY:  And, again, we're not going
20    to dispose of any of his personal items.
21              THE COURT:  They're not taking anything
22    out of there.  Do you understand that, sir?
23              MR. FENTON:  My understanding is --
24              THE COURT:  Whoa, whoa.
25              MR. FENTON:  No, I don't understand.
```

```
 1              THE COURT:  Your personal property.  Your
 2   clothes.  Personal property being like your watch.
 3              MR. FENTON:  Furniture.  That's all.
 4              THE COURT:  No.
 5              MR. FENTON:  We already agreed when me
 6   and my wife split it up that the house was mine.  What
 7   she came and tagged is hers.
 8              THE COURT:  This isn't working.  What you
 9   want to do is be a lawyer.
10              MR. FENTON:  No, I don't.  I can't afford
11   a lawyer.
12              THE COURT:  I'm talking right now.  This
13   is not a barroom.  I have to maintain order.
14              MR. FENTON:  Uh-huh.
15              THE COURT:  I don't want you to get your
16   feelings hurt, but if you get your feelings hurt,
17   that's your business.  I have got to maintain the
18   integrity of this hearing.  You need to quit
19   interrupting me.  And I'm going to make a ruling and
20   you're going to have to stick with it.
21              MR. FENTON:  Yeah.
22              THE COURT:  All right?  You are going to
23   have to.
24              We are not touching any of the furniture
25   and furnishings.  You are to tag the items that you
```

510

```
 1    would like to have.  Go buy some little tags, you

 2    know.

 3                MR. FENTON:  But I wanted to take them

 4    with me so I'm only going over the bridge one time.

 5    That's what I was saying.

 6                THE COURT:  Well, I know that you would

 7    like to do that but we're not doing that.  Okay?

 8    That's not the fair way to do it.  And I'm not going

 9    to sit here and explain to you why it's not because

10    it's part of the law that you assume when you stand up

11    and start representing yourself.  Assume that you

12    know.

13                MR. FENTON:  Okay.  Then I would

14    rather --

15                THE COURT:  I can't talk while you're

16    talking.

17                MR. FENTON:  Okay.  I'm sorry.  I would

18    rather stay in the house during the auction with that

19    being the case.  But the only reason I was going to

20    leave ahead of time --

21                THE COURT:  You're not going to stay in

22    the house.

23                MR. FENTON:  I'm not going to stay in the

24    house?

25                THE COURT:  No, sir.  You're going to
```

5).1

1   leave by September 3rd noon, and you've got to be out

2   of there or the sheriff will escort you off the

3   property.

4            MR. FENTON:  So have I done wrong to

5   receive that kind of treatment, Your Honor?  I mean,

6   my wife had two months to move out.

7            THE COURT:  Sir, we have already talked

8   about all that.  We had a previous hearing.  We have a

9   previous Court Order.  You're representing yourself.

10   You're assuming to know everything we've already

11   talked about.  I'm not going to go over it with you

12   and spend four hours --

13            MR. FENTON:  I understand.

14            THE COURT:  Excuse me.  Trying to be nice

15   to you when you are presumed to know and understand

16   what we have already done.  I'm trying my best to be

17   patient with you and you're trying my patience.  I'm

18   just letting you know.

19            MR. FENTON:  I'm not trying to -- my last

20   counsel had told me --

21            THE COURT:  Sir, I'm not interested in

22   what your counsel told you.  I'm sorry.  It's not

23   important to me at this point.

24            Now, let's go back to what I was saying.

25   I want you out of the house by 12 noon September 3rd.

512

```
 1   If you're not out, the sheriff will escort you off the
 2   property.  Do you understand that?
 3              MR. FENTON:  Yeah.
 4              THE COURT:  Number two, you are not to
 5   take with you any furniture, any furnishings, anything
 6   like that.  All of that is going to remain in the home
 7   for now.  You are to tag the items that you would like
 8   to have.  That doesn't mean you're going to get them,
 9   but that you -- may I finish, please?
10              MR. FENTON:  Uh-huh.
11              THE COURT:  Is that a yes?
12              MR. FENTON:  Yes, sir.
13              THE COURT:  You are to tag the items that
14   you would like to have.
15              MR. FENTON:  Uh-huh.
16              THE COURT:  In addition, you're to sign
17   this contract today.
18              MR. FENTON:  On the last Court Order you
19   said that I could take my stuff with me after the
20   ten-day walkthrough.  That's what your last Court
21   Order said, and I would like to be able to do that.
22              THE COURT:  The day that you leave or
23   that you have -- you have between now and
24   September 3rd to get your personal items and you out
25   of there.
```

5]3

FAWN███ FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1              MR. FENTON:  Yeah.
 2              THE COURT:  Do you understand that?  Your
 3   personal items, sir.  You're not stupid.  Listen,
 4   please.  Your personal items are your clothes, your
 5   personal jewelry, and that's it.
 6              MR. FENTON:  My bed or my furniture?
 7              THE COURT:  No, sir.  I'm going to say it
 8   for the third time.  No furniture, no furnishings, no
 9   nothing.
10              MR. FENTON:  That's not what you said in
11   the last order.
12              THE COURT:  Sir, you're not paying
13   attention.  You're not listening to what has happened.
14   You're not paying attention to anything.  And I'm not
15   going to spend three or four hours here at the -- just
16   trying to be nice to you and go through everything
17   again.  I'm just not going to do that.  You're
18   expected to know all of this.
19              Now, you're choosing to represent
20   yourself.  There's not a thing that I can do about
21   that.
22              MR. FENTON:  I --
23              THE COURT:  Excuse me.  I'm talking.
24              When you choose to represent yourself,
25   you take it upon yourself to know all of the rules,
```

1  the law, everything.

2          Now, that doesn't sound fair but that's

3  part of why we have to do it.  We can't sit here and

4  be your lawyer for you and start explaining things to

5  you.

6          MR. FENTON:  Okay.

7          THE COURT:  I will try to be as

8  accommodating and as nice to you as I possibly can.  I

9  don't think you're accepting that very well.

10         MR. FENTON:  I'm not trying to be

11  stubborn.

12         THE COURT:  You're trying to fuss with me

13  and argue with me and that's not what we're going to

14  do today.

15         MR. FENTON:  I'm not trying to fuss and

16  argue with you.  It's not what I understood your last

17  order to be.

18         THE COURT:  I'm going to go over it one

19  more time.

20         MR. FENTON:  I heard you.

21         THE COURT:  No.  I don't want there to be

22  any misunderstanding because you have interrupted me

23  several times.

24         MR. FENTON:  Can I say one thing?

25         THE COURT:  No.  Listen.  Don't try my

514a

```
 1    patience.
 2              MR. FENTON:  I'm not trying to.
 3              THE COURT:  Yeah, you are.
 4              MR. FENTON:  No, I'm not.
 5              THE COURT:  Well, quit being rude.  This
 6    is what we're doing.  You're going to sign this
 7    contract now.  Give it to him, Ms. Story.
 8              You are to be out of the house.  Do not
 9    take any furniture, furnishings, or anything.  But
10    you're to be out September 3rd at noon.  The only
11    thing you can take with you -- I'm saying this for the
12    fourth time because I don't want there to be a
13    misunderstanding.  This is going to be a court order.
14    Now, items that you would like to have, that doesn't
15    mean you're going to get them, tag them.  Put a tag on
16    them.  Go to the 5 and 10 store, get some red tags,
17    whatever, and say I want this.  Post it.  Or just put
18    "H" on it, or something like that.  Just commonsense.
19              Wait a minute.  I'm not through.
20              There will be a deputy there to make sure
21    that you followed the Court Order and do what you're
22    supposed to do.  That means -- let me finish.  You
23    keep wanting to interrupt.  You're not listening to
24    what I'm saying.  You're thinking about what you're
25    going to tell me.  And then I don't want you coming in
```

FAWN ███ FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1   and say, Judge, I didn't really understand that.
 2            Because I've been down this road with
 3   folks who represent themselves.  They don't get it.
 4   They don't understand, and then they whine and
 5   bellyache and come back and say that just wasn't fair.
 6   Fair is something you do in the fall.  This is a
 7   courtroom.  You are expected to know the rules.  I am
 8   trying to be as cordial and as nice to you as I can
 9   but you're not letting me.  All right.
10            You signed the agreement, you understand
11   that you're to be out September 3rd at 12 noon, no
12   later.  Not one minute later.  You're to tag the items
13   that you would like to have before you leave.  Do you
14   understand that?
15            MR. FENTON:  Yes, sir.
16            THE COURT:  Do not, in the meantime, move
17   anything else out of that house.  Do not sell
18   anything.  Do you understand me?
19            MR. FENTON:  Uh-huh.
20            THE COURT:  Is that a yes?
21            MR. FENTON:  Yes.  Yes, Your Honor.
22            THE COURT:  Well, "uh-huh" doesn't --
23            MR. FENTON:  I'm sorry.  Yes, Your Honor.
24            THE COURT:  We're not in the bar.  We're
25   in the courtroom.
```

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1526.00

FAWN [redacted] FENTON vs JEFFREY RYAN FENTON
08/29/2019

```
 1                 MR. FENTON:  Okay.

 2                 THE COURT:  All right.  What else,

 3    Ms. Story?

 4                 MS. STORY:  That'll do it.  We can

 5    account for the items he sold at a later time and

 6    address that.

 7                 MR. FENTON:  Can I make a comment about

 8    those, Your Honor?

 9                 THE COURT:  No.

10                 MR. FENTON:  That is before this was in

11    Court.

12                 THE COURT:  No, sir.  I'm sorry.  I've

13    got to have a tight rein on this case.  I knew that

14    there were going to be problems at the beginning and

15    I'm going to keep a tight rein and whatever I need to

16    do to maintain the integrity of these Orders to

17    maintain the integrity of this lawsuit, and for you to

18    understand what your role is as a litigant

19    representing themselves.  I'm going to have to keep a

20    tight rein on you.  I would love to be nice --

21                 MR. FENTON:  I'm not --

22                 THE COURT:  Let me finish.  Let me

23    finish.

24                 That would be much easier but you won't

25    let me do it.  So anything else, Ms. Story?
```

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1527.00

```
1              MS. STORY:  Since he probably will be

2    moving to Michigan, I would be amenable to him

3    attending the final hearing by telephone if he doesn't

4    want to drive back.  And I can tell you, I will try to

5    accommodate him in any way I can.

6              THE COURT:  I know you will.  You already

7    have.

8              MS. STORY:  And, also, the order probably

9    needs to say that Ms. Fenton can execute any other

10   documents that need to be executed because he might

11   not be here to sign anything, that Mr. Anderson might

12   need signed.  So I would like to be able to put that

13   in the Order.

14             THE COURT:  All right.  Then if you'll

15   prepare the Order, that'll take care of us.  That's

16   what we're doing.  That's the Order of the Court.

17   Thank you very much.

18             (Proceedings were adjourned at 11:44 a.m.)

19

20

21

22

23

24

25
```

FAWN ████ FENTON vs JEFFREY RYAN FENTON
00/29/2019

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | REPORTER'S CERTIFICATE                                       |
| 2   | I, Emily L. Sipe, Court Reporter and Notary                  |
| 3   | Public, do hereby certify that I recorded to the best        |
| 4   | of my skill and ability by machine shorthand all the         |
| 5   | proceedings in the foregoing transcript, and that said       |
| 6   | transcript is a true, accurate, and complete                 |
| 7   | transcript to the best of my ability.                        |
| 8   | I further certify that I am not an attorney                  |
| 9   | or counsel of any of the parties, nor a relative or          |
| 10  | employee of any attorney or counsel connected with the       |
| 11  | action, nor financially interested in the action.            |
| 12  | SIGNED this 18th day of September 2019.                      |

*Emily L. Sipe*

Emily L. Sipe, RPR, LCR
Tennessee LCR No. 608
Expires: 6/30/2020

FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.002.1529.00

FAWN [redacted] FENTON vs JEFFERY RYAN FENTON
08/29/2019

Index: $1,000..difficult

**$**

$1,000 6:18
$2,500 6:19

**1**

1 4:13
10 21:16
11:44 24:18
12 17:25 22:11
14th 3:11
15th 5:11
16th 4:23
19 3:11
1986 3:21
1st 4:22,24 5:12, 16,24 6:6

**3**

3,000 14:16
3,500 6:20
30 14:9
35 12:5
3rd 6:7 8:10 13:1 17:1,25 18:24 21:10 22:11

**4**

45 4:21,23 5:14, 16,23
45th 14:7

**5**

5 21:16
5,000 11:19

**A**

a.m. 24:18
accepting 20:9
accommodate 9:6 24:5
accommodating 8:7 20:8
accompany 6:10
account 23:5
addition 18:16
address 23:6
ADHD 13:14
adjourned 24:18
afford 15:10
agreed 15:5
agreement 8:13 22:10
ahead 7:19 16:20
amenable 24:2
ammunition 11:19
Anderson 4:2,4, 5,8 5:5 6:24 8:11 24:11
anymore 13:13
apply 9:18
argue 3:14 20:13, 16
assault 11:19
assets 6:22
assume 16:10,11
assuming 17:10
attending 24:3
attention 10:7 19:13,14
attorney 11:24
attorneys 3:23

auction 3:22 4:25 5:22 16:18
auctioned 4:21 5:23
auctioneer 3:23
auctions 4:2,3
August 3:11 4:22,23,24 5:24
authority 5:4 8:15

**B**

back 9:19 10:14 17:24 22:5 24:4
bar 22:24
barroom 15:13
basement 6:19
basically 11:13 12:3
bed 11:20 19:6
beginning 23:14
bellyache 22:5
belongings 7:3
big 6:15
bit 8:17 11:11
Brentwood 3:22
bridge 7:5 16:4
Briefly 11:12
brother 6:16
brought 11:14
burdens 13:20, 23
business 4:5 15:17
buy 16:1

**C**

car 7:11

care 8:11 12:18 24:15
case 8:16 9:3 16:19 23:13
certified 11:21
chancery 3:24
children 9:9
choose 19:24
choosing 19:19
Cincinnati 7:5
clear 9:23
clerk's 3:25 7:25
client 7:21
client's 6:16
closing 14:13
clothes 8:9 13:7 15:2 19:4
clothing 7:10
Clyde 4:2,3
comment 23:7
commonsense 21:18
communicated 14:8
communication 3:13
completely 11:15
concern 8:25
condition 8:7
continue 8:20
contract 4:25 18:17 21:7
cordial 22:8
correspondence 6:5
counsel 17:20, 22
County 6:9

court 3:2,11,25 5:3,8,18,19,21,25 6:3,11 7:16,19 8:18,23 9:10,12, 15,22 10:1,4,5,8, 12,14,21,25 11:3, 5,8,12,14,25 12:5,8,11,18,22 13:1,4,19,22 14:2,17,21,24 15:1,4,8,12,15,22 16:6,15,21,25 17:7,9,14,21 18:4,11,13,16,18, 20,22 19:2,7,12, 23 20:7,12,18,21, 25 21:3,5,13,21 22:16,20,22,24 23:2,9,11,12,22 24:6,14,16
courtroom 22:7, 25
crossways 14:4

**D**

date 4:7,20,24 5:24 6:3 14:5,7
day 12:19 14:17 18:22
days 4:21,23 5:14,16,23 14:9
deadline 5:9
deadlines 3:20
deal 9:1
dealing 11:25
deals 3:17
dehumidifier 6:19,20
department 6:9
deposit 7:25
deputy 21:20
destroy 8:12
diem 3:5
difficult 8:17 9:6

FRBP Violated: #3:19-bk-02693    TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)    JRF.002.1530.00

FAWN ████ FENTON vs JEF █ Y RYAN FENTON
08/29/2019

Index: difficulty..means

difficulty 4:7 22:7

discussion 9:24

disobeyed 11:3

disobeying 10:16

disorders 13:16

dispense 11:1

dispose 14:20

dissipating 6:22

disturb 7:1

documentation 11:17

documents 5:4 8:15 9:17 24:10

drive 3:21 7:5,8, 12 24:4

driving 7:4 8:5

Duke 4:8

**E**

easier 23:24

easy 12:22

effect 8:23

effects 7:10

emotional 9:24

endangered 11:23

ended 3:25

enforce 10:5

entered 3:12

escort 17:2 18:1

excuse 10:15 17:14 19:23

excuses 14:2

execute 5:4 24:9

executed 24:10

expect 10:2

expected 19:18

expenses 3:5

explain 16:9

explaining 20:4

extent 13:24

**F**

fair 13:8,9 16:8 20:2 22:5,6

fall 22:6

father 4:15

fear 7:4 8:4

feeling 10:13 11:23

feelings 15:16

feet 14:16

Fenton 3:13 4:6, 10,12 5:1,3,13 7:3,6,14,18 9:14, 19 10:3,11,19,24 11:2,7,10,13 12:2,7,10,17,21, 25 13:2,5,21 14:1,6,23,25 15:3,5,10,14,21 16:3,13,17,23 17:4,13,19 18:3, 10,12,15,18 19:1, 6,10,22 20:6,10, 15,20,24 21:2,4 22:15,19,21,23 23:1,7,10,21 24:9

Fenton's 4:9 7:2

filed 6:15 8:21

final 9:1 24:3

fine 8:22

finish 18:9 21:22 23:22,23

folks 22:3

fourth 21:12

fraudulent 11:15

front 11:6

furnishings 15:25 18:5 19:8 21:9

furniture 7:12,14 15:3,24 18:5 19:6,8 21:9

fuss 20:12,15

**G**

gentleman 3:4

Give 21:7

Good 10:25

granted 5:22 9:10

gulse 11:23

**H**

half 3:5

handgun 11:18

happened 19:13

hard 7:6 12:6 13:9

he'll 7:22

hear 10:16

heard 20:20

hearing 9:1 15:18 17:8 24:3

heights 7:4

highly 11:18

home 4:15 18:6

Honor 3:9,19 4:19 5:7 6:14 13:6 17:5 22:21, 23 23:8

hours 17:12 19:15

house 3:20 4:8, 13 12:24 15:6 16:18,22,24 17:25 21:8 22:17

hurt 15:16

**I**

important 5:6 12:9 17:23

incur 3:6

instructor 11:18

integrity 15:18 23:16,17

interested 17:21

interrupt 21:23

interrupted 20:22

interrupting 15:19

issue 3:19

issues 3:17 9:12 12:22

items 4:11 7:20, 21,22 14:20 15:25 18:7,13,24 19:3,4 21:14 22:12 23:5

**J**

jail 10:17

jewelry 7:10 19:5

judge 10:4,13 22:1

**K**

kind 17:5

knew 23:13

**L**

laid 12:3

lake 4:15

law 12:5 16:10 20:1

lawsuit 23:17

lawyer 4:9 12:14, 15 13:17 15:9,11 20:4

leased 3:21

leave 16:20 17:1 18:22 22:13

left 13:6

lengthy 3:16

letting 17:18 22:9

life 13:8

Listen 14:3 19:3 20:25

listening 19:13 21:23

listing 8:13

litigant 23:18

litigation 13:13

lives 4:15 13:24

logical 4:17

logistically 8:17

Long 12:6

lose 13:7

lot 9:21

love 23:20

**M**

made 3:17

maintain 15:13, 17 23:16,17

make 5:17 7:23 14:2,5 15:19 21:20 23:7

marital 4:24 5:22 6:22 8:25 9:20

Marlin 4:1

matter 3:15

means 21:22

(615) 933-6786
www.harpethcourtreporters.com

521

Index: meantime..side

meantime 22:16

mediation 9:2,4

mediator 9:6

Michigan 4:14
7:4 8:16 24:2

mind 12:9

mine 15:6

minute 7:16
21:19 22:12

misunderstanding 20:22 21:13

moisture 6:20

months 17:6

morning 3:16

mother 4:14

motion 3:9,10,14
5:22 8:21 9:3

move 5:13,16
13:11 17:6 22:16

moving 5:11
11:9 24:2

**N**

narrative 11:14

narrowing 9:12

necessarily 3:14

nice 17:14 19:16
20:8 22:8 23:20

noon 17:1,25
21:10 22:11

NRA 11:20

Number 18:4

**O**

obey 10:2

obvious 4:19

office 3:25 4:10
7:25

order 3:3,4,11,12
4:11,21,23 5:3,
10,19,21 6:8,23
7:22 8:14,19,23,
24 9:4,16 10:1,5,
8,14,16,18 11:3
12:23 15:13 17:9
18:18,21 19:11
20:17 21:13,21
24:8,13,15,16

ordered 3:7,22,
23

Orders 23:16

originally 14:6,
11

owned 13:8

owns 11:19

**P**

pack 7:11

packing 13:18

part 16:10 20:3

parte 8:22

Pat 3:25

patience 17:17
21:1

patient 17:17

pay 3:4 8:1

paying 10:7
19:12,14

people 10:2,6

pepper 11:22

person 11:15

personal 7:10
8:9 9:7 10:13
13:6 14:20 15:1,2
18:24 19:3,4,5

physically 11:23
13:17

place 6:2

play 13:17

point 6:10,21,24
7:12 17:23

portion 3:6 8:21
9:19

possibly 13:11
20:8

Post 21:17

practiced 12:5

preference
14:14

prepare 24:15

pressing 3:15,19

presumed 17:15

pretty 3:12

prevention
11:22

previous 4:9
17:8,9

problems 10:9
23:14

proceedings
24:18

proceeds 7:1,24
8:3 9:9

process 8:8

property 3:21
4:6,10 5:5 6:11,
12,13 8:10,12,25
9:8 13:7 14:12
15:1,2 17:3 18:2

Protection 9:4,
16

provided 11:17
13:15

psychiatrist
13:16

put 3:3 5:3 7:22
8:14 10:1,17
12:23 21:15,17
24:12

**Q**

question 11:2

quick 13:5,10

quit 15:18 21:5

**R**

rape 11:21

ready 6:2 8:2

real 12:22

Realtor 4:1

reason 5:2 16:19

reasonable
10:15

receive 17:5

received 3:16

red 21:16

referral 3:24

reflect 6:8

refuses 5:2 10:5

rein 23:13,15,20

relevant 12:15

remain 18:6

remains 8:22

represent 19:19,
24 22:3

representing
16:11 17:9 23:19

requested 9:3

reset 8:21 9:17

residence 4:24
5:22 9:20

respect 13:19

response 3:15,
16 6:14,17 7:3
8:22

rest 11:1

restraining 6:23

result 3:6

road 22:2

role 23:18

room 13:23

roommates
14:10

rounds 11:19

rude 12:12 21:5

rule 11:11

rules 19:25 22:7

ruling 15:19

**S**

sale 7:24

scary 3:12

scheduling 4:7

screen 6:16

select 3:23

sell 5:22 22:17

selling 8:25
14:12

sense 5:17

separate 12:8

September 4:13
5:11,12,16 6:6,7
8:10 13:1 14:18
17:1,25 18:24
21:10 22:11

services 4:2

set 4:20 14:5

settling 9:7

share 3:4

sheriff 17:2 18:1

sheriff's 6:9

shipped 8:4

shows 11:17

side 11:11,14

522

FAWN [REDACTED] FENTON vs JE[  ]RY RYAN FENTON
08/29/2019

Index: sign..years

**sign** 5:1,2 8:13, 15 18:16 21:6 24:11

**signed** 22:10 24:12

**simple** 8:8

**sir** 9:11 13:19 14:22 16:25 17:7, 21 18:12 19:3,7, 12 22:15 23:12

**sit** 16:9 20:3

**skilled** 11:18

**sold** 3:20,22 4:25 5:5 6:17,20,22 23:5

**son** 4:4

**Sony** 6:15

**sound** 20:2

**speak** 13:2

**spend** 17:12 19:15

**split** 15:6

**spray** 11:22

**square** 14:16

**stand** 16:10

**start** 16:11 20:4

**State** 11:21

**statements** 3:18

**stay** 14:12 16:18, 21,23

**staying** 14:11

**stick** 5:19 15:20

**storage** 7:2 8:1

**store** 21:16

**stored** 7:23

**Story** 3:8,9 5:10, 15,21 6:1,5,12 7:8,20 8:20 14:19 21:7 23:3,4,25 24:1,8

**stubborn** 20:11

**stuff** 11:16 14:16 18:19

**stupid** 19:3

**suggest** 5:8 6:4, 7

**Sunday** 5:12

**Sunnyside** 3:21

**supposed** 21:22

**T**

**tag** 6:25 7:20,22 8:10 15:25 18:7, 13 21:15 22:12

**tagged** 4:11 7:21 15:7

**tags** 16:1 21:16

**taking** 10:8 14:21

**talk** 9:11,20 13:22 16:15

**talked** 17:7,11

**talking** 9:15 15:12 16:16 19:23

**telephone** 24:3

**telling** 12:14

**tells** 6:17

**ten-day** 18:20

**tenants** 5:13

**Tennessee** 4:16 11:21

**that'll** 23:4 24:15

**thing** 5:6 6:18 7:13 9:12 10:17, 20 12:14 19:20 20:24 21:11

**things** 3:18 8:2 9:2 12:9,11 13:10,15,23 20:4

**thinking** 21:24

**thought** 4:16 14:10

**tight** 23:13,15,20

**till** 14:13

**time** 7:17 10:8 13:11,12,18 16:4, 20 19:8 20:19 21:12 23:5

**times** 20:23

**today** 3:10,13 5:2 8:13,22 9:13,18 12:1 18:17 20:14

**told** 4:11 17:20, 22

**Tommy** 4:4

**tone** 12:3

**touching** 15:24

**trained** 11:20 12:8

**transcript** 3:7

**treatment** 17:5

**trenches** 12:6

**true** 5:15

**trust** 12:13

**Tuesday** 6:8

**TV** 6:15

**two-week's** 13:11

**type** 3:18

**U**

**U-HAUL** 7:9,12 8:5

**uh-huh** 15:14 18:10,15 22:19, 22

**understand** 12:25 14:13,14, 22,25 17:13,15 18:2 19:2 22:1,4, 10,14,18 23:18

**understanding** 4:12 10:22 14:11, 23

**understood** 14:7 20:16

**unimportant** 12:12

**unit** 7:2 8:1

**V**

**video** 6:25

**violating** 10:18

**violation** 3:10 6:23 8:19 9:16

**violations** 8:24

**violent** 11:16

**W**

**Wait** 7:16 21:19

**waive** 9:2

**waived** 9:4

**walkthrough** 18:20

**wanted** 16:3

**wanting** 21:23

**watch** 15:2

**weapons** 11:19

**week** 14:18

**weeks** 14:5

**whine** 22:4

**whoa** 14:24

**wife** 11:18 15:6 17:6

**Williamson** 6:9

**working** 15:8

**works** 10:1

**worthless** 10:14

**wrong** 17:4

**Y**

**Yarbro** 4:9

**years** 4:3 12:5,6

(615) 933-6786
www.harpethcourtreporters.com

523

TNJudicial... ... Williamson County Chancery Court Tennessee (Trial Court Records) ... Filed 10/13/23 ... Page 534 of 719

Case 1:23-cv-01097-PLM-RSK   ECF No. 1-24, PageID.1184   Filed 10/13/23   DOC... ... Page 76 of 100

EXHIBIT #3

1          IN THE CHANCERY COURT
       FOR WILLIAMSON COUNTY, TENNESSEE    2020 FEB 19 ... 1:11
2                AT FRANKLIN
                                          FILED FOR ...
3    FAWN [        ] FENTON,          )
                                      )
4         Plaintiff/Wife,             )
                                      )
5    vs.                              )   No. 48419B
                                      )
6    JEFFREY RYAN FENTON,             )
                                      )
7         Defendant/Husband.          )

8    ------------------------------------------------------

9

10

11              TRANSCRIPT OF PROCEEDINGS

12                 August 1, 2019

13   Heard Before:   HON. MICHAEL W. BINKLEY, JUDGE

14

15   ------------------------------------------------------

16

17

18

19

20

21

22                  Prepared by:
23       Susan D. Murillo, LCR, CCR
             118 Wheaton Hall Lane
24       Franklin, Tennessee 37069
          Phone:  (615) 479-7511          524
25

                                                          1

```
 1     APPEARANCES:

 2         For the Plaintiff/Wife:

 3                 Ms. Virginia Lee Story
                   Attorney at Law
 4                 136 Fourth Avenue, South
                   Franklin, Tennessee   37064
 5
           For the Defendant/Husband:
 6
                   Mr. Mitchell R. Miller
 7                 Mr. Charles M. Duke
                   Attorneys at Law
 8                 1200 Villa Place
                   Suite 201
 9                 Nashville, Tennessee   37212

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

525

2

```
 1                    P R O C E E D I N G S

 2

 3              MS. STORY:  Your Honor, with your

 4    permission what we would like to do is leave the

 5    ex parte order of protection in place.

 6              THE COURT:  All right.

 7              MS. STORY:  That has given relief to

 8    these parties not being able to contact each

 9    other.

10              THE COURT:  Okay.

11              MS. STORY:  And put as part of that,

12    that she does not contact him, he does not contact

13    her, which the ex parte already has him restrained

14    and enjoined from any contact whatsoever.

15              THE COURT:  All right.

16              MS. STORY:  Because what we don't

17    want to do is have something go down on his

18    record that's going to affect his employability,

19    because he needs to get a job ASAP, so as long as

20    we have the protection, the order of protection

21    under the ex parte, we are good with that.

22              THE COURT:  Okay.

23              MR. DUKE:  Thank you, your Honor.

24              THE COURT:  Any other issues?

25              MS. STORY:  We can move on to the
```

526

3

```
 1    sale of the house.

 2              THE COURT:  Okay.

 3              MS. STORY.  This is the situation,

 4    your Honor.  These parties have no minor children.

 5    They've been separated since March of 2018.  Mrs.

 6    Fenton filed for divorce back in '18, and she was

 7    unable to get Mr. Fenton served.  In that period

 8    of time Mr. Fenton was in the marital home, which

 9    is in Sunnyside Drive, 1986 Sunnyside Drive,

10    Brentwood, Tennessee.

11              We believe that house should sell in

12    the neighborhood of 414,000 we hope.  It's a great

13    location.  People want to get in Brentwood, to get

14    into Brentwood in that zip code.  Those schools

15    for that kind of price is wonderful.  This thing

16    could sell immediately if you had a good marketer

17    to get that thing on the market and get it sold.

18              Mr. Fenton and Mrs. Fenton had

19    agreed last year that they would do that.  She

20    then dropped the divorce.  They were going to try

21    to get it on the market.  The problem with the

22    private realtor is that Mr. Fenton posts these

23    kind of documents that are -- this is the do not

24    enter my property, and I'll hand you a copy of

25    that.                                    527
```

4

1             It was made as part of the exhibits

2 when we filed for divorce in 2019. Mr. Fenton was

3 avoiding service. We hired two different process

4 servers to try to go out to the residence, and

5 this is what they would encounter. We're

6 concerned that if a private realtor was going to

7 list this property, that it would just be more

8 road blocks.

9             In 2018, when they made this

10 agreement, if she dropped the divorce he would

11 agree to put the house on the market. It never

12 got on the market. It was he's got to fix this,

13 he's got to fix that. It was one excuse after

14 another, and here we are sitting a year later,

15 and now my client had to file bankruptcy.

16             She is paying the second mortgage on

17 the house. She's paying $48,000 in credit card

18 debt, and this credit card debt is in her name,

19 but the genesis of those cards, I have a history

20 of the cards where Mr. Fenton would transfer

21 balances from his credit cards to a credit card in

22 her name, and then she became in a horrible

23 financial situation.

24             She is -- she used to make around **52**

25 90,000 a year. Her most recent income is 5800 a

5

1   month.  She is an architect, works for a firm,

2   and Mr. Fenton was the IT person for the firm,

3   and he hacked the emails so he lost that job.  He

4   is very intelligent.  He has a high school

5   education, but he is a self-taught computer

6   genius.

7           And he also has -- or he had a real

8   estate license.  I don't believe that's current.

9   He had a flip home of rental property in 2016, is

10   my understanding, but he never filed his tax

11   return for 2016, when he sold that home, and so

12   we've got a tax liability from 2-2016, standing

13   out there.

14           2017, 2018, my client did get the

15   tax returns filed, but they withheld everything

16   she paid in because they still haven't filed the

17   2016 tax return.  So we have woes, IRS woes.  We

18   have unsecured credit card debt in excess of

19   $48,000.  There is a Chapter 13.  Because my

20   client makes $5800 a month, she can't qualify for

21   a Chapter 7 bankruptcy.

22           And so what happened in the

23   bankruptcy proceedings is they allowed her six

24   months to sell this house.  She will have to use

25   her equity from the house.  There should be about

529

6

```
 1    120,000 equity.  We have asked --
 2              THE COURT:  Total or just her share?
 3              MS. STORY:  Total.  So my client is
 4    around 80 -- his -- no.  If it's 120 hers would be
 5    around 60.  Most of hers will go to pay off the
 6    debt.
 7              THE COURT:  Is the IRS going to be
 8    intercepting this money?
 9              MS. STORY:  When he gets his -- the
10    holdup here is the 2016 tax returns because he had
11    the property that he sold, so I don't know where
12    he is on getting that information together, but
13    the IRS is clearly not bankruptable.  Once he --
14              Once he files the 2016 tax returns,
15    I imagine they will take that $8,000 they're
16    holding of her money from the -- from her
17    employment where she pays in her taxes.  They will
18    take that and apply it toward the '16 taxes, no
19    doubt.  So that's --
20              THE COURT:  Any possibility she
21    could be an innocent spouse?  I don't know how
22    that works anymore.
23              MS. STORY:  She could probably, but
24    since they are already holding 8,000 of her money,
25    at this point, your Honor, she just needs the
```

530

TNJudicial.org/o/o/irf002.pdf          Williamson County Chancery Court (Tennessee (Trial Court Records)          DOC 002, Page 541 of 719

Case 1:23-cv-01097-PLM-RSK          ECF No. 1-24, PageID.1191          Filed 10/13/23          Page 83 of 100

```
 1    burden of all the debt off her mentally.  She

 2    suffers from narcolepsy and she suffers -- she has

 3    very sleepless nights.  She can't -- she has

 4    chronic fatigue.

 5              Her health has declined

 6    considerably.  It's a toxic marriage.  It's been

 7    unbelievably difficult just dealing with Mr.

 8    Fenton to even get him served.  So we continued

 9    this matter from Ms. Brittany Gates who was the

10    attorney who was first retained to represent him.

11    We continued it from June 29 until today to give

12    her a month to work on him, to see if we could get

13    the house on the market, do something.

14              We really believe the only thing we

15    can do, your Honor, is to auction this house.  We

16    got a text on June 15th from Mr. Fenton.  Here's a

17    copy of the text, and he says --

18              THE COURT:  Could this be with

19    reserve or without reserve?

20              MS. STORY:  I think without reserve,

21    just let it go.  I think a good auctioneer will do

22    a fabulous job.  It's a good flip property.  It's

23    a good -- as I said, in that zip code you can't

24    hardly find anything for that price.  So Mr.

25    Fenton sent her an email.
```

· **531**

8

```
 1                Said I will -- text.  (Quoted as

 2     read.)   "I will stay here until the bank -- until

 3     you, the banks and the police carry me out of

 4     here, while they carry truckloads of junk and

 5     treasures out to the lawn."  Then it goes on and

 6     on.

 7                But that is truly what we've dealt

 8     with.  So he's going to say that he doesn't have

 9     anyplace to live, and that he has renters.  He has

10     gotten renters in there.  Well, we didn't sign a

11     lease.  We never authorized any renters to be in

12     that house.  I think the renters need to go.

13                THE COURT:  Okay.

14                MS. STORY:  So --

15                THE COURT:  Do you know whether or

16     not they are month to month or if there's a

17     contract?

18                MS. STORY:  I just got the lease,

19     and I didn't have a chance to look at it.

20                THE COURT:  Okay.

21                MS. STORY:  I have been told that it

22     says 90 days to vacate but -- I don't know.  He

23     says --

24                MR. DUKE:  Your Honor, I'm sorry,

25     but if Mrs. Fenton is going to make comments from
```

532

9

```
 1   the table here, can we go ahead and put her under

 2   oath, please?

 3                  THE COURT:  She won't make any more.

 4                  MR. DUKE:  Thank you, your Honor.

 5                  MS. STORY:  And I don't mind being

 6   under oath whatsoever.  So I don't know.  Like I

 7   said, I was just handed this lease.

 8                  THE COURT:  Sure.

 9                  MS. STORY:  So I do not know.

10                  THE COURT:  Okay.

11                  MS. STORY:  I feel sure we have an

12   escape clause because my client didn't sign the

13   lease.  She is the owner of the property.

14                  THE COURT:  Is she the only titled

15   owner?

16                  MS. STORY:  Both of them.

17                  THE COURT:  Okay.

18                  MS. STORY:  So that is our argument.

19   I would ask that the exhibit on the note, don't

20   come on my property, the no trespassing be made an

21   exhibit to this hearing, and the email or the text

22   from Mr. Fenton that says I will stay here until

23   you, the banks and the police carry me out.

24                  THE COURT:  All right.  We'll make

25   this picture the first exhibit, number one.
```

```
 1

 2                    (Exhibit One received into

 3                    evidence to this hearing.)

 4

 5          THE COURT:  What about the ...

 6          ·MS. STORY:  The text, yes.  I would

 7  like those texts to be made an exhibit.

 8          THE COURT:  The text will be

 9  accepted into evidence as Exhibit Number Two.

10

11                    (Exhibit Two received into

12                    evidence to this hearing.)

13

14          MS. STORY:  I have the bankruptcy,

15  your Honor, that says it has to be sold within

16  180 days or goes to foreclosure.

17          THE COURT:  What is the starting

18  date of that order?

19          MS. STORY:  She filed in April,

20  April 29th.

21          THE COURT:  Okay.

22          MS.  STORY:  Well, April 26.

23          THE COURT:  Okay.  So when does the

24  120 or 80 days start?

25          MS. STORY:  I believe it starts from
```

534

11

TNJudicial.org/efile/rf002.pdf    Williamson County Chancery Court Tennessee (Trial Court Records)    DOC-002 | Page 545 of 719

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-24, PageID.1195    Filed 10/13/23    Page 87 of 100

1    the confirmation, but I'm not a bankruptcy lawyer,

2    so I was counting from -- I have talked to the

3    bankruptcy lawyer to make sure what relief we have

4    to get.

5              THE COURT:  Okay.

6              MS. STORY:  And I'm supposed to send

7    him a copy of this order from this court so that

8    he can get the Bankruptcy Court to ratify that

9    order so they're also in -- notified of that

10   process.

11             THE COURT:  What about -- just to

12   fill in your statement here.  I want to get the

13   whole picture.  Have y'all talked about an

14   auctioneer?  I know there are two opposite sides

15   here.  I get that, but have y'all gotten that

16   far?  You probably haven't because you disagree?

17             MS. STORY:  Their position is they

18   want a private realtor to come in.

19             THE COURT:  Okay.

20             MS.  STORY:  I don't mind doing

21   that, but, quite frankly, your Honor, I would not

22   recommend any of the realtors I work with because

23   I think it would be a nightmare.  We get emails,

24   books and books and books from Mr. Fenton all

25   hours of the night, and I don't even think

- - - 535

12

```
 1    there's anybody I could send into that situation.

 2              THE COURT:  Not even Ms. Martin?

 3    She probably --

 4              MS. STORY:  She could do it.  Mr.

 5    Fenton would have to be put on a really short

 6    leash until -- he could throw kinks in it, and

 7    the other thing we're worried about -- it's what

 8    Mrs. Fenton said -- is even if you got a realtor,

 9    if he had to sign a listing contract within five

10    days, sell it as is, theyre going to --

11              The  buyers are probably going to

12    want a home inspection.  I don't know if it will

13    pass a home inspection, and with three people

14    living here with him, and if he says in that

15    email, you'll have to carry me out, he says all

16    my treasures, I don't know what the status that

17    house is.  It's been since March of -- 18 months,

18    almost 18.

19              THE COURT:  The tenants that are in

20    there now, is it a family or one person?

21              MS. STORY:  You will have to ask

22    him.  We don't know.  Let me see if I can tell

23    from a name.  Jesse Garcia.  I don't know who that

24    is.

25              MR. DUKE:  There's another one as
```

536                    13

```
 1    well.

 2                 THE COURT:  Okay.  All right.  Yes,

 3    sir.  Well, whoever the lawyer is.

 4                 MR. MILLER:  My name is Mitchell

 5    Miller from the Nashville Bar.

 6                 THE COURT:  Yes, sir, Mr. Miller.

 7    How are you today?

 8                 MR. MILLER:  I'm doing very well.

 9    We have made a lot of progress talking about this

10    case so far, and my client is essentially coming

11    down to accept the inevitability that we're going

12    to need to sell this home to get this divorce

13    finalized and to move Mrs. Fenton through the

14    bankruptcy.

15                 At this time, however, Mr. Fenton

16    is not employed although he is looking for

17    employment.  He does have renters in this home,

18    and I know that Ms. Story has taken issue with

19    that, but I would also like to tell the court

20    that this has sort of come about because of the

21    bankruptcy and Mrs. Fenton stopped the -- you

22    know, discontinuing her payment on the primary

23    mortgage happened around the same time.

24                 And so Mr. Fenton has tenants in

25    this home and has what is supplements and provides
```

**537**          14

TNJudicial.com Case 1:23-cv-01097-PLM-RSK — Williamson County Chancery Court Tennessee (Trial Court Records) — DOC: 002 | Page 548 of 719

ECF No. 1-24, PageID.1198   Filed 10/13/23   Page 90 of 100

1   his ongoing day-to-day costs, although the first

2   mortgage is not currently being paid.

3   Mr. Fenton did not know that the first mortgage

4   was not being paid until several months after Mrs.

5   Fenton stopped paying.

6           So, Judge, we have sort of an issue

7   here where the wife, by filing bankruptcy, filing

8   divorce and stopping to pay the first mortgage,

9   has created the financial crisis that we're now

10   here to resolve.

11           Obviously, Mrs. Fenton would

12   contend that my client ran up all the debt, and

13   we're not necessarily here to determine all of

14   the marital assets and how to distribute marital

15   debt and assets conclusively, but my client would

16   show the court that many of those -- many of those

17   transactions and I'll say creative financial

18   decisions were done by agreement, or at least with

19   the knowledge of the wife.

20           However, for today's purposes we

21   agree that the home needs to be sold, but Mr.

22   Fenton's liability to his current tenants needs

23   to be taken into account.  Mr. Fenton's current

24   financial ability needs to be taken into account,

25   and we would oppose the motion in terms of an

538

15

1    auction, especially to the extent that it

2    requested an immediate auction.

3              At minimum, Mr. Fenton needs some

4    degree of time to gather his personal belongings,

5    give proper notice to his tenants, find

6    subsequent housing, and most importantly, if he

7    doesn't have a renter income coming in, have some

8    transitional time to figure out how to be self-

9    sustaining in the short run.

10             We're not here on an alimony

11   pendente lite motion, but we probably should be

12   soon because --

13             THE COURT:  Can I ask you this?

14             MR. MILLER:  Yes, sir.

15             THE COURT:  One of the biggest

16   problems I'm bumping up against in trying to make

17   the best decision here is who's going to control

18   the husband?  Exhibit One and Exhibit Two show

19   some very disturbing conduct.  I know you are not

20   in charge of trying to control your client all the

21   time.

22             I do know good lawyers like you

23   gentlemen on the left side of the table will tell

24   your clients, if you don't do what I tell you to

25   do, we're out of here.  I don't know how people

539

16

1    work any more, but that's the way we used to

2    practice law.  The lawyer is in charge.  You can

3    be nice and sweet, but tell the client what they

4    need to do.

5              And I don't have any assurance at

6    this point that his conduct won't continue

7    thereby delaying this process even more.  I know

8    you can't guarantee his conduct.  I know that,

9    but is there anything you can give me to indicate

10   that his conduct will not be an issue at all?  You

11   probably can't.  ·If I were in your shoes I would

12   probably say --

13             MR. MILLER:  I can give you no

14   guarantees.

15             THE COURT:  I'm not an insurer of my

16   client's conduct.

17             MR. MILLER:  I will adopt that

18   statement as Mr. Fenton's -- but, your Honor, I

19   would indicate that there's been an ex parte order

20   in place for some time now --

21             THE COURT:  Right.

22             MR. MILLER:  -- and that Mr. Fenton

23   has complied with that to the letter, and that we

24   stipulate he will continue to comply with that to

25   the letter, and Mrs. Fenton has agreed with that

- 540                17

```
 1   and also agreed, you know, not to have any contact
 2   with him.
 3              So we are in a place.  We are
 4   coming to the table and starting to realize -- I
 5   say "we" as in my whole team here and Mr. Fenton,
 6   that this is where the rubber is meeting the road,
 7   and this divorce is going to get moving along, and
 8   we're going to have to take this one step at a
 9   time.
10              This is going to have to be done.
11   So I will tell the court that I am confident that
12   my client now understands that.  We spent many
13   hours working with him to impress upon him the
14   realistic difficulties of any divorce and, in
15   particular, this one.
16              So I think what you are seeing there
17   is probably something that you've seen a lot
18   before, where spouses in emotional and financial
19   crisis are lashing out in irrational, unstable
20   ways.  That is coming to an end, and I can give
21   the court my best confidence that I believe that
22   Mr. Fenton is turning a corner on that.
23              He has expressed that to the court
24   by agreeing with Ms. Story's very generous
25   proposal to continue the ex parte order rather
```

FRBP Violated: #3:19-bk-02693        TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)        JRF.002.1551.00

1  than go for it on 402.  So I do think that there

2  are some good indicators there.  Mr. Fenton just

3  told me that he is willing to take down all those

4  troubling signs that Ms. Story mentioned.

5              We are prepared to entertain any

6  other limitations and orders that the court would,

7  you know, would want in that kind of order, but we

8  do think that because the main asset in this

9  divorce is this home, which we are essentially

10  disposing of before there's been any discovery and

11  any further analysis on this, that we need to

12  proceed in a way that absolutely maximizes the

13  total take on this.

14              THE COURT:  Under the circumstances.

15              MR. MILLER:  Under the

16  circumstances.

17              THE COURT:  That's where the real

18  issue is here.

19              MR. MILLER:  Yes, sir.

20              THE COURT:  Can I ask you some more

21  questions too?  Ms. Story may be able to answer

22  this.  The other concern I have is:  What kind of

23  condition is the interior of the home?  Have we

24  seen -- has Ms. Story and her client had an

25  opportunity to look at the interior to see what it

542

19

TNJudicial.org/exhibit002.pdf Williamson County Chancery Court Tennessee (Trial Court Records) DOC.002 | Page 553 of 719

Case 1:23-cv-01097-PLM-RSK ECF No. 1-24, PageID.1203 Filed 10/13/23 Page 95 of 100

```
 1   looks like?

 2            MR. MILLER:  Your Honor, I'm not

 3   sure.  There's definitely some clutter, and my

 4   client is willing to get to work today to make

 5   sure that that is done, and in terms of following

 6   recommendations for a realtor, we'll follow all

 7   those recommendations.  There may be some

 8   financial limitations about, you know, what

 9   extraordinary efforts can be made.

10            THE COURT:  I'm going to think out

11   loud here for a moment.  My tendency is to --

12   considering all these factors, first of all we're

13   getting ready to close out the best marketing

14   months of real estate; however, when we look at

15   property that is specialty property or property

16   that is very desirable like Brentwood, that

17   really doesn't matter like it used to.

18            People, if they want to buy, will

19   buy.  If the right buyer comes along -- and they

20   do in these desirable neighborhoods -- they'll buy

21   it.

22            MR. MILLER:  Yes, sir.

23            THE COURT:  So the next thing is,

24   looking at the husband's past conduct, which

25   bothers me, and his interruption of the smooth
```

543

20

```
 1    transition of a sale or auction, I want to get
 2    the highest and best price as everyone does.
 3    It's such a close decision for me.
 4              I'm thinking of three options.
 5    Number one, getting a real estate person who is
 6    aggressive, who'll sell the property, and if it
 7    can't be sold within 30 days, auction it.  But
 8    what that's going to require, if the interior of
 9    the home looks like trash, I mean, that's going to
10    cost money to get it in good condition.
11              So I guess the question there is
12    that no one has an answer, and I don't expect
13    one.  What is the margin of additional equity
14    that could be obtained to fix the home up and
15    make it marketable and sold with an aggressive
16    seller within a month, and is it going to be
17    worth it to do that financially?
18              MR. MILLER:  From my understanding
19    -- from my understanding an investment of five to
20    10,000 would yield an additional profit of about
21    50.  That calculus might make sense, but I don't
22    think that either party has the money to make
23    that investment even though that may be a rational
24    decision to make.
25              THE COURT:  My tendency is to sell
```

```
 1    it at auction -- it really is -- for a lot of good
 2    reasons.
 3                  MR. MILLER:  Your Honor, if I could
 4    add another note about how I've arrived on this
 5    case, especially just a few days before this
 6    hearing ...
 7                  THE COURT:  Yes, sir.
 8                  MR. MILLER:  Mr. Fenton contacted
 9    me I would say in February maybe before some of
10    these things happened, and he wanted to engage
11    me, but at that time I was working with HCA, and
12    we developed a rapport -- I couldn't take his
13    case, but we developed a rapport several months
14    ago.
15                  Although I wasn't able to take his
16    case, I think that we've connected and we've
17    established a rapport, and since I've moved back
18    into private practice he contacted me just last
19    week.  So since this has gotten rolling -- and I
20    know that there was a divide between he and his
21    prior counsel -- I do have a strong rapport with
22    my client.
23                  And I would be willing to do
24    whatever the court would like to try to work with
25    him and make sure that all phases of this divorce
```

545          22

1   proceed in an orderly and respectful fashion.  I

2   think that we're ready to turn a corner and do

3   that if the court would allow us that opportunity,

4   if the court's main concern is how we conduct

5   ourselves.

6          THE COURT:  If the margin of

7   additional money pales against the cost to get

8   there, and we know that no one has the money to

9   get there, that particular option, that's not

10   going to work, so it looks like to me -- correct

11   me if I'm wrong, but it look like to me that

12   trying to get the home fixed up for purposes of

13   producing a higher return --

14          MR. MILLER:  Let me clarify.  We're

15   not proposing further investment to -- we're

16   proposing an as-is sale, but through a -- on the

17   market rather than at auction so that -- I mean

18   without additional --

19          THE COURT:  But you have to pay the

20   realtor, don't you?

21          MS. STORY:  I was looking at the

22   realtors that Ms. Martin would -- or the auction

23   companies that might be suggested --

24          THE COURT:  Right.

25          MS. STORY:  -- and there's an

546

23

```
 1    auctioneer in Brentwood, First Cumberland

 2    Auctioneers.  What they would probably do is go

 3    out and just do an estate sale and sell whatever

 4    treasures are there that he's not going to take

 5    with him.  Then they would just sell everything.

 6    We would just sell personal property and the

 7    home.

 8            They do charge six percent.  Now a

 9    realtor -- an auctioneer is going to charge the

10    same amount.

11            THE COURT:  Okay.  So that's not

12    a --

13            MS. STORY:  It's the same, six

14    percent.  They do a pretty good job of getting

15    advertising out there.  You would be surprised

16    how many people show up on these courthouse

17    steps.

18            THE COURT:  I see them all the time.

19            MS. STORY:  For auction.

20            THE COURT:  Right.  Can I just ask

21    this question too?  I've seen where -- I don't

22    want it to look like a desperation sale, and y'all

23    don't either because the hawks will be out there.

24    But at the same time these auctioneers now are

25    marketing these sales not as an auction
```

647

24

```
 1    necessarily, but like Ms. Story said, like an

 2    estate sale to kind of disguise the idea that it's

 3    a desperate sale when it --

 4              MR. MILLER:  If an auction has to be

 5    the way to go we certainly appreciate, you know,

 6    proceeding within some form that appears

 7    respectful and doesn't just result in a basement

 8    price.

 9              THE COURT:  There are auctioneers

10    who can do that.  They understand that because

11    that makes their commission a lot higher if they

12    don't make it look like it's desperate, and

13    they're doing a good job of that from what I've

14    seen.

15              MR. MILLER:  And, your Honor, if an

16    auction has to be the way we go, I would still ask

17    for that auction to be out a ways so that he can

18    obtain -- if we're talking about 30 days, he can't

19    both clear the home out and apply for jobs.  So

20    then he's got to sell -- we got to figure out

21    where his personal property goes, find a storage

22    unit for that.

23              We've got to kick the tenants out,

24    which are providing income, so he can't really go

25    buy a storage unit to keep the stuff he wants to,
```

548

25