TN Judicial.org/c/a/trf123.pdf          8-YEAR "DEFAULT" ORDER of PROTECTION (TO RSTORY MY SILENCED)          DOC 123   Page of
of 31

(615) 837-1300 **OFFICE**
(615) 837-1301 **MOBILE**
(615) 837-1302 **FAX**

**TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,
WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!**

SUBMIT OR RESPOND TO A SUPPORT TICKET HERE.

A DIVISION OF METICULOUS MARKETING LLC

**From:** Fawn Fenton [mailto:ffenton@███████architects.com]
**Sent:** Wednesday, August 02, 2017 9:29 AM
**To:** Jeff Fenton
**Subject:** RE: TN Code (Combining Lines)

I have spent 10-15 minutes searching online, and I still don't know the answer to this... I will have to look at it later this afternoon.
Sorry!

**From:** Jeff Fenton
**Sent:** Wednesday, August 02, 2017 9:07 AM
**To:** Fawn Fenton <ffenton@███████architects.com>; Fawn Fenton
**Subject:** TN Code (Combining Lines)

Lovie,

How would this be expressed:

- T.C.A. § 39-14-405
- PLUS
- T.C.A. § 39-14-406

How would that be combined and denoted?

T.C.A. § 39-14-405, 406?

I need the line to be a little longer to justify with all the other lower lines. ☺

Gracias!

**JEFF FENTON**
**METICULOUS.TECH**
(615) 837-1300 **OFFICE**
(615) 837-1301 **MOBILE**
(615) 837-1302 **FAX**

**TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,
WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!**

2

TN Judicial.org/s/a/jrf123.pdf

## Jeff Fenton

**From:** Fawn Fenton <ffenton@███architects.com>
**Sent:** Wednesday, August 2, 2017 6:13 PM
**To:** Jeff Fenton
**Subject:** RE: Very Minor Change in Dimensional PDF WITH BLEED
**Attachments:** Jeffy Sign_Bleed Dimensions.pdf

Ok here it is

**From:** Jeff Fenton
**Sent:** Tuesday, August 01, 2017 10:50 PM
**To:** Fawn Fenton <ffenton@██architects.com>; Fawn Fenton
**Subject:** Very Minor Change in Dimensional PDF WITH BLEED

Hello Lovie,

Can you please make just one minor change for me of the ONE dimensional PDF, which includes the BLEED?

I'd like to change the LABEL on the bottom of the page:
- FROM: "DIMENSIONS OF PRINT COPY WITH BLEED"
- TO: "DIMENSIONS OF OVERPRINT COPY WITH ¼" BLEED"

Exactly as quoted above please! I know that I gave you the wording last time, but in working on this I've remembered that the term "overprint" is what is commonly referred to as the copy WITH Bleed, and that it would be helpful to specify the exact amount of bleed used throughout.

That is the ONLY change. Please just the highlighted text above (without the highlight), replacing the label at the bottom of the sheet.

Everything else is PERFECT!

THANKS LOVIE!!!

## JEFF FENTON
### METICULOUS.TECH
(615) 837-1300 **OFFICE**
(615) 837-1301 **MOBILE**
(615) 837-1302 **FAX**

**TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,
WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!**

1

TN Judicial.org/s/a/jrf123.pdf ... DESIGNED primarily by WIFE at WORK! ... NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!

TNJudicial.org/e/a/d123.pdf    9-YEAR "DEFAULT" ORDER of PROTECTION (TO EXTORT MY SILENCE)    DOC 123 Page 52 of 80

NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!



DIMENSIONS OF FINISHED SIGN (METAL PLATE)

TN Judicial.org/s/a/jff123.pdf    8-YEAR "DEFAULT" ORDER of PROTECTION (TO EXTORT MY SILENCE)    Filed 10/13/23   DOP 123 | Page 53 of 80

Case 1:23-cv-01097-PLM-RSK    ECF No. 1-53, PageID.1846    Filed 10/13/23   Page 4
of 31

TN Judicial.org/s/a/jff123.pdf · DESIGNED primarily by WIFE at WORK! · Used by Attorney Virginia Story to Assassinate my Character in Court: · NO TRESPASSING SIGNS

## Jeff Fenton

**From:** Fawn Fenton <ffenton@████architects.com>
**Sent:** Monday, July 31, 2017 9:11 PM
**To:** Jeff Fenton
**Subject:** RE: Sign PDFs
**Attachments:** Jeffy Sign_Master.dgn

CAD File Master.....

**From:** Fawn Fenton
**Sent:** Monday, July 31, 2017 8:06 PM
**To:** 'Jeff Fenton'
**Subject:** RE: Sign PDFs

Again...

**From:** Fawn Fenton
**Sent:** Monday, July 31, 2017 7:47 PM
**To:** 'Jeff Fenton'
**Subject:** RE: Sign PDFs

Revised again....

**From:** Fawn Fenton
**Sent:** Monday, July 31, 2017 7:41 PM
**To:** 'Jeff Fenton'
**Subject:** Sign PDFs

Revised PDFs....

TN judicial.org/c/e/d/123.cv "2-YEAR 'DEFAULT' ORDER N PROTECTION-TO-ENFORCE MY SILENCE!   DOD 123   Page 5 of 31

NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!



## DIMENSIONS OF OVERPRINT COPY WITH 1/4" BLEED

FRBP Violated: #3:19-bk-02693   TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)   JRF.123.1054.00

TN judicial.org/e/a/id123.pdf    9-YEAR "DEFAULT" ORDER of PROTECTION -TO-EXTORT MY SILENCE! DOC 123 Page 55 of 80

## Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton <ffenton@ ████ architects.com> |
| **Sent:** | Friday, July 28, 2017 3:30 PM |
| **To:** | Jeff Fenton |
| **Subject:** | RE: Sign! |
| **Attachments:** | Jeffy Sign2.dgn |

Here's the Microstation file, just in case.

---

**From:** Jeff Fenton
**Sent:** Friday, July 28, 2017 2:24 PM
**To:** Fawn Fenton <ffenton@ ████ architects.com>
**Subject:** RE: Sign!

Cool! So that is the v2000, right?

Can you send me the microstation master just to have, or have changes been made in the AutoCad version, where it is now the working master?

## JEFF FENTON
### METICULOUS.TECH
(615) 837-1300 **OFFICE**
(615) 837-1301 **MOBILE**
(615) 837-1302 **FAX**

**TECHNICAL CONSULTING, SERVICES, AND SOLUTIONS,**
**WHEN IT'S WORTH DOING RIGHT THE FIRST TIME!**

SUBMIT OR RESPOND TO A SUPPORT TICKET HERE.

A DIVISION OF METICULOUS MARKETING LLC

---

**From:** Fawn Fenton [mailto:ffenton@ ████ architects.com]
**Sent:** Friday, July 28, 2017 2:21 PM
**To:** Jeff Fenton
**Subject:** Sign!

Whee.... Autocad finally came up!
I changed the layer names to be descriptive of exactly what they are. I added a layer for the 1/4" outside bleed lines. Let me know if this isn't what you wanted.

1

TN judicial.org/oc/ds/123.pdf 6-YEAR "DEFAULT" ORDER of PROTECTION TO EXTORT MY SILENCE! DOC 123 Page 7

NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!



FRBP Violated: #3:19-bk-02693          TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)          JRF.123.1056.00

TN Judicial.org 7/3/af1133.D8

"A 9 YEAR (DEFAULT" ORDER of PROTECTION to ENFORCE SILENCE DOC123of31Page Page 8 of 31

# Jeff Fenton

| | |
|---|---|
| **From:** | Fawn Fenton <ffenton@█████architects.com> |
| **Sent:** | Wednesday, July 26, 2017 6:48 PM |
| **To:** | Jeff Fenton |
| **Subject:** | FW: Hikvision Video Surveillance \| Scheduling a Lunch & Learn |

Heh, FYI....

**From:** Zach.Geiser [mailto:Zach.Geiser@hikvision.com]
**Sent:** Wednesday, July 26, 2017 12:27 PM
**To:** Fawn Fenton <ffenton@█████architects.com>
**Subject:** RE: Hikvision Video Surveillance \| Scheduling a Lunch & Learn

Hi Fawn,
Not a problem and thank you for the information. If the high school would like to look into Hikvision solutions, please feel free to pass my information along. On average we are able to save 30% on cost in comparison to our competitors, which is often key in being able to provide quality systems to education projects as they tend to have tighter budgets. We also have 3-5yr warranties, and have a product failure rate less than 1%.

If I can be of any help on future projects, please do not hesitate to reach out as I am happy to consult with you. I will also be sure to get you're A&E online portal registration approved so that you have access to the resources there.

Have a great day!

Best Regards,

*Zach* Geiser
Business Development Associate
A&E Program, Mid-Atlantic
NJ • PA • MD • DE • DC • VA • WV • TN • KY
☎ 609.235.2624
✉ zach.geiser@hikvision.com

**HIKVISION** U.S.A

www.hikvision.com
Follow Hikvision USA and Canada on Facebook, Twitter, YouTube, and LinkedIn!

**View and Download the 2017 Spring/Summer PQG**

**Read the cybersecurity interview conducted by SSI Magazine with the President of Hikvision, Jeffery He:**

DISCLAIMER:
This e-mail and its attachments contain confidential information from Hikvision that  is intended only for  the person or entity whose address is listed above. Any use of the information contained herein in any way (including, but not limited to, total or partial disclosure, reproduction, or dissemination) by persons other than the intended recipient(s) is prohibited. If you receive this e-mail in error, please notify the sender by phone or email immediately and delete it.

1

NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!

TN Judicial.org "SixYEAR "DEFAULT" ORDER of PROFESSION TO EXTORT MY SILENCE DOC 123 Page 58 of 80

NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!

**From:** Fawn Fenton [mailto:ffenton@▮▮▮▮architects.com]
**Sent:** Monday, July 24, 2017 6:04 PM
**To:** Zach.Geiser
**Subject:** RE: Hikvision Video Surveillance | Scheduling a Lunch & Learn

Hi Zack,

Thanks for following up. My apologies for not getting back to you earlier; I am working on a project where the client had decided they wanted a video surveillance system (at a new restroom/concessions/meeting building of a high school track and football field that we are building), and I had started researching possible systems; however, the school decided they will provide the security system under a separate contract themselves, so that is not in my scope of work now. I will certainly let you know if we come across another opportunity in the future; I have always heard good things about HikVision's systems.

We are a small architectural office, and we do not normally entertain lunch-n-learns; myself and Ken Adkisson are the only two licensed architects, and we typically pursue education on separate paths. In any case, I am glad to have your contact information now, and will keep you on file if we can use your services on a future project.

Best wishes,

Fawn Fenton

**▮▮▮▮▮▮▮ Architects, Inc.**
3322 West End Ave., Suite 103
Nashville, Tennessee 37203
(615) 298-9829
*ffenton@▮▮▮architects.com*

---

**From:** Zach.Geiser [mailto:Zach.Geiser@hikvision.com]
**Sent:** Monday, July 24, 2017 3:11 PM
**To:** Fawn Fenton <ffenton@▮▮▮architects.com>
**Subject:** Hikvision Video Surveillance | Scheduling a Lunch & Learn

Hi Fawn,

My name is Zach Geiser, and I am the Mid-Atlantic A&E Business Development Manager at Hikvision – world's largest video surveillance manufacturer.

I will be in the Tennessee region either the last week in August, or 1st week in September, and I am curious if might we be able to arrange a Lunch N' Learn with the electrical engineering, technology integration, or security design team sometime within that timeframe? Our objective would be to introduce Hikvision at a high level, review our latest products and technologies, as well review our recently implemented A&E program / online portal. I would greatly appreciate the opportunity, and would be great to learn how I can best be a resource to Adkisson& Assoc. on projects with a CCTV element moving forward. My goal is to make the design/specification process as easy as possible, as Hikvision would love to be considered as an approved equal manufacturer / the basis of on various projects whenever possible!

Thank you for your time & assistance - I look forward to your feedback and the prospect of meeting you in person! Feel free to let me know any available dates you might have from **August 28th to September 8th**, and I will be happy to pencil in the date and send over a meeting invitation.

Have a great day!

Best Regards,

2

*Zach* Geiser
Business Development Associate
A&E Program, Mid-Atlantic
NJ • PA • MD • DE • DC • VA • WV • TN • KY
☎ 609.235.2624
✉ zach.geiser@hikvision.com

**HIK**VISION° U.S.A

www.hikvision.com
Follow Hikvision USA and Canada on Facebook, Twitter, YouTube, and LinkedIn!

**View and Download the 2017 Spring/Summer PQG**

**Read the cybersecurity interview conducted by SSI Magazine with the President of Hikvision, Jeffery He:**

DISCLAIMER:
This e-mail and its attachments contain confidential information from Hikvision that is intended only for the person or entity whose address is listed above. Any use of the information contained herein in any way (including, but not limited to, total or partial disclosure, reproduction, or dissemination) by persons other than the intended recipient(s) is prohibited. If you receive this e-mail in error, please notify the sender by phone or email immediately and delete it.

FRBP Violated: #3:19-bk-02693     TENNESSEE: #M2019-02059-COA-R3-CV (WILCO: 48419B)     JRF.123.1059.00

Case 1:23-cv-01097-PLM-RSK ECF No. 1-33, PageID.1853 Filed 10/13/23 Page 60 of 80
of 31
TN Judicial.org/s/a/jsf123.pdf "8-YEAR "DEFAULT" ORDER of PROTECTION TO RESTORE MY SILENCE" DOE-123 Page 11

NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court: DESIGNED primarily by WIFE at WORK!

# TNJ:On the Hill

## The Tennessee Journal's updates on Tennessee government & politics

« More legislator campaign spending: 3 bought passports, 10 paid family

Trump announces Sen. Mark Green as Army Secretary »

## TN Supreme majority: Police can ignore 'no trespassing' signs

**Published April 7, 2017 | By Tom Humphrey**

*News release from Administrative Office of the Courts*

**Nashville, Tenn.** - A majority of the Supreme Court has ruled that, despite the existence of "no trespassing" signs near an unobstructed driveway, police officers' warrantless entry onto the defendant's property was constitutionally permissible.

This matter arose when two investigators went to a different residence after receiving information regarding a pseudoephedrine purchase. One of the individuals at that residence informed the officers that he had given the pills to the defendant who lived next door and who was in the process of using them to produce methamphetamine. The officers then left that residence and drove down the defendant's unobstructed driveway and walked up to his front porch.

Upon smelling the odor of the manufacture of methamphetamine when the defendant opened his door, the officers requested consent to enter the residence. When the defendant denied consent, the officers forced entry and discovered an active methamphetamine lab, several inactive labs, various items commonly associated with methamphetamine manufacture, and several guns.

Prior to trial, the defendant filed a motion to suppress evidence obtained as a result of the warrantless entry onto his property, claiming that, because he had posted "No Trespassing" signs near his driveway, the officers' entry onto the property without a warrant violated both the United States and Tennessee Constitutions.

The trial court denied the defendant's motion to suppress. The defendant then proceeded to trial and was convicted by a jury of resisting arrest, promoting the manufacture of methamphetamine, initiating the manufacture of methamphetamine, and two counts of possession of a firearm during the commission of a dangerous felony.

The Supreme Court granted the defendant's application for permission to appeal from the Court of Criminal Appeal's decision affirming the trial



*Tom Humphrey*

### ABOUT THIS BLOG

Former Knoxville News Sentinel capitol bureau chief Tom Humphrey writes about Tennessee politics, government, and legislative news.

### Subscribe by Email

Enter your email address to subscribe to this blog and receive notifications of new posts by email.

Email*

[                    ]

[ Subscribe ]

### Search

[                    ]

### Recent Posts

› In 6th Congressional District, Rose takes big money lead over Matheny with $250K loan and Haslam help

› Boyd camp fires back at Black: 'This is Tennessee, not DC'

› U.S. Senate panel

court judgments in order to consider the legality of the police officers' warrantless entry onto the defendant's property.

In the majority opinion authored by Chief Justice Jeffrey S. Bivins, the Court determined that the defendant "failed to demonstrate that he had a reasonable expectation that ordinary citizens would not occasionally enter his property by walking or driving up his driveway and approaching his front door to talk with him 'for all the many reasons that people knock on front doors.'" Therefore, the Court held, the police officers' warrantless entry did not violate the United States or Tennessee Constitutions.

Justice Sharon G. Lee dissented from the Court's decision. She concluded that the police had no right to ignore the multiple "No Trespassing" signs Mr. Christensen posted at the entrance to his driveway and enter the area around his home without first getting a warrant. As a result, the search of Mr. Christensen's home violated his rights under the United States and Tennessee Constitutions. Justice Lee wrote that citizens should not have to barricade their homes with a fence and a closed gate, perhaps even a locked gate, to protect their constitutional rights. In Justice Lee's view, the ability to prevent the public, including the police, from entering one's home and the land around it should be available to all citizens.

Note: The majority ruling is HERE. Justice Lee's dissenting opinion is HERE.



Home | Copyright/Reprint Policy | Press
Copyright © The Tennessee Journal 2017. All Rights Reserved. 1.800.727.5257

votes to confirm Overbey as U.S. attorney for East TN

› Attorneys General reach $120M settlement with General Motors

› TN unemployment rate falls to lowest level ever recorded (again)

**Archives**

› October 2017
› September 2017
› August 2017
› July 2017
› June 2017
› May 2017
› April 2017
› March 2017
› February 2017
› January 2'017
› December 2016
› November 2016
› October 2016

TN Judicial.org/s/a/jrf123.pdf   5-YEAR "DEFAULT" ORDER (PROTECTION-THE EXTORTION BY SILENCE)   Page | 13   Page 62 of 80
of 31

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
June 2, 2016 Session Heard at Nashville

## STATE OF TENNESSEE v. JAMES ROBERT CHRISTENSEN, JR.

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Tipton County**
**No. 7799      Joseph H. Walker III, Judge**

---

### No. W2014-00931-SC-R11-CD – Filed April 7, 2017

---

SHARON G. LEE, J., dissenting.

The maxim, "every man's house is his castle," is deeply rooted in our jurisprudence. *Weeks v. United States*, 232 U.S. 383, 390 (1914). It applies whether the house is a castle or a cottage—a mansion or a mobile home.[1] The right to retreat into the privacy of one's home and be free from governmental intrusion is a basic tenet of the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution. Our homes and adjoining land are protected spaces; governmental officers must have a warrant, absent special circumstances, to intrude onto this private area.

Today, the Court holds that the posting of multiple "No Trespassing" signs is not enough to protect our constitutional rights against a warrantless search and that it may take "a fence and a closed gate that physically block access to the front door of a house" to revoke the implied license to enter the land around a residence.

I disagree that we must barricade our homes with a fence and a closed gate, and perhaps even a locked gate, to protect our constitutional rights against warrantless searches. This option is rarely convenient, affordable, practical, or even possible. Revocation of implied consent to enter one's property should be available to all—not just to those citizens who can afford to erect a fence and a gate and live in an area where this form of barricade is possible.

---

[1] "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" *Miller v. United States*, 357 U.S. 301, 307 (1958) (quoting remarks of William Pitt, Earl of Chatham, during 1763 debate in Parliament) (internal quotation marks omitted).

TN Judicial.org/s/a/jrf123.pdf   DESIGNED primarily by WIFE at WORK!   Character in Court: DESIGNED primarily by WIFE at WORK!   NO TRESPASSING SIGNS Used by Attorney Virginia Story to Assassinate my Character in Court:

A search occurs when the government obtains information through an actual physical intrusion into a constitutionally protected area[2] or by violating a person's reasonable expectation of privacy.[3] By ignoring the "No Trespassing" signs, the officers physically intruded into Mr. Christensen's constitutionally protected area and violated his reasonable expectation of privacy.

### *Physical Intrusion*

A person's right to retreat into his home and be free from unreasonable government searches and seizures stands at the very core of the Fourth Amendment's protections.[4] "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . ." *Jardines*, 133 S. Ct. at 1414. The protections of the Fourth Amendment extend to the curtilage of a home. *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

Visitors have an implied license to enter another person's property and step onto the front porch. The Supreme Court has held that "'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.'" *Id.* at 1415 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)).[5] This license also extends to law enforcement. *Id.* at 1416 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" (quoting *King*, 563 U.S. at 469)).

A citizen may revoke the public's implied license to enter his property. Police officers may lawfully "knock and talk" at a citizen's front door without having probable cause or reasonable suspicion, but *not* when the citizen has expressly revoked the implied

---

[2] *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)).

[3] *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *see also Jardines*, 133 S. Ct. at 1417.

[4] *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Kentucky v. King*, 563 U.S. 452, 474 (2011) (Ginsburg, J., dissenting) ("In no quarter does the Fourth Amendment apply with greater force than in our homes . . . .").

[5] *See also State v. Cothran*, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) ("A sidewalk or pathway leading from a public street to the front door of a residence represents an 'implied invitation' to the public to use the pathway in pursuing legitimate business or social interests with those inside the residence." (quoting *State v. Harris*, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995))).

-2-

license to enter. *State v. Blackwell*, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010).[6]

Mr. Christensen sufficiently revoked the public's implied license to enter his property by posting multiple "No Trespassing" and "Private Property" signs near the entrance to his driveway. A person need not have a law degree or an understanding of the various legal nuances of "trespass" discussed by the Court to know that these signs meant visitors were not welcome. Ms. Tammy Atkins, who visited homes in the area to share her faith, understood the meaning of the signs. She testified there were several "No Trespassing" signs near Mr. Christensen's driveway, and she did not go to houses that had "No Trespassing" signs.

Courts across the country have taken different approaches when determining whether an individual has revoked the public's implied license for entry onto his property. In Tennessee, the Court of Criminal Appeals has held that "No Trespassing" signs, even without physical barriers such as fences and gates, are sufficient to revoke the public's implied license to enter. *Blackwell*, 2010 WL 454864, at *7 (acknowledging that a "knock and talk" is generally a lawful technique absent express orders against trespass, but the presence of a "No Trespassing" sign evidences a subjective expectation of privacy and a revocation of the implied license to enter the property); S*tate v. Draper*, No. E2011-01047-CCA-R3-CD, 2012 WL 1895869, at *1, *6 (Tenn. Crim. App. May 24, 2012) (quoting *Blackwell*, 2010 WL 454864, at *7) (ruling a search was illegal where an officer bypassed the front door, entered the backyard, and knew that the owner had posted "No Trespassing" signs, which effectively revoked the implied invitation of the front door); *see also State v. Henry*, No. W2005-02890-CCA-R3-CD, 2007 WL 1094146, at *5 (Tenn. Crim. App. Apr. 11, 2007) (holding a "knock and talk" permissible but noting that if there had been evidence that "No Trespassing" signs were present at the time of the search, the "knock and talk" would have been unacceptable).

---

[6] *See also United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) ("'Absent express orders from the person in possession,' an officer may 'walk up the steps and knock on the front door of any man's "castle," with the honest intent of asking questions of the occupant thereof.'" (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964))); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (quoting *Davis*, 327 F.2d at 303); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir. 1996) (quoting *United States v. Hersh*, 464 F.2d 228, 230 (9th Cir. 1972)); *United States v. Holmes*, 143 F. Supp. 3d 1252, 1259 (M.D. Fla. 2015) (holding that a person may revoke the implied license but must do so expressly (quoting *Taylor*, 458 F.3d at 1204)); *State v. Grice*, 767 S.E.2d 312, 319 (N.C. 2015) (finding that the implied license to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners (citing *Jardines*, 133 S. Ct. at 1415–16)), *cert. denied*, 135 S. Ct. 2846 (2015).

These Tennessee cases are consistent with decisions from other jurisdictions that have also determined that "No Trespassing" signs, without physical barriers, are sufficient for a person to preserve his privacy and revoke the implied license to enter his property. *See Powell v. State*, 120 So. 3d 577, 584 (Fla. Dist. Ct. App. 2013), *on reh'g* (Aug. 1, 2013) (stating that homeowners who post "No Trespassing" or "No Soliciting" signs effectively negate the license to enter the property and conduct a "knock and talk"); *State v. Roubique*, 421 So. 2d 859, 861–62 (La. 1982) (finding a "Private Road, No Trespassing" sign at the entrance to the driveway was ample evidence of the resident's intent to preserve his privacy); *see also State v. Poulos*, 942 P.2d 901, 904 (Or. Ct. App. 1997) (indicating that "No Hunting or Trespassing Under Penalty of Law," "KEEP OUT," "Guard Dog on Duty," and "STOP" signs posted along the driveway were sufficient to communicate the property owner's intent to exclude the public even without a gate or barrier).[7]

In other jurisdictions, courts have held that the expectation of privacy and desire to restrict entry can be effectuated by either physical barriers *or* appropriate signage. *See People v. Scott*, 593 N.E.2d 1328, 1338 (N.Y. 1992) (holding that "where landowners fence or post 'No Trespassing' signs on their private property or, by some other means, indicate unmistakably that entry is not permitted, the expectation that their privacy rights will be respected and that they will be free from unwanted intrusions is reasonable"), *quoted in State v. Bullock*, 901 P.2d 61, 74 (Mont. 1995); *Dixson*, 766 P.2d at 1024 (stating that signs, such as "No Trespassing" signs, fences, or other similar measures indicate the property owner's intent to protect privacy and exclude the public); *Cooksey v. State*, 350 S.W.3d 177, 184 (Tex. Ct. App. 2011) (stating that a homeowner may manifest an expectation of privacy, restrict access to pathways leading to the house, and revoke the implied license by erecting a locked gate or by posting "No Trespassing" signs); *see also State v. Hubbel*, 951 P.2d 971, 977 (Mont. 1997) (holding that the property owner had no reasonable expectation of privacy in the property leading to the front door where the property owner did not erect a fence, place a gate, plant shrubs or

---

[7] Under this approach, signs may be sufficient to revoke the implied license, but they must be appropriately worded and placed. *See Holmes*, 143 F. Supp. 3d at 1262 (noting that other courts have required that the revocation of the implied license be accomplished by clear demonstrations that are unambiguous and obvious to the casual visitor); *State v. Kapelle*, 344 P.3d 901, 905 (Idaho Ct. App. 2014) (noting that where a "No Trespassing" sign is ambiguous and not clearly posted, the implied license is not revoked); *State v. Howard*, 315 P.3d 854, 860 (Idaho Ct. App. 2013) (finding that the implied license had not been revoked because the "No Trespassing" sign was very small and not easily noticed, was not posted over or next to the entrance to the curtilage, and was over a mile from the actual residence); *State v. Dixson*, 766 P.2d 1015, 1024 (Or. 1988) (en banc) (finding that "No Hunting" signs were insufficient to communicate to law enforcement an intent to exclude non-hunting access).

-4-

of 31

bushes, or post "No Trespassing" or other signs), *as modified on denial of reh'g* (Feb. 3, 1998).

Another approach taken by courts in other jurisdictions is to determine whether the public's implied license to enter has been revoked by considering the totality of the circumstances, with a "No Trespassing" or similar signage a factor to be considered. *See Powell*, 120 So. 3d at 584 (finding that the existence and extent of a license to conduct a "knock and talk" depends on the circumstances); *Jones v. State*, 943 A.2d 1, 12 (Md. Ct. Spec. App. 2008) (finding that "No Trespassing" signs may be considered as part of the totality of the circumstances); *State v. Kuchera*, Nos. 27375-6-II, 27376-4-II, 2002 WL 31439839, at *5 (Wash. Ct. App. Nov. 1, 2002) (holding that the presence of "No Trespassing" signs "is not dispositive of the establishment of privacy, but is a factor to be considered 'in conjunction with other manifestations of privacy'" (quoting *State v. Johnson*, 879 P.2d 984, 992 (Wash. Ct. App. 1994))).

Under any of these approaches and particularly under existing Tennessee law, Mr. Christensen revoked the public's implied license to enter his property. Near the entrance to his driveway, he posted two signs that said "PRIVATE PROPERTY, NO TRESPASSING" and one sign that said "NO TRESPASSING, HUNTING OR FISHING, VIOLATORS PROSECUTED, UNDER PENALTY OF LAW" and listed his phone number. These signs were clearly visible to anyone approaching his driveway from the main road. Even in the absence of a fence or other physical barrier, the signs effectively communicated Mr. Christensen's intent to protect his privacy and exclude others from approaching his home. As the Idaho Supreme Court has said, "[C]itizens, especially those in rural areas, should not have to convert the areas around their homes into the modern equivalent of a medieval fortress in order to prevent uninvited entry by the public, including police officers." *State v. Christensen*, 953 P.2d 583, 587 (Idaho 1998).

The Court appears to adopt the totality of the circumstances approach but then determines that an objectively reasonable person faced with a "No Trespassing" sign would not conclude that entry is barred. I disagree. Common sense tells us that "No Trespassing" signs, depending on the circumstances, can communicate the property owner's desire not to have members of the public on his land.[8] Moreover, a "No

---

[8] *Cf. Madruga v. County of Riverside*, 431 F. Supp. 2d 1049, 1061 (C.D. Cal. 2005) (noting that even if signs do not contain the words "No Trespassing" or "Keep Away" "[c]ommon sense and common experiences teaches us that such 'WARNING Guard Dog' signs are placed to dissuade people, be they intruders, sales representatives, delivery agents, or even police officers, from approaching the home. . . . [A]nyone seeing such a sign would understand that the homeowner seeks to exclude them from entering the area beyond the sign.").

-5-

Trespassing" sign should be of particular significance to law enforcement officers in communicating that they may need to obtain a warrant before entering the property.

"No Trespassing" signs factor into criminal trespass cases. In Tennessee, it is a crime to enter or remain on property without the owner's consent. Tenn. Code Ann. § 39-14-405(a). A defense to this crime is that the alleged trespasser reasonably believed that he had the owner's consent to enter the property. *Id.* § 39-14-405(b)(1). However, this defense is not available if the property owner has posted signs "visible at all major points of ingress to the property . . . and the signs are reasonably likely to come to the attention of a person entering the property." *Id.* § 39-14-405(c).

Mr. Christensen did not just post one "No Trespassing" sign—he posted multiple signs near the entrance to his property that were clear, unambiguous, and obvious to anyone approaching his driveway. These signs adequately communicated Mr. Christensen's intent to revoke the implied license to enter his property. Under the facts of this case, law enforcement officers should have heeded the signs and taken the appropriate steps to obtain a search warrant.

### *Expectation of Privacy*

Without a physical intrusion, a search can occur when the government violates a subjective expectation of privacy that society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361 (Harlan, J., concurring).[9] To determine whether a search has occurred under the *Katz* analysis, courts consider whether the individual had an actual, subjective expectation of privacy and whether society will view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010) (quoting *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001)).

In deciding whether Mr. Christensen had an actual, subjective expectation of privacy, we apply a multi-factor test that inquires into whether the defendant owns the property seized; has a possessory interest in the thing seized and the place searched; has the right to exclude others from that place; has shown a subjective expectation that the

---

[9] *See also Jardines*, 133 S. Ct. at 1417 ("The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas."); *Jones*, 565 U.S. at 407 ("*Katz* did not erode the principle 'that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'" (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring))).

-6-

place would remain free from governmental invasion; took normal precautions to maintain his privacy; and was legitimately on the premises. *State v. Ross*, 49 S.W.3d 833, 841 (Tenn. 2001) (quoting *United States v. Haydel*, 649 F.2d 1152, 1154–55 (5th Cir. 1981)); *see also Talley*, 307 S.W.3d at 730–31.

Under this test, Mr. Christensen had an actual, subjective expectation of privacy in his property. He owned the property, had a possessory interest in the place searched, had the right to exclude others from the property, showed a legitimate interest in keeping others off his property, took precautions to maintain his privacy by posting multiple "No Trespassing" signs, and was legitimately on the premises.

To determine whether society views Mr. Christensen's subjective expectation of privacy as reasonable and justifiable, we consider factors such as the "intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion." *Oliver*, 466 U.S. at 177–78 (citations omitted).

Privacy expectations are heightened in the home and the adjacent area. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 237 n.4 (1986). The Court in *Katz* held that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But *what he seeks to preserve as private*, even in an area accessible to the public, *may be constitutionally protected.*" *Katz*, 389 U.S. at 351 (emphases added) (citations omitted).

Mr. Christensen did not expose his home and the adjoining property to the public; instead, he tried to protect his property by posting multiple signs clearly communicating that visitors were not welcome. If multiple "No Trespassing" signs are not sufficient to convey a property owner's intent to exclude the public from his property, then the constitutional protections against unreasonable searches may be beyond the grasp of ordinary citizens for whom the posting of "No Trespassing" signs is the only feasible option.

Mr. Christensen's expectation of privacy by the posting of multiple "No Trespassing" signs was reasonable and justifiable under the circumstances. Police officers violated Mr. Christensen's reasonable expectation of privacy when they entered his land without a warrant despite the "No Trespassing" signs.

### Conclusion

For the reasons stated, law enforcement officers conducted an illegal search of Mr. Christensen's property, and the evidence obtained from the search should be suppressed.

-7-

The Court's decision that multiple "No Trespassing" signs are not sufficient to revoke the implied license for entry denies ordinary citizens the protections of the United States and the Tennessee Constitutions against warrantless searches. The result is that only citizens wealthy enough and situated in an area where they can "convert the areas around their homes into the modern equivalent of a medieval fortress," *Christensen*, 953 P.2d at 587, may protect themselves from governmental intrusion and invasion of privacy.

_____

SHARON G. LEE, JUSTICE

## ATTACHMENT 4 - FORM MOTION FOR EXTENSION

IN THE _____ **COURT OF APPEALS** _____ **COURT FOR THE STATE OF TENNESSEE**
[Insert which appellate court]

_____ **MIDDLE DIVISION** _____ **SECTION AT NASHVILLE**
[Insert which Grand Division]                                  [Insert which city]

| | |
|---|---|
| JEFFREY RYAN FENTON, <br> [Insert Name of Party] <br><br> Plaintiff/_____ Appellant _____, <br> [Insert Appellant or Appellee] <br><br> Appeal No. M2019-02059-COA-R3-CV <br> _____ <br> [Insert Appeal No.] <br><br> v. <br><br> FAWN TIFFANY FENTON, <br> [Insert Name of Party] <br><br> Defendant/_____ Appellee _____, <br> [Insert Appellant or Appellee] | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**FILED**

SEP 11 2020

Clerk of the Appellate Courts
Rec'd By _____

### Motion for Extension of Time for Filing Brief

_____ Appellant _____ requests __122__ days extension of time within which to file a
[Insert Appellant/Appellee]

brief from the original due date of _7/15/2020_, in this case.

This is Movant's: ___ 1st : _X_ 2nd : ___ (Other) request for extension in this case.

Opposing Counsel:               ___ **Does Not** object to this motion.
[check one]

___ **Objects**

___ **Called, unable to reach and left message**

### Reason (Good Cause) for Extension:

I have and continue to exert my honestly most vigorous efforts to be heard by this Court, despite
the enormous challenges which it presents me. As with most things in my life, due to my
disabilities, I have significantly underestimated the amount of TIME and work which each
communication with the Court has and will likely take me.

For the past month, I have steadfastly worked upon writing only FOUR MOTIONS (alternately),
ONE Motion to Supplement the Record, and ONE Motion to Correct the Record. Repeatedly, day
after day, with each document becoming 20 - 40 pages long every time, while yet remaining
unfinished! My goal is to explain briefly (1) why the content wasn't originally included or needs
to be corrected, in the Record (2) explain the relevance and importance of the content, (3) and why

TNJudicial.g... Case 1:23-cv-01097-PLM-RSK... "JLT" ... ORDER No. PROTECTION ... ID: 2864 ... FILED 10/13/23 DC Page 22 ... Page 71 of 80

of 31

the content is "necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of (my) appeal." In accordance with T.R.A.P. RULE 24(g).

I try DAY AFTER DAY, to start with a blank document, to keep this down to a few pages, but I just cannot do it. I have so much pent-up emotion about how unfairly I believe that I was treated. No matter how many times I re-write this, without professional legal help, I simply have no idea how much "justification" is required, to substantiate my requests. Meanwhile, I'm seriously behind schedule, feeling the urgency and pressure of the upcoming deadlines.

I've been working on this for over 30 hours straight right now, in hopes of getting something of meaning into the court before the weekend, where if I can't confirm an extension first, I'll need to stay awake for most of the weekend, drafting the brief however I can figure to cite it, adding in the necessary content to have any chance at a fair trial, as almost all of Ms. Story's NARRATIVE was falsely presented from the start, I believe to assassinate my character in the eyes of the court, before I ever even entered a court room.

If your Honor would PLEASE simply LISTEN to the attached AUDIO from my 8/29/2019 court hearing (M2019-02059 Transcript of Evidence-2b (audio).mp3) with Chancellor Michael W. Binkley and Ms. Virginia Lee Story, while "FACT CHECKING" what they BOTH SAID, with the "2019-08-29 FACT CHECKING PROOF OF FALSE TESTIMONY IN WILLIAMSON CHANCERY TO HUSBANDS TREMENDOUSLY UNFAIR LOSS (compare with audio).pdf" attached, I'm hopeful that it will be clear that I did NOT receive a FAIR and UNBIASED TRIAL!

If you can derive that, then PLEASE provide me with an extension ALONG with COUNSEL so that I will have SOME OPPORTUNITY to obtain some realistic CURE from the parties involved. My ex-wife is destroyed right now, financially, emotionally, bankrupt, unemployed, depressed, hopeless, I fear for her safety from herself, having been suicidal after her previous divorce. I wish NOT to harm her in any way! I further wish to PROTECT her from Ms. Story throwing my ex-wife "under the bus", when the TRUTH comes out about Ms. Story's FALSE testimony in my case.

I try every day, but it is one thing to need to refute a few false claims, while I am up against an entire SYSTEM maliciously twisted by Virginia Lee Story to cause me as MUCH HARM AS IS IMAGINABLY POSSIBLE!

I can keep writing franticly every day... trying to send in more EVIDENCE... I literally have probably a THOUSAND pages... recorded phone calls, all SORTS.. but I am so OVERWHELMED! I can't realistically REACH A CURE without SOME LEGAL HELP, which I believe that the extreme nature of the situation, and the tremendous loss which I suffered, I don't see ANY way for me to prevail against the "bad actors" in my forced sale/default op/default divorce, without some substantial legal HELP!

Even if I do all the FOOT WORK, and I just am awarded TIME and SOMEONE whom I can consistently counsel with over the phone, who can tell me HOW to seek awards against all the parties involved. That would be tremendously helpful!

PLEASE ADD the attached TRANSCRIPTS, both audio and print, from the 2019-08-29 Hearing, as "TRANSCRIPTS OF EVIDENCE" for my Record!

Please also add to my Record the "2019-08-29 FACT CHECKING PROOF OF FALSE TESTIMONY IN WILLIAMSON CHANCERY TO HUSBANDS TREMENDOUSLY UNFAIR

LOSS (compare with audio).pdf", as I believe that is a quick and easy "FACT CHECKER", without which, it sounds like the NARRATIVE in court might actually be ACCURATE, however I don't believe that it is!

Please also add to my Record the "FAWNS NOT A VICTIM.pdf" It merely helps CLEARLY EXPOSE the fact that my OP was never NEEDED to protect my ex-wife! Ms. Fenton is a FIREARMS EXPERT, all the GUNS in the photos are HERS, the 5,000 rounds of ammo are all HERS, the 2 assault rifles are HERS, the photos in the Nevada Desert shooting are of HER! This OP was merely a tactic to TRAP ME while they pounced on me! Even if that hasn't been proven to your satisfaction, please attach this to my Record, that I may better argue this later in my brief.

I don't understand how to fill in the number of days which I'm requesting an additional extension for, since it refers back to the original date. My intent herein, is to REQUEST 60-DAYS MORE PLEASE!

Please don't add my two "UNFINISHED DRAFTS" yet, I plan to finish those first. I just wanted to exhibit that I am TRYING, and they are both factual to my knowledge, just not finished and "polished" yet.

Thank you for any HELP which you can provide!

Jeffrey Ryan Fenton

## Declaration

I, __JEFFREY RYAN FENTON__, declare under penalty of perjury that the foregoing is true
[Insert Appellant/Appellee or counsel]
and correct to the best of my knowledge.

[Signature of Appellant/Appellee or counsel]

JEFFREY RYAN FENTON (pro se)
[Print Name of Appellant/Appellee or counsel]

FILED
09/15/2020
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## FAWN TIFFANY FENTON v. JEFFREY RYAN FENTON

**Chancery Court for Williamson County**
**No. 48419B**

---

### No. M2019-02059-COA-R3-CV

---

### ORDER

The appellant has moved for an additional sixty day extension of time within which to file his brief. We find good cause to grant the appellant an additional thirty days.

The appellant also requests appointment of counsel. With the exception of a few specific types of proceedings, primarily those involving the termination of parental rights, there is no absolute right to counsel in a civil case. *Bell v. Todd* 206 S.W.3d 86, 92 (Tenn. Ct. App. 2005); *Memphis Bd. of Realtors v. Cohen*, 786 S.W.2d 951, 953 (Tenn. Ct. App. 1989). Unlike indigent defendants in criminal cases, indigent civil litigants have neither the constitutional nor the statutory right to appointed counsel. *Hessmer v. Miranda*, 138 S.W.3d 241, 245 (Tenn. Ct. App. 2003). Thus, we deny the request for appointment of counsel.

It is, therefore, ordered that the time for filing the appellant's brief is extended through October 15, 2020. No further extensions will be granted absent a showing of exigent circumstances. The request for appointment of counsel is denied.

PER CURIAM

*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.*

UNIVERSAL DECLARATION OF HUMAN RIGHTS (1948, art. 5)
INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (1976, art. 7)

*[T]he term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.*

CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT (1984, art. 1, para.1)

# change.org

☰

Petition details    Comments    Updates

🔒 **Petition Closed**



## STOP false allegations to get Order of Protections in Tennessee & hold false accusers accountable!

This petition had 1,837 supporters

 **B K** started this petition to Senator Bob Corker and **5 others**

I hope of bringing to your attention a dire misjustice that is occurring in our state as well as many others across the US. Laws enacted to protect the victims of the vile crime of domestic violence are being misused by both citizens as well as law enforcement, and in this process innocent men & women's lives are being destroyed. In Tennessee, the burden of proof is being thrown out and the simple word of the accuser is being taken without question, **without the accused even being allowed to speak**. True victims of domestic violence find this to be deplorable. Not only can a woman or man falsely accuse a person of domestic violence without fear of consequence, but the accused person has no voice against the accuser. The accuser can be a mentally disturbed individual using such laws to enact her/his revenge against a man or woman who simply does not want to be in a relationship anymore, and the *accuser's word is automatically taken, even when no evidence is in place*. The man or woman in such cases is automatically arrested, forced to leave their own home, injunctions are automatically set in place, and even if he

or she is able to prove their innocence in court they have lost months of their life due to the fact that the accuser cried wolf. Worse yet are the cases of these innocent people who are poor and have no means to hire private attorneys. Their public defenders assume they are guilty and therefore do only the bare necessities to be their legal voice.We are *not in any way asking for a revocation of the laws that protect true victims of domestic violence.* Our wish is that these laws be revisited and indications made to to allow for criminal and civil prosecution when someone, whether male or female, has misused these laws in a vindictive and cunning way. We also would ask that law enforcement officers, public attorneys, and judges be forced to recognize the precept that the accused is innocent until proven guilty.

**IT'S TIME FOR THIS TO STOP AND MAKE THE FALSE ACCUSERS PAY FOR THEIR ACTIONS!**

## Reasons for signing



**Renee Roekl** · 7 years ago

I'm appalled at how easy they make these things to get. False accusers need to punished severely.

♡ 241 · Report



**Anonymous Friend** · 7 years ago

I've known Betty, the woman who started this petition, for at least 18 years. We use to work together and even though we don't talk as often as we should we've remained friends through the years. I want everyone to know she has always been a sweet and very kind person. She especially has a soft spot for animals. In all the years I've known her she's been a business owner and hard worker. When she owned The Dam Store and the little market on the Parkway she was always helping people out in the community, including my family. I feel blessed to know Betty, as do many others I've talked to. I also remember her telling me years ago, how she would love to leave Ned and live by herself with her birds. I also know Ned. I work for Sevier County and she told me what was going on the day before all this nonsense happened. When she told me about what was going on I was blown away. Goes to show, no matter how long your married or live with someone, you don't ever really know them. Mr. Crowder and others at the jail knew this

was nonsense but said Ned was very convincing when he swore his statement to the
judge and that's why this temporary order was granted. She was at the jail the day before
to tell them Ned was getting ready to file an order of protection or restraining order on
her. She was asked if she wanted to see the judge and swear out an order against Ned.
Against her better judgement she didn't file one first. She told me at the time she felt she
had no reason to and didn't want to "just file a report" for nothing.

I agree whole heartedly that men and women filing false statements to get these order of
protections need to be prosecuted. I'm all for making the first example out of Ned Lines.
He weighs 200+ pounds Betty is a petite 110 pounds, I ask you who's going to cause who
"bodily harm".

♡  199  ·  Report

© 2021, Change.org, PBC  Certified B Corporation

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.



## Tenn. Code § 39-16-403

Section 39-16-403 - Official oppression

**(a)** A public servant acting under color of office or employment commits an offense who:
**(1)** Intentionally subjects another to mistreatment or to arrest, detention, stop, frisk, halt, search, seizure, dispossession, assessment or lien when the public servant knows the conduct is unlawful; or

**(2)** Intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity, when the public servant knows the conduct is unlawful.

**(b)** For purposes of this section, a public servant acts under color of office or employment if the public servant acts, or purports to act, in an official capacity or takes advantage of the actual or purported capacity.
**(c)** An offense under this section is a Class E felony.

**(d)** Charges for official oppression may be brought only by indictment, presentment or criminal information; provided, that nothing in this section shall deny a person from pursuing other criminal charges by affidavit of complaint.

*T.C.A. § 39-16-403*

Acts 1989, ch. 591, § 1; 1990, ch. 980, § 11.

 casetext

# 18 U.S.C. § 1951

**Section 1951 - Interference with commerce by threats or violence**

**(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

**(b)** As used in this section-

**(1)** The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

**(2)** The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

**(3)** The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

**(c)** This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101-115, 151-166 of Title 29 or sections 151-188 of Title 45.

*18 U.S.C. § 1951*

June 25, 1948, ch. 645, 62 Stat. 793; Pub. L. 103-322, title XXXIII, §330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.

*HISTORICAL AND REVISION NOTES Based on title 18, U.S.C., 1940 ed., §§420a-420e-1 (June 18, 1934, ch. 569, §§1-6, 48 Stat. 979, 980; July 3, 1946, ch. 537, 60 Stat. 420).Section consolidates sections 420a to 420e-1 of Title 18, U.S.C., 1940 ed., with changes in phraseology and arrangement necessary to effect consolidation.Provisions designating offense as felony were omitted as unnecessary in view of definitive section 1 of this title. (See reviser's note under section 550 of this title.) Subsection (c) of the revised section is derived from title II of the 1946 amendment. It substitutes references to specific sections of the United States Code, 1940 ed., in place of references to numerous acts of Congress, in conformity to the style of the revision bill. Subsection (c) as rephrased will preclude any construction of implied repeal of the specified acts of Congress codified in the sections enumerated.The words "attempts or conspires so to do" were substituted for sections 3 and 4 of the 1946 act, omitting as unnecessary the words "participates in an attempt" and the words "or acts in concert with another or with others", in view of section 2 of this title which makes any person who participates in an unlawful*

casetext

1

## AMENDMENTS

2008—Subsecs. (e) to (h). Pub. L. 110–325 added subsecs. (e) to (h).

### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–325 effective Jan. 1, 2009, see section 8 of Pub. L. 110–325, set out as a note under section 705 of Title 29, Labor.

## §12202. State immunity

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in[1] Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

(Pub. L. 101–336, title V, §502, July 26, 1990, 104 Stat. 370.)

### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

## §12203. Prohibition against retaliation and coercion

### (a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

### (b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

### (c) Remedies and procedures

The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to subchapter I, subchapter II and subchapter III, respectively.

(Pub. L. 101–336, title V, §503, July 26, 1990, 104 Stat. 370.)

### REFERENCES IN TEXT

This chapter, referred to in subsecs. (a) and (b), was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

[1] So in original. Probably should be "in a".

## CONSTITUTIONALITY

For constitutionality of section 503 of Pub. L. 101–336, see Congressional Research Service, The Constitution of the United States of America: Analysis and Interpretation, Appendix 1, Acts of Congress Held Unconstitutional in Whole or in Part by the Supreme Court of the United States.

## §12204. Regulations by Architectural and Transportation Barriers Compliance Board

### (a) Issuance of guidelines

Not later than 9 months after July 26, 1990, the Architectural and Transportation Barriers Compliance Board shall issue minimum guidelines that shall supplement the existing Minimum Guidelines and Requirements for Accessible Design for purposes of subchapters II and III of this chapter.

### (b) Contents of guidelines

The supplemental guidelines issued under subsection (a) shall establish additional requirements, consistent with this chapter, to ensure that buildings, facilities, rail passenger cars, and vehicles are accessible, in terms of architecture and design, transportation, and communication, to individuals with disabilities.

### (c) Qualified historic properties

#### (1) In general

The supplemental guidelines issued under subsection (a) shall include procedures and requirements for alterations that will threaten or destroy the historic significance of qualified historic buildings and facilities as defined in 4.1.7(1)(a) of the Uniform Federal Accessibility Standards.

#### (2) Sites eligible for listing in National Register

With respect to alterations of buildings or facilities that are eligible for listing in the National Register of Historic Places under division A of subtitle III of title 54, the guidelines described in paragraph (1) shall, at a minimum, maintain the procedures and requirements established in 4.1.7(1) and (2) of the Uniform Federal Accessibility Standards.

#### (3) Other sites

With respect to alterations of buildings or facilities designated as historic under State or local law, the guidelines described in paragraph (1) shall establish procedures equivalent to those established by 4.1.7(1)(b) and (c) of the Uniform Federal Accessibility Standards, and shall require, at a minimum, compliance with the requirements established in 4.1.7(2) of such standards.

(Pub. L. 101–336, title V, §504, July 26, 1990, 104 Stat. 370; Pub. L. 113–287, §5(k)(5), Dec. 19, 2014, 128 Stat. 3270.)

### REFERENCES IN TEXT

This chapter, referred to in subsecs. (a) and (b), was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

### AMENDMENTS

2014—Subsec. (c)(2). Pub. L. 113–287 substituted "division A of subtitle III of title 54" for "the National Historic Preservation Act (16 U.S.C. 470 et seq.)".