UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF MICHIGAN

**FILED - LN**

January 19, 2024 5:03 PM
CLERK  OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __jlg /_____    SCANNED BY: ⟨handwritten⟩

JEFFREY RYAN FENTON,

PLAINTIFF

v.

VIRGINIA LEE STORY ET AL.,

DEFENDANTS

CASE NO. 1:23-CV-1097

## DECLARATION ABOUT ARONS & ASSOCIATES DIVORCE PLANNING

Plaintiff brings this testimony pursuant to 28 U.S. Code § 1746.

I, Jeffrey Ryan Fenton, declare under oath as follows:

1. References in this document to Ms. Fawn Tiffany Fenton are hereinafter "Ms. Fenton", "wife", and/or "ex-wife".

2. Ms. Fenton was voluntarily the primary breadwinner for our family from 2011-2019 and was our only breadwinner at the time when she decided to leave me and file for a divorce in 2018.

3. When Ms. Fenton moved out of our marital residence, she changed the account credentials and contact information on all of our marital financial accounts[1], including our mutually used banking, income, credit, and mortgage accounts.

---

[1]   https://rico.jefffenton.com/evidence/2018-04-23_wife-locked-plaintiff-out-of-financial-accounts.pdf

Initials: ⟨signature⟩

4. She also changed the contact information on our mortgage accounts, to use an email address which she alone had access to and changed the mailing address from the marital residence to her new apartment, where she was the only person with access.

5. As a result, I was physically denied access to all our financial accounts, including outstanding balances and all financial information related to our mortgages and other payments.

6. Ms. Fenton did this proactively, though she acted as though this were some act of self-preservation. In truth, I never financially betrayed her or did anything financially malicious toward her or our family.

7. Ms. Fenton provided me with a budget[2] whereby she said that she could afford and would continue to pay the bills for both households until a divorce settlement could be reached.

8. I tried many times to persuade Ms. Fenton to restore my access (I was offended and felt like I was being treated as a child, without just cause), but she refused.

9. At the recommendation of my ADHD therapist, Terry M. Huff[3], LCSW, MSSW, MA, on July 12th, 2018, I hired "Collaborative Divorce" professional, Sandy Arons, MBA, Certified Divorce Financial Analyst, Certified Divorce Practitioner, Certified Financial Divorce Specialist, Financial Counselor & Mediator.

---

[2]   https://rico.jefffenton.com/evidence/2018-05-02_family-budget-living-apart.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-26, PageID.1343-1344)

[3]   Author of "LIVING WELL with ADHD" and founder of the "ADDNashville" Support Group (https://terrymhuff.com)

Initials: 

10. At that time Ms. Fenton and I explored the possibility of obtaining a "Collaborative Divorce", with the help of Ms. Arons.

11. At this point I had conceded that a divorce was inevitable, due to Ms. Fenton's mindset, so I sought to do so in the most fiscally responsible way possible.



12. There were four specific facts, beliefs, or expectations which were established during our work, negotiations, and discovery with Arons and Associates Divorce Planning. Per Sandy Arons, MBA (Certified Divorce Financial Analyst, Certified Financial Divorce Practitioner, Certified Financial Divorce Specialist, Financial Counselor and Mediator), a "fair" divorce settlement with "all factors considered" would have included the following:

(1) I needed and was due vocational rehabilitation and training so that I could qualify for gainful employment again, prior to re-entering the workforce. Below are some of the factors which went into that decision:

Initials:

➤ Level of Education: (W) MIT Graduate versus (H) High School Graduate (only).

➤ Vocational Experience: (W) Architecture (20+ years) versus (H) Real Estate (3-years full-time), Printing (12+ years), and Food Service (10+ years),

➤ (H) Commercial Manufacturing Printing, once one of the largest sources of commerce by volume in the Greater Nashville Area, now is nearly extinct.

➤ Professional Licenses: (W) Architect versus (H) "Affiliate Broker" in Real Estate

➤ Projected Income: (W) $100k +/- per year (actual) versus (H) $30k per year (potential) to start.

(2) Transitional Alimony due the Plaintiff, calculated at **22.5% of Ms. Fenton's gross income** ($94k), due for a term equal to **half the duration of our marriage** (13 years).

➤ This was negotiated a bunch of different ways, with several offers from my Ms. Fenton where she offered to pay more than this for a season, but we finally agreed that she would pay me "transitional alimony" in the amount of **$1,750 per month**, for a duration of **6-years**, starting the date of our divorce.

Initials:



> In the meantime, Ms. Fenton had agreed and was paying me $250 every two weeks (each payday), for my consumable expenses, such as food, gas, healthcare, while she was directly responsible for paying all of the bills for our marital residence, including both mortgages and utilities.

> Many of the divorce negotiations discussed between Ms. Fenton and I included a means by which I could keep our marital residence and continue to live in it, since my wife had decided that she did not personally want to keep our home.[4]

---

[4]   https://rico.jefffenton.com/evidence/2018-10-09_wife-does-not-want-to-keep-marital-residence.pdf

Initials:

➢ Here is an excerpt of an email[5] written by Ms. Fenton to me on 8/4/2018:

*"Hello, I am not theoretically opposed to you keeping the house, but I don't know how financially we could make that happen. Maybe there is a way we can make a deal like, **I keep paying the current mortgage payment and 2nd mortgage payment for the next 6 years or so instead of giving you alimony payments.** The financing would have to stay as it is in my name until you can rebuild your credit. When you can re-build your credit and have a job and all, then you could re-fi the house into your own name and cash me out my equity. That plan would suck for the credit card debt, though, as I was counting on the house equity (after sale of the house) to pay off both of our credit card debts. What are your thoughts."*

➢ On 8/30/2018 Ms. Fenton emailed me a settlement proposal[6] which included a budget whereby I could keep the marital residence, but I would need to obtain two roommates, one renting our large (spare) bedroom for **$800 per month**, and another renting our smaller spare bedroom for **$600 per month**. Then Ms. Fenton would pay the remainder of the household expenses, and I only needed to earn another $248 per month to support himself.

---

[5]    Case 1:23-cv-01097-PLM-RSK, ECF No. 1-26, PageID.1341

[6]    Case 1:23-cv-01097-PLM-RSK, ECF No. 1-26, PageID.1336-1337

Initials: _____

> ➤ This was to provide me with an opportunity to obtain the needed vocational rehabilitation, and to ease back into the workforce, without needing to immediately sink or swim.

(3) I showed immediate interest, but she ultimately rescinded her proposal. In an email[7] Ms. Fenton sent to me and Ms. Arons on 8/30/2018, she stated in part, *"Our office lease is up in March 2020, and Ken really wants to retire, and so there's no telling what my job will be after that."*



> ➤ Upon information and belief, the notification above tells one of the major motivations for my ex-wife's eventual bankruptcy filing, along with her timing, though it wasn't yet a consideration. After the tax consequences to be explained shortly, I believe this drove her decision to waste our money on legal fees rather than on an equitable divorce settlement.

---

[7] https://rico.jefffenton.com/evidence/2018-08-30_wife-notifies-about-employers-retirement.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-35, PageID.1941)

Initials: 

> In another email[8] I received from Ms. Fenton on 10/9/2018 she stated, *"At this point, to be honest, **I do not really even want to keep the Sunnyside house.** If the house is not sold, then I will be stuck paying for the very-expensive bills that come with the house, AND I will still have a ton of credit card debt from this divorce. I am emotionally burnt out, and **Ken is making zero steps towards any transition plan for the company,** so in a year or two **I'd really like to take a less stressful job.** I need life to be simpler to help me recover emotionally and financially after all of this upheaval. **But I will be trapped as long as I'm saddled with the house + alimony + credit card debt.** I don't know if I can realistically handle the stress level of **being forced to make a high salary only to give it all away** every month for many years into the future."*

> This was a major factor in why I ultimately rented two of the bedrooms, in our marital residence, in an attempt to become financially self-sufficient as quickly as possible, so not to need as much financial support from my wife.

(4) On January 1st, 2019, the "Trump Tax Reform"[9] went into effect. (I believe that this became the unsurmountable hurdle, in my wife's mind.) As a result, the alimony payments for divorces finalized after January 1st, 2019, were no longer tax deductible.

---

8    https://rico.jefffenton.com/evidence/2018-10-09_wife-does-not-want-to-keep-marital-residence.pdf
9    https://rico.jefffenton.com/evidence/2018-12-31_divorce-deadline-for-trump-tax-reform.pdf

Initials:

➤ However, for any divorce which was finalized by December 31ˢᵗ, 2018, the alimony payments were "grandfathered" and remained tax deductible, for the entire duration of the alimony.

➤ We had agreed that Ms. Fenton would pay me $21,000 in alimony per year, from her $94k+/- annual salary (plus roughly $20k in benefits), for the duration of 6 years.

➤ That meant the difference in Ms. Fenton being able to deduct the $21k per year in alimony she paid from her gross income before taxes (significantly reducing her tax bracket), or being taxed upon all that money, as her earnings, as if she had personally benefitted from it.

➤ Upon information and belief, ultimately in this case, this meant that if we could not obtain a final decree of divorce before the end of 2018, then in the end Ms. Fenton was not willing to settle or obtain an amicable divorce.

➤ Upon information and belief, Ms. Fenton became unwilling to continue working hard, to earn that much money, while giving almost 60% of it away between alimony and taxes.

➤ I understood Ms. Fenton's concerns, while I did everything within my power to provide her with relief, but I was powerless to cure them without her being willing to work with me in good faith, which she ultimately refused to do.

Initials: _____

> ➤ Upon information and belief, someone convinced Ms. Fenton that her money would be better spent at that point on legal fees, to try to out-leverage me legally, while doing everything they could to evade her financial responsibilities as our family's primary breadwinner. If the divorce could not be finalized by the end of 2018, prior to the Trump Tax Reform taking place, Ms. Fenton calculated her income as follows:

> ➤ **"90k gross – 31k taxes – 21k alimony = 38k net. Plus or minus."** [10]

> ➤ Upon information and belief, in the end this was what caused Ms. Fenton to become a prime candidate for "predatory litigation".

13. Upon information and belief, Ms. Fenton became willing to throw away almost everything that we both owned, in order to evade six years of financial responsibility, needing to earn $90k plus per year, while taking home less than half that amount.

14. Upon information and belief, because of this, Ms. Fenton absolutely demanded that for any "fair" amicable, uncontested divorce action, that the divorce needed to finalize prior to the end of 2018, or else she refused to cooperate.

15. Upon information and belief, the problem was, the courts were getting backed-up with divorces[11] trying to make it to completion by the end of 2018, because of the significant financial implications for those paying alimony.

---

[10]   https://rico.jefffenton.com/evidence/2018-12-22_projected-gross-taxes-alimony-net.pdf
[11]   https://rico.jefffenton.com/evidence/2018-12-31_divorce-deadline-for-trump-tax-reform.pdf

Initials: _____

16. Upon information and belief, by the start of October 2018, the Williamson County Chancery Court docket was nearly full for the remainder of the year.

17. Ms. Fenton presented the last proposed MDA which she was willing to entertain on 9/14/2018.

18. I was very interested in this offer and tried to accept it, but Ms. Fenton said that it was still contingent upon review and approval by her counsel as well as another independent attorney who she had hired for a document review.

19. The very first paragraph of Ms. Fenton's offer stated, *"This offer is only good if we successfully sign this into a Marital Dissolution Agreement Contract as soon as possible AND **the divorce Final Order is entered by the court before December 31, 2018.** The financial tax incentives integral to this offer will not apply in 2019, and this Agreement is void if the divorce is not final in 2018."*

20. Unfortunately, Ms. Fenton's two attorneys shot down the offer, before I was permitted to accept it.

21. In an email from Ms. Fenton on 9/19/2018 she stated, *"I sent my attorney the draft of our contract to review also, and he just told me he thinks this agreement is totally nuts; it's too complicated and is not at all in my best interest, and there are a thousand ways this could go wrong in the future, and he says he will not write it or facilitate it. He says if we do successfully write up an agreement for both of us to sign, we will have to do our best to format it with the structure and language that the courts expect to see for an MDA, and then I will have to file it myself, appending it to my file that is already active at the*

Initials:

*Williamson County courts, and I will have to get the court clerks to help me request a court date for a judge to look at the contract. My attorney also says, that even though we might both have agreed to this contract and both voluntarily signed it, the judge could still think it is too unequal or complicated and strike it down. My attorney says the judges will refuse to finalize a divorce degree if they personally do not like/agree with the MDA."*

22. On the following day, on 9/20/2018 Ms. Fenton stated in another email, *"Tommy confirmed what my lawyer had said: this agreement is so far out of the ordinary, he thinks that even if we both sign it and agree to it, that the judges will strike it down. Tommy says the main problem is the long timeline, the judges do not want open-ended issues after a divorce. He said that they will either want one person to get the house free and clear from the other, or they will order the sale of the house and tell us to split the proceeds..."*

23. I even tried to give Ms. Fenton my equity for free,[12] as long as she agreed to live in our home and keep it, so that one of us could enjoy the fruits of both of our labor. Instead of liquidating our treasure and losing all that we had worked for and invested.

24. I could accept forfeiting what I had for someone that I love, but not to give our hopes and dreams along with the sum total of the investments throughout both of our lives over to a stranger to capitalize upon our misfortune.

---

[12] https://rico.jefffenton.com/evidence/2018-08-06_offered-to-give-wife-my-equity-for-free.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-27, 1472)

Initials:

25. Unfortunately, in the end, she and her counsel would not let me.

26. Before the defendants within this complaint were given an opportunity to ransack our lives, there was still one more attempt to settle amicably, based on an agreement between us on October 27th, 2018, which later became known as our "Verbal Settlement Agreement[13]".

27. I honestly don't know if Ms. Fenton was ever dealing in good faith about our "Verbal Settlement Agreement" though, because she ultimately refused to put her own words into writing.

28. She wanted me to provide her with a Quit Claim Deed or a Power of Attorney, while trusting her to sell our home, leaving the State of Tennessee as she sold it. All based upon her promise through an email[14] which she wasn't even willing to sign her own name to.

29. I will cover our "Verbal Settlement Agreement" in a separate declaration.

30. Through the fraudulent bankruptcy scheme cooked-up and executed by Ms. Fenton's counsel in both State and Federal Courts[15] concurrently,[16] I was illegally deprived of my rights and my property, by which I could stop them from liquidating and disbursing nearly everything we both owned, to the sole benefit of strangers.

31. Defendant Story didn't mention any honest aspect of our preceding attempts to obtain an

---

[13]  https://www.rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf  (Case  1:23-cv-01097-PLM-RSK, ECF No. 1-26, PageID.1317-1318)

[14]  Case 1:23-cv-01097-PLM-RSK, ECF No. 1-26, PageID.1317-1318

[15]  https://rico.jefffenton.com/evidence/2019-04-26_wifes-ch13-petition-3-19-bk-02693.pdf

[16]  https://rico.jefffenton.com/evidence/2019-08-14_bankrupcy-planned-for-when-employer-retires.pdf

Initials:

amicable divorce, before she was hired.

32. Upon information and belief, this attempt with Sandy Arons shows more verifiable truth than any other single action, both because Ms. Arons was a witness, but also because we learned about the "fair" financial expectations in obtaining a divorce in Tennessee. In the end, much of what we learned, ultimately sabotaged our efforts.

33. At the time I was clueless, but I cashed my last $250 support check from Ms. Fenton after she had already secretly filed for bankruptcy, while her attorneys failed to even mention on her bankruptcy petition, that she had any past or future "domestic support obligations", of any sort.

34. They abruptly terminated all financial support without one single day of notice.

35. This was timed almost perfectly with defendant Story's malicious ambush of me, which began with a fraudulent "Order of Protection Ex Parte", obtained under the false **unsigned personal testimony** of Ms. Fenton, for completely nefarious ulterior motives.

36. I never touched Ms. Fenton in anger, nor have I ever threatened to. I love her. I forgive her. I want her to be healed, restored, and to have a happy life. I've asked the FBI, the DOJ/USTP, the Tennessee Supreme Court, the Tennessee Court of Appeals, all to give her **"immunity"** for any role she played in the crimes which befell us. (I can provide evidence to substantiate my requested immunity for Ms. Fenton, with each of those entities.)

37. Literally none of this was physically possible without a number of powerful and connected **"members of the court"**, including both judges and attorneys who were compromised and

Initials:

corrupt, operating in both the State and Federal Courts of Tennessee concurrently, who were not only willing to participate, but who engineered the crimes executed.

38. This was to **"bind the strongman"**,[17] so that both courts and counsel could do (and did) whatever they wanted. While I was powerless to stop them.

39. Without a court who respected my rights and obeyed the law, everything that took place in both courts was an almost unbelievably unconscionable miscarriage of justice, by some of the most powerful and affluent **"members of the court"** throughout Middle Tennessee.

40. Unfortunately, that does not change the truth though.

41. I was illegally destroyed beyond belief by the courts through a miscarriage of justice.

42. Only by receiving justice from the courts can I be restored so that I can survive and pursue happiness again. I have no choice but to pursue this as I must my every waking breath, through to the very end.

---

[17]  https://rico.jefffenton.com/evidence/the-ancient-paths-strong-man-principal.pdf

Initials:

## DECLARATION

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct, except as to matters herein stated to be on information and belief, and as to such matters, I certify as aforesaid that I verily believe the same to be true.

Executed on December 31, 2023

JEFFREY RYAN FENTON, PRO SE

17195 SILVER PARKWAY, #150
FENTON, MI, 48430-3426
JEFF.FENTON@LIVE.COM
(P) 615.837.1300
(F) 810.255.4438

Initials: