UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF MICHIGAN

**FILED- LN**

March 25, 2024 4:07 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: eod  FILED BY:

**JEFFREY RYAN FENTON,**

PLAINTIFF

v.

**CASE NO. 1:23-cv-1097**

**VIRGINIA LEE STORY ET AL.,**

DEFENDANTS

## DECLARATION ABOUT PROFESSIONAL AND JUDICIAL MISCONDUCT
## DURING MY 8/1/2019 HEARING IN CHANCERY COURT

Plaintiff brings this testimony pursuant to 28 U.S. Code § 1746.

I, Jeffrey Ryan Fenton, declare under oath as follows:

1.    My name is Jeffrey Ryan Fenton.

2.    I am the Plaintiff in this federal lawsuit (CASE NO. 1:23-cv-1097).

3.    I am a citizen of the United States of America.

4.    I was born in 1969 at Fairchild Airforce Base, in Washington State.

5.    I am domiciled in Genesee County, Michigan.

6.    My mailing address is 17195 Silver Parkway, #150, Fenton, MI 48430-3426.

7.    My phone number is (615) 837-1300.

Page **1** of **82**

Initials:

## PRO SE LITIGANT – MERITS RULE OVER TECHNICALITIES

8.    I am acting in a *pro se*[1] capacity in this lawsuit, due to my poverty, entitled to a liberal reading and less stringent standards since it was prepared without assistance of counsel. See *Haines v. Kerner, et al.*, 404 U.S. 519, 92 S. Ct. 594 (1972).

## QUALIFIED AMERICAN WITH DISABILITIES ACT LITIGANT

9.    I am a qualified ADA party with disabilities affecting my communication and cognitive functions, which make researching and drafting legal pleadings exceptionally slow and challenging.

10.    I request any considerations which the court can allow to help me participate in, be protected by, and benefit from the federal judiciary.

11.    I suffer from several cognitive disabilities: Obsessive-Compulsive Personality Disorder (OCPD) DSM-5 301.4 (F60.5), Generalized Anxiety Disorder (GAD) DSM-5 300.02 (F4L1), Attention-Deficit Hyperactivity Disorder (ADHD) DSM-5 314.01 (F90.2), Circadian Rhythm Sleep Disorder (CRSD) Non-24-Hour Sleep-Wake Disorder (Non-24) DSM-5 307.45 (G47.24).

12.    Medications that I take regularly can only control these afflictions, not cure them.

13.    Due to my disabilities, it is extremely difficult for me to concisely write long documents without losing focus and experiencing significant sprawl, causing repetition, countless

---

[1]    Case 1:23-cv-01097-PLM-RSK, ECF No. 1-35, PageID.1960

Initials:

rewrites, and bloated documents. For this reason, I am trying to file multiple short declarations to concisely address specific topics, to help communicate more effectively, for the benefit of all parties.

## DECLARATIONS INCLUDED BY REFERENCE HEREIN AND THROUGHOUT

14.     This declaration shall include a master list of other declarations which I have written in this lawsuit, which shall be periodically updated, both in court and online, to have the most comprehensive and complete set of facts available in this case.

15.     Every declaration and the facts therein written by me and mentioned in this document are incorporated herein by reference and made a part of this declaration.

16.     Similarly, this declaration and the facts herein, along with those contained in my other declarations cited in this list, are all incorporated by reference and made a part of all my declarations that refer to this "Fenton Master Declaration and List of Declarations to Date".

17.     As a result of my disabilities, my principal loss of cognitive function is that I'm extremely slow in performing any significant and/or challenging task. Further exacerbated by an inability to effectively "multi-task" high-value projects, meet pressing demands, or lose all that I love in my life as a consequence.

18.     Deadlines are extremely stressful, and often even frantic for me. Typically, the final 48-hours before a critical court deadline, I become extremely anxious, my mind starts racing and my thoughts become fragmented. To explain how it feels, I'd compare it to standing outside in the middle of a blizzard. I can completely forget what I'm working on and get lost in the multiple windows on my computer screen, to no avail.

Initials:

19.     It is common for me to rewrite pleadings for the court 50+ times, in an attempt to communicate the depth and the breadth of the cruel, fraudulent, criminal, and unconstitutional damages which I have experienced to date, because so far, it doesn't appear that a single word of my testimony on Court records has ever been used to my benefit.

## MY HIGHEST VALUES: TRUTH & AUTHENTICITY

20.     TRUTH is my highest value in life.

21.     AUTHENTICITY is my second highest value.   (Which I define as truth in relationships.)

## MY PSYCHOLOGICAL BENT TOWARDS TRUTH DESPITE THE CONSEQUENCES

22.     By the clinical definitions of Obsessive-Compulsive Personality Disorder, one of my most defining disabilities, coupled with my personal values and belief system, I am far more likely to be honest and tell the truth **regardless of the consequences to myself** or anyone else, than most people in society.

23.     Therefore, the fact that not one court to date has used one word of my testimony to my benefit outside the court process itself, is not only unconstitutional and wreaks of foul play, but it is also purely **illogical**, because I bring the most reliable, uncompromised, unadulterated, and trustworthy testimony regarding the preceding Tennessee litigation.  Whether the court accepts that or not, that is a psychological fact about who I am.

24.     On top of that, I have gone to great pains to provide the courts with a wealth of evidence by which to substantiate my testimony, beyond any reasonable margin of error.

Initials:

25.     According to Merck Manuals Professional Edition (online), in their section of psychiatric disorders, they state the following[2] about "Obsessive-Compulsive Personality Disorder", which I have been accurately diagnosed[3] with and suffer from:

26.     *"Obsessive-compulsive personality disorder is characterized by a pervasive preoccupation with orderliness, perfectionism, and control (with no room for flexibility) that ultimately slows or interferes with completing a task."*

27.     *"These patients may be overzealous, picky, and rigid about issues of morality, ethics, and values. They apply rigid moral principles to themselves and to others and are harshly self-critical. They are rigidly deferential to authorities and insist on exact compliance to rules, with no exceptions for extenuating circumstances."*

28.     Ironically, I'm the one who honors and submits to the law by psychological disorder.

29.     Show me someone else in this group who is honestly "overzealous, picky, and rigid about issues of morality, ethics, and values". That is me, and I'm tired of my testimony being ignored, while my life has been destroyed by repugnant lies which could never survive cross examination.

30.     Which is exactly why Chancery Court cast fraudulent "default" judgements against me, after driving me out of Tennessee to survive their harsh bias orders, instead of allowing "discovery" to begin and having the court hear and decide anything at all based upon the truth.

---

[2]   https://rico.jefffenton.com/evidence/tn-ada-disabilities-exploited-for-advantage-ocpd-merck.pdf

[3]   https://rico.jefffenton.com/evidence/2020-07-08_tnsc-coa-ada-request-for-modification.pdf

Initials:

## MY BELOVED

31.     Ms. Fawn Fenton (hereinafter "Ms. Fenton", "wife", and "ex-wife") and I were together for fifteen years, thirteen during which we were married.

32.     On August 1, 2019, in the court room of Judge Michael Weimer Binkley in the Williamson County Chancery Court, the following took place:

## UNCONSTITUTIONAL: NO OPPORTUNITY TO SAVE MY PROPERTY INTERESTS OR TO MITIGATE MY LOSSES

33.     After a pre-trial conference in the back of the Chancery Court I told my counsel Charles "Marty" Duke that I could borrow money from my mother to bring our mortgages current and to keep them current (roughly $8k, less than I collectively spent on counsel for that day), provided I could continue living in my home.

34.     After telling Mr. Duke this, I asked if that might be possible.

35.     Defendant Story overheard me and answered me directly by stating, **"No. It's already too far along in the bankruptcy."**

36.     That was unconstitutional, a violation of bankruptcy law, as well as a violation of due process.

37.      Upon information and belief, I believe that this statement by defendant Story was also factually false. I see no such finding, judgment, or documentation in the bankruptcy record to support this claim. The bankruptcy court pretended to sell the marital residence based upon the orders from the Chancery Court, while Chancery Court played much of the same game, as if compelled to sell the marital residence to accommodate the bankruptcy, while neither court had

Page **6** of **82**

Initials:

the lawful jurisdiction and authority to force the sale of the martial residence, without discovery
and full due process of law, which they both refused.

38.    I was strategically deprived of lawful notice and *"adequate protection"* required by
the bankruptcy court, while I was also denied any opportunity to save my property or to attempt to
mitigate my losses in my property interests prior to the forced deprivation of my property by the
Chancery Court.

## DEFENDANT STORY'S FRAUDULENT NARRATIVE AND SMEAR CAMPAIGN

### (1) STORY'S LIE: UNABLE TO GET MR. FENTON SERVED

1.  On page-4[4] in lines 5-7 of the transcript of evidence[5] from the 8/1/2019 hearing in
Chancery Court, defendant Story stated, "Mrs. Fenton filed for divorce back in '18, and she was
unable to get Mr. Fenton served."

2.    That statement by defendant Story was false.

3.    I was served on October 1st, 2018. I responded to that service by filing an
"ANSWER & COUNTER-COMPLAINT FOR DIVORCE" in Williamson County Chancery
Court docket #47426, on October 30th, 2018[6].

4.    By stating this, defendant Story violated <u>Tenn. R. Sup. Ct. 3.3 - Candor Toward
the Tribunal</u>: "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a
tribunal." And <u>Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel</u>: "A lawyer shall

---

[4]    Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2821

[5]    https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf  (Case  1:23-cv-01097-PLM-RSK,  ECF
No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[6]    https://rico.jefffenton.com/evidence/2018-10-30_husbands-answer-counter-complaint-47426.pdf

Initials:

not: (e) in trial, (2) assert personal knowledge of facts in issue except when testifying as a witness."

5.     Defendant Story's statements of fact were not only false, but she knew that they would be "in issue", because she intentionally spoke in a manner by which to assassinate my character before the court. Hence by the Tennessee Supreme Court's Rules of Professional Conduct, defendant Story was prohibited from even making these statements in open court.

## (2) STORY'S LIE: THE PROBLEM WITH A PRIVATE REALTOR

6.     On the bottom of page-4[7] in lines 21-25 of the transcript of evidence[8] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "The problem with the private realtor is that Mr. Fenton posts these kind of documents that are -- this is the do not enter my property, and I'll hand you a copy of that."

7.     That statement was absolutely false.

8.     By making this statement, defendant Story violated the Tennessee Supreme Court's Rules of Professional Conduct by "testifying as a witness", without any firsthand knowledge, while making entirely false and bias statements to mislead the court.

9.     Defendant Story violated Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel: "A lawyer shall not: (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence; or (2) *assert personal knowledge of facts in issue except when testifying as a witness*; or (3) state a personal opinion

---

[7]     Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2821

[8]     https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Initials: _____

as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt
or innocence of an accused".

10.      I was a licensed real estate agent[9] in the State of Tennessee for 16 ½ years, with
access to hundreds of millions of dollars' worth of Middle Tennessee real estate, without one single
complaint filed against me throughout my entire career. Contrary to defendant Story's narrative,
my real estate license remained current for over a year after this divorce.

11.      I was a highly skilled and capable residential real estate *listing agent*. I was able to
market and sell properties in Middle Tennessee for *top-dollar*, as good if not better than anyone
else that either I or my wife had knowledge of and experience working with.

12.      If ever my wife and I had reached terms by which we could have sold our home
amicably together[10], then I would have removed any signage which might have hindered the full
sales potential of our property.  It is both obscene and completely unsubstantiated to suggest
otherwise.

13.      An "impartial tribunal" cannot refuse to afford me the slightest "benefit of the
doubt" in every circumstance.

---

[9]   https://rico.jefffenton.com/evidence/2004-12-09_through_2021-07-25_tn-real-estate-license.pdf

[10]   https://rico.jefffenton.com/evidence/2019-01-28_verbal-agreement-needed-in-writing-for-closing.pdf

Page **9** of **82**

Initials:

### (3) STORY'S LIE: MR. FENTON WAS AVOIDING SERVICE

14. On the top of page-5[11] in lines 1-5, of the transcript of evidence[12] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "It was made as part of the exhibits when we filed for divorce in 2019. Mr. Fenton was avoiding service."

15. That statement was false. I never knowingly avoided service for a divorce in 2019.

16. By stating this, defendant Story violated Tenn. R. Sup. Ct. 3.3 - Candor Toward the Tribunal: "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal." And Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel: "A lawyer shall not: (b) falsify evidence, counsel or assist a witness to offer false or misleading testimony; or (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence."

17. Defendant Story knew that this was a "non-issue", she mentioned it for no reason other than to abusively defame my character to bias the court against me.

### (4) STORY'S LIE: HUSBAND FAILED TO LIST HOUSE AS AGREED

18. On page-5[13] in lines 9-14 of the transcript of evidence[14] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "In 2018, when they made this agreement, if she dropped the divorce he would agree to put the house on the market. It never got on the market. It

---

[11] Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2822

[12] https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[13] Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2822

[14] https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Initials:

was he's got to fix this, he's got to fix that. It was one excuse after another…"

19. This statement was false.

20. By stating this, defendant Story violated <u>Tenn. R. Sup. Ct. 3.3 - Candor Toward the Tribunal</u>: "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal." And <u>Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel</u>: "A lawyer shall not: (b) falsify evidence, counsel or assist a witness to offer false or misleading testimony; or (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence." (Unfortunately a recurring tactic by defendant Story.)

21. It wasn't my fault that our home was never listed on the market for sale, it was my wife's fault, because she refused to put her own words, from our "Verbal Settlement Agreement[15]", in writing[16] and sign it.

22. While the closing agent we were working with required a simple signed agreement between Ms. Fenton and myself, stating how the proceeds from the sale of our home would be divided and dispersed between us, before she was willing to allow Ms. Fenton to use a Specific Power of Attorney, which I had obtained in good faith, to allow Ms. Fenton to list and sell our home while only requiring my participation on the final closing documents.

23. Selling our home was contingent upon our alimony agreement, because I needed the financial means to purchase or rent myself replacement housing. I never volunteered to render myself homeless, while it is wholly unreasonable for defendant Story to even suggest such.

---

[15] https://www.rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf

[16] https://rico.jefffenton.com/evidence/2019-01-28_verbal-agreement-needed-in-writing-for-closing.pdf

Initials:

24.     This wasn't about me being difficult, asking for a lot, or trying to "take advantage" of my wife, in any way. It was a pragmatic matter of me needing food and shelter, as well as being entitled to food and shelter, otherwise nobody had a lawful or ethical right to deprive me of the food and shelter which **I already had.** Yet unconscionably they did, with careless disregard for my life, liberty, and property.

## (5) STORY'S LIE: WIFE "HAD TO" FILE BANKRUPTCY BECAUSE HUSBAND FAILED/REFUSED TO SELL THEIR HOUSE AS AGREED

25.     On page-5[17] in lines 13-15 of the transcript of evidence[18] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "It was one excuse after another, and here we are sitting a year later, **and now my client had to file bankruptcy.**"

26.     This statement was obscenely false.

27.     Ms. Fenton never "needed" to file bankruptcy[19]. It was entirely a fraudulent rouse[20], planned for the date when she knew over a year in advance that her employer planned to retire and close their architecture firm[21]. Purely to evade her financial responsibility[22] of paying me $1,750 per month in alimony[23] for a duration of 6-years, as repeatedly agreed[24].

---

[17] Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2822

[18] https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[19] https://rico.jefffenton.com/evidence/2021-01-26_trustees-final-account-and-distribution-report.pdf

[20] https://rico.jefffenton.com/evidence/2019-04-26_ausbrooks-story-fraudulent-bk-petition.pdf

[21] https://rico.jefffenton.com/evidence/2019-04-26_bankrupcy-planned-for-when-employer-retires.pdf

[22] https://rico.jefffenton.com/evidence/2018-09-14_fair-settlement-offer-by-wife-with-tax-truth.pdf

[23] https://rico.jefffenton.com/evidence/2018-07-12_arons-and-associates-divorce-planning.pdf

[24] https://rico.jefffenton.com/evidence/2018-10-27_verbal-settlement-agreement.pdf
https://rico.jefffenton.com/evidence/2019-01-08_wifes-claims-about-alimony-and-lawyers.pdf

Initials:

28.     Largely because of the Trump Tax Reform[25], which made it so that Ms. Fenton
could no longer write-off alimony payments, since we were unable to finalize our divorce by
December 31st, 2018, as we had both hoped.

29.     In a series of text messages[26] with Ms. Fenton on December 22nd, 2018, discussing
the financial impact of the Trump Tax Reform on Ms. Fenton's net income, she stated in part,
"Correct, my tax situation is going to suck for a very long time... **90k gross - 31k taxes - 21k
alimony = 38k net**. Plus or minus... Someday when alimony is done, I can get a job making only
$43k gross and have same net of +/- $38k."

30.     The other major incentive for Ms. Fenton to file for bankruptcy, was because the
mortgages were in her name, but she had abandoned our marital residence[27] and rented herself an
apartment in April of 2018[28]. As such, she had no lawful means of forcing me to move out of our
marital residence or to compel its sale. Unfortunately, she had already decided that our marital
residence was a financial burden on her, so she no longer wanted to keep our home[29], despite the
tremendous loss we would both suffer from selling our home during that season[30].

31.     We had invested hundreds of thousands of dollars into improvements[31], and the
market needed time for property appreciations to catch up and surpass our investments.  This

---

[25]   https://rico.jefffenton.com/evidence/2018-12-31_divorce-deadline-for-trump-tax-reform.pdf

[26]   https://rico.jefffenton.com/evidence/2018-12-22_projected-gross-taxes-alimony-net.pdf

[27]   https://rico.jefffenton.com/evidence/2018-04-23_wife-locked-plaintiff-out-of-financial-accounts.pdf

[28]   https://rico.jefffenton.com/evidence/2018-05-02_family-budget-living-apart.pdf

[29]   https://rico.jefffenton.com/evidence/2018-10-09_wife-does-not-want-to-keep-marital-residence.pdf

[30]   https://rico.jefffenton.com/evidence/2019-10-10_chancery-no-proceeds-from-forced-auction.pdf

[31]   https://rico.jefffenton.com/evidence/1986-sunnyside-property-improvement-highlights.pdf

Initials:

happened dramatically over the four years to follow[32], appreciating roughly a hundred thousand dollars per year[33]. But we both knew there was no way that we could sell our home in 2019 without suffering an extreme financial loss[34], which we had no means of compensating for or recovering from.

32.     Upon information and belief, unfortunately my wife's counsel coached her to secretly default upon our mortgage payments (which she had promised to pay[35] and had been paying), followed by secretly filing for bankruptcy, while falsifying her bankruptcy petition[36] to conceal my cash investment[37] and ownership interests in our equally deeded[38] marital residence[39] as tenancy by the entirety[40], as well as her domestic support obligations[41], paid up to and even a month after her fraudulent federal bankruptcy petition[42] was filed.

33.     Neither me nor my two lawful roommates/tenants[43] were ever given notice[44] about Ms. Fenton's fraudulent federal bankruptcy filing, nor about the bad-faith motion by her counsel

---

[32]   https://rico.jefffenton.com/evidence/2022-01-03_1986-sunnyside-brentwood-tn-appreciation.pdf

[33]   https://rico.jefffenton.com/evidence/2023-05-31_1986-sunnyside-brentwood-tn-appreciation.pdf

[34]   https://rico.jefffenton.com/evidence/2019-10-10_chancery-no-proceeds-from-forced-auction.pdf

[35]   https://rico.jefffenton.com/evidence/2018-05-02_family-budget-living-apart.pdf

[36]   https://rico.jefffenton.com/evidence/2019-04-26_ausbrooks-story-fraudulent-bk-petition.pdf

[37]   https://rico.jefffenton.com/evidence/2011-04-29_1986-sunnyside-premarital-assets-invested.pdf

[38]   https://rico.jefffenton.com/evidence/2011-04-29_1986-sunnyside-brentwood-tn-deed.pdf

[39]   https://rico.jefffenton.com/evidence/1986-sunnyside-brentwood-tn-2019-property-taxes.pdf

[40]   https://rico.jefffenton.com/evidence/2011-04-29_fenton-marital-residence-tenancy-by-entirety.pdf

[41]   https://rico.jefffenton.com/evidence/2019-05-16_support-email-wife-never-mentioned-bankruptcy.pdf

[42]   https://rico.jefffenton.com/evidence/2019-04-26_ausbrooks-story-fraudulent-bk-petition.pdf

[43]   https://rico.jefffenton.com/evidence/2018-08-30_wifes-budget-for-husband-keeping-home.pdf
       https://rico.jefffenton.com/evidence/2019-03-26_fenton-sunnyside-roommate-lease-merriman.pdf
       https://rico.jefffenton.com/evidence/2019-04-09_fenton-sunnyside-roommate-lease-garcia.pdf

[44]   https://rico.jefffenton.com/evidence/2022-03-15_ustp-bk-fraud-referral-confirmed-no-notice.pdf

Initials:

to sell our marital residence.

34.    The height of absurdity in this action is the fact that in the end Ms. Fenton only received "bankruptcy relief" of **$44,079.09** worth of claims discharged[45] (after defendant Story's alleged debt was subtracted, since her fees were never necessary and purely procured unconscionable fraud.)

35.    Upon information and belief, the cost of Ms. Fenton's combined counsel for her bankruptcy and vexatious divorce actions must have surpassed, or at least rivalled, her alleged "bankruptcy relief" obtained through this absolutely unnecessary and legally unjustifiable fraudulent federal bankruptcy filing and forced liquidation of our marital residence[46].

36.    While irresponsibly discarding roughly two-hundred and fifty thousand dollars worth of our investment (including our premarital retirement funds) and equity as of the closing of the forced auction on October 31st, 2019. We have further lost roughly four hundred thousand dollars **more** in appreciation since[47].

37.    Yet defendants Story had the nerve to blame this absolutely unnecessary bankruptcy scam which she and defendant Ausbrooks engineered, upon me. To my own substantial detriment of course. This is completely **unreasonable** and obscenely **absurd**.

---

[45]    https://rico.jefffenton.com/evidence/2021-01-26_trustees-final-account-and-distribution-report.pdf

[46]    https://rico.jefffenton.com/evidence/2019-10-10_chancery-no-proceeds-from-forced-auction.pdf

[47]    https://rico.jefffenton.com/evidence/2022-01-03_1986-sunnyside-brentwood-tn-appreciation.pdf
       https://rico.jefffenton.com/evidence/2023-05-31_1986-sunnyside-brentwood-tn-appreciation.pdf

Initials:

## (6) STORY'S LIE: HUSBAND IS AT FAULT FOR WIFE'S CREDIT CARD DEBTS

38.     On page-5[48] in lines 17-23 of the transcript of evidence[49] from the 8/1/2019 hearing

in Chancery Court, defendant Story stated, "She's paying $48,000 in credit card debt, and this

credit card debt is in her name, but the genesis of those cards, I have a history of the cards where

Mr. Fenton would transfer balances from his credit cards to a credit card in her name, and then she

became in a horrible financial situation."

39.     In this statement defendant Story indirectly said or "insinuated" something which

is "materially misleading", that was intentionally deceptive and demeaning to further bias the

court, which was substantially false (if not entirely), and met the Tennessee Supreme Court's own

definition for "fraud" and "fraudulent".

40.     This point touches upon one of the most egregious issues of fraud committed on

both the Chancery and Bankruptcy Courts in the associated cases by Ms. Fenton's counsel, the

idea that we financially operated in marriage as if two independent and separate persons. That

could not have been more false.

41.     Ms. Fenton and I lived under the spiritual, financial, and legal principle[50] of *"the*

*two becoming one at marriage"*, referred to as *"Tenancy by Entirety"*. Throughout the entire duration

of our marriage. All of our income, assets and debts were always held as one *"tenancy by entirety"*.

Regardless of whose name any were technically in. Those choices were strategically for the benefit

---

[48]   Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2822

[49]   https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[50]   https://bwp.tnble.org/wp-content/uploads/2019/09/Property-Law.pdf

Initials:

of *both* of us, whether for preferential interest rates, risk mitigation, etc... Most things were a matter of whether **we** held them in **our** "left pocket" vs **our** "right pocket". Not whether they were "hers" or "mine". (There were some very minor sentimental and premarital exceptions.)

## (7) STORY'S LIE: HUSBAND HACKED WIFE'S EMPLOYER, SO HE WAS FIRED

42.    On page-6[51] in lines 1-3 of the transcript of evidence[52] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "She is an architect, works for a firm, and Mr. Fenton was the IT person for the firm, and he hacked the emails so he lost that job."

43.    That statement was false.

44.    I don't even know how to "hack" a computer or network.

45.    I voluntarily terminated my contract working for Ms. Fenton's employer[53], because I was fed-up feeling like he was taking advantage of both myself and my wife, while not keeping his promises, being extremely cheap, and having poor financial integrity.

46.    Ms. Fenton told me many times that in regard to contracts bid on by her company, including significant government and education contracts, that her boss would low bid jobs to "win" or be awarded the contracts. Then later down the road, her employer would use add-ons, change orders, or something substantially similar, to charge them enough for what they ultimately wanted.

47.    Ms. Fenton told me many times, that one of her employers' favorite sayings was,

---

[51] Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2823

[52] https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[53] https://rico.jefffenton.com/evidence/2017-04-27_voluntarily-terminated-contract-with-wifes-firm.pdf

Page **17** of **82**

Initials:

*"If we don't lie to them, then someone else will."*

48.    Ms. Fenton told me many times that her employer playfully said, chanted, or sang those words in their office.

49.    That is a philosophy and business model which both I and my ex-wife found repulsive.

50.    Ms. Fenton told me many times that her employer was "slow pay" with many industry professionals, and that some of her favorite engineers and other trade professionals she had worked with in years past, refused to work for her employer, because of his failure to timely pay them.

51.    I also experienced problems with being nickel and dimed and timely paid by her employer, though less than other professionals, since my wife was essentially her boss's "operations manager" and "lead architect".

52.    My wife's employer (Mr. Ken Adkisson) promised her a partnership for years, when business was slow after the 2007-2008 market crash, to persuade Ms. Fenton not to leave their company and seek employment at a larger firm. Yet I never saw him make good on any of those promises to her, except after I confronted him in an email[54] on March 28th, 2017, after he gave Ms. Fenton her annual payroll review on March 22nd, 2017, with exactly a *zero percent* raise.

53.    I found that highly insulting on her behalf, knowing the prosperity of the company during that season, combined with the critical role my wife played in that firm, and the weight she

---

[54]    https://rico.jefffenton.com/evidence/2017-04-06_wifes-belated-raise-after-protest.pdf

Page **18** of **82**

Initials: _____

carried on her shoulders to meet demanding deadlines, often working significant amounts of unrewarded overtime, adding more stress into our home life.

54.     After I confronted Mr. Adkisson about his failure to show his appreciation for my wife, and the value she provides both to his company and his life, on April 6th, 2017, Mr. Adkisson gave Ms. Fenton a thirteen percent raise[55], in the amount of $10,154.64 per year increase in her salary.

55.     Unfortunately, after Mr. Adkisson gave my wife the raise, he began talking trash about me around their office, upsetting my wife, at which point I had my fill of working for Adkisson & Associates Architects, Inc.

56.     On April 27th, 2017, I emailed[56] Mr. Ken Adkisson and I voluntarily terminated my IT contract with their firm, while assisting their company in a peaceful transition to a new IT firm or vender of their choice, without ever causing any damage to their office computers or network.

57.     At 4:01pm on April 27th, 2017, Mr. Ken Adkisson emailed me back[57] in response to my termination notice and stated, "Thank you Jeff, we certainly appreciated your efforts. Good luck in the future."

58.     I saved Adkisson & Associates Architects Inc. tens-of-thousands of dollars, by prolonging the life of outdated systems and software with preventative maintenance and upgrades, rather than replacements, with almost no downtime since I performed my work overnight, while

---

[55]    https://rico.jefffenton.com/evidence/2017-04-06_wifes-belated-raise-after-protest.pdf

[56]    https://rico.jefffenton.com/evidence/2017-04-27_voluntarily-terminated-contract-with-wifes-firm.pdf

[57]    https://rico.jefffenton.com/evidence/2017-04-27_voluntarily-terminated-contract-with-wifes-firm.pdf

Initials:

only charging them a fraction of "standard industry rates" which they paid both before my employ and after.

59.    To say or insinuate that I did anything malicious to this company is obscene.

## (8) STORY'S LIE: HUSBAND IS A "SELF-TAUGHT COMPUTER GENIUS"

60.    On page-6[58] in lines 3-6 of the transcript of evidence[59] from the 8/1/2019 hearing in Chancery Court, while referring to me, defendant Story stated, "He is very intelligent. He has a high school education, but he is a self-taught computer genius."

61.    This statement was false.

62.    I have only a "hobby" skill level in computers.

63.    I'm not any sort of "genius" nor have I ever been accused of such.

64.    I was told that I scored 100 on an IQ test as a teenager, which to my understanding is baseline average.

65.    I have a number of vocationally challenging disabilities[60], including Obsessive Compulsive Personality Disorder (OCPD), Attention Deficit Hyperactivity Disorder (ADHD), and Generalized Anxiety Disorder (GAD), which significantly hinder my vocational pursuits more than any intelligence factor could ever benefit me.

66.    In large part, this means that I am extremely slow, studied, and repetitive in the work that I perform. I am a perfectionist who values doing things "right", over speed, at all costs.

---

[58]    Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2823

[59]    https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[60]    https://rico.jefffenton.com/evidence/2020-07-08_tnsc-coa-ada-request-for-modification.pdf

Initials: 

https://rico.jefffenton.com/evidence/2019-08-01_hearing-professional-and-judicial-misconduct.pdf    Case 1:23-cv-01097-PLM-RSK (FENTON v. STORY et al.)

While being unable to effectively "multi-task" more than one significant task, pursuit, or project at a time.

67.    In a text message[61] from my wife on January 23, 2019, Ms. Fenton stated in significant part, "I used to always think of you like you were riding a stationary exercise bicycle; peddling furiously, working so hard, but going nowhere."

68.    This has never been for any lack of work or effort on my part.

69.    In another text message[62] from my wife on February 9th, 2019, Ms. Fenton stated, "I don't know how to answer your question right now. I hate it when you ask me to choose what you "should" work on, since you can't multitask."

70.    Those two texts reveal my wife's two most significant pet-peeves about both my disabilities and my vocational potential. We both expected that with her MIT education and her advanced accreditations as a licensed professional architect, with that she had two to three times the vocational potential of what I could ever realistically reach. I never misrepresented my potential or my worth either.

71.    Most of my vocational experience is in working in food service and in running large commercial printing presses. In the United States the commercial printing industry has almost all but become extinct over the past twenty years. For me to be able to qualify for any reasonably rewarding job, I need to obtain some sort of technical certification or skill first, where there are meaningful opportunities within the geography that I have now been forced to live.

---

[61]    https://rico.jefffenton.com/evidence/2019-01-23_riding-an-exercise-bicycle-peddling-furiously.pdf

[62]    https://rico.jefffenton.com/evidence/2019-02-09_wife-hates-that-plaintiff-can-not-multi-task.pdf

Initials: _____

72.     I had probably 20x the vocational opportunities[63], living in my home in Brentwood Tennessee, then I have now in Michigan, or than I expect will ever be within my reach again.

73.     My primary vocational experience working with computers for money was in my contract with Ms. Fenton's architecture firm, but despite the outstanding service I gave them and the amount of money I saved their firm, because of the divorce neither my ex-wife nor her employer will provide me with a reference, which leaves me both with no education and no vocational experience to speak of.

74.     The only way I was able to obtain the IT contract for Ms. Fenton's architecture firm was because of her employment, trust, and role in that company. Combined with the fact that I knew what their problems were as well as how much they had paid for completely unsatisfactory solutions.

75.     Armed with that knowledge and nightly access due to my wife's trust and role in the company, I was able to meet their needs (which were otherwise unmet, extremely cost prohibitive, for essentially emergency triage IT services upon complete failure), while performing "hobby" level routine maintenance and service, preventing failures, while prolonging the life of their equipment. Plus, I only charged approximately one third of typical industry rates.

76.     I doubt that I could even qualify for an entry level IT job with another company without first going back to school to obtain some sort of technical certification. Even then, with my age and disabilities, my potential is quite limited.

---

[63]    https://rico.jefffenton.com/evidence/2017-2021_census-brentwood-tennessee-v-fenton-michigan.pdf

Page 22 of 82

Initials:

### (9) STORY'S LIE: WE'VE GOT A TAX LIABILITY FROM 2016

77.     On page-6[64] in lines 12-13 of the transcript of evidence[65] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "…we've got a tax liability from 2-2016, standing out there."

78. Followed in line 17 by defendant Story stating, "So we have woes, IRS woes."

79.     Those statements were both false[66].

80.     Those statements were both literally the opposite of the truth.

81.     Again, defendant Story materially misrepresented the financial structure of our family, pretending that our finances were separate while fraudulently concealing the fact that any monies previously paid to the IRS or owed to the IRS for back tax years, were equally Ms. Fenton's and mine, to gain or lose, not either one of us independently.

82.     There was a planned tax credit on our account for 2016 with the IRS, never a liability of any sort. The IRS even paid me $174.43 in **interest** for our 2016 tax credit in 2021, when the IRS reopened after being locked-down for COVID-19.

83.     For more evidence to substantiate my claims, please see Ms. Fenton's own words from a settlement offer that she made me[67], when she was still operating in good faith, before hiring defendant Story.

---

[64]  Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2823

[65]  https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf  (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[66]  https://rico.jefffenton.com/evidence/2016-2017_fenton-family-irs-tax-credit-refunds-with-interest.pdf

[67]  https://rico.jefffenton.com/evidence/2018-09-14_fair-settlement-offer-by-wife-with-tax-truth.pdf

Initials:

84.     I received a tax refund from the IRS for 2016 in the amount of $5,619.36. "Color" it as you like, that is definitely not a "tax liability" as falsely testified by defendant Story in open court on 8/1/2019.

## (10) STORY'S LIE: MS. FENTON COULD PROBABLY BE AN INNOCENT SPOUSE

85.     In response to defendant Story's fraudulent claims about an outstanding tax liability, on page-7[68] of this same transcript of evidence[69], in lines 7-8, defendant Binkley asked, "Is the IRS going to be intercepting this money?"

86. Followed shortly thereafter on the same page, defendant Binkley asked in lines 20-21, "Any possibility she could be an innocent spouse?"

87.     On page-7[70] in lines 23, 25 and line 1 of page-8, of the transcript of evidence[71] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "She could probably, but... at this point, your Honor, she just needs the burden of all the debt off her mentally..."

88.     That statement was false.

89.     That statement is a fraudulent misrepresentation of many things, including the financial structure of our family, the source of her indebtedness, as well as our standing with the IRS, my good skills and stewardship in the management of our income taxes, and my good character in general as a person and husband who was an equal partner.

---

[68]   Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2824

[69]   https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

[70]   Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2824

[71]   https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Initials:

90.    I received a tax refund from the IRS for 2017 in the amount of $3,112.62. Which I

amicably split with Ms. Fenton[72] in good faith, while trusting her to mail me a check for $1,556.00

(which she did) after I endorsed the $3,112.62 check from the IRS and mailed it to her, along with

a letter to her bank, authorizing her to cash our joint check from our 2017 income tax refund.

91.    Moreover, I received an interest statement from the IRS for the $174.43 in interest

paid to me by the IRS.

92.    Managing our income taxes is one of my best skills and attributes, admitted openly

by my ex-wife prior to this charade. Yet defendants Story and Binkley colored it to fraudulently

belittle and defame my character beyond belief, with absolutely no regard for the truth or the rules

of professional conduct.

93.    Defendant Story's motive is clear, as is defendant Binkley's bias, in the fact that he

refused/failed to do his job and provide a tribunal free of misconduct, discrimination, harassment,

and abuse, where both parties had an equal opportunity to be fairly heard, considered, protected,

and to benefit from the judicial process.

## (11) STORY'S LIE: PROJECTED SALES PRICES, USING A DISHONEST
## BAIT & SWITCH TACTIC

94.    On page-4[73] in lines 11-12 of the transcript of evidence[74] from the 8/1/2019 hearing

in Chancery Court, defendant Story stated, "We believe that house should sell in the neighborhood

---

72

73    Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2821

74    https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF
No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Initials:

of 414,000 we hope."

95.     This statement was used to deceive the court, as part of a "bait and switch" scheme by defendant Story. $414,000 was the estimated retail "as is" market sales price for the property, if it were listed on the market with a real estate agent. But that is not how defendant Story *demanded* that the property be sold.

96.     By stating this, defendant Story violated Tenn. R. Sup. Ct. 8.4 - MISCONDUCT: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation".

97.     On page 8[75], lines 14-15, defendant Story stated, "We really believe the only thing we can do, your Honor, is to *auction* this house."

98.     By stating this, defendant Story violated Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel: "A lawyer shall not: (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence; or (2) assert personal knowledge of facts in issue except when testifying as a witness; or (3) state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused".

---

[75]    Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2825

Page **26** of **82**

Initials:

## I THINK WITHOUT RESERVE, JUST LET IT GO

99.    To which defendant Binkley asked in lines 18-19, *"Could this be with reserve or without reserve?"*

100.    Defendant Story answered in lines 20-21[76], "I think without reserve, just let it go."

101.    While that decision was likely to produce a final sales price which was 25-35% below the price of a typical market sale. As such, defendant Story's projected sales price should have been adjusted to be in alignment with the relief that she requested, but it was not. It was instead strategically deceptive, and hence a "bait and switch" fraud on the court.

102.    This also shows both defendant Story's position as well as that of her client Ms. Fenton toward the marital residence, **"just let it go."** That was exactly what they did, without being of any benefit whatsoever to either of the property owners, which I believe was the defendant's expectation and goal from the start.

103.    Ms. Fenton was willing to *forfeit* the property to evade the financial responsibility of *mortgage payments* and *alimony*.

104.    The defendants were interested in stealing the property and siphoning as much equity, professional fees and opportunity out of it as possible, which they did.

---

[76]    Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2825

Initials:

## (12) STORY'S LIE: PRETENDING THERE WAS A JUSTIFIABLE BENEFIT TO THE COURT FORCING THE SALE OF OUR PROPERTY, WHEN THERE WAS NOT

105.     Since all that they wanted was to discard and be alleviated of the financial responsibility of the property, the court should have allowed me to continue living in my home and to take over the mortgage payments and bills associated with the property, as I had requested.

106.     That property was the sum total of both my life savings and my premarital retirement funds, as well as the same for my ex-wife.

107.     Defendant Story proposed the forced sale to the court while providing a retail "as is" market price, but in the end, she demanded a wholesale auction with no minimum price. That is fraud.

108.     The purpose of this was to make it sound as if there would be some benefit to myself and my wife if the court forced the sale of our home. When in fact, it did not place a dollar into either of our pockets, while forcibly rendering myself unnecessarily homeless and destitute, while liquidating and discarding the only asset of real value in both of our lives, besides my wife's education and vocational potential, with no means of compensating for or recovering from such an overwhelming loss.

Page **28** of **82**

Initials:

## (13) STORY'S LIE: THE PROBLEM WITH A PRIVATE REALTOR

109. On the bottom of page-4[77] in lines 21-25, of the transcript of evidence[78] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "The problem with the private realtor is that Mr. Fenton posts these kind of documents that are -- this is the do not enter my property, and I'll hand you a copy of that."

110. That statement was absurdly false.

111. This was part of defendant Story's "fraudulent narrative" and smear campaign to assassinate my character, to abusively bias the court against me, absent of truth, facts, and honorable testimony.

112. By making this statement, defendant Story violated the Tennessee Supreme Court's Rules of Professional Conduct by testifying as a witness, without any firsthand knowledge, while making entirely false and bias statements to mislead the court.

113. Defendant Story again violated Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel: "A lawyer shall not: (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence; or (2) assert personal knowledge of facts in issue except when testifying as a witness; or (3) state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused".

114. Defendant Binkley not only allowed defendant Story to abusively bias the court with

---

[77] Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2821

[78] https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Page **29** of **82**

Initials:

harassing and fraudulent claims without meaningful merit, but defendant Binkley assisted defendant Story in her vexatious and unethical tactics, depriving me of any chance to be heard by an equal and impartial tribunal.

115.    I was a licensed real estate agent in the State of Tennessee for 16 ½ years, with access to hundreds of millions of dollars' worth of Middle Tennessee real estate, without one single complaint filed against me throughout my career.

116.    I was a highly skilled and capable residential real estate "listing agent". I was able to *market* and *sell* properties in Middle Tennessee for *top-dollar*, as good if not better than anyone else who my wife and I had knowledge and experience working with.

117.    If ever my ex-wife and I had reached terms by which we could sell our home amicably together, then I would have removed any signage which might have hindered the full sales potential of our property. It is both obscene and unsubstantiated to suggest otherwise.

## (14) STORY'S LIE: IT'S A TOXIC MARRIAGE

118.    On page-8[79] in line 6, of the transcript of evidence[80] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "It's a toxic marriage."

119.    That statement was false.

120.    In truth, it was a "toxic divorce", because in the end Ms. Fenton and her counsel refused to operate honestly in good faith or allow any division by which we both had a fair chance

---

[79] Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2825

[80] https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Initials:

at rebuilding our lives.

121.    Once again, this was defendant Story *"testifying as a witness"* to something which she was never a witness to. That is a repeated theme throughout each hearing.

122.    Regardless of whether or not defendant Story's claimed "*merits*" contain any truth or not (while most did not), the *language* used by defendant Story to harshly bias the court against me was a clearly unethical violation of the State of Tennessee's Rules of Professional Conduct, because it was *unfair to the opposing party and counsel*,[81] while being *prejudicial to the administration of justice*.[82]

123.    My wife would have never stayed with me for fifteen years (thirteen married and two prior) if we had a "toxic marriage". Especially since *she made the majority of the money* in our family and could have easily left me anytime that she wanted.

124.    Ms. Fenton was not bound by anything other than the life, liberty, and happiness which she found in our marriage.

125.    It is unreasonable to believe otherwise, based solely upon her testimony or that of her attorney, *after the relationship had ended*, as part of contested divorce action, where critical decisions affecting her financial future hung in the balance.

126.    Discovery was needed to fairly substantiate any such claims, while meaningful

---

[81]    Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel: "A lawyer shall not: (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence; or (2) assert personal knowledge of facts in issue except when testifying as a witness; or (3) state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused".

[82]    Tenn. R. Sup. Ct. 8.4 - Rule 8.4 - MISCONDUCT: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice".

Initials:

evidence needed to be produced from throughout the term of our marriage, not just since Ms. Fenton had abandoned our marital residence and decided to get a divorce.

127.    Furthermore, no such production of evidence should have been taken as if a *matter of fact* by the court without allowing the other party [me] to produce evidence of my own, to cross examine their claims, and to be equally heard before reaching any substantial conclusions about facts which were clearly disputed and so critical to the outcome of the case.

128.    The court never allowed discovery to begin. Defendant Story never honestly, ethically, or fairly introduced, discussed, or argued any real issues from our marriage, which subsequently lead to our divorce.

129.    It was entirely a smear campaign. An unethical character assassination, intended to *cloud* the facts and the laws while I was illegally deprived of my critical and essential property interests, needed to simply survive and rebuild any sort of financially independent life again. In stark violation of the State of Tennessee's Rules of Judicial and Professional Conduct.

## (15) STORY'S LIE: IT'S BEEN UNBELIEVABLY DIFFICULT JUST DEALING WITH MR. FENTON

130.    On page-8[83] in lines 6-8, of the transcript of evidence[84] from the 8/1/2019 hearing in Chancery Court, defendant Story stated, "It's been unbelievably difficult just dealing with Mr. Fenton to even get him served."

131.    That statement was false.

---

[83]    Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2825

[84]    https://rico.jefffenton.com/evidence/2019-08-01_chancery-hearing-transcript.pdf (Case 1:23-cv-01097-PLM-RSK, ECF No. 1-24, PageID.1184 ~ ECF No. 1-25, PageID.1225), Case 1:23-cv-01097-PLM-RSK, ECF No. 22, PageID.2818-2862

Page 32 of 82

Initials: ⟋⟋

132.    Defendant Story repeatedly and abusively served me, over and over, to bully, intimidate, harass, stalk, and abuse me via the courts, as she continued throughout the entire case.

133.    By stating this, defendant Story violated <u>Tenn. R. Sup. Ct. 3.3 - Candor Toward the Tribunal</u>: "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal." And <u>Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel</u>: "A lawyer shall not: (b) falsify evidence, counsel or assist a witness to offer false or misleading testimony; or (e) in trial, (1) allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence."

134.    This was also a "non-issue", being mentioned by defendant Story to fabricate a fraudulent court record, in alignment with her fraudulent narrative, which was based upon her fraudulent misrepresentation of my person and my character, as well as the circumstances which gave rise to our divorce.

135.    Regardless of whether anything defendant Story said in court was in fact true or false (while I'm providing clear evidence here that most was false), almost every sentence she spoke was a flagrant violation of the Tennessee Supreme Court's Rules of Professional Conduct.

136.    Upon information and belief, everything done in the Chancery Court was literally a "strategic distraction" to cloud the ruling facts and laws being violated by the courts and counsel.

137.    Attorney Story continued violating the State of Tennessee's Rules of Professional Conduct throughout almost every *sentence* she spoke during this hearing on 8/1/2019.

138.    If necessary, I will try to document each and every violation, **but it is obscenely overwhelming.** At what point is defendant Story deemed a discredited **liar** by the court, so that I

Page **33** of **82**

Initials: ⬭

no longer must **prove** every single sentence of my testimony, for fear of my case being dismissed for lack of meaningful merits? Once again, I beg the court to intervene and help the obviously injured party receive justice, instead of allowing Ms. Story's crimes to continue to be covered-up because I'm simply incapable of procedurally defeating her without the court prioritizing my natural human and constitutional rights over technicalities and procedures, while demanding that any definition for justice include honesty, truth, honor, and good-faith pleadings.

139.    The court is likewise charged with the responsibility to take action and discipline both attorney and judicial misconduct, while I have gone to tremendous pains to provide the court with an abundance of irrefutable evidence clearly showing defendant Story has unquestionably lied over and over and over. I am likewise in the process of proving to the court that the other defendants in this case, with only a few exceptions, have been made aware of the attorney and judicial misconduct in my case, and have violated their oaths of office, along with the codes of conduct requiring the courts to self-police and report misconduct by other officers of the court. I tried everything known within my power for years struggling to obtain the slightest cure, simply so I could move forward with my life, obtain the vocational training and employment needed to begin rebuilding my life, so that I not end up homeless or be a liability upon my family or the government, neither of which was ever an issue until the defendants herein ambushed me. Unfortunately, most of the people named in this complaint absolutely refused me the most miniscule humanitarian consideration, as eventually you will see, so I have been left with no choice but to litigate as if my life depends upon it, because it literally does.

Page **34** of **82**

Initials:

## TENNESSEE SUPREME COURT RULES OF JUDICIAL CONDUCT

### TENN. R. SUP. CT. 1.1 – COMPLIANCE WITH THE LAW

140.    A judge shall comply with the law, including the Code of Judicial Conduct.

### TENN. R. SUP. CT. 1.2 – PROMOTING CONFIDENCE IN THE JUDICIARY

141.    A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

### TENN. R. SUP. CT. 2.2 – IMPARTIALITY AND FAIRNESS

142.    A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.

> ➢ [1] To ensure impartiality and fairness to all parties, a judge must be objective and open-minded.

### TENN. R. SUP. CT. 2.3 – BIAS, PREJUDICE, AND HARASSMENT

143.    (A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

144.    (B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

Page **35** of **82**

Initials:

145.    (C) A judge shall require lawyers in proceedings before the court to refrain from manifesting bias or prejudice, or engaging in harassment, based upon attributes including but not limited to race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, against parties, witnesses, lawyers, or others.

> ➢ [1] A judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute.

### TENN. R. SUP. CT. 2.4 – EXTERNAL INFLUENCES ON JUDICIAL CONDUCT

146.    (A) A judge shall not be swayed by partisan interests, public clamor or fear of criticism.

147.    (B) A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.

> ➢ [1] An independent judiciary requires that judges decide cases according to the law and facts, without regard to whether particular laws or litigants are popular or unpopular with the public, the media, government officials, or the judge's friends or family. Confidence in the judiciary is eroded if judicial decision making is perceived to be subject to inappropriate outside influences.

### TENN. R. SUP. CT. 2.5 – COMPETENCE, DILIGENCE, AND COOPERATION

148.    (A) A judge shall perform judicial and administrative duties competently, promptly

Page **36** of **82**

Initials:

and diligently.

## TENN. R. SUP. CT. 2.6 – ENSURING THE RIGHT TO BE HEARD

149.    (A) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.

150.    (B) A judge may encourage settlement of disputed matters in a proceeding but shall not act in a manner that coerces any party into settlement. A judge who participates in a judicial settlement conference shall not preside over the trial or any other contested issue in that matter.

> ➤ [1] The right to be heard is an essential component of a fair and impartial system of justice. Substantive rights of litigants can be protected only if procedures protecting the right to be heard are observed.

## TENN. R. SUP. CT. 2.8 – DECORUM, DEMEANOR, AND COMMUNICATION WITH JURORS

151.    (A) A judge shall require order and decorum in proceedings before the court.

152.    (B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control.

## TENN. R. SUP. CT. 2.9 – EX PARTE COMMUNICATIONS

153.    (A) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their

Initials:

lawyers, concerning a pending or impending matter, except as follows:

154. (1) When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided:

155. (a) the judge reasonably believes that no party will gain procedural, substantive, or tactical advantage as a result of the ex parte communication; and

156. (b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond.

## TENN. R. SUP. CT. 2.12 – SUPERVISORY DUTIES

157. (A) A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code.

> ➢ [1] A judge is responsible for his or her own conduct and for the conduct of others, such as staff, when those persons are acting at the judge's direction or control. A judge may not direct court personnel to engage in conduct on the judge's behalf or as the judge's representative when such conduct would violate the Code if undertaken by the judge.

## TENN. R. SUP. CT. 2.15 – RESPONDING TO JUDICIAL AND LAWYER MISCONDUCT:

158. (A) A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question regarding the judge's honesty, trustworthiness, or fitness as a judge in other respects shall inform the appropriate authority.

Page **38** of **82**

Initials: _____

159.    (B) A judge having knowledge that a lawyer has committed a violation of the Rules
of Professional Conduct that raises a substantial question regarding the lawyer's honesty,
trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority.

160.    (C) A judge who receives information indicating a substantial likelihood that
another judge has committed a violation of this Code shall take appropriate action.

161.    (D) A judge who receives information indicating a substantial likelihood that a
lawyer has committed a violation of the Rules of Professional Conduct shall take appropriate
action.

> [1] Taking action to address known misconduct is a judge's obligation.
> Paragraphs (A) and (B) impose an obligation on the judge to report to the
> appropriate disciplinary authority the known misconduct of another judge or a
> lawyer that raises a substantial question regarding the honesty, trustworthiness,
> or fitness of that judge or lawyer.

> [2] A judge who does not have actual knowledge that another judge or a lawyer
> may have committed misconduct, but receives information indicating a
> substantial likelihood of such misconduct, is required to take appropriate action
> under paragraphs (C) and (D).

### CANON 3 (B)(3)

162.    A judge should take or initiate appropriate disciplinary measures against a judge or
lawyer for unprofessional conduct of which the judge may become aware.

163.    Had defendant Binkley *obeyed* his *oath of office,* the *federal Canons,* and the

Page **39** of **82**

Initials: _____

Tennessee Supreme Court's *Rules of Judicial Conduct*, he would have *required* defendant Story to *stop* slinging *bias*, *harassment*, and *abuse* around his court room. He would have *prohibited* her from *"testifying as a witness"* to nearly everything that she said in court, when she clearly was a witness to none of it. He would have *corrected* her and/or *disciplined* her when she made completely *false statements* about *matters of law*. He would have never decided to order the *forced deprivation of my property* during the very first hearing, before *discovery* began. Without allowing my counsel even *one week* to prepare my *defense*, due to the *negligence* of my prior counsel who *failed to perform*, at absolutely no fault of my own. Especially when the court knew that such an order would literally render me *homeless*, *destitute*, *unemployed*, and *unemployable*, while discarding *hundreds of thousands of dollars'* worth of my *critical* and *essential*, hard earned and *irreplaceable* property interests, without affording me *an opportunity to save my property interests*, or at the very least to *mitigate my losses in my property interests*, prior to the *forced deprivation* of my life's work, investments, and wealth, **without one dollar to my benefit.**

164.    Had defendant Binkley acted ethically and legally, he would have exercised care, caution, and adequate protection for my property interests and my only stream of income, at that time. As well as over my tenants legitimate leasehold property interests. Allowing all the affected parties to perform discovery and be fully heard before harming a single one of us. He would not have exercised jurisdiction over property, which the state courts were specifically prohibited from exercising jurisdiction over, by federal law, because it had been included in a *federal bankruptcy estate*, while the property was *core* to the bankruptcy filing itself. All which defendant Binkley *reasonably should have known.*

Page **40** of **82**

Initials:

165.    Especially when the bankruptcy was *filed* and the *estate* formed 39-days before any action was filed in the Chancery Court, clearly giving the *federal courts* both *original* and *exclusive jurisdiction* over the marital residence. These were routine matters of law, which the "members of the court" all *reasonably should have known,* while I believe they did, but they refused to *respect* and *obey* the *law.*

166.    Had defendant Binkley obeyed his oath of office, he would have demonstrated *respect* for my *constitutional rights*, bankruptcy *laws*, and care or interest in me obtaining a *fair* divorce and having an *opportunity* to *rebuild* my life and *survive* without becoming *geographically displaced* by hundreds of miles or becoming a *financial liability* upon my *family* or the *government.* Neither had ever been the case previously, and neither should have been the case moving forward, but some *care* and *justice* was needed to *protect* me.

167.    Had defendant Binkley **obeyed** the State of Tennessee's *Rules of Judicial Conduct*, he would have *required* defendant Story to *speak* in court, in a manner which *complied* with the Tennessee Supreme Court's *Rules of Professional Conduct*, thereby maintaining a *neutral, unbiased*, and *impartial* atmosphere in the court, where *honest* issues could be *heard* and *justice* were possible. **Unfortunately, he did not.**

168.    I'm going to skip ahead now, in hopes of not losing the attention of the reader, to point out an even more significant problem during this hearing, than strategic misconduct and fraudulent character assassination.

Initials:

# ❶ FALSE CLAIM OF LAW: WE DIDN'T SIGN A LEASE – WE DIDN'T AUTHORIZE ANY RENTERS – THE RENTERS NEED TO GO

## E-1 (9:8-12):

8       with. So he's going to say that he doesn't have

9       anyplace to live[85], and that he has renters[86]. He has

10      gotten renters in there. Well, we didn't sign a

11      lease[87]. We never authorized any renters[88] to be in

12      that house. I think the renters need to go.

169.    Defendant Story's statement, *"I think the renters need to go."* is a clear violation of

Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel (e) in trial, (3) *state a personal opinion as to the justness of a cause,* the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused".

## IT DOES NOT MATTER WHAT DEFENDANT STORY THINKS

170.    It does not matter what defendant Story "thinks", she is not allowed to project her *opinions* in court. It is the judge's job solely to make conclusions of law.

171.    Defendant Story clearly sought to (and succeeded at) influencing judge Binkley by means prohibited by law. By violating the Rules of Professional Conduct and slinging her

---

[85] See attached exhibit Tenn. Code § 39-16-507, Tenn. Code § 39-16-503, Tenn. Code § 29-41-101 §§ 106, 3, along with Which is TRUE, without me being forced out of the State of TN, which is illegal & unethical since SHE summoned me to participate in multiple legal actions. Yet they still do. Filing DEFAULTS!

[86] Which is TRUE, and my ONLY Source of Provision hy which to be able to remain in Tennessee, at this specific juncture. After my ex-wife stopped all support, without NOTICE, at Story's que.

[87] Fraudulently implying that I could not legally enter a lease without my ex-wife's permission and signature. Which is a false representation of MATTERS OF LAW.

[88] Again, fraudulently misrepresenting real estate deed laws and landlord tenant laws.

Initials:

substantially fraudulent character assassination about myself around the court, while forcefully stating her opinions, which is expressly prohibited. While Judge Binkley refused or failed his judicial supervisory duties to correct her and allowed her misconduct to continue.

172.    Tenn. R. Sup. Ct. 3.5 - Impartiality and Decorum of The Tribunal: *A lawyer shall not: (a) seek to influence a judge,* juror, prospective juror, or other official *by means prohibited by law*".

173.    What defendant Story said there was even more seditious than seeking to influence the judge by a prohibited means with her *opinion*, while weaving *strategic deception* into her statement.

## WHY DID DEFENDANT STORY TESTIFY FOR ME?

174.    In lines 8 and 9 defendant Story stated, "…So he's going to say that he doesn't have anyplace to live, and that he has renters. He has gotten renters in there."

175.    Why is defendant Story dominating the narrative in the hearing to the point of testifying on my behalf? She appears to be trying to control the statements of facts which are put on the record, but she is not allowed to assert personal knowledge of facts involving me and my testimony. This is obscenely inappropriate and another violation of Tenn. R. Sup. Ct. 3.4 - Fairness to Opposing Party and Counsel: *A lawyer shall not: (e) in trial, (2) assert personal knowledge of facts* in issue except when testifying as a witness."

176.    Had defendant Story not been a close family friend of defendant Binkley, and had defendant Binkley performed his judicial supervisory duties in alignment with his office, by requiring defendant Story to comply with the Tennessee Supreme Court's Rules of Professional Conduct, while maintaining an impartial atmosphere in the court, to promote equality and fairness,

Page **43** of **82**

Initials: _____

while preventing harassment and abuse under color of law, defendant Binkley had an ethical responsibility and duty to stop defendant Story's almost non-stop misconduct before him in court.

177.    Lastly, in the few sentences above, defendant Story also strategically planted deception into the court record, when she stated, "He has gotten renters in there. Well, we didn't sign a lease. We never authorized any renters to be in that house. I think the renters need to go."

178.    Defendant Story incorrectly implied that I had no legal right to obtain roommates/renters in my home, without Ms. Fenton's permission and signature on their leases.

179.    That implication is not only false and in bad faith, but it is based upon a false representation "about a matter of law". (Which is even further misconduct, that the judge should have never allowed in court, further proving judicial bias and/or collusion.)

180.    Defendant Story does this *many times* throughout this case, but that doesn't make her tactics *lawful* or *ethical*.

## FRAUD

181.    At the least offensive level, defendant Story's implication is that one spouse (myself, the husband) lacks the authority to lawfully execute a lease agreement for marital property owned by both husband and wife, without the approval and signatures of both spouses.

182.    That is false.

183.    This is where I believe that defendant Binkley became "guilty by association", if he wasn't already a party to defendant Story's conspiracy against my rights and property. In hindsight though, I'm forced to conclude that he probably was.

184.    Clearly nothing lawful or ethical took place after this point in docket #48419B.

Page 44 of 82

Initials:

## TENNESSEE LANDLORD TENANT ACT

➤ T.C.A. § 66-28-101. Short title. This chapter shall be known and may be cited as the "Uniform Residential Landlord and Tenant Act."

➤ T.C.A. § 66-28-102. Application — Preemption.

  ➤ (a) This chapter applies only in counties having a population of more than seventy-five thousand (75,000), according to the 2010 federal census.

  ➤ (b) This chapter applies to rental agreements entered into or extended or renewed after July 1, 1975...

➤ T.C.A. § 66-28-103. Purposes — Rules of construction.

  ➤ (a) This chapter shall be **liberally construed** and **applied** *to promote its underlying purposes and policies.*

  ➤ (b) Underlying purposes and policies of this chapter are to:

  ➤ (1) *Simplify, clarify, modernize and revise the law governing the rental of dwelling units and the rights and obligations of landlord and tenant;*

  ➤ (2) Encourage landlord and tenant to maintain and improve the quality of housing;

  ➤ (3) *Promote equal protection to all parties*; and

  ➤ (4) Make uniform the law in Tennessee.

Initials:

> (c) Unless displaced by this chapter, the principles of law and equity, including the law relating to capacity to contract, health, safety and fire prevention, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause supplement its provisions.

> (d) This chapter being a general chapter intended as a unified coverage of its subject matter, *no part of it is to be construed as impliedly repealed by subsequent legislation if that construction can reasonably be avoided.*

> (e) In the counties in which this chapter applies, *this chapter occupies and preempts the entire field of legislation concerning the regulation of landlords and tenants.* The governing body of a county subject to this chapter shall not enact or enforce regulations that conflict with, or are an addition to, this chapter. (But that is what defendants Story and Binkley unlawfully did.)

> T.C.A. § 66-28-104. Chapter definitions.

>> (A) "Owner" means one (1) or more persons, *jointly* or *severally*, in whom is vested:

>> (i) All or *part* of the legal title to property; or

>> (ii) **All or *part* of the beneficial ownership *and a right to the present use and enjoyment of the premises*;** (Which was unequivocally me, because my wife had abandoned our marital residence roughly a year prior, while I was known to be the party in possession of our home.)

Page **46** of **82**

Initials:

## I NEVER NEEDED MS. FENTON'S PERMISSION OR SIGNATURE
## TO EXECUTE A LEASE FOR ROOMMATES

185.    I never needed Ms. Fenton's permission, agreement, or signature to execute legally

binding lease agreements for portions of our marital residence, while I also lived there. These were

roommates which I had prior to knowing anything about Ms. Fenton's plans to secretly file

bankruptcy, seeking to liquidate and discard our home, or hiring attorneys again toward another

contested divorce action.

186.    Ms. Fenton had assured me that she was done with attorneys, as is evident in her

text message from January 8th, 2019, below:



Initials:

187.    There was no legal action pending or expected at the time when I obtained roommates in good faith, to try to alleviate my wife of some of her financial responsibilities, while providing me with needed income, to help me cash-flow during that season.

188.    Defendant Story continued to testify in bad faith during the 8/1/2019 in Chancery Court:

## ❷ FALSE CLAIM OF LAW: ESCAPE CLAUSE & PROPERTY OWNER

### E-1 (10:11-16):

11    MS. STORY: I feel sure we have an

12    escape clause[89]  because my client didn't sign the

13    lease. She is the owner of the property[90].

14    THE COURT: Is she the only titled[91]

15    owner?

16    MS. STORY: Both of them.

17    THE COURT: Okay.

189.    This is outright fraud upon the court by defendant Story, while defendant Binkley recognized her fraudulent claims of law, but failed or refused to correct her misconduct or to require defendant Story to comply with the Tennessee Supreme Court's clear Rules of

---

[89]    No "escape clause" is legally required, and even if it were, that would not void the entire lease.

[90]    https://rico.jefffenton.com/evidence/2011-04-29_fenton-marital-residence-tenancy-by-entirety.pdf
https://rico.jefffenton.com/evidence/2011-04-29_1986-sunnyside-premarital-assets-invested.pdf
https://rico.jefffenton.com/evidence/2011-04-29_1986-sunnyside-brentwood-tn-deed.pdf
https://rico.jefffenton.com/evidence/1986-sunnyside-brentwood-tn-2019-property-taxes.pdf
https://rico.jefffenton.com/evidence/1986-sunnyside-property-improvement-highlights.pdf

[91]    AH! The crux of the LIE upon both the Chancery and Bankruptcy Courts, in harmony!

Page **48** of **82**

Initials:

Professional Conduct throughout this hearing.

190.     In addition to defendant Story's fraudulent claim that Ms. Fenton is "**the** owner of the property", without mentioning my equal or greater investment in and ownership of our equally deeded marital residence as "tenants by the entirety", she is again making false claims "about matters of law".

191.     Defendant Story stated, "I feel sure we have an escape clause because my client didn't sign the lease."

192.     Again, defendant Story leveraged the authority of her office as a powerful respected "member of the court", to falsely imply that an "escape clause" is required by law, due to Ms. Fenton's ownership interest in our marital residence. While that claim is not only false, it is almost the exact opposite of the law.

193.     I've already shown the portions of the State of Tennessee's Landlord and Tenant Act which show that I never needed my ex-wife's permission or signature to execute completely lawful binding lease agreements with my roommates. Now let me address this fraudulent claim about an "escape clause".

194.     An "escape clause" would in effect let the landlord out of his obligations to the tenant in the contract, by some predetermined metric or condition. Such a condition could protect the landlord but would offer no protection whatsoever to the tenants.

195.     There is no duty or requirement that a lease agreement have an "escape clause". In fact, there are provisions which are expressly prohibited by the Tennessee Landlord Tenant Act from being in a lease, which provide landlords with too much freedom to "escape", without

Initials: